# 24-1997

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

J. M., AS ADMINISTRATOR OF THE ESTATE OF HER SON, C.B.,

*Plaintiff-Appellant,*

—against—

ASHLEY SESSIONS, ELISE M. WILLIAMS, JOSHUA A. BUELL, COREY C. BEHLEN, RAYMOND J. MCGINN, KATHERINA L. CASSATA, MICHAEL NOVACK,

*Defendants-Appellees,*

DOES 1-6,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME I OF X
## (Pages JA1 to JA280)
## [REDACTED]

ALEXANDRA VON STACKELBERG
BENJAMIN W. HILL
CAPEZZA HILL, LLP
30 South Pearl Street, Suite P-110
Albany, New York 12207
(518) 478-6065

*Attorneys for Defendant-Appellee
  Ashley Sessions*

ILANN MARGALIT MAAZEL
LAURA KOKOTAILO
SAMUEL SHAPIRO
EMERY CELLI BRINCKERHOFF
  ABADY WARD & MAAZEL, LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff-Appellant
  J. M., as Administrator of
  the Estate of Her Son, C.B*

(*Counsel continued on inside cover*)

ALEXANDRIA TWINEM
BARBARA D. UNDERWOOD
NEW YORK STATE ATTORNEY
    GENERAL'S OFFICE
The Capitol
Albany, New York 12224
(518) 776-2010

*Attorneys for Defendants-Appellees*
    *Elise M. Williams, Joshua A. Buell,*
    *Corey C. Behlen, Raymond J.*
    *McGinn, Katherina L. Cassata,*
    *and Michael Novack*

# TABLE OF CONTENTS

PAGE

District court docket sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1

Complaint, dated January 27, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA26

Amended Complaint, dated July 10, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA43

Answer by Defendants Elise Williams, Joshua A. Buell,
    Corey C. Behlan, Raymond J. McGinn, Katherine L. Cassata,
    and Michael Novack, dated September 21, 2020 . . . . . . . . . . . . . . . . . . . JA61

Answer by Defendant Ashley Sessions, dated November 20, 2020 . . . . . . . JA74

Plaintiff's Motion to Amend Complaint, dated March 30, 2022 . . . . . . . . . JA92

Declaration of Samuel Shapiro in support of Motion to Amend,
    dated March 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA94

    Exhibit A to Shapiro Declaration—
    Proposed Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA96

    Exhibit B to Shapiro Declaration—
    Proposed Second Amended Complaint showing the changes
    between the First Amended Complaint and Proposed Second
    Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA117

    Exhibit C to Shapiro Declaration—
    Excerpts of the deposition of Katherina Cassata,
    taken on February 8, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA138

    Exhibit D to Shapiro Declaration—
    Excerpts of the deposition of Anita Baral,
    taken on February 8, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA150

ii

PAGE

Exhibit E to Shapiro Declaration—
Defendants' Elise M. Williams, Joshua A. Buell, Corey C.
Behlen, Raymond J. McGinn, Katherina L. Cassata and Michael
Novack Initial Disclosures, dated September 23, 2020 ............ JA158

Plaintiff's Memorandum of Law in support of Motion to Amend,
dated March 30, 2022 .......................................... JA163

Defendant Ashley Sessions' Memorandum of Law in Opposition
to Motion to Amend, dated May 6, 2022 ....................... JA175

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
Raymond J. McGinn, Katherine L. Cassata, and Michael
Novack's Memorandum of Law in Opposition to Motion
to Amend, dated May 6, 2022 .................................. JA180

Declaration of Ryan W. Hickey, for Defendants Elise Williams,
Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn,
Katherine L. Cassata, and Michael Novack, in Opposition
to Motion to Amend, dated May 6, 2022 ...................... JA190

Exhibit A to Hickey Declaration—
January 19, 2021 email to Plaintiff's counsel .................... JA192

Exhibit B to Hickey Declaration—
Summary of Interviews
[filed under seal, see volume 6, page 1141] ..................... JA195

Plaintiff's Reply Memorandum of Law in Further Support of Motion
to Amend, dated May 12, 2022 ................................. JA196

Reply Declaration of Samuel Shapiro in Further Support of Motion
to Amend, dated May 12, 2022 ................................. JA219

Exhibit F to Shapiro Declaration—
Plaintiff's First Consolidated Set of Interrogatories and Requests
for Production of Documents, dated October 6, 2020 ............. JA220

iii

PAGE

Decision and Order of Magistrate Judge Hummel denying Motion
to Amend  [filed under seal, see volume 6, page 1145]............ JA237

Notice of Appeal of Magistrate Judge Decision to District Court,
dated December 30, 2022 ....................................... JA238

Decision and Order of the District Court affirming Order,
dated April 24, 2023 ........................................... JA240

Motion for Summary Judgment filed by Defendant Ashley Sessions,
dated November 15, 2023 ....................................... JA245

Declaration of Benjamin W. Hill, for Defendant Ashley Sessions, in
Support of Motion for Summary Judgment,
dated November 15, 2023 ....................................... JA247

Exhibit A to Hill Declaration—
Deposition Transcript of Ashley Sessions,
dated December 21, 2021 ....................................... JA249

Exhibit B to Hill Declaration—
Deposition Transcript of Elise M. Williams,
dated December 20, 2021 ....................................... JA409

Exhibit C to Hill Declaration—
Deposition Transcript of Katherina Cassata,
dated February 8, 2022.......................................... JA537

Exhibit D to Hill Declaration—
Expert Disclosure of Bruce Charash
[filed under seal, see volume 6, page 1163] ..................... JA686

Exhibit E to Hill Declaration—
Compendium of Exhibits marked during Depositions
[filed under seal, see volume 6, page 1180] ..................... JA687

Statement of Material Facts in support of Motion for Summary
Judgment by Defendant Ashely Sessions ,
dated November 15, 2023 ....................................... JA688

iv

PAGE

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
    Raymond J. McGinn, Katherine L. Cassata, and Michael
    Novack's Motion for Summary Judgment,
    dated November 15, 2023 ........................................ JA694

Declaration of Raymond McGinn in Support of Motion
for Summary Judgment, dated November 14, 2023 .............. JA696

    Exhibit A to McGinn Declaration—
    Unit Physician Notes
    [filed under seal, see volume 6, page 1233] ................. JA701

    Exhibit B to McGinn Declaration—
    Unit Physician Notes
    [filed under seal, see volume 6, page 1238] ................. JA702

    Exhibit C to McGinn Declaration—
    C.B.'s "Physicians Order Form"
    [filed under seal, see volume 6, page 1243] ................. JA703

Declaration of Elise Williams in Support of Motion for Summary
Judgment, dated November 13, 2023............................ JA704

Declaration of Ryan W. Hickey in Support of Motion
for Summary Judgment, dated November 15, 2023 .............. JA707

    Exhibit A to Hickey Declaration—
    Stipulation and Proposed Order for a Conditional Dismissal,
        dated December 11, 2020 ................................... JA709

    Exhibit B to Hickey Declaration—
    Deposition Transcript of Elisa M. Williams,
    dated December 20, 2021
    [filed under seal, see volume 6, page 1248] ................. JA715

    Exhibit C to Hickey Declaration—
    Deposition Transcript of Joshua Buell,
    dated January 13, 2022
    [filed under seal, see volume 7, page 1591] ................. JA716

v

PAGE

Exhibit D to Hickey Declaration—
Deposition Transcript of Corey Behlen,
dated January 13, 2022
[filed under seal, see volume 7, page 1699] .................. JA717

Exhibit E to Hickey Declaration—
Deposition Transcript of Raymond McGinn,
dated February 11, 2022
[filed under seal, see volume 8, page 1866] .................. JA718

Exhibit F to Hickey Declaration—
Deposition Transcript of Katherina Cassata,
dated February 8, 2022
[filed under seal, see volume 8, page 1926] .................. JA719

Exhibit G to Hickey Declaration—
Deposition Transcript of Michael Novack,
dated January 10, 2022
[filed under seal, see volume 9, page 2074] .................. JA720

Declaration of Cassaundra Murray, dated October 31, 2023 ....... JA721

Exhibit A to Murray Declaration—
C.B.'s May 19, 2015 Application for Voluntary Admission
[filed under seal, see volume 9, page 2236] .................. JA724

Statement of Material Facts in support of Motion for Summary
Judgment by Defendants Elise Williams, Joshua A. Buell, Corey
C. Behlan, Raymond J. McGinn, Katherine L. Cassata, and
Michael Novack, dated November 15, 2023 ...................... JA725

Plaintiff's Statement of Material Facts in Opposition to Motions for
Summary Judgment December 22, 2023 .......................... JA732

Plaintiff's Counter-Statement of Material Facts in Opposition to
Defendant Ashley Sessions, dated December 22, 2023 ............ JA749

vi

PAGE

Plaintiff's Counter-Statement of Material Facts in Opposition
    Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
    Raymond J. McGinn, Katherine L. Cassata, and Michael Novack,
    dated December 22, 2023 ........................................ JA755

Declaration of Samuel Shapiro, for Plaintiff, in Opposition to
    Motions for Summary Judgment, dated December 22, 2023 ....... JA767

    Exhibit A to Shapiro Declaration—
    C.B.'s Death Certificate
    [filed under seal, see volume 9, page 2239] ..................... JA772

    Exhibit B to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Plaintiff J.M.
    [filed under seal, see volume 9, page 2242] ..................... JA773

    Exhibit C to Shapiro Declaration—
    C.B.'s Behavioral Support Program
    [filed under seal, see volume 9, page 2254] ..................... JA774

    Exhibit D to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of  Defendant
    Michael Novack, dated January 10, 2022......................... JA775

    Exhibit E to Shapiro Declaration—
    Broome DDSO's Nursing and Policy Procedure on focus
    charting, dated August 2008.................................... JA794

    Exhibit F to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Defendant
    Elise M. Williams, dated December 20, 2021..................... JA797

    Exhibit G to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Defendant
    Raymond J. McGinn, dated February 11, 2022 ................... JA851

    Exhibit H to Shapiro Declaration—
    Expert Report of Georgia Persky, RN, BSN, MBA, PhD, NEA-
    BC, dated June 28, 2023 ....................................... JA890

vii

PAGE

Exhibit I to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Katherina L. Cassata, dated February 8, 2022 .................... JA919

Exhibit J to Shapiro Declaration—
C.B.'s Staff Observations/Notes from February 23, 2018, through
April 9, 2018 [filed under seal, see volume 10, page 2265]........ JA930

Exhibit K to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Anita Baral,
dated February 8, 2022.......................................... JA931

Exhibit L to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Ashley Sessions, dated December 21, 2021...................... JA937

Exhibit M to Shapiro Declaration—
C.B.'s bed check charts
[filed under seal, see volume 10, page 2270] .................... JA954

Exhibit N to Shapiro Declaration—
Defendant Ashley M. Sessions' statement to the New York State
Police, dated April 9, 2018
[filed under seal, see volume 10, page 2277] .................... JA955

Exhibit O to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Corey C. Behlen, dated January 13, 2022 ....................... JA956

Exhibit P to Shapiro Declaration—
Defendant Corey C. Behlen's OPWDD OIIA interview
[filed under seal, see volume 10, page 2279] .................... JA978

Exhibit Q to Shapiro Declaration—
email message from Laurie Miller dated April 17, 2018
[filed under seal, see volume , page 2283]....................... JA979

Exhibit R to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Joshua A. Buell, dated January 13, 2022 ....................... JA980

viii

PAGE

Exhibit S to Shapiro Declaration—
Broome DDSOO's Policy and Procedures for Resident
Documentation and Charting, issued August 2018 ............... JA994

Exhibit T to Shapiro Declaration—
C.B.'s Plan of Nursing Services dated January 30, 2018
and March 27, 2018 [filed under seal, see volume 10, page 2285]. JA998

Exhibit U to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Jennifer Smith,
dated January 12, 2022........................................... JA999

Exhibit V to Shapiro Declaration—
Excerpts from the Transcript of the deposition of Leisa
McKown, dated January 12, 2022............................... JA1014

Exhibit W to Shapiro Declaration—
C.B.'s Weight Chart is attached
[filed under seal, see volume 10, page 2288] ................... JA1027

Exhibit X to Shapiro Declaration—
email from Margaret Fassett, RD II, to Defendant Raymond
McGinn dated April 21, 2017
[filed under seal, see volume 10, page 2291] ................... JA1028

Exhibit Y to Shapiro Declaration—
C.B.'s Unit Physician Notes
[filed under seal, see volume __, page 2293] ................... JA1029

Exhibit Z to Shapiro Declaration—
Expert Report of Dr. Bruce D. Charash, M.D.
[filed under seal, see volume 10, page 2295] ................... JA1030

Exhibit AA to Shapiro Declaration—
call log of Plaintiff J.M. from April 8, 2018................... JA1031

Exhibit BB to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Samantha
Feliciano, dated August 16, 2023 ............................. JA1033

ix

PAGE

Exhibit CC to Shapiro Declaration—
Excerpts from a Transcript of Leisa McKown's interview with
OIIA  [filed under seal, see volume 10, page 2312] . . . . . . . . . . . . .  JA1038

Exhibit DD to Shapiro Declaration—
C.B.'s Nursing Notes
[filed under seal, see volume 10, page 2315] . . . . . . . . . . . . . . . . . .  JA1039

Exhibit EE to Shapiro Declaration—
excerpts from a transcript of Elise M. Williams's interview with
OIIA  [filed under seal, see volume 10, page 2322] . . . . . . . . . . . . .  JA1040

Exhibit FF to Shapiro Declaration—
photograph of the exterior of buildings at Valley Ridge CIT . . . . .  JA1041

Exhibit GG to Shapiro Declaration—
Notice to Provider of C.B.'s Investigation Determination
[filed under seal, see volume 10, page 2325] . . . . . . . . . . . . . . . . . .  JA1043

Exhibit HH to Shapiro Declaration—
Medical Examiner's Report for C.B., dated June 12, 2018
[filed under seal, see volume 10, page 2328] . . . . . . . . . . . . . . . . . .  JA1044

Defendant Ashley Sessions' Reply Statement of Material Facts,
dated January 17, 2024. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1045

Defendants Behlen et al.'s Reply Statement of Material Facts,
dated January 17, 2024. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1071

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
Raymond J. McGinn, Katherine L. Cassata, and Michael
Novack's Response to Statement of Material Facts,
dated January 18, 2024. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1090

Decision and Order of the District Court granting Defendants' Motion
for Summary Judgment, dated July 11, 2024 . . . . . . . . . . . . . . . . . .  JA1118

Judgment, dated July 11, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1137

Plaintiff's Notice of Appeal, dated July 25, 2024 . . . . . . . . . . . . . . . . . .  JA1139

x

PAGE

# FILED UNDER SEAL

Exhibit B to Hickey Declaration—
    Summary of Interviews ......................................... JA1141

Decision and Order of Magistrate Judge Hummel denying Motion to
    Amend ....................................................... JA1145

Exhibit D to Hill Declaration—
    Expert Disclosure of Bruce Charash ........................... JA1163

Exhibit E to Hill Declaration—
    Compendium of Exhibits marked during Depositions ............ JA1180

Exhibit A to McGinn Declaration—
    Unit Physician Notes .......................................... JA1233

Exhibit B to McGinn Declaration—
    Unit Physician Notes .......................................... JA1238

Exhibit C to McGinn Declaration—
    C.B.'s "Physicians Order Form" ............................... JA1243

Exhibit B to Hickey Declaration—
    Deposition Transcript of Elisa M. Williams, dated December 20,
    2021 ........................................................ JA1248

Exhibit C to Hickey Declaration—
    Deposition Transcript of Joshua Buell, dated January 13, 2022 ... JA1591

Exhibit D to Hickey Declaration—
    Deposition Transcript of Corey Behlen, dated January 13, 2022 .. JA1699

Exhibit E to Hickey Declaration—
    Deposition Transcript of Raymond McGinn, dated February 11,
    2022 ........................................................ JA1866

xi

PAGE

Exhibit F to Hickey Declaration—
    Deposition Transcript of Katherina Cassata, dated February 8,
    2022 ....................................................... JA1926

Exhibit G to Hickey Declaration—
    Deposition Transcript of Michael Novack, dated January 10,
    2022 ....................................................... JA2074

Exhibit A to Murray Declaration—
    C.B.'s May 19, 2015 Application for Voluntary Admission ...... JA2236

Exhibit A to Shapiro Declaration—
    C.B.'s Death Certificate........................................ JA2239

Exhibit B to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Plaintiff J.M. . JA2242

Exhibit C to Shapiro Declaration—
    C.B.'s Behavioral Support Program............................ JA2254

Exhibit J to Shapiro Declaration—
    C.B.'s Staff Observations/Notes from February 23, 2018, through
    April 9, 2018 ................................................. JA2265

Exhibit M to Shapiro Declaration—
    C.B.'s bed check charts ........................................ JA2270

Exhibit N to Shapiro Declaration—
    Defendant Ashley M. Sessions' statement to the New York State
    Police, dated April 9, 2018 ..................................... JA2277

Exhibit P to Shapiro Declaration—
    Defendant Corey C. Behlen's OPWDD OIIA interview.......... JA2279

Exhibit Q to Shapiro Declaration—
    email message from Laurie Miller dated April 17, 2018 ......... JA2283

xii

PAGE

Exhibit T to Shapiro Declaration—
   C.B.'s Plan of Nursing Services dated January 30, 2018 and
   March 27, 2018 ............................................... JA2285

Exhibit W to Shapiro Declaration—
   C.B.'s Weight Chart is attached ............................... JA2288

Exhibit X to Shapiro Declaration—
   email from Margaret Fassett, RD II, to Defendant Raymond
   McGinn dated April 21, 2017................................... JA2291

Exhibit Y to Shapiro Declaration—
   C.B.'s Unit Physician Notes................................... JA2293

Exhibit Z to Shapiro Declaration—
   Expert Report of Dr. Bruce D. Charash, M.D. .................. JA2295

Exhibit CC to Shapiro Declaration—
   Excerpts from a Transcript of Leisa McKown's interview with
   OIIA ........................................................ JA2312

Exhibit DD to Shapiro Declaration—
   C.B.'s Nursing Notes ......................................... JA2315

Exhibit EE to Shapiro Declaration—
   excerpts from a transcript of Elise M. Williams's interview with
   OIIA ........................................................ JA2322

Exhibit GG to Shapiro Declaration—
   Notice to Provider of C.B.'s Investigation Determination ........ JA2325

Exhibit HH to Shapiro Declaration—
   Medical Examiner's Report for C.B., dated June 12, 2018 ....... JA2328

# JA1

## U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.2.1)] (Albany)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00091-GTS-CFH

J.M. v. Sessions et al
Assigned to: U.S. District Judge Glenn T Suddaby
Referred to: Magistrate Judge Christian F. Hummel
Case in other court: 2nd Circuit, 24-01997
Cause: 42:1983 Civil Rights Act

Date Filed: 01/27/2020
Date Terminated: 07/11/2024
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**J.M.**
*as Administrator of the Estate of Her Son, C.B.*

represented by **Ilann Margalit Maazel**
Emery Celli Brinckerhoff, Abady, Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbawm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel Shapiro**
Emery Celli Brinckerhoff, Abady, Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Fax: 212-763-5001
Email: sshapiro@ecbawm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ashley Sessions**

represented by **Abby McCormick-Foley**
Capezza Hill, LLP
30 S Pearl Street, P-110
Albany, NY 12207

# JA2

518-478-6065
Email: abby@capezzahill.com
*ATTORNEY TO BE NOTICED*

**Benjamin W. Hill**
Capezza Hill, LLP
30 South Pearl Street - Suite P-110
Albany, NY 12207
518-478-6065
Fax: 518-407-5661
Email: ben@capezzahill.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1-6**

**Defendant**

**Elise M. Williams**                    represented by    **Kasey K. Hildonen**
New York State Attorney General -
Albany
The Capitol
Albany, NY 12224
518-776-2590
Email: Kasey.Hildonen@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan W. Hickey**
New York State Attorney General -
Albany
The Capitol
Albany, NY 12224
518-776-2616
Fax: 518-915-7738
Email: ryan.hickey@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joshua A. Buell**                    represented by    **Kasey K. Hildonen**
*TERMINATED: 07/11/2024*                               (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan W. Hickey**
(See above for address)
*ATTORNEY TO BE NOTICED*

# JA3

**Defendant**

**Corey C. Behlen**                    represented by   **Kasey K. Hildonen**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ryan W. Hickey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Raymond J. McGinn**                  represented by   **Kasey K. Hildonen**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ryan W. Hickey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Katherina L. Cassata**              represented by   **Kasey K. Hildonen**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ryan W. Hickey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Novack**                     represented by   **Kasey K. Hildonen**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ryan W. Hickey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/27/2020 | 1 | COMPLAINT WITH JURY DEMAND against Ashley Sessions and Does 1-6 (Filing fee $400 receipt number ANYNDC-5011227) filed by J.M. (Attachments: # 1 Certificate of Merit, # 2 Civil Cover Sheet) (kmp) (Entered: 01/27/2020) |

# JA4

| 01/27/2020 | 2 | Summons Issued as to Ashley Sessions. (kmp) (Entered: 01/27/2020) |
|---|---|---|
| 01/27/2020 | 3 | G.O. 25 FILING ORDER ISSUED: Initial In Person Rule 16 Conference set for 4/27/2020 at 9:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 4/20/2020. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (kmp) (Entered: 01/27/2020) |
| 01/27/2020 | 4 | NOTICE of Admission Requirement as to Party Plaintiff; Attorney Alison Frick. Phone number is 212-763-5000. Admissions due by 2/10/2020. {Copy served upon Attorney Frick by regular mail}. (kmp) (Entered: 01/27/2020) |
| 01/27/2020 | | TEXT NOTICE: Although the plaintiff herein has named Does 1-6 in the Complaint, the Clerk's Office will not issue a summons for service of process on "Does 1-6" defendants at this time. In the event plaintiff wishes to pursue the claims against these defendants, plaintiff shall take reasonable steps to ascertain the defendants identity. When plaintiff determines the identity of "Does 1-6" defendants, plaintiff may seek to amend the pleading to add the properly named defendant pursuant to FED. R. CIV. P. 15 and summons will be issued at that time. (kmp) (Entered: 01/27/2020) |
| 03/23/2020 | 5 | AFFIDAVIT of Service for Summons and Complaint served on Ashley Sessions on 3/14/2020, filed by J.M.. (Maazel, Ilann) (Entered: 03/23/2020) |
| 03/24/2020 | | ***Answer due date set for Ashley Sessions answer due 4/6/2020. (kmp) (Entered: 03/24/2020) |
| 03/25/2020 | 6 | MOTION to Withdraw as Attorney *BY ALISON FRICK* filed by J.M.. Motions referred to Christian F. Hummel. (Maazel, Ilann) (Entered: 03/25/2020) |
| 03/30/2020 | 7 | TEXT ORDER approving 6 Motion to Withdraw as Attorney, filed by Alison Frick, Esq. Authorized by Magistrate Judge Christian F. Hummel on 3/30/2020. (tab) (Entered: 03/30/2020) |
| 04/03/2020 | 8 | Letter Motion from Kasey K. Hildonen for Ashley Sessions requesting 30-day extension of Answer deadline submitted to Judge McAvoy . (Hildonen, Kasey) (Entered: 04/03/2020) |
| 04/03/2020 | 9 | RESPONSE TO LETTER BRIEF filed by J.M. as to 8 Letter Request/Motion filed by Ashley Sessions . (Maazel, Ilann) (Entered: 04/03/2020) |
| 04/07/2020 | 10 | TEXT ORDER granting 8 Letter Request for a 30 day extension f the answer deadline. Ashley Sessions answer due 5/6/2020. Parties are advised that no further extension requests will be granted. Authorized |

# JA5

| | | |
|---|---|---|
| | | by Magistrate Judge Christian F. Hummel on 4/7/2020. (tab) (Entered: 04/07/2020) |
| 04/13/2020 | 11 | NOTICE of Resetting Initial Conferene: The Initial Conference has been reset for Wednesday, 6/3/2020 @ 9:00 AM in Albany before Magistrate Judge Christian F. Hummel. The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 5/27/2020. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) Parties are permitted to appear by telephone for this conference and are directed to dial in at 1-888-684-8852, enter access code 9772719# and use security code 1234# to join the call.(tab) (Entered: 04/13/2020) |
| 04/17/2020 | 12 | Letter Motion from Samuel Shapiro for J.M. requesting to conduct limited early discovery submitted to Judge Christian F. Hummel . (Attachments: # 1 Exhibit(s) A)(Shapiro, Samuel) (Entered: 04/17/2020) |
| 05/04/2020 | 13 | COURT NOTICE of Conference: A Telephone Status Conference has been set for Tuesday, 5/5/2020 @ 1:30 PM in Albany before Magistrate Judge Christian F. Hummel. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and use security code 1234 # to join the call. (tab) (Entered: 05/04/2020) |
| 05/05/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 5/5/2020. Appearances by Sam Shapiro, Esq. and Illan Maazel, Esq. for plaintiff. Ashley Sessions, defendant appearing, unrepresented. The Court explains to Ms. Sessions that she needs to seek and secure counsel as soon as possible so that she can appear in the case and not be found in default. Plaintiff advises the Court that counsel will send Ms. Sessions a copy of the complaint for her review and for her to present to potential counsel. The Court schedules a follow up telephone conference for 5/18/2020 @ 1:30pm. The current answer deadline of 5/6/2020 is adjourned and will be reset by the Court after the next conference. (tab) (Entered: 05/05/2020) |
| 05/05/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Discovery Conference held on 5/5/2020 @ 2:00 pm. Appearances by Sam Shapiro, Esq. and Illan Maazel, Esq. for Plaintiff; non-party counsel for NYS OPWDD, Steven Brickman, appearing. The issue regarding plaintiff's subpoena to the OPWDD office are addressed and parties are heard. Plaintiff's counsel and Mr. Brickman have reached an agreement as to what can be produced by subpoena as it relates to items 2-8. Plaintiff agrees to review documents that are provided and if, after review, a motion to compel is necessary in order to better address discovery requested under subpoena item #1, plaintiff is permitted to file such a letter |

# JA6

| | | |
|---|---|---|
| | | motion. Plaintiff will provide a subpoena to the Court, that includes the necessary language required by OPWDD, for the Court to so order and issue. (Court Reporter Theresa Casal) (tab) (Entered: 05/05/2020) |
| 05/05/2020 | 14 | Letter Motion from Samuel Shapiro for J.M. requesting Court to Endorse the Proposed Order submitted to Judge Christian F. Hummel . (Attachments: # 1 Proposed Order/Judgment)(Shapiro, Samuel) (Entered: 05/05/2020) |
| 05/05/2020 | 15 | NOTICE of Conference: a Telephone Conference has been set for Monday, 5/18/2020 @ 1:30 PM before Magistrate Judge Christian F. Hummel. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call.(tab)(Notice emailed to Defendant Ashley Sessions on 5/5/2020) (Entered: 05/05/2020) |
| 05/06/2020 | 16 | ORDER granting 14 Letter Request for Order and issuance of Order. Signed by Magistrate Judge Christian F. Hummel on 5/6/2020. (tab) (Entered: 05/06/2020) |
| 05/13/2020 | 17 | Letter Motion from Samuel Shapiro for J.M. requesting OPWDD to produce an unredacted copy of the February 8, 2019 Justice Center Report . (Attachments: # 1 Exhibit(s) A)(Shapiro, Samuel) (Entered: 05/13/2020) |
| 05/15/2020 | 18 | RESPONSE to Motion re 17 Letter Motion from Samuel Shapiro for J.M. requesting OPWDD to produce an unredacted copy of the February 8, 2019 Justice Center Report filed by Eileen Haynes. (Haynes, Eileen) (Entered: 05/15/2020) |
| 05/18/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 5/18/2020 by telephone. Appearances by Plaintiff's counsel and Defendant Ashley Sessions. Sessions indicates to the Court that she has secured counsel and that an attorney would be filing an appearance on her behalf soon. The Court resets the answer deadline and will reschedule the Initial Rule 16 conference and it's associated deadlines accordingly. (Court Reporter Lisa Tennyson) (tab) (Entered: 05/26/2020) |
| 05/26/2020 | | ***Answer due date updated for Ashley Sessions answer due 6/15/2020. (tab) (Entered: 05/26/2020) |

# JA7

| | | |
|---|---|---|
| 05/26/2020 | 19 | COURT NOTICE of Conference: The Initial Conference has been reset for Monday, 7/13/2020 @ 9:30 AM before Magistrate Judge Christian F. Hummel. The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 7/6/2020. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) Parties will participate by telephone and are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call.(tab) (Entered: 05/26/2020) |
| 06/26/2020 | 20 | NOTICE of Conference: A Telephone Status Conference has been set for Thursday, 7/2/2020 @ 1:30 PM before Magistrate Judge Christian F. Hummel. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call.(tab) (Entered: 06/26/2020) |
| 07/02/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Status Conference held on 7/2/2020 by telephone. Appearances by Sam Shapiro, Esq. for Plaintiff; Ashley Sessions, appearing unrepresented. Attorney for OPWDD, Steven Brickman appearing. Ms. Sessions advises the Court that she has been unable to secure counsel even though she has made great effort. The Court advises Sessions that at some point, plaintiff's will look for a default judgment against her, but plaintiff's would prefer she be represented or proceed pro se and answer to the complaint. The Court gives Ms. Sessions additional time to find counsel. The issue of plaintiff's request for an unredacted report from OPWDD (Dkt. No. 17) is addressed. The Court denies the request for an unredacted copy, but reserves plaintiff's right to re-open the issue after defendants have appeared in this case. Plaintiff is permitted to amend the complaint, adding the John Doe replacements and effecting service in a timely manner. The Amended Complaint to be filed by 7/10/2020. The Court sets a follow-up conference for 9/2/2020 @ 10:30am. Defendant Sessions is advised that by September 2nd, she should have either secured counsel to represent her or answer the complaint as pro se, to avoid default. The 9/2/2020 conference will be set under separate notice. (Court Reporter Theresa Casal) (tab) (Entered: 07/02/2020) |
| 07/02/2020 | | ***Answer due date updated for Ashley Sessions answer due 9/2/2020. (tab) (Entered: 07/02/2020) |
| 07/02/2020 | 21 | COURT NOTICE of Conference: A Status Conference has been set for Wednesday, 9/2/2020 @ 10:30 AM before Magistrate Judge Christian F. Hummel. This Court conference will be conducted telephonically and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719 #, and use Security code 1234 # to join the call.(tab) (Entered: 07/02/2020) |

# JA8

| 07/02/2020 | 22 | NOTICE of Initial Conference (Rescheduled): The Initial Conference is reset for Wednesday, 9/30/2020 @ 9:30 AM in Albany before Magistrate Judge Christian F. Hummel. The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 9/23/2020. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) This Court conference will be conducted telephonically and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719 #, and use Security code 1234# to join the call.(tab) (Entered: 07/02/2020) |
|---|---|---|
| 07/02/2020 | 23 | TEXT ORDER denying 17 Letter Request from Samuel Shapiro for J.M. requesting OPWDD to produce an unredacted copy of the February 8, 2019 Justice Center Report. As was set forth on the record during the 7/2/2020 court conference, Plaintiff's request is denied, with leave to renew the request, if necessary, after Defendants have appeared in this case and have had an opportunity to respond. Authorized by Magistrate Judge Christian F. Hummel on 7/2/2020. (tab) (Entered: 07/02/2020) |
| 07/07/2020 | 24 | TRANSCRIPT REQUEST by J.M. for proceedings held on July 2, 2020 before Judge Hon. Christian F. Hummel.. (Shapiro, Samuel) (Entered: 07/07/2020) |
| 07/10/2020 | 25 | AMENDED COMPLAINT *& Jury Demand* against Ashley Sessions, Elise M. Williams, Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn, Katherina L. Cassata, Michael Novack filed by J.M.. (Attachments: # 1 Certificate of Merit)(Shapiro, Samuel) (Entered: 07/10/2020) |
| 07/23/2020 | 26 | NOTICE of Appearance by Kasey K. Hildonen on behalf of Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams (Hildonen, Kasey) (Entered: 07/23/2020) |
| 07/23/2020 | 27 | WAIVER OF SERVICE Returned Executed by J.M.. Elise M. Williams waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |
| 07/23/2020 | 28 | WAIVER OF SERVICE Returned Executed by J.M.. Corey C. Behlen waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |
| 07/23/2020 | 29 | WAIVER OF SERVICE Returned Executed by J.M.. Michael Novack waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |
| 07/23/2020 | 30 | WAIVER OF SERVICE Returned Executed by J.M.. Joshua A. Buell waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |

# JA9

| | | |
|---|---|---|
| 07/23/2020 | 31 | WAIVER OF SERVICE Returned Executed by J.M.. Katherina L. Cassata waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |
| 07/23/2020 | 32 | WAIVER OF SERVICE Returned Executed by J.M.. Raymond J. McGinn waiver sent on 7/23/2020, answer due 9/21/2020. (Shapiro, Samuel) (Entered: 07/23/2020) |
| 07/27/2020 | 33 | TRANSCRIPT of Proceedings: Teleconference held on July 2, 2020 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/17/2020. Redacted Transcript Deadline set for 8/27/2020. Release of Transcript Restriction set for 10/26/2020. Notice of Intent to Redact due by 8/3/2020 (tjc, ) (Entered: 07/27/2020) |
| 08/31/2020 | 34 | NOTICE of Appearance by Ryan W. Hickey on behalf of Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams (Hickey, Ryan) (Entered: 08/31/2020) |
| 09/02/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 9/2/2020 by telephone. Appearances by Samuel Shapiro, Esq. for plaintiff; AAG Ryan Hickey, Esq. for Defendants. Deft Ashley Sessions does not appear and no counsel on her behalf appears, after numerous opportunities and conferences held to address her representation issue. Plaintiffs advise the Court that they do intend to request a Clerk's certificate of default and will pursue Default Judgment against Sessions. Defendants answer deadline is set for 9/21/2020 and the Rule 16 conference will proceed on 9/30/2020 @ 9:30am, by telephone. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 09/03/2020) |
| 09/21/2020 | 35 | AFFIDAVIT of Service for Amended Complaint served on Ashley Sessions on 8/5/2020, filed by J.M.. (Shapiro, Samuel) (Entered: 09/21/2020) |

# JA10

| 09/21/2020 | 36 | ANSWER to 25 Amended Complaint by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams.(Hickey, Ryan) (Entered: 09/21/2020) |
|---|---|---|
| 09/22/2020 | 37 | CIVIL CASE MANAGEMENT PLAN by J.M.. (Shapiro, Samuel) (Entered: 09/22/2020) |
| 09/30/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Initial Pretrial Conference held on 9/30/2020 by telephone. Appearances by Sam Shapiro, Esq. for Plaintiff; AAG Ryan Hickey appearing for Defendants. Pretrial deadlines are established and a Scheduling order will be issued. The issue of Deft Sessions and her failure to secure counsel or appear in the case is discussed. The Court agrees to schedule another conference with Ms. Sessions to determine her status. (tab) (Entered: 10/01/2020) |
| 10/01/2020 | 38 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 8 days (Jury Trial). Preferred Trial Location: Albany, NY. Joinder of Parties due by 12/11/2020. Amended Pleadings due by 12/11/2020. Discovery due by 6/25/2021. Motions to be filed by 8/27/2021. Status Report due by 2/18/2021. Signed by Magistrate Judge Christian F. Hummel on 10/1/2020. (tab) (Entered: 10/01/2020) |
| 10/02/2020 | 39 | COURT NOTICE of Conference: A Telephone Status Conference has been set for Wednesday, 10/7/2020 @ 1:30 PM before Magistrate Judge Christian F. Hummel. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. (tab)(Notice was e-mailed to Defendant Sessions on 10/2/2020 and a detailed voice message was also left on Ms. Sessions phone line on 10/2/2020) (Entered: 10/02/2020) |
| 10/07/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 10/7/2020 by telephone. Appearances by Sam Shapiro, Esq. for plaintiff; AAG Ryan Hickey for defendants. Ashley Sessions, appearing. The Court advises Deft. Ashley Sessions that she needs to secure counsel as soon as possible to avoid being in default. The Court offers a short list of attorneys in the Albany area that are familiar with this type of case and may be a good starting point for her to call. (Counsel for parties had no objections to the Court providing a list to Ms. Sessions.) Ms. Sessions is given until 10/30/2020 to secure counsel. (Court Reporter Jacqueline Stroffolino) (tab, ) (Entered: 10/13/2020) |
| 10/20/2020 | 40 | NOTICE of Appearance by Benjamin W. Hill on behalf of Ashley Sessions (Hill, Benjamin) (Entered: 10/20/2020) |
| 10/20/2020 | 41 | Letter Motion from Benjamin W. Hill for Ashley Sessions requesting Extension of Time to Respond to the Amended Complaint submitted to Judge Hummel . (Hill, Benjamin) (Entered: 10/20/2020) |

# JA11

| | | |
|---|---|---|
| 10/25/2020 | 42 | TEXT ORDER granting 41 Letter Request for an extension of the answer deadline. Ashley Sessions answer due 11/20/2020. Authorized by Magistrate Judge Christian F. Hummel on 10/25/2020. (tab) (Entered: 10/25/2020) |
| 11/20/2020 | 43 | ANSWER to 25 Amended Complaint by Ashley Sessions.(Hill, Benjamin) (Entered: 11/20/2020) |
| 11/20/2020 | 44 | STIPULATION *(Request to So-Order)* by J.M. submitted to Judge Christian F. Hummel. (Shapiro, Samuel) (Entered: 11/20/2020) |
| 11/20/2020 | 45 | STIPULATION *(Confidentiality Agreement and Order)* by J.M. submitted to Judge Christian F. Hummel. (Shapiro, Samuel) (Entered: 11/20/2020) |
| 11/23/2020 | 46 | ORDER approving 44 Stipulation filed by J.M. (re: release of records). Signed by Magistrate Judge Christian F. Hummel on 11/23/2020. (tab) (Entered: 11/23/2020) |
| 11/23/2020 | 47 | ORDER approving 45 Stipulation filed by J.M. (Confidentiality Agreement and Order). Signed by Magistrate Judge Christian F. Hummel on 11/23/2020. (tab) (Entered: 11/23/2020) |
| 01/12/2021 | 48 | Letter Motion from Samuel Shapiro for J.M. requesting a Discovery Conference submitted to Judge Christian F. Hummel . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Shapiro, Samuel) (Entered: 01/12/2021) |
| 01/13/2021 | 49 | Letter Motion from Samuel Shapiro for J.M. requesting Endorsement of Proposed Order submitted to Judge Christian F. Hummel . (Attachments: # 1 Exhibit(s) A: Text of Proposed Order, # 2 Exhibit(s) B)(Shapiro, Samuel) (Entered: 01/13/2021) |
| 01/13/2021 | 50 | TEXT ORDER granting 48 Letter Request from Samuel Shapiro for J.M. requesting a Discovery Conference. **Defendants are directed to file a response to Dkt. no. 48 by 1/20/2021.** A Telephone Discovery Conference is set for Friday, 1/22/2021 @ 11:00 AM. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 1/13/2021. (tab) (Entered: 01/13/2021) |
| 01/13/2021 | 51 | ORDER granting 49 Letter Request from Samuel Shapiro for J.M. requesting Endorsement of Proposed Order. (Order issued). Signed by Magistrate Judge Christian F. Hummel on 1/13/2021. (tab) (Entered: 01/13/2021) |
| 01/14/2021 | 52 | Letter Motion from Samuel Shapiro for J.M. requesting Adjournment of Discovery Conference submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 01/14/2021) |

# JA12

| 01/15/2021 | 53 | TEXT ORDER granting 52 Letter Request to reset the Court conference. The Telephone Conference is reset for Monday, 1/25/2021 @ 10:00 AM. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 1/15/2021. (tab) (Entered: 01/15/2021) |
|---|---|---|
| 01/20/2021 | 54 | LETTER BRIEF *Regarding Plaintiff's Discovery Demands* by Ashley Sessions. (Hill, Benjamin) (Entered: 01/20/2021) |
| 01/20/2021 | 55 | LETTER BRIEF *in response to plaintiff's request for a discovery conference* by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Hickey, Ryan) (Entered: 01/20/2021) |
| 01/25/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 1/25/2021 by telephone. Appearances by Sam Shapiro, Esq. for plaintiff; Ben Hill, Esq. for Deft Sessions; AAG Ryan Hickey appearing for remaining defendants. After parties and the Court discuss the discovery issues at hand, the Court directs that AAG Hickey provide the personnel files of all named defendants to the Court for in camera review, as well as any disciplinary files that may exist that are not part of a personnel file. The files for in camera review should be provided within 10 days and can be mailed directly to chambers.(Court Reporter Lisa Tennyson) (tab) (Entered: 01/25/2021) |
| 02/01/2021 | 56 | STATUS REPORT *confirming 1 week extension to provide personnel records* by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Galligan, Colleen) (Entered: 02/01/2021) |
| 02/16/2021 | 57 | NOTICE of Conference: This case is scheduled for a Telephone Conference on 2/18/2021 @ 10:00 AM. Parties are directed to dial in at 1-888-684-8852, enter Access code 9772719#, and use Security code 1234# to join the call.(tab) (Entered: 02/16/2021) |
| 02/18/2021 | 58 | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 2/18/2021. Appearances by Sam Shapiro, Esq. for plaintiff; Ben Hill, Esq. for Deft Sessions, AAG Ryan Hickey, for defendants. After discussion is had regarding the files presented to the Court for in camera review, counsel agree to work out language for a protective Order by 3/5/2021. in order for the AAG to provide counsel with certain portions of the employee personnel files. A follow up conference is set for 3/29/2021 @ 10:30am. A notice will be filed confirming the dial in instructions for that conference. Case deadlines are extended and will be reset in a text Order to follow. (tab) (Entered: 02/19/2021) |

# JA13

| 02/19/2021 | 59 | COURT NOTICE of Conference: A Status Conference set for 3/29/2021 @ 10:30 AM before Magistrate Judge Christian F. Hummel. This Court conference will be conducted by telephone and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719#, and use Security code 1234# to join the call.(tab) (Entered: 02/19/2021) |
|---|---|---|
| 02/19/2021 | 60 | TEXT ORDER resetting case deadlines: All fact Discovery to be completed by 6/25/2021. Expert Discovery and depositions to be completed by 10/25/2021. Motions to be filed by 12/20/2021. Authorized by Magistrate Judge Christian F. Hummel on 2/19/2021. (tab) (Entered: 02/19/2021) |
| 03/08/2021 | 61 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting execution of Proposed Order regarding personnel files submitted to Judge Hummel . (Attachments: # 1 Proposed Order/Judgment)(Hickey, Ryan) (Entered: 03/08/2021) |
| 03/10/2021 | 62 | ORDER granting 61 Letter Request from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting execution of Proposed Order regarding personnel files. (Order issued). Signed by Magistrate Judge Christian F. Hummel on 3/10/2021. (tab) (Entered: 03/10/2021) |
| 03/24/2021 | 63 | ORDER: It is ORDERED that Plaintiff's request for the portions of the defendants' personnel files which were reviewed by the Court is DENIED as nothing in the personnel files which the Court reviewed is the proper subject of discovery pursuant to Rule 26 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.). Signed by Magistrate Judge Christian F. Hummel on March 24, 2021. (kmc) (Entered: 03/24/2021) |
| 03/24/2021 | 64 | Letter Motion from Samuel Shapiro for J.M. requesting that the Court compel the Justice Center to comply with the Court's January 13, 2021 Order by April 2, 2021 submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 03/24/2021) |
| 03/26/2021 | 65 | COURT NOTICE of Conference (Change in date/time): The Discovery Conference has been reset for Wednesday, 3/31/2021 @ 10:30 AM before Magistrate Judge Christian F. Hummel. This Court conference will be conducted by telephone and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719#, and use Security code 1234# to join the call.(tab) (Entered: 03/26/2021) |
| 03/31/2021 | 66 | Letter Motion from Samuel Shapiro for J.M. requesting to So-Order Proposed Order Regarding Justice Center Production submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 03/31/2021) |
| 03/31/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 3/31/2021 by telephone. Appearances by Sam Shapiro, Esq. for plaintiff; Ben Hill, |

| | | |
|---|---|---|
| | | Esq. for Deft Sessions; AAG Ryan Hickey and AAG Kasey Hildonen, for Defendants. Dkt. no. 64 is discussed and the Court directs plaintiff to file a proposed order setting forth an April 9th deadline for the subject subpoena to be complied with. Parties discuss the potential need to extend discovery deadlines, but the Court directs that parties wait until the beginning of May to see where they are at before applying for an extension of deadlines. AAG Hickey also advises the Court that there are an additional 15 pages of in camera review documents that were not included in the original review, but that are in the Court's possession. The Court directs AAG Hickey to file a letter to the Court, indicating the bates numbers of those documents and the court will review the additional pages. (tab) (Entered: 03/31/2021) |
| 03/31/2021 | 67 | ORDER granting and issuing 66 Order directing the Justice Center to comply with the Court's January 13, 2021 Order. Signed by Magistrate Judge Christian F. Hummel on 3/31/2021. (tab) (Entered: 03/31/2021) |
| 03/31/2021 | 68 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting in camera review of personnel records submitted to Judge Hummel . (Hickey, Ryan) (Entered: 03/31/2021) |
| 04/07/2021 | 69 | ORDER RE 68 Letter Request for *in camera* review of additional records. The Court has conducted an *in camera* review of page numbers 11-26 of Defendant Behlen's personnel file. The Court finds that the additional pages which were reviewed by the Court are the proper subject of discovery pursuant to Rule 26 of the Federal Rules of Civil Procedure (Fed.R.Civ.P). Defendants shall provide those pages to Plaintiff by April 26, 2021. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 4/7/2021. (tab) (Entered: 04/07/2021) |
| 06/21/2021 | 70 | Letter Motion from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting an extension of the deadlines in this matter submitted to Judge Christian F. Hummel . (Hildonen, Kasey) (Entered: 06/21/2021) |
| 07/07/2021 | 71 | *Joint* Letter Motion from Samuel Shapiro for J.M. requesting the Court to So-Order the enclosed Stipulation submitted to Judge Christian F. Hummel . (Attachments: # 1 Stipulation)(Shapiro, Samuel) (Entered: 07/07/2021) |
| 07/08/2021 | 72 | TEXT ORDER granting 70 Letter Request from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting an extension of the deadlines: Fact Discovery due by 9/30/2021. Expert discovery and depositions to be completed by January 31, 2022, and Dispositive Motions to be filed by 3/31/2022. Authorized by Magistrate Judge Christian F. Hummel on 7/8/2021. (tab) (Entered: 07/08/2021) |

| 07/08/2021 | 73 | ORDER granting 71 Letter Request from Samuel Shapiro for J.M. requesting the Court to So-Order the enclosed Stipulation. [Stipulation and Order issued]. Signed by Magistrate Judge Christian F. Hummel on 7/8/2021. (tab) (Entered: 07/08/2021) |
| --- | --- | --- |
| 09/17/2021 | 74 | Letter Motion from Samuel Shapiro for J.M. requesting Extension of Discovery Deadlines submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 09/17/2021) |
| 09/21/2021 | 75 | TEXT ORDER granting *in part* 74 Letter Motion from Samuel Shapiro for J.M. requesting Extension of Discovery Deadlines : The fact discovery deadline is extended to December 10, 2021, (ii) the deadline to complete expert discovery and depositions is extended to April 1, 2022, and (iii) the dispositive motion deadline is extended to May 12, 2022. Authorized by Magistrate Judge Christian F. Hummel on 9/21/2021. (tab) (Entered: 09/21/2021) |
| 12/02/2021 | 76 | *Joint* Letter Motion from Samuel Shapiro for J.M. requesting Extension of Discovery Deadlines submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 12/02/2021) |
| 12/06/2021 | 77 | TEXT ORDER granting 76 *Joint* Letter Motion from Samuel Shapiro for J.M. requesting Extension of Discovery Deadlines submitted to Judge Christian F. Hummel : Fact discovery deadline is extended from December 10, 2021 to January 31, 2022, the deadline to complete expert discovery and depositions is extended from April 1, 2022 to April 29, 2022, and the dispositive motion deadline is extended from May 12, 2022 to June 10, 2022. Parties are advised that no further extension requests will be considered. Authorized by Magistrate Judge Christian F. Hummel on 12/6/2021. (tab) (Entered: 12/06/2021) |
| 01/03/2022 | 78 | Letter Motion from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting telephonic conference submitted to Judge Christian F. Hummel . (Hildonen, Kasey) (Entered: 01/03/2022) |
| 01/04/2022 | 79 | TEXT ORDER granting 78 Letter Motion from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting telephonic conference : Discovery Conference has been set for 1/11/2022 @ 9:30 AM. This Court conference will be conducted by telephone and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719#, and use Security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 1/4/2022. (tab) (Entered: 01/04/2022) |
| 01/11/2022 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Conference held on 1/11/2022 by telephone. Appearances by Samuel Shapiro, Esq. for plaintiff; Ben Hill, Esq. AAG Kasey Hildonen, and AAG Ryan Hickey, appearing for |

# JA16

| | | |
|---|---|---|
| | | Defendants. Counsel advise the Court what discovery and depositions remain to be completed and the timeline expected. The Court resets the Discovery and Motion filing deadlines to accommodate the remaining deposition schedule. Plaintiff also advises the Court of an issue surrounding recorded statements of residents taken by OPWDD investigators at the time of the incident that Plaintiff has an interest in receiving. The parties agree to confer on the issue and will advise the Court if further Court involvement is needed. (tab) (Entered: 01/11/2022) |
| 01/11/2022 | 80 | TEXT ORDER resetting deadlines: Discovery extended and now due by 2/28/2022. Dispositive Motions to be filed by 4/22/2022. Authorized by Magistrate Judge Christian F. Hummel on 1/11/2022. (tab) (Entered: 01/11/2022) |
| 01/11/2022 | 81 | *Joint* Letter Motion from Samuel Shapiro for J.M. requesting Amendment to New Discovery Schedule Ordered on January 11, 2022 submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 01/11/2022) |
| 01/12/2022 | 82 | TEXT ORDER granting 81 *Joint* Letter Motion from Samuel Shapiro for J.M. requesting Amendment to New Discovery Schedule Ordered on January 11, 2022 : Fact discovery shall be completed by February 28, 2022; Expert discovery and depositions shall be completed by April 29, 2022; and Dispositive motions shall be filed by June 10, 2022. [Fact Discovery due by 2/28/2022; Dispositive Motions to be filed by 6/10/2022]. Authorized by Magistrate Judge Christian F. Hummel on 1/12/2022. (tab) (Entered: 01/12/2022) |
| 01/12/2022 | 83 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting endorsement of Stipulation regarding disclosure of audio files submitted to Judge Hummel . (Attachments: # 1 Proposed Stipulation)(Hickey, Ryan) (Entered: 01/12/2022) |
| 01/13/2022 | 84 | ORDER approving 83 Stipulation regarding disclosure of audio files (Order issued). Signed by Magistrate Judge Christian F. Hummel on 1/13/2022. (tab) (Entered: 01/13/2022) |
| 01/14/2022 | 85 | TRANSCRIPT REQUEST by J.M. for proceedings held on January 11, 2022 before Judge Christian F. Hummel.. (Shapiro, Samuel) (Entered: 01/14/2022) |
| 02/14/2022 | 86 | Letter Motion from Samuel Shapiro for J.M. requesting that the Court So Order the enclosed Site Inspection Agreement submitted to Judge Christian F. Hummel . (Attachments: # 1 Site Inspection Agreement) (Shapiro, Samuel) (Entered: 02/14/2022) |
| 02/15/2022 | 87 | ORDER granting 86 Letter Motion from Samuel Shapiro for J.M. requesting that the Court So Order the enclosed Site Inspection |

# JA17

| | | |
|---|---|---|
| | | Agreement : [Order issued]. Signed by Magistrate Judge Christian F. Hummel on 2/15/2022. (tab) (Entered: 02/15/2022) |
| 03/01/2022 | 88 | Letter Motion from Samuel Shapiro for J.M. requesting a conference to address Plaintiff's proposed motion for leave to amend the complaint submitted to Judge Christian F. Hummel . (Attachments: # 1 Exhibit(s) A - Plaintiff's Proposed Second Amended Complaint, # 2 Exhibit(s) B - Excerpt from Anita Baral's Deposition Transcript, 2/8/22, # 3 Exhibit(s) C - Excerpt from Katherina Cassata's Deposition Transcript, 2/8/22) (Shapiro, Samuel) (Entered: 03/01/2022) |
| 03/04/2022 | 89 | TEXT ORDER granting 88 Letter Motion from Samuel Shapiro for J.M. requesting a conference to address Plaintiff's proposed motion for leave to amend the complaint : An In-Person Discovery/Status Hearing has been set for Friday, 3/11/2022 @ 11:00 AM in Albany. Authorized by Magistrate Judge Christian F. Hummel on 3/4/2022. (tab) (Entered: 03/04/2022) |
| 03/08/2022 | 90 | NOTICE of Appearance by Abby McCormick-Foley on behalf of Ashley Sessions (McCormick-Foley, Abby) (Entered: 03/08/2022) |
| 03/08/2022 | 91 | NOTICE of Appearance by Abby McCormick-Foley on behalf of Ashley Sessions (McCormick-Foley, Abby) (Entered: 03/08/2022) |
| 03/11/2022 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 3/11/2022. Appearances by Samuel Shapiro, Esq. for Plaintiff; Abby McCormick-Foley, Esq. for Deft Sessions; AAG Ryan Hickey for the remaining Defendants. AAG Hickey advises the Court that his clients would not be stipulating to the Plaintiff's Amended Complaint. The Court sets a briefing schedule for a Motion to Amend. The motion is to be filed by 3/30/2022; Response by Defendants due by 4/22/2022 and a reply is permitted by 4/29/2022. The Court hears counsel on the issue of plaintiff's desire to take the deposition of some non-party witnesses. Parties agree to meet and confer to try and narrow the scope and to see if anything in that regard can be stipulated to. The Court sets a follow up telephone conference for April 6, 2022 @ 9:30 am. The notice and dial in instructions for that conference will be issued under a separate docket entry.(Court Reporter Jacqueline Stroffolino)[11:00 am-11:20am] (tab) (Entered: 03/11/2022) |
| 03/14/2022 | 92 | TEXT ORDER and NOTICE: Setting briefing Schedule for Motion to Amend Complaint. Motion to Amend to be filed by 3/30/2022; Response to be filed by 4/22/2022; and any Reply should be filed by 4/29/2022. A Follow-up Telephone Status Conference has been set for Wednesday, 4/6/2022 @ 9:30 AM. Counsel are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 3/14/2022. (tab) (Entered: 03/14/2022) |

# JA18

| | | |
|---|---|---|
| 03/30/2022 | 93 | MOTION to Amend/Correct 25 Amended Complaint filed by J.M.. Response to Motion due by 4/20/2022 (Attachments: # 1 Declaration of Samuel Shapiro in Support of Motion for Leave to Amend the Complaint, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C, # 5 Exhibit(s) D, # 6 Exhibit(s) E, # 7 Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint) Motions referred to Christian F. Hummel. (Shapiro, Samuel) (Entered: 03/30/2022) |
| 04/06/2022 | | Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 4/6/2022 by telephone. Appearances by Sam Shapiro, Esq. for Plaintiff; Ben Hill, Esq. for Defendant Sessions; AAG Ryan Hickey for the Defendants. Defense indicates that they are not in a position to consent to Plaintiff's proposed Amended Complaint and that they would be responding in opposition. In regard to Plaintiff's desire to depose a past OPWDD resident, Plaintiff will use a subpoena. Defense is directed to provide a last known address for the resident of interest to Plaintiff. (Court Reporter Hannah Cavanaugh)[9:30am-9:45am] (tab) (Entered: 04/07/2022) |
| 04/15/2022 | 94 | Letter Motion from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a two-week adjournment of all deadlines related to Plaintiff's motion to amend the Complaint, on consent of all parties submitted to Judge Christian F. Hummel . (Hildonen, Kasey) (Entered: 04/15/2022) |
| 04/18/2022 | 95 | TEXT ORDER granting 94 Letter Motion from Kasey K. Hildonen for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a two-week adjournment of all deadlines related to Plaintiff's 93 MOTION to Amend/Correct : Response to Motion due by 5/6/2022. Reply to Response to Motion due by 5/13/2022. Authorized by Magistrate Judge Christian F. Hummel on 4/18/2022. (tab) (Entered: 04/18/2022) |
| 05/06/2022 | 96 | RESPONSE in Opposition re 93 MOTION to Amend/Correct 25 Amended Complaint filed by J.M.. filed by Ashley Sessions. (Hill, Benjamin) (Entered: 05/06/2022) |
| 05/06/2022 | 97 | RESPONSE in Opposition re 93 MOTION to Amend/Correct 25 Amended Complaint filed by J.M.. filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Attachments: # 1 Declaration of Ryan W. Hickey, # 2 Exhibit(s) A, # 3 Exhibit(s) B (Cover sheet for proposed sealed exhibit))(Hickey, Ryan) (Additional attachment(s) added on 5/11/2022: # 4 Exhibit(s) SEALED Exhibit B) (tab, ). (Entered: 05/06/2022) |
| 05/06/2022 | 98 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a sealing order submitted to Judge Hummel . |

# JA19

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Sealing Order)(Hickey, Ryan) (Entered: 05/06/2022) |
| 05/11/2022 | 99 | TEXT ORDER granting 98 Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a sealing order : Exhibit B to the Declaration of Ryan W. Hickey filed in opposition to plaintiffs motion for leave to amend the complaint [ECF No. 97-3] shall be filed under seal. Signed by Magistrate Judge Christian F. Hummel on 5/11/2022. (tab) (Entered: 05/11/2022) |
| 05/12/2022 | 100 | ***STRICKEN PURSUANT TO 102 ORDER*** REPLY re 93 MOTION to Amend/Correct 25 Amended Complaint filed by J.M.. *Memorandum of Law* filed by J.M. (Shapiro, Samuel) Modified on 5/13/2022 to edit the docket text of the title of the entry from Response to Reply (ztc, ). Modified on 12/19/2022 (ztc, ). (Entered: 05/12/2022) |
| 05/12/2022 | 101 | ***STRICKEN PURSUANT TO 102 ORDER*** REPLY re 93 MOTION to Amend/Correct 25 Amended Complaint filed by J.M.. *Declaration of Samuel Shapiro* filed by J.M.. (Attachments: # 1 Exhibit(s) F- Plaintiffs First Consolidated Set of Interrogatories and Requests for Production of Documents)(Shapiro, Samuel) Modified on 5/13/2022 to edit the docket text of the title of the entry from Response to Reply (ztc, ). Modified on 12/19/2022 (ztc, ). (Entered: 05/12/2022) |
| 05/13/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re 101 REPLY, 100 REPLY, Clerk edited the docket text of the title of the entry from Response in support of Motion to Reply. (ztc, ) (Entered: 05/13/2022) |
| 12/19/2022 | 102 | DECISION & ORDER: It is hereby ORDERED, that plaintiff's motion to file a second amended complaint (dkt. no. 93 ) is DENIED, and it is further ORDERED, that plaintiffs reply (dkt. nos. 100 , 101 ) is STRICKEN as violative of Northern District of New York Local Rule 7.1, and it is further ORDERED, that the Clerk of this Court SEAL this Decision & Order due to its references to a sealed exhibit. Signed by Magistrate Judge Christian F. Hummel on December 19, 2022. (Copy served via regular mail on All Counsel)(ztc) (ztc, ). (Entered: 12/19/2022) |
| 12/30/2022 | 103 | NOTICE of Appeal of Magistrate Decision to District Court by J.M. re 102 Order on Motion to Amend/Correct,, (Attachments: # 1 Memorandum of Law in Support of Plaintiff's Objections to Magistrate Judge Hummel's Decision Denying Plaintiff Leave to Amend her Complaint)(Shapiro, Samuel) Modified on 1/5/2023 (amt, ). (Entered: 12/30/2022) |
| 01/05/2023 | | COURT TEXT NOTICE to counsel: Document 103 was filed as a Notice of Objections to MJ Hummel's 102 Order. This has been converted on the docket to appear as a pending APPEAL OF MAGISTRATE JUDGE DECISION to District Court. This Appeal will |

# JA20

|  |  |  |
|---|---|---|
|  |  | be handled by Judge McAvoy. A response to the Appeal shall be filed on or before 1/13/2023. (amt) (Entered: 01/05/2023) |
| 01/09/2023 | 104 | Letter Motion for Ashley Sessions requesting Extension of time to respond to appeal submitted to Judge Hon. Christian Hummel . (McCormick-Foley, Abby) (Entered: 01/09/2023) |
| 01/10/2023 | 105 | TEXT ORDER granting the 104 Letter requesting Extension of time to respond to 103 APPEAL OF MAGISTRATE JUDGE DECISION. Response to Motion due by 1/27/2023. Authorized by Senior Judge Thomas J. McAvoy on 1/10/2023. (amt) (Entered: 01/10/2023) |
| 01/22/2023 | 106 | MEMORANDUM OF LAW re 103 Appeal of Magistrate Judge Decision to District Court, *Memorandum of Law in Response to Plaintiff's Appeal of the December 19, 2022 Decision and Order* filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Hickey, Ryan) (Entered: 01/22/2023) |
| 01/27/2023 | 107 | MEMORANDUM OF LAW re 103 Appeal of Magistrate Judge Decision to District Court, *Memorandum of Law in Response to Plaintiff's Appeal of the December 19, 2022 Decision and Order* filed by Ashley Sessions. (McCormick-Foley, Abby) (Entered: 01/27/2023) |
| 04/24/2023 | 108 | ORDER: The Plaintiff's objections to Judge Hummel's findings, docketed as an appeal of a non-dispositive decision, dkt. # 103 , are hereby OVERRULED. Judge Hummels decision is AFFIRMED. Signed by Senior Judge Thomas J. McAvoy on April 24, 2023. (ztc) (Entered: 04/24/2023) |
| 04/27/2023 | 109 | *JOINT* Letter Motion from Samuel Shapiro for J.M. requesting telephonic conference submitted to Judge Christian F. Hummel . (Shapiro, Samuel) (Entered: 04/27/2023) |
| 04/27/2023 | 110 | TEXT ORDER granting 109 *JOINT* Letter Motion from Samuel Shapiro for J.M. requesting telephonic conference : Telephone Conference set for 5/4/2023 @ 11:30 AM. Counsel are to DIAL IN @ 518-217-2288 and use Conference ID 815 260 499 # to connect to the conference call. Authorized by Magistrate Judge Christian F. Hummel on 4/27/2023. (tab) (Entered: 04/27/2023) |
| 05/04/2023 |  | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 5/4/2023. [11:33am-11:45am] Appearances by Samuel Shapiro, Esq. for plaintiff; Ben Hill, Esq. for Sessions; AAG Ryan Hickey for the Defendants. The Status of discovery is discussed with the Court and deadlines are reset. A text Order resetting deadlines will be issued. (tab) (Entered: 05/08/2023) |
| 05/08/2023 | 111 | TEXT ORDER resetting deadlines: All Fact Discovery due by 6/30/2023, Dispositive Motions to be filed by 11/1/2023. Plaintiffs |

# JA21

| | | |
|---|---|---|
| | | Expert Disclosure Deadline is 6/30/2023, Defendants Expert Disclosure Deadline is 8/15/2023, Rebuttal Expert Disclosure Deadline is 9/1/2023. All Expert Discovery including expert depositions to be completed by 9/30/2023. Authorized by Magistrate Judge Christian F. Hummel on 5/8/2023. (tab) (Entered: 05/08/2023) |
| 10/11/2023 | 112 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting an extension of the expert disclosure and dispositive motion deadlines submitted to Judge Hummel . (Hickey, Ryan) (Entered: 10/11/2023) |
| 10/12/2023 | 113 | RESPONSE in Opposition re 112 Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting an extension of the expert disclosure and dispositive motion deadlines submitted to J filed by J.M.. (Shapiro, Samuel) (Entered: 10/12/2023) |
| 10/18/2023 | 114 | TEXT ORDER denying 112 Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting an extension of the expert disclosure and dispositive motion deadlines: Defendants have had more than sufficient time to file expert disclosure. The deadline for the filing of dispositive motions remains set for November 1, 2023. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 10/18/2023. (tab) (Entered: 10/18/2023) |
| 10/26/2023 | 115 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a two week extension of time to file the State Defendants' motion for summary judgment submitted to Judge Hummel . (Hickey, Ryan) (Entered: 10/26/2023) |
| 10/27/2023 | 116 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting Approval of briefing schedule on consent of all counsel submitted to Judge Hummel . (Hickey, Ryan) (Entered: 10/27/2023) |
| 10/27/2023 | 117 | TEXT ORDER granting 115 Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a two week extension of time to file the State Defendants' motion and approving 116 Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting Approval of briefing schedule on consent of all counsel : *Motions to be filed by 11/15/2023. Response to Motions to be filed by 12/22/2023 and any Reply to Motions to be filed by 1/10/2024. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 10/27/2023. (tab) (Entered: 10/27/2023)* |

| 11/15/2023 | 118 | MOTION for Summary Judgment filed by Ashley Sessions. Motion returnable before Judge McAvoy. Response to Motion due by 12/6/2023. Reply to Response to Motion due by 12/13/2023 (Attachments: # 1 Declaration, # 2 Exhibit(s) Deposition of Ashley Sessions, # 3 Exhibit(s) Deposition of Elisa Williams, # 4 Exhibit(s) Deposition of Katherina Cassada, # 5 Exhibit(s) Expert Report of Bruce Carash (filed separately as medical record), # 6 Exhibit(s) Compendium of Deposition Exhibits (filed separately as medical records), # 7 Memorandum of Law, # 8 Statement of Material Facts) (Hill, Benjamin) (Entered: 11/15/2023) |
|---|---|---|
| 11/15/2023 | 119 | Medical Records filed by Ashley Sessions. (Attachments: # 1 Exhibit(s) Expert Report of Dr. Carash, # 2 Exhibit(s) Compendium of Deposition Exhibits)(Hill, Benjamin) (Entered: 11/15/2023) |
| 11/15/2023 | 120 | MOTION for Summary Judgment filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. Motion returnable before Judge McAvoy. Response to Motion due by 12/6/2023. Reply to Response to Motion due by 12/13/2023 (Attachments: # 1 Declaration of Raymond McGinn (exhibits filed as medical records), # 2 Declaration of Elise Williams, # 3 Declaration of Ryan Hickey (exhibits B-G filed as medical records), # 4 Exhibit(s) A to Hickey Declaration (Stipulation of Conditional Dismissal ), # 5 Declaration of Cassaundra Murray (exhibit filed as medical record), # 6 Statement of Material Facts, # 7 Memorandum of Law) (Hickey, Ryan) (Entered: 11/15/2023) |
| 11/15/2023 | 121 | Medical Records filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Attachments: # 1 Exhibit(s) B to McGinn Declaration, # 2 Exhibit(s) C to McGinn Declaration, # 3 Exhibit(s) B to Hickey Declaration (Williams Deposition Transcript), # 4 Exhibit(s) C to Hickey Declaration (Buell Deposition Transcript), # 5 Exhibit(s) D to Hickey Declaration (Behlen Deposition Transcript), # 6 Exhibit(s) E to Hickey Declaration (McGinn Deposition Transcript), # 7 Exhibit(s) F to Hickey Declaration (Cassata Deposition Transcript), # 8 Exhibit(s) G to Hickey Declaration (Novack Deposition Transcript), # 9 Exhibit(s) Exhibit A to Murray Declaration (Application for Voluntary Admission))(Hickey, Ryan) (Entered: 11/15/2023) |
| 12/22/2023 | 122 | MEMORANDUM OF LAW re 120 Motion for Summary Judgment,, 118 Motion for Summary Judgment,, *in Opposition to Defendants' Motions for Summary Judgement* filed by J.M.. (Shapiro, Samuel) (Entered: 12/22/2023) |
| 12/22/2023 | 123 | STATEMENT OF MATERIAL FACTS re 120 MOTION for Summary Judgment filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. Motion returnable before Judge McAvoy., 118 MOTION for Summary |

| | | |
|---|---|---|
| | | Judgment filed by Ashley Sessions. Motion returnable before Judge McAvoy. *Plaintiff's L.R. 56.1 Statement of Material Facts* filed by J.M.. (Attachments: # 1 Statement of Material Facts Plaintiff's Response to Ashley Sessions' L.R. 56.1 Statement of Material Facts, # 2 Statement of Material Facts Plaintiff's Response to Defendants' L.R. 56.1 Statement of Material Facts)(Shapiro, Samuel) (Entered: 12/22/2023) |
| 12/22/2023 | 124 | AFFIDAVIT in Opposition re 118 MOTION for Summary Judgment filed by Ashley Sessions. Motion returnable before Judge McAvoy., 120 MOTION for Summary Judgment filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. Motion returnable before Judge McAvoy. *Declaration of Samuel Shapiro* filed by J.M.. (Attachments: # 1 Exhibit(s) A to Shapiro Declaration (Filed as Medical Record), # 2 Exhibit(s) B to Shapiro Declaration (Filed as Medical Record), # 3 Exhibit(s) C to Shapiro Declaration (Filed as Medical Record), # 4 Exhibit(s) D to Shapiro Declaration, # 5 Exhibit(s) E to Shapiro Declaration, # 6 Exhibit(s) F to Shapiro Declaration, # 7 Exhibit(s) G to Shapiro Declaration, # 8 Exhibit(s) H to Shapiro Declaration, # 9 Exhibit(s) I to Shapiro Declaration, # 10 Exhibit(s) J to Shapiro Declaration (Filed as Medical Record), # 11 Exhibit(s) K to Shapiro Declaration, # 12 Exhibit(s) L to Shapiro Declaration, # 13 Exhibit(s) M to Shapiro Declaration (Filed as Medical Record), # 14 Exhibit(s) N to Shapiro Declaration (Filed as Medical Record), # 15 Exhibit(s) O to Shapiro Declaration, # 16 Exhibit(s) P to Shapiro Declaration (Filed as Medical Record), # 17 Exhibit(s) Q to Shapiro Declaration (Filed as Medical Record), # 18 Exhibit(s) R to Shapiro Declaration, # 19 Exhibit(s) S to Shapiro Declaration, # 20 Exhibit(s) T to Shapiro Declaration (Filed as Medical Record), # 21 Exhibit(s) U to Shapiro Declaration, # 22 Exhibit(s) V to Shapiro Declaration, # 23 Exhibit(s) W to Shapiro Declaration (Filed as Medical Record), # 24 Exhibit(s) X to Shapiro Declaration (Filed as Medical Record), # 25 Exhibit(s) Y to Shapiro Declaration (Filed as Medical Record), # 26 Exhibit(s) Z to Shapiro Declaration (Filed as Medical Record), # 27 Exhibit(s) AA to Shapiro Declaration, # 28 Exhibit(s) BB to Shapiro Declaration, # 29 Exhibit(s) CC to Shapiro Declaration (Filed as Medical Record), # 30 Exhibit(s) DD to Shapiro Declaration (Filed as Medical Record), # 31 Exhibit(s) EE to Shapiro Declaration (Filed as Medical Record), # 32 Exhibit(s) FF to Shapiro Declaration, # 33 Exhibit(s) GG to Shapiro Declaration (Filed as Medical Record), # 34 Exhibit(s) HH to Shapiro Declaration (Filed as Medical Record))(Shapiro, Samuel) (Entered: 12/22/2023) |
| 12/22/2023 | 125 | DECLARATION OF SAMUEL SHAPIRO (Medical Records) filed by J.M.. (Attachments: # 1 Exhibit(s) A to Shapiro Declaration, # 2 Exhibit(s) B to Shapiro Declaration, # 3 Exhibit(s) C to Shapiro Declaration, # 4 Exhibit(s) J to Shapiro Declaration, # 5 Exhibit(s) M to Shapiro Declaration, # 6 Exhibit(s) N to Shapiro Declaration, # 7 |

| | | |
|---|---|---|
| | | Exhibit(s) P to Shapiro Declaration, # 8 Exhibit(s) Q to Shapiro Declaration, # 9 Exhibit(s) T to Shapiro Declaration, # 10 Exhibit(s) W to Shapiro Declaration, # 11 Exhibit(s) X to Shapiro Declaration, # 12 Exhibit(s) Y to Shapiro Declaration, # 13 Exhibit(s) Z to Shapiro Declaration, # 14 Exhibit(s) CC to Shapiro Declaration, # 15 Exhibit(s) DD to Shapiro Declaration, # 16 Exhibit(s) EE to Shapiro Declaration, # 17 Exhibit(s) GG to Shapiro Declaration, # 18 Exhibit(s) HH to Shapiro Declaration)(Shapiro, Samuel) Modified on 12/27/2023 to edit docket text to better reflect the filing. (ztc, ). (Entered: 12/22/2023) |
| 01/10/2024 | 126 | Letter Motion from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a one week extension of defendants' deadline to file their summary judgment replies on consent of all parties submitted to Judge Hummel . (Hickey, Ryan) (Entered: 01/10/2024) |
| 01/10/2024 | 127 | TEXT ORDER granting the 126 Letter from Ryan Hickey for Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams requesting a one week extension of defendants' deadline to file their summary judgment replies. Reply to Response to Motion due by 1/17/2024. Authorized by Senior Judge Thomas J. McAvoy on 1/10/2024. (amt) (Entered: 01/10/2024) |
| 01/17/2024 | 128 | REPLY to Response to Motion re 118 MOTION for Summary Judgment filed by Ashley Sessions. Motion returnable before Judge McAvoy. filed by Ashley Sessions. (Attachments: # 1 Statement of Material Facts)(Hill, Benjamin) (Entered: 01/17/2024) |
| 01/17/2024 | 129 | REPLY to Response to Motion re 120 MOTION for Summary Judgment filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. Motion returnable before Judge McAvoy. filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Attachments: # 1 Reply to Response to Statement of Material Facts)(Hickey, Ryan) (Entered: 01/17/2024) |
| 01/18/2024 | 130 | STATEMENT OF MATERIAL FACTS re 120 MOTION for Summary Judgment filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. Motion returnable before Judge McAvoy. *Response to Plaintiff's L.R. 56.1 Statement* filed by Corey C. Behlen, Joshua A. Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, Elise M. Williams. (Hickey, Ryan) (Entered: 01/18/2024) |
| 01/18/2024 | 131 | Letter Motion from Samuel Shapiro for J.M. requesting Oral Argument on Defendants' Motions for Summary Judgment, ECF Nos. 118, 120 submitted to Judge Thomas J. McAvoy . (Shapiro, Samuel) (Entered: 01/18/2024) |

| 06/27/2024 | 132 | TEXT ORDER REASSIGNING CASE. Case reassigned to U.S. District Judge Glenn T Suddaby for all further proceedings. Senior Judge Thomas J. McAvoy no longer assigned to case. Authorized by Chief Judge Brenda K. Sannes on 6/27/2024. (amt) (Entered: 06/27/2024) |
|---|---|---|
| 07/11/2024 | 133 | DECISION AND ORDER that Defendants' motions for summary judgment, Dkt. Nos. 118 , 120 , are GRANTED. Plaintiff's federal claims, and any claims against Defendant Buell, are DISMISSED with prejudice. Plaintiff's remaining claims, which arise under state law and DISMISSED without prejudice to refiling in state court. The statute of limitations governing those state-law claims is TOLLED for THIRTY (30) DAYS pursuant to 28 U.S.C. § 1367(d). Signed by U.S. District Judge Glenn T Suddaby on 7/11/2024. (sal) (Entered: 07/11/2024) |
| 07/11/2024 | 134 | JUDGMENT that, pursuant to the Decision and Order (Dkt. No. 133 ) issued on July 11, 2024 by the Honorable Glenn T. Suddaby, Defendants' motions for summary judgment, Dkt. Nos. 118 , 120 , are GRANTED. Plaintiff's federal claims, and any claims against Defendant Buell, are DISMISSED with prejudice. Plaintiff's remaining claims, which arise under state law and DISMISSED without prejudice to refiling in state court. The statute of limitations governing those state-law claims is TOLLED for THIRTY (30) DAYS pursuant to 28 U.S.C. § 1367(d). All of the above pursuant to the Decision and Order dated July 11, 2024 issued by the Honorable Glenn T. Suddaby. Dkt. No. 133 . (sal ) (Entered: 07/11/2024) |
| 07/25/2024 | 135 | NOTICE OF APPEAL as to 134 Judgment,, by J.M.. Filing fee $ 605, receipt number ANYNDC-6812462. (Shapiro, Samuel) (Entered: 07/25/2024) |
| 07/25/2024 | 136 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re # 135 Notice of Appeal. (mmg). (Entered: 07/25/2024) |
| 07/30/2024 | | USCA Case Number 24-1997 for 135 Notice of Appeal filed by J.M.. (nas ) (Entered: 07/30/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/23/2024 10:37:10 | | |
| **PACER Login:** | imaazel2261 | **Client Code:** | 2833.1 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00091-GTS-CFH |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

J.M., as Administrator of the Estate of Her Son,
C.B.,

                              Plaintiff,

          -against-

ASHLEY SESSIONS; DOES 1-6,

                              Defendants.

Case No. ___1:20-cv-91 (TJM/CFH)___

**COMPLAINT &
<u>JURY DEMAND</u>**

---

**AN UNNECESSARY AND TRAGIC DEATH IN A NEW YORK STATE GROUP HOME**

1.      C.B. died on April 9, 2018 in his room in Valley Ridge CIT, a New York State group home for developmentally disabled individuals. C.B. was thirty-four years old.

2.      This case involves, in the words of the New York State Justice Center for the Protection of People With Special Needs, "substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed C.B. to harm or risk of harm."

3.      C.B.'s tragic death should never have happened. With basic care, C.B.'s heart condition would have been discovered and treated, and he would be alive today. But the staff at Valley Ridge failed to help C.B. when, the day before his death, he complained of trouble breathing and his mother also called staff to say C.B. had trouble breathing. They failed to notice or treat C.B.'s substantial edema. They failed to inquire why C.B. had gained 50 pounds in a year, over 20 of those pounds in the last four months before his death—let alone address that alarming weight gain.

4.      The night of C.B.'s death, staff including Defendant Ashley Sessions failed to conduct required bed checks that would have saved his life. Staff then tried to cover up that

failure to the police; Sessions pled guilty to the crime of filing a false statement and lying—
twice—to the police.

5.       As a result of these failures, C.B. was left helpless in his room, his heart failing.
He died alone in his bed, slowly asphyxiating on fluid in his lungs.

6.       Valley Ridge staff failed to do their most basic job: keeping a disabled resident in
their custody safe. Now they must be held accountable.

## PARTIES

7.       Plaintiff J.M. is a United States citizen; she currently resides in Glens Falls, New
York. Plaintiff is C.B.'s mother and the Administratrix of his estate.

8.       At all relevant times, Defendant Ashley Sessions was an employee of the New
York State Office for People with Developmental Disabilities ("OPWDD"), an agency of the
State of New York, acting in the capacity of agent, servant, and employee of the State of New
York, and within the scope of her employment as such, and under color of law. Sessions was
working the overnight shift at the Valley Ridge Center for Intensive Treatment ("Valley Ridge
CIT") on April 8-9, 2018. Sessions was required to check on C.B. every two hours during her
overnight shift on April 8-9, 2018, which she failed to do. Sessions is sued in her individual
capacity.

9.       Defendant Doe 1 is the nurse who examined C.B. on April 8, 2018 at the Valley
Ridge CIT, and who was interviewed by OPWDD's Office of Investigations and Internal Affairs
("OIIA") in connection with C.B.'s death on April 10, 2018. At all relevant times, Doe 1 was an
employee of OPWDD, an agency of the State of New York, acting in the capacity of agent,
servant, and employee of the State of New York, and within the scope of his/her employment as
such, and under color of law. Doe 1 is sued in his/her individual capacity.

2

10.     Defendant Doe 2 was the Valley Ridge CIT Head of Shift on April 8, 2018. Doe 2 was physically present when C.B. was examined by a nurse on April 8, 2018. Doe 2 was interviewed by OIIA in connection with C.B.'s death on April 10, 2018. At all relevant times, Doe 2 was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his/her employment as such, and under color of law. Doe 2 is sued in his/her individual capacity.

11.     Defendant Doe 3 was the Valley Ridge CIT Head of Shift on the overnight shift of April 8-9, 2018. Doe 3 was interviewed by OIIA in connection with C.B.'s death on April 9, 2018. At all relevant times, Doe 3 was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his/her employment as such, and under color of law. Doe 3 is sued in his/her individual capacity.

12.     Defendant Doe 4 is the Valley Ridge CIT employee responsible for monitoring "acute and chronic medical problems," "medications," and seeing "individuals at the clinic for acute illnesses as well as admission history and complete annual physicals." Doe 4 was interviewed by OIIA in connection with C.B.'s death on April 20, 2018. At all relevant times, Doe 4 was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his/her employment as such, and under color of law. Doe 4 is sued in his/her individual capacity.

13.     Defendant Doe 5 is a Valley Ridge CIT staff member who heard C.B. state on April 4, 2018, "I don't feel good, I can't breathe." Doe 5 observed that C.B. could not finish vacuuming without taking a break on April 4, 2018. Doe 5 did not document any of C.B.'s behavior on April 4, 2018. Doe 5 was interviewed by OIIA in connection with C.B.'s death on

3

April 12, 2018. At all relevant times, Doe 5 was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his/her employment as such. Doe 5 is sued in his/her individual capacity.

14.     Defendant Doe 6 was the Approved Medication Administration Person working at the Valley Ridge CIT on April 8, 2018 and assigned to "E" house. On April 8, C.B.'s mother told Doe 6 that C.B. could not breathe and needed medical attention. Doe 6 did not report or memorialize his conversation with C.B.'s mother. Doe 6 was interviewed by OIIA in connection with C.B.'s death on April 12, 2018. At all relevant times, Doe 6 was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his/her employment as such. Doe 6 is sued in his/her individual capacity.

### JURISDICTION AND VENUE

15.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

16.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and the doctrine of supplemental jurisdiction.

17.     The acts complained of occurred in the Northern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

### JURY DEMAND

18.     Plaintiff demands trial by jury in this action.

4

## FACTUAL ALLEGATIONS

**The Valley Ridge CIT**

19.     The Valley Ridge CIT is a 14-acre campus located in Norwich, NY operated by New York State through OPWDD.

20.     The Valley Ridge CIT is a highly structured active treatment and facilitative residential program within a secure setting.

21.     The Valley Ridge CIT provides services to approximately 43 individuals. Each individual has their own bedroom with key card access entry.

**C.B.**

22.     C.B. was born on May 28, 1983.

23.     C.B. was a disabled individual. He was diagnosed with mild mental retardation, among other disabilities.

24.     When C.B. was 10 years old, he was hit by a car and suffered a head injury.

25.     At age 18, C.B. was placed in the care of OPWDD at Broome Developmental Center.

26.     In 2015, C.B. moved to Valley Ridge CIT.

27.     Unlike many other residents at Valley Ridge CIT, C.B. was not sent there as part of a criminal conviction.

28.     Staff at Valley Ridge CIT reported that C.B. was social and loved interacting with staff and peers.

29.     C.B. worked a janitorial job at Valley Ridge CIT and was a punctual, diligent worker.

30.    C.B. loved music and singing. He discussed his goal to live in a less restrictive setting than Valley Ridge CIT.

31.    C.B. has a loving family, including his mother and siblings.

**C.B.'s Premature Death**

32.    C.B. died on April 9, 2018 at approximately 5 a.m. at Valley Ridge CIT. He was thirty-four years old.

33.    C.B.'s death was caused by either an idiopathic or viral cardiomyopathy.

34.    C.B. was in heart failure at the time of his death.

35.    On the night he died, C.B. was in pulmonary edema—*i.e.*, he had fluid in his lungs.

**Defendants Ignore the Significant Health Concerns that Led to C.B.'s Death**

36.    Defendants' deliberate indifference to C.B.'s health proximately caused his premature death.

37.    The heart failure that ultimately killed C.B. began 3-4 months before his death. During those months, Defendants ignored (i) C.B.'s extreme weight gain, (ii) significant swelling on C.B.'s arms and legs, (iii) C.B.'s fatigue, (iv) C.B.'s difficulties breathing, and (v) C.B.'s difficulties using the bathroom.

38.    Rapid weight gain, edema/swelling, difficulty breathing, and difficulty voiding (*i.e.*, going to the bathroom) are all telltale signs of pulmonary edema. C.B. displayed all of these symptoms over the final month of his life. Defendants ignored them.

***Weight Gain***

39.    Defendants ignored C.B.'s significant weight gain during his time at the Valley Ridge CIT.

6

40.     In June 2015, just after his arrival at the Valley Ridge CIT, C.B. weighed 238 pounds. Less than three years later, when he died in April 2018, he weighed 294 pounds. C.B. gained ten pounds in just the final month of his life.

41.     OPWDD's Justice Center noted that "there was little in the record to explain or rectify [C.B.'s] significant weight gain over the course of several years prior to his death at the [Valley Ridge] CIT." The Justice Center explained that "further evaluation of his weight gain and whether [C.B.] demonstrated symptoms consistent with Metabolic Syndrome or some other medical condition should have been identified and addressed by [Valley Ridge] CIT medical staff." *Id.* But OPWDD staff, including Defendants, ignored C.B.'s alarming weight gain and took no action.

42.     Doe 4 in particular was responsible for monitoring C.B.'s "acute and chronic medical problems." But she/he recklessly ignored C.B.'s chronic weight gain and the significant heart issues that it portended.

***Swelling***

43.     The medical examiner reported that C.B.'s arms and legs showed "2+ pitting edema bilaterally" at the time of his death. Pitting edema means that, when a finger is pressed into the skin, an indentation remains. On the edema scale of 0 to 2+, 2+ reflects serious edema.

44.     Pitting edema is a clear sign of heart failure.

45.     The enormous amount of fluid in C.B.'s extremities was obvious to the naked eye.

46.     For days and even weeks prior to his death, OPWDD staff, including Defendants, failed to treat or even note the significant swelling in C.B.'s arms and legs.

47.     On April 8, 2018, the day before his death, C.B. was seen by Doe 1, a Valley Ridge CIT nurse. Doe 2, the Head of Shift at Valley Ridge CIT on April 8, 2018, was also present for the exam.

48.     Upon information and belief, Doe 1 and Doe 2 saw the significant swelling in C.B.'s arms and legs.

49.     Neither Doe 1 nor Doe 2 recorded or addressed the massive swelling in C.B.'s arms and legs.

***"I Can't Breathe"***

50.     On April 4, 2018, just four days before C.B.'s death, Doe 5 observed that C.B. "could not complete vacuuming" without stopping to rest. C.B. told Doe 5: "I don't feel good. I can't breathe."

51.     This was a serious cry for help, and strong evidence of a serious—even potentially life-threatening—medical issue.

52.     Doe 5 did not document C.B.'s breathing troubles on April 4, 2018.

53.     Upon information and belief, properly documenting medical complaints of Valley Ridge CIT residents is critical to ensuring the residents receive necessary medical care.

54.     Upon information and belief, Doe 5 did not take sufficient action to address or report the medical issue that was causing C.B.'s breathing problems.

55.     Another Valley Ridge CIT staff member noticed that C.B.'s "breathing had been a little erratic" in the "last few weeks" before he died.

56.     On April 8, 2018, C.B. again complained to Valley Ridge CIT staff that he could not breathe.

57.    On April 8, Doe 1 noticed that when C.B. arrived at the clinic, "he was breathing fairly heavily."

58.    Doe 2 was present at the clinic with C.B. on April 8 and, upon information and belief, noticed that he was breathing fairly heavily.

59.    And Doe 3 was aware that C.B. "usually gets up a lot at night complaining of heart burn."

60.    None of these Defendants (Doe 1, Doe 2, or Doe 3) took any action to address C.B.'s breathing difficulties. None sought medical intervention. Had these Defendants taken even minimal action, they would have uncovered the significant health problems of which C.B.'s breathing difficulties were a symptom.

*Fatigue*

61.    C.B. had been exhibiting signs of fatigue for nearly a month before he died.

62.    Nursing notes from March 15, 2018 indicate that C.B. "seem[ed] tired, 'not with it.'"

63.    Doe 4, who was responsible for monitoring "acute and chronic medical problems," was aware that C.B. had made "some complaints" to his psychiatrist about being tired.

64.    Doe 4 did nothing to address C.B.'s fatigue or diagnose the serious health issues of which his fatigue was a clear symptom.

65.    Doe 4's failure to address C.B.'s repeated complaints of fatigue was a proximate cause of C.B.'s death.

*Difficulty Voiding*

66.     On April 8, 2019, C.B. complained to Doe 1 that he was having "difficulty voiding."

67.     Upon information and belief, Doe 2, who was present at the clinic with C.B. on April 8, heard C.B.'s complaint about having difficulty voiding.

68.     Doe 1 examined C.B. but did nothing to provide C.B. relief and ignored the obvious likelihood that his voiding problems—coupled with his breathing troubles, his fatigue, his swelling, and his weight gain—were symptomatic of more serious health concerns.

**Defendants Exacerbate the Health Issues that Led to C.B.'s Death**

69.     On at least three occasions, Defendants responded to C.B.'s health complaints by telling him to drink more fluids.

70.     Drinking fluids increases the likelihood of death in people suffering from pulmonary edema.

71.     On March 15, 2018, a Valley Ridge CIT nurse "encouraged . . . [C.B.] to drink plenty of fluids."

72.     This was disastrous advice, and it contributed to C.B.' death.

73.     On April 4, 2018, after C.B. complained about not feeling well and could not finish vacuuming the floor without taking a rest, a Valley Ridge CIT staff member told him to drink plenty of fluids.

74.     On April 8, 2018, after she/he finished examining C.B., Doe 1 instructed him to "drink plenty of water."

75.     Again, this was disastrous medical advice for someone with pulmonary edema.

76.     Staff's repeated instruction to C.B. to drink plenty of fluids was a proximate cause of C.B.'s death.

**C.B.'s Mother's Call for Help Is Ignored**

77.     On the morning of April 8, 2018 C.B. called his mother, J.M., and complained that he was having trouble breathing and could not urinate. During the call, C.B. was in obvious distress, crying on the phone. His mom was afraid.

78.     Shortly after that call, J.M. called Valley Ridge CIT.

79.     J.M. told a staff member, Doe 6, that her son could not breathe.

80.     J.M. also told Doe 6 that C.B. could not urinate.

81.     J.M. told Doe 6 that her son needed immediate medical attention.

82.     In response, Doe 6 apparently did nothing.

83.     Doe 6 did not note the alarming report from J.M. that C.B. could not breathe.

84.     Doe 6 did not note that J.M. called at all.

85.     The nursing notes from April 8, 2018 do not mention J.M.'s call.

86.     The nursing notes from April 8, 2018 do not mention C.B.'s complaints about trouble breathing.

87.     No one at Valley Ridge CIT, including Doe 6, did anything in response to Plaintiff's report about her son.

88.     No one even called J.M. back to follow-up with her.

89.     J.M. never had the chance to speak with her son again.

**Ashley Sessions and Doe 3 Leave C.B. Alone to Die, then Sessions Lies About It**

90.     On the night of April 8-9, 2018, Ashley Sessions was responsible for checking on C.B. every two hours, starting at 11:00 p.m.

91.    On the night of April 8-9, 2018, Doe 3 was assigned to be the Head of Shift.

92.    Sessions was supposed to check on C.B. at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 5:00 a.m.

93.    Sessions did not check on C.B. at 3:00 a.m. on April 9.

94.    Sessions did not check on C.B. at 5:00 a.m. on April 9.

95.    Doe 3 was in Valley Ridge CIT's "E" house, where C.B. lived, from 3:00 a.m. to 5:30 a.m. on April 9.

96.    Doe 3 did not check on C.B. between 3:00 a.m. and 5:30 a.m. on April 9 to ensure he was safe.

97.    As the Head of Shift, Doe 3 was responsible for ensuring that Valley Ridge CIT staff working on April 8-9, 2018 did their jobs.

98.    Doe 3 did not ensure that Sessions or anyone else checked on C.B. every two hours on April 9.

99.    Doe 3 did not ensure that Sessions or anyone else protected C.B. on the night of April 8-9, 2018.

100.    After C.B. died, Sessions falsified Valley Ridge CIT documents, writing that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

101.    On the morning of April 9, 2018, Sessions signed a sworn supporting deposition, claiming (i) she saw C.B. walking to the bathroom at 1:00 a.m. and (ii) "I do nightly checks every two hours, and check to make sure that each consumer is responsive and breathing. I checked on C.B. at 3AM and again at 5AM."

102.    These statements were lies.

103.    Later on April 9, 2018, Sessions admitted to police that she had lied.

104.    She stated, "I did not [check] C.B.'s door at 3 and 5 as I had stated," though she "was supposed to do bed checks at 11, 1, 3, and 5."

105.    In another police interview on April 11, 2018, Sessions admitted: "I falsified a document for work that said I saw C.B. up at around 1 AM."

106.    She also admitted that she *never* saw C.B. awake during her shift.

107.    Though Sessions still claimed she did bed checks at 11:00 p.m. and 1:00 a.m., she couldn't even "tell if C.B. was alive when [she] performed these checks."

108.    Sessions also admitted that her supervisor, OPWDD employee Jen Smith, had told her to lie to police and claim she had seen C.B. that night, when in fact she had not.

109.    Sessions eventually pleaded guilty to providing false statements.

110.    Had Sessions completed the bed checks she was required to complete on the night of April 8-9, 2018, she would have seen C.B. in increasing distress and called for assistance to save his life.

111.    Had Doe 3 ensured that Sessions was completing the bed checks she was required to complete on the night of April 8-9, 2018, Sessions would have seen C.B. in increasing distress and called for assistance to save his life.

112.    Sessions' failure check on C.B. on the night of April 8-9, 2018, as she was required do, proximately caused C.B.'s death.

113.    Doe 3's failure to ensure that Sessions did her job by checking on C.B. on the night of April 8-9, 2018 proximately caused C.B.'s death.

**OPWDD Substantiates Three Charges of Abuse and Neglect**

114.    The New York State Justice Center for the Protection of People with Special Needs ("Justice Center") investigated C.B.'s death.

115.    "[T]he investigation revealed substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed [C.B.] to harm or risk of harm."

116.    "This includes the facility's failures: (1) to implement a procedure to require all communications from the house to nursing be documented in the individual resident record as well as house communication log; (2) to require shift notices [to] include any signs and symptoms of individual medical complaints."

117.    The Justice Center also substantiated charges of abuse and neglect due to Sessions's failure to conduct required bed checks and the State's falsification of documents to cover up those incomplete bed checks.

**C.B. Suffered Before as He Died**

118.    The pulmonary edema that C.B. experienced leading up this death was immensely painful.

119.    For a significant period of time prior to his death, C.B. was drowning in his own fluids and struggling to catch his breath.

120.    As a result, C.B. suffered severe physical and emotional injury, pre-death terror, pain and suffering, and was deprived of his life, and the lost enjoyment of life.

<u>**FIRST CLAIM**</u>
**42 U.S.C. § 1983, Substantive Due Process**

121.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

122.    As C.B.'s custodians, responsible for his safety and well-being, the Defendants had an affirmative duty to care for and protect C.B. under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

14

123.    The Defendants breached that duty. The Defendants' actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice and standards, were grossly negligent, and amounted to deliberate indifference to C.B.'s health and welfare.

124.    The Defendants acted with deliberate indifference to, and callous disregard for, the significant health problems that led to C.B.'s death, about which he and others complained to Defendants repeatedly.

125.    The Defendants' complete failure to respond to C.B.'s evident and excessive weight gain; their disregard for the substantial swelling in his arms and legs in the days before his death; their failure to respond to his repeated complaints of fatigue and difficulty breathing; their instructions to C.B. that he keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; their failure to check on C.B. on the night of April 8-9, 2018, as required; and all their other conduct set forth above exhibited deliberate indifference to, and callous disregard for, the safety, well-being and civil rights of C.B., proximately causing him substantial and unnecessary physical and emotional harm, and proximately causing his death.

126.    By virtue of the foregoing, the Defendants deprived C.B. of clearly-established rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and C.B. sustained the damages hereinbefore alleged.

### SECOND CLAIM
**Negligence**

127.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

128.    Defendants had a duty to care for C.B., diagnose his health problems, check on him during the night, prevent him from suffering, and protect his life.

129.    Defendants breached those duties by the conduct set forth above, and by failing to respond to C.B.'s evident and excessive weight gain; disregarding the substantial swelling in his arms and legs in the days before his death; failing to respond to his repeated complaints of fatigue and difficulty breathing; instructing C.B. to keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; and failing to check on C.B. on the night of April 8-9, 2018, as they were required to do.

130.    As a direct and proximate result of Defendants' breaches of their duties, C.B. sustained the damages hereinbefore alleged.

### THIRD CLAIM
#### Medical Malpractice (against Does 1, 4 and 6 only)

131.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

132.    Upon information and belief, and subject to further discovery, at all relevant times, Does 1, 4, and 6 (the "Medical Defendants") undertook to provide medical care to residents of the Valley Ridge CIT, including C.B., and were legally obligated and had a special duty to do so effectively.

133.    Upon information and belief, and subject to further discovery, the Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and held themselves out as using reasonable care and diligence in the care and treatment of the residents of Valley Ridge CIT, including C.B.

134.    By their misconduct detailed above, the Medical Defendants acted contrary to sounds medical practice and committed acts of medical malpractice against C.B.

135.    As a direct and proximate result of the Medical Defendants' negligence, C.B. endured the damages hereinbefore alleged.

136.    A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to Plaintiff's Complaint.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.    Compensatory damages in an amount to be determined at trial.

B.    Punitive damages against each Defendant in an amount to be determined at trial.

C.    An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

D.    Such other and further relief as the Court may deem appropriate.

Dated: January 27, 2020
       New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP

                                        _____/s_____
                                        Ilann M. Maazel
                                        Samuel Shapiro
                                        Alison Frick*
                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiff*

                                        *Application to Northern District of New York pending*

17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., <br><br> Plaintiff, <br><br> -against- <br><br> ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLAN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, <br><br> Defendants. | 20 Civ. 00091 (TJM)(CFH) <br><br> **AMENDED COMPLAINT & JURY DEMAND** |

**AN UNNECESSARY AND TRAGIC DEATH IN A NEW YORK STATE GROUP HOME**

1.      C.B. died on April 9, 2018 in his room at the Valley Ridge Center for Intensive Treatment ("Valley Ridge CIT"), a group home for developmentally disabled individuals that is run by New York State.

2.      C.B. died of heart failure at the age of thirty-four. Prior to his death, there were open and obvious signs that his heart had been failing—complaints by C.B. and his mother, objective medical evidence—but Defendants, all staff members at Valley Ridge CIT, ignored them.

3.      This case involves, in the words of the New York State Justice Center for the Protection of People With Special Needs, "substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed C.B. to harm or risk of harm."

4.      C.B.'s tragic death should never have happened. With basic care, C.B.'s heart condition would have been discovered and treated, and he would be alive today. But Defendants, failed to help C.B. They did nothing when, the day before his death, he complained of trouble

breathing and his mother called to say C.B. was having trouble breathing. They failed to notice

or treat C.B.'s substantial edema. They failed to inquire why C.B. had gained 50 pounds in a

year, over 20 of those pounds in the last four months before his death, and they failed to address

that alarming weight gain.

     5.     The night of C.B.'s death, staff including Defendant Ashley Sessions failed to

conduct required bed checks that would have saved his life. Staff then tried to cover up that

failure to the police. Sessions pled guilty to the crime of filing a false statement and lying—

twice—to the police.

     6.     As a result of these failures, C.B. was left helpless in his room, his heart failing.

He died alone in his bed, slowly asphyxiating on fluid in his lungs.

     7.     Valley Ridge CIT staff failed to do their most basic job: keeping a disabled

resident in their custody safe. Now they must be held accountable.

<u>**PARTIES**</u>

     8.     Plaintiff J.M. is a United States citizen; she currently resides in Glens Falls, New

York. Plaintiff is C.B.'s mother and the Administratrix of his estate.

     9.     At all relevant times, Defendant Ashley Sessions was an employee of the New

York State Office for People with Developmental Disabilities ("OPWDD"), an agency of the

State of New York, acting in the capacity of agent, servant, and employee of the State of New

York, and within the scope of her employment as such, and under color of law. Sessions was

working the overnight shift at the Valley Ridge Center for Intensive Treatment ("Valley Ridge

CIT") on April 8-9, 2018. Sessions was required to check on C.B. every two hours during her

overnight shift on April 8-9, 2018, which she failed to do. Sessions is sued in her individual

capacity.

10.     At all relevant times, Defendant Elise M. Williams was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such, and under color of law. Williams is the nurse who examined C.B. on April 8, 2018 at the Valley Ridge CIT, and who failed to do anything to address the clear signs that C.B. was in distress.  Williams is sued in his/her individual capacity.

11.     At all relevant times, Defendant Joshua A. Buell was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. Buell was the Valley Ridge CIT Head of Shift on April 8, 2018. He was physically present when Williams examined C.B. on April 8, 2018, and like Williams, he too failed to do anything to address the clear signs that C.B. was in distress. Buell is sued in his individual capacity.

12.     At all relevant times, Defendant Corey C. Behlan was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. Behlan was the Valley Ridge CIT Head of Shift on the overnight shift of April 8-9, 2018. Behlan is sued in his individual capacity.

13.     At all relevant times, Defendant Raymond J. McGinn was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. In April 2018, McGinn was the Valley Ridge CIT employee responsible for monitoring "acute and chronic medical problems," "medications," and seeing "individuals at the

3

clinic for acute illnesses as well as admission history and complete annual physicals." McGinn is sued in his individual capacity.

14.    At all relevant times, Defendant Katherina L. Cassata was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such. In April 2018, Cassata was a Valley Ridge CIT staff member. On April 4, 2018, Cassata heard C.B. state, "I don't feel good, I can't breathe," and observed that C.B. could not finish vacuuming without taking a break. Cassata did not document any of C.B.'s behavior on April 4, 2018. Cassata is sued in her individual capacity.

15.    At all relevant times, Defendant Michael Novack was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such. Novack was the Approved Medication Administration Person working at the Valley Ridge CIT on April 8, 2018 and assigned to "E" house. On April 8, 2018, C.B.'s mother told Novack that C.B. could not breathe and needed medical attention. Novack did not report or memorialize his conversation with C.B.'s mother. Novack is sued in his individual capacity.

**JURISDICTION AND VENUE**

16.    This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

17.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and the doctrine of supplemental jurisdiction.

18.    The acts complained of occurred in the Northern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

**JURY DEMAND**

19.     Plaintiff demands trial by jury in this action.

**FACTUAL ALLEGATIONS**

**The Valley Ridge CIT**

20.     The Valley Ridge CIT is a 14-acre campus located in Norwich, NY operated by New York State through OPWDD.

21.     The Valley Ridge CIT is a highly structured active treatment and facilitative residential program within a secure setting.

22.     The Valley Ridge CIT provides services to approximately 43 individuals. Each individual has their own bedroom with key card access entry.

**C.B.**

23.     C.B. was born in 1983.

24.     C.B. was a disabled individual. He was diagnosed with mild mental retardation, among other disabilities.

25.     When C.B. was 10 years old, he was hit by a car and suffered a head injury.

26.     At age 18, C.B. was placed in the care of OPWDD at Broome Developmental Center.

27.     In 2015, C.B. moved to Valley Ridge CIT.

28.     Unlike many other residents at Valley Ridge CIT, C.B. was not sent there as part of a criminal conviction.

29.     Staff at Valley Ridge CIT reported that C.B. was social and loved interacting with staff and peers.

30.     C.B. worked a janitorial job at Valley Ridge CIT and was a punctual, diligent worker.

31.     C.B. loved music and singing. He discussed his goal to live in a less restrictive setting than Valley Ridge CIT.

32.     C.B. has a loving family, including his mother and siblings.

**C.B.'s Premature Death**

33.     C.B. died on April 9, 2018 at approximately 5 a.m. at Valley Ridge CIT. He was thirty-four years old.

34.     C.B.'s death was caused by either an idiopathic or viral cardiomyopathy.

35.     C.B. was in heart failure at the time of his death.

36.     On the night he died, C.B. was in pulmonary edema—*i.e.*, he had fluid in his lungs.

**Defendants Ignore the Significant Health Concerns that Led to C.B.'s Death**

37.     Defendants' deliberate indifference to C.B.'s health proximately caused his premature death.

38.     The heart failure that ultimately killed C.B. began 3-4 months before his death. During those months, New York State employees at Valley Ridge CIT ignored (i) C.B.'s extreme weight gain, (ii) significant swelling on C.B.'s arms and legs, (iii) C.B.'s fatigue, (iv) C.B.'s difficulties breathing, and (v) C.B.'s difficulties using the bathroom.

39.     Rapid weight gain, edema/swelling, difficulty breathing, and difficulty voiding (*i.e.*, going to the bathroom) are all telltale signs of pulmonary edema. C.B. displayed all of these symptoms over the final month of his life. Defendants ignored them.

6

*Weight Gain*

40.     Defendants ignored C.B.'s significant weight gain during his time at the Valley Ridge CIT.

41.     In June 2015, just after his arrival at the Valley Ridge CIT, C.B. weighed 238 pounds. Less than three years later, when he died in April 2018, he weighed 294 pounds. C.B. gained ten pounds in just the final month of his life.

42.     OPWDD's Justice Center noted that "there was little in the record to explain or rectify [C.B.'s] significant weight gain over the course of several years prior to his death at the [Valley Ridge] CIT." The Justice Center explained that "further evaluation of his weight gain and whether [C.B.] demonstrated symptoms consistent with Metabolic Syndrome or some other medical condition should have been identified and addressed by [Valley Ridge] CIT medical staff." *Id.* But OPWDD staff, including Defendants, ignored C.B.'s alarming weight gain and took no action.

43.     Defendant McGinn in particular was responsible for monitoring C.B.'s "acute and chronic medical problems." But he recklessly ignored C.B.'s chronic weight gain and the significant heart issues that it portended.

*Swelling*

44.     The medical examiner reported that C.B.'s arms and legs showed "2+ pitting edema bilaterally" at the time of his death. Pitting edema means that, when a finger is pressed into the skin, an indentation remains. On the edema scale of 0 to 2+, 2+ reflects serious edema.

45.     Pitting edema is a clear sign of heart failure.

46.     The enormous amount of fluid in C.B.'s extremities was obvious to the naked eye.

47.     For days and even weeks prior to his death, OPWDD staff, including Defendants, failed to treat or even note the significant swelling in C.B.'s arms and legs.

48.     Defendant McGinn, who was responsible for monitoring C.B.'s "acute and chronic medical problems," was aware, or should have been aware, of the swelling in C.B.'s arms and legs.

49.     On April 8, 2018, the day before his death, C.B. was seen by Defendant Williams, a Valley Ridge CIT nurse. Defendant Buell, the Head of Shift at Valley Ridge CIT on April 8, 2018, was also present for the exam.

50.     Upon information and belief, Williams and Buell saw the significant swelling in C.B.'s arms and legs.

51.     Neither Williams nor Buell recorded or addressed the massive swelling in C.B.'s arms and legs.

***"I Can't Breathe"***

52.     On April 4, 2018, just four days before C.B.'s death, Defendant Cassata observed that C.B. "could not complete vacuuming" without stopping to rest. C.B. told Cassata: "I don't feel good. I can't breathe."

53.     This was a cry for help, and strong evidence of a serious—even potentially life-threatening—medical issue.

54.     Cassata did not document C.B.'s breathing troubles on April 4, 2018.

55.     Upon information and belief, properly documenting medical complaints of Valley Ridge CIT residents is critical to ensuring the residents receive necessary medical care.

56.     Upon information and belief, Cassata did not take sufficient action to address or report the medical issue that was causing C.B.'s breathing problems.

8

57.    Another Valley Ridge CIT staff member noticed that C.B.'s "breathing had been a little erratic" in the "last few weeks" before he died.

58.    On April 8, 2018, C.B. again complained to Valley Ridge CIT staff that he could not breathe.

59.    On April 8, Defendant Williams noticed that when C.B. arrived at the clinic, "he was breathing fairly heavily."

60.    Defendant Buell was present at the clinic with C.B. on April 8 and, upon information and belief, noticed that he was breathing fairly heavily.

61.    Defendant Behlan was also aware that C.B. "usually gets up a lot at night complaining of heart burn."

62.    None of these Defendants (Williams, Buell, or Behlan) took any action to address C.B.'s breathing difficulties. None sought medical intervention. Had these Defendants taken even minimal action, they would have uncovered the significant health problems of which C.B.'s breathing difficulties were a symptom. Their failure was a proximate cause of C.B.'s death.

*Fatigue*

63.    C.B. had been exhibiting signs of fatigue for nearly a month before he died.

64.    Nursing notes from March 15, 2018 indicate that C.B. "seem[ed] tired, 'not with it.'"

65.    Defendant McGinn, who was responsible for monitoring "acute and chronic medical problems," was aware that C.B. had made "some complaints" to his psychiatrist about being tired.

66.    McGinn did nothing to address C.B.'s fatigue or diagnose the serious health issues of which his fatigue was a clear symptom.

67.     McGinn's failure to address C.B.'s repeated complaints of fatigue was another proximate cause of C.B.'s death.

***Difficulty Voiding***

68.     On April 8, 2018, C.B. complained to Defendant Williams that he was having "difficulty voiding."

69.     Upon information and belief, Defendant Buell, who was present at the clinic with C.B. on April 8, heard C.B.'s complaint about having difficulty voiding.

70.     Defendant Williams examined C.B. on April 8, 2018, but did nothing to provide C.B. relief and ignored the obvious likelihood that his voiding problems—coupled with his breathing troubles, his fatigue, his swelling, and his weight gain—were symptomatic of more serious health concerns. Williams' failure to take any action to help C.B. was another proximate cause of C.B.'s death.

**Defendants Exacerbate the Health Issues that Led to C.B.'s Death**

71.     On at least three occasions, Valley Ridge CIT staff responded to C.B.'s health complaints by telling him to drink more fluids.

72.     Drinking fluids increases the likelihood of death in people suffering from pulmonary edema.

73.     On March 15, 2018, a Valley Ridge CIT nurse "encouraged . . . [C.B.] to drink plenty of fluids."

74.     On April 4, 2018, after C.B. complained about not feeling well and could not finish vacuuming the floor without taking a rest, a Valley Ridge CIT staff member told him to drink plenty of fluids.

75.    On April 8, 2018, after she finished examining C.B., Defendant Williams instructed him to "drink plenty of water."

76.    This was disastrous medical advice for someone with pulmonary edema.

77.    Staff's repeated instruction to C.B. to drink plenty of fluids was a proximate cause of C.B.'s death.

**C.B.'s Mother's Call for Help Is Ignored**

78.    On the morning of April 8, 2018 C.B. called his mother, J.M., and complained that he was having trouble breathing and could not urinate. During the call, C.B. was in obvious distress, crying on the phone. His mom was afraid.

79.    Shortly after that call, J.M. called Valley Ridge CIT.

80.    J.M. told a staff member, Defendant Novack, that her son could not breathe.

81.    J.M. also told Novack that C.B. could not urinate.

82.    J.M. told Novack that her son needed immediate medical attention.

83.    In response, Novack apparently did nothing.

84.    Novack did not note the alarming report from J.M. that C.B. could not breathe.

85.    Novack did not note that J.M. called at all.

86.    The nursing notes from April 8, 2018 do not mention J.M.'s call.

87.    The nursing notes from April 8, 2018 do not mention C.B.'s complaints about trouble breathing.

88.    No one at Valley Ridge CIT, including Novack, did anything in response to Plaintiff's report about her son.

89.    Novack's failure to take action to help C.B. was another proximate cause of his death.

90.     No one even called J.M. back to follow-up with her.

91.     J.M. never had the chance to speak with her son again.

**Defendants Sessions and Behlan Leave C.B. Alone to Die, then Sessions Lies About It**

92.     On the night of April 8-9, 2018, Defendant Sessions was responsible for checking on C.B. every two hours, starting at 11:00 p.m.

93.     On the night of April 8-9, 2018, Behlan was assigned to be the Head of Shift.

94.     Sessions was supposed to check on C.B. at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 5:00 a.m.

95.     Sessions did not check on C.B. at 3:00 a.m. on April 9.

96.     Sessions did not check on C.B. at 5:00 a.m. on April 9.

97.     Behlan was in Valley Ridge CIT's "E" house, where C.B. lived, from 3:00 a.m. to 5:30 a.m. on April 9.

98.     Behlan did not check on C.B. between 3:00 a.m. and 5:30 a.m. on April 9 to ensure he was safe.

99.     As the Head of Shift, Behlan was responsible for ensuring that Valley Ridge CIT staff working on April 8-9, 2018 did their jobs.

100.    Behlan did not ensure that Sessions or anyone else checked on C.B. every two hours on April 9.

101.    Behlan did not ensure that Sessions or anyone else protected C.B. on the night of April 8-9, 2018.

102.    After C.B. died, Sessions falsified Valley Ridge CIT documents, writing that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

103.    On the morning of April 9, 2018, Sessions signed a sworn supporting deposition, claiming (i) she saw C.B. walking to the bathroom at 1:00 a.m. and (ii) "I do nightly checks every two hours, and check to make sure that each consumer is responsive and breathing. I checked on C.B. at 3AM and again at 5AM."

104.    These statements were lies.

105.    Later on April 9, 2018, Sessions admitted to police that she had lied.

106.    She stated, "I did not [check] C.B.'s door at 3 and 5 as I had stated," though she "was supposed to do bed checks at 11, 1, 3, and 5."

107.    In another police interview on April 11, 2018, Sessions admitted: "I falsified a document for work that said I saw C.B. up at around 1 AM."

108.    She also admitted that she *never* saw C.B. awake during her shift.

109.    Though Sessions still claimed she did bed checks at 11:00 p.m. and 1:00 a.m., she could not even "tell if C.B. was alive when [she] performed these checks."

110.    Sessions also admitted that her supervisor, OPWDD employee Jen Smith, had told her to lie to police and claim she had seen C.B. that night, when in fact she had not.

111.    Sessions eventually pleaded guilty to providing false statements.

112.    Had Sessions completed the bed checks she was required to complete on the night of April 8-9, 2018, she would have seen C.B. in increasing distress and called for assistance to save his life.

113.    Had Behlan ensured that Sessions was completing the bed checks she was required to complete on the night of April 8-9, 2018, Sessions would have seen C.B. in increasing distress and called for assistance to save his life.

114.    Sessions' failure check on C.B. on the night of April 8-9, 2018, as she was required do, proximately caused C.B.'s death.

115.    Behlan's failure to ensure that Sessions did her job by checking on C.B. on the night of April 8-9, 2018 proximately caused C.B.'s death.

**OPWDD Substantiates Three Charges of Abuse and Neglect**

116.    The New York State Justice Center for the Protection of People with Special Needs ("Justice Center") investigated C.B.'s death.

117.    The Justice Center reported that its investigation "revealed substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed [C.B.] to harm or risk of harm."

118.    The Justice Center specifically cited Valley Ridge CIT's "failures: (1) to implement a procedure to require all communications from the house to nursing be documented in the individual resident record as well as house communication log; (2) to require shift notices [to] include any signs and symptoms of individual medical complaints."

119.    The Justice Center also substantiated charges of abuse and neglect due to Sessions's failure to conduct required bed checks and the State's falsification of documents to cover up those incomplete bed checks.

**C.B. Suffered Before He Died**

120.    The pulmonary edema that C.B. experienced leading up this death was immensely painful.

121.    For a significant period of time prior to his death, C.B., while conscious, was drowning in his own fluids and struggling to catch his breath.

122.    As a result, C.B. suffered severe physical and emotional injury, pre-death terror, pain and suffering, and was deprived of his life, and the lost enjoyment of life.

## FIRST CLAIM
### 42 U.S.C. § 1983, Substantive Due Process
### (Against All Defendants)

123.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

124.    As C.B.'s custodians, responsible for his safety and well-being, Defendants had an affirmative duty to care for and protect C.B. under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

125.    The Defendants breached that duty. The Defendants' actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice and standards, were grossly negligent, and amounted to deliberate indifference to C.B.'s health and welfare.

126.    The Defendants acted with deliberate indifference to, and callous disregard for, the significant health problems that led to C.B.'s death, about which he and others complained to Defendants repeatedly.

127.    The Defendants' complete failure to respond to C.B.'s evident and excessive weight gain; their disregard for the substantial swelling in his arms and legs in the days before his death; their failure to respond to his repeated complaints of fatigue and difficulty breathing; their instructions to C.B. that he keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; their failure to check on C.B. on the night of April 8-9, 2018, as required; and all their other conduct set forth above exhibited deliberate indifference to, and callous disregard for, the safety, well-being and civil

rights of C.B., proximately causing him substantial and unnecessary physical and emotional harm, and proximately causing his death.

128.    By virtue of the foregoing, the Defendants deprived C.B. of clearly-established rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and C.B. sustained the damages hereinbefore alleged.

**SECOND CLAIM**
**Negligence**
**(Against All Defendants)**

129.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

130.    Defendants had a duty to care for C.B., diagnose his health problems, check on him during the night, prevent him from suffering, and protect his life.

131.    Defendants breached those duties by the conduct set forth above, and by failing to respond to C.B.'s evident and excessive weight gain; disregarding the substantial swelling in his arms and legs in the days before his death; failing to respond to his repeated complaints of fatigue and difficulty breathing; instructing C.B. to keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; and failing to check on C.B. on the night of April 8-9, 2018, as they were required to do.

132.    As a direct and proximate result of Defendants' breaches of their duties, C.B. sustained the damages hereinbefore alleged.

**THIRD CLAIM**
**Medical Malpractice**
**(Against Defendants Williams, McGinn, and Novack only)**

133.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

16

134.    Upon information and belief, and subject to further discovery, at all relevant times, Defendants Williams, McGinn, and Novack (the "Medical Defendants") undertook to provide medical care to residents of the Valley Ridge CIT, including C.B., and were legally obligated and had a special duty to do so effectively.

135.    Upon information and belief, and subject to further discovery, the Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and held themselves out as using reasonable care and diligence in the care and treatment of the residents of Valley Ridge CIT, including C.B.

136.    By their misconduct detailed above, the Medical Defendants acted contrary to sound medical practice and committed acts of medical malpractice against C.B.

137.    As a direct and proximate result of the Medical Defendants' negligence, C.B. endured the damages hereinbefore alleged.

138.    A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to Plaintiff's Amended Complaint.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.     Compensatory damages in an amount to be determined at trial.

B.     Punitive damages against each Defendant in an amount to be determined at trial.

C.     An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

D.     Such other and further relief as the Court may deem appropriate.

Dated: July 10, 2020
          New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

_____/s_____
Ilann M. Maazel
Samuel Shapiro
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

J.M., as Administrator of the Estate of Her Son, C.B.,

|                                                                 |                        |
|-----------------------------------------------------------------|------------------------|
|                                                *Plaintiff*,     | **ANSWER**             |
|                                                                 |                        |
|                        -against-                                | **Jury Trial Demanded**|
|                                                                 |                        |
| ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A.                   | 20-CV-00091            |
| BUELL; COREY C. BEHLAN; RAYMOND J. McGINN;                      |                        |
| KATHERINA L. CASSATA; MICHAEL NOVACK,                           | (TJM)(CFH)             |
|                                                                 |                        |
|                                              *Defendants*.      |                        |

─────────────────────────────────────

Defendants Elise M. Williams, Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack by their attorney, Letitia James, Attorney General of the State of New York, Ryan W. Hickey, Assistant Attorney General, of counsel, answer the Amended Complaint [Dkt. No. 25] ("the complaint") as follows:

1.     Admit the allegations contained in paragraph **1** of the complaint.

2.     Deny the allegations contained in paragraph **2** of the complaint.

3.     As to the allegations contained in paragraph **3** of the complaint, respectfully refer to the cited report of the New York State Justice Center for the Protection of People With Special Needs as the best evidence of what is stated and contained therein and otherwise deny the allegations to the extent they are inconsistent therewith.

4.     Deny the allegations contained in paragraph **4** of the complaint.

5.     As to the allegations contained in paragraph **5** of the complaint, the answering defendants deny any allegations of wrongdoing.

6.     Deny the allegations contained in paragraph **6** of the complaint.

7.      Deny the allegations contained in paragraph **7** of the complaint.

8.      As to the allegations contained in paragraph **8** of the complaint, admit that Plaintiff J.M. is C.B.'s mother, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

9.      As to the allegations contained in paragraph **9** of the complaint, admit that defendant Ashley Sessions was an employee of OPWDD during the time period alleged and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

10.     As to the allegations contained in paragraph **10** of the complaint, admit that defendant Elise M. Williams was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

11.     As to the allegations contained in paragraph **11** of the complaint, admit that defendant Joshua A. Buell was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

12.     As to the allegations contained in paragraph **12** of the complaint, admit that defendant Corey C. Behlan was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

13.     As to the allegations contained in paragraph **13** of the complaint, admit that defendant Raymond J. McGinn was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

14.      As to the allegations contained in paragraph **14** of the complaint, admit that defendant Katherina L. Cassata was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

15.      As to the allegations contained in paragraph **15** of the complaint, admit that defendant Michael Novack was an employee of OWPDD during the time period alleged and otherwise deny the allegations of this paragraph.

16.      As to the allegations contained in paragraph **16** of the complaint, deny that plaintiff has stated a cause of action against the answering defendants under the Fourteenth Amendment, 42 U.S.C. §§ 1983, 1988, or any other provision of federal or state law.

17.      Paragraph **17** of the complaint is a statement of jurisdiction to which no response is required.  Defendants respectfully refer all issues of law to the court.

18.      Paragraph **18** of the complaint is a statement of venue to which no response is required.  Defendants respectfully refer all issues of law to the court.

19.      Paragraph **19** of the complaint is a jury demand to which no response is required.

20.      Admit the allegations contained in paragraph **20** of the complaint.

21.      Admit the allegations contained in paragraph **21** of the complaint.

22.      Admit the allegations contained in paragraph **22** of the complaint.

23.      Admit the allegations contained in paragraph **23** of the complaint.

24.      Admit the allegations contained in paragraph **24** of the complaint.

25.      Admit the allegations contained in paragraph **25** of the complaint.

26.      Admit the allegations contained in paragraph **26** of the complaint.

27.      Admit the allegations contained in paragraph **27** of the complaint.

28.     Admit the allegations contained in paragraph **28** of the complaint.

29.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **29** of the complaint.

30.     As to the allegations contained in paragraph **30** of the complaint, admit that C.B. worked in a housekeeping job at Valley Ridge CIT, but otherwise deny the allegations of this paragraph.

31.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **31** of the complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **32** of the complaint.

33.     Admit the allegations contained in paragraph **33** of the complaint.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **34** of the complaint.

35.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **35** of the complaint.

36.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **36** of the complaint.

37.     Deny the allegations contained in paragraph **37** of the complaint.

38.     Deny the allegations contained in paragraph **38** of the complaint.

39.     Deny the allegations contained in paragraph **39** of the complaint.

40.     Deny the allegations contained in paragraph **40** of the complaint.

41.     Admit the allegations contained in paragraph **41** of the complaint.

42.     As to the allegations contained in paragraph **42** of the complaint, refer to the report of the New York State Justice Center for the Protection of People with Special Needs for the best evidence of what is stated and contained therein and deny the allegations of this paragraph to the extent they are inconsistent therewith.  The answering defendants further deny that they "ignored C.B.'s alarming weight gain and took no action."

43.     Deny the allegations contained in paragraph **43** of the complaint.

44.     As to the allegations contained in paragraph **44** of the complaint, refer to the medical examiner's report for the best evidence of what is stated and contained therein, and deny the allegations of this paragraph to the extent they are inconsistent therewith.

45.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **45** of the complaint.

46.     Deny the allegations contained in paragraph **46** of the complaint.

47.     Deny the allegations contained in paragraph **47** of the complaint.

48.     Deny the allegations contained in paragraph **48** of the complaint.

49.     Admit the allegations contained in paragraph **49** of the complaint.

50.     Deny the allegations contained in paragraph  **50** of the complaint.

51.     Deny the allegations contained in paragraph **51** of the complaint.

52.     Admit the allegations contained in paragraph **52** of the complaint.

53.     Deny the allegations contained in paragraph **53** of the complaint.

54.     Admit the allegations contained in paragraph **54** of the complaint.

55.     Deny the allegations contained in paragraph **55** of the complaint.

56.     Deny the allegations contained in paragraph **56** of the complaint.

57.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **57** of the complaint.

58.    As to the allegations contained in paragraph **58** of the complaint admit that on April 8, 2018 plaintiff requested to speak to Defendant Williams and complained of difficulty voiding and sinus congestion and otherwise deny the allegations of this paragraph.

59.    Admit the allegations contained in paragraph **59** of the complaint.

60.    As to the allegations contained in paragraph **60** of the complaint, admit that Defendant Buell was present for the medical exam of C.B. by Defendant Williams on April 8, 2018, but deny that Defendant Buell "noticed that [C.B.] was breathing fairly heavily."

61.    Admit the allegations contained in paragraph **61** of the complaint.

62.    Deny the allegations contained in paragraph **62** of the complaint.

63.    Deny the allegations contained in paragraph **63** of the complaint.

64.    As to the allegations contained in paragraph **64** of the complaint, refer to the cited nursing notes dated March 15, 2018 for the best evidence of what is stated and contained therein, and deny the allegations of this paragraph to the extent they are inconsistent therewith.

65.    Admit the allegations contained in paragraph **65** of the complaint.

66.    Deny the allegations contained in paragraph **66** of the complaint.

67.    Deny the allegations contained in paragraph **67** of the complaint.

68.    Admit the allegations contained in paragraph **68** of the complaint.

69.    Admit the allegations contained in paragraph **69** of the complaint.

70.    Deny the allegations contained in paragraph **70** of the complaint.

71.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **71** of the complaint.

72.     Deny the allegations contained in paragraph **72** of the complaint.

73.     Admit the allegations contained in paragraph **73** of the complaint.

74.     Admit the allegations contained in paragraph **74** of the complaint.

75.     Admit the allegations contained in paragraph **75** of the complaint.

76.     Deny the allegations contained in paragraph **76** of the complaint.

77.     Deny the allegations contained in paragraph **77** of the complaint.

78.     As to the allegations contained in paragraph **78** of the complaint, admit that C.B. spoke to J.M. on the phone on April 8, 2018 and indicated to her that he was not feeling well, but deny knowledge or information sufficient to form a belief as to the truth of the allegations that "C.B. was in obvious distress, crying on the phone," of that "His mom was afraid."

79.     As to the allegations contained in paragraph **79** of the complaint, admit that J.M. spoke to Defendant Novack on April 8, 2018.

80.     As to the allegations contained in paragraph **80** of the complaint, admit that J.M. told Defendant Novack that C.B. had told her that he was not feeling well on April 8, 2018.

81.     Deny the allegations contained in paragraph **81** of the complaint.

82.     Deny the allegations contained in paragraph **82** of the complaint.

83.     Deny the allegations contained in paragraph **83** of the complaint.

84.     Deny the allegations contained in paragraph **84** of the complaint.

85.     Deny the allegations contained in paragraph **85** of the complaint.

86.    As to the allegations contained in paragraph **86** of the complaint, refer to the cited nursing notes for the best evidence of what is stated and contained therein, and deny the allegations of this paragraph to the extent they are inconsistent therewith.

87.    As to the allegations contained in paragraph **87** of the complaint, refer to the cited nursing notes for the best evidence of what is stated and contained therein, and deny the allegations of this paragraph to the extent they are inconsistent therewith.

88.    Deny the allegations contained in paragraph **88** of the complaint.

89.    Deny the allegations contained in paragraph **89** of the complaint.

90.    Deny the allegations contained in paragraph **90** of the complaint.

91.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **91** of the complaint.

92.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **92** of the complaint.

93.    Admit the allegations contained in paragraph **93** of the complaint.

94.    Admit the allegations contained in paragraph **94** of the complaint.

95.    As to the allegations contained in paragraph **95** of the complaint, the answering defendants deny that they were aware that Defendant Sessions was not performing bed checks as she was assigned on April 9, 2018.

96.    As to the allegations contained in paragraph **96** of the complaint, the answering defendants deny that they were aware that Defendant Sessions was not performing bed checks as she was assigned on April 9, 2018.

97.    Admit the allegations contained in paragraph **97** of the complaint.

8

98.    Deny the allegations contained in paragraph **98** of the complaint.

99.    Deny the allegations contained in paragraph **99** of the complaint.

100.    Deny the allegations contained in paragraph **100** of the complaint.

101.    Deny the allegations contained in paragraph **101** of the complaint.

102.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **102** of the complaint.

103.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **103** of the complaint.

104.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **104** of the complaint.

105.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **105** of the complaint.

106.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **106** of the complaint.

107.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **107** of the complaint.

108.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **108** of the complaint.

109.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **109** of the complaint.

110.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **110** of the complaint.

111.    Admit the allegations contained in paragraph **111** of the complaint.

112.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **112** of the complaint.

113.    Deny the allegations contained in paragraph **113** of the complaint.

114.    Deny the allegations contained in paragraph **114** of the complaint.

115.    Deny the allegations contained in paragraph **115** of the complaint.

116.    Admit the allegations contained in paragraph **116** of the complaint.

117.    As to the allegations contained in paragraph **117** of the complaint, refer to the report of the New York State Justice Center for the Protection of People with Special Needs for the best evidence of what is stated and contained therein and deny the allegations of this paragraph to the extent they are inconsistent therewith.

118.    As to the allegations contained in paragraph **118** of the complaint, refer to the report of the New York State Justice Center for the Protection of People with Special Needs for the best evidence of what is stated and contained therein and deny the allegations of this paragraph to the extent they are inconsistent therewith.

119.    As to the allegations contained in paragraph **119** of the complaint, refer to the report of the New York State Justice Center for the Protection of People with Special Needs for the best evidence of what is stated and contained therein and deny the allegations of this paragraph to the extent they are inconsistent therewith.

120.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **120** of the complaint.

10

121.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph **121** of the complaint.

122.    Deny the allegations contained in paragraph **122** of the complaint.

123.    As to the allegations contained in paragraph **123** of the complaint, the answering defendants repeat all prior responses.

124.    Deny the allegations contained in paragraph **124** of the complaint.

125.    Deny the allegations contained in paragraph **125** of the complaint.

126.    Deny the allegations contained in paragraph **126** of the complaint.

127.    Deny the allegations contained in paragraph **127** of the complaint.

128.    Deny the allegations contained in paragraph **128** of the complaint.

129.     As to the allegations contained in paragraph **129** of the complaint, the answering defendants repeat all prior responses.

130.    Deny the allegations contained in paragraph **130** of the complaint.

131.    Deny the allegations contained in paragraph **131** of the complaint.

132.    Deny the allegations contained in paragraph **132** of the complaint.

133.    As to the allegations contained in paragraph **133** of the complaint, the answering defendants repeat all prior responses.

134.    Deny the allegations contained in paragraph **134** of the complaint.

135.    Deny the allegations contained in paragraph **135** of the complaint.

136.    Deny the allegations contained in paragraph **136** of the complaint.

137.    Deny the allegations contained in paragraph **137** of the complaint.

138.    Paragraph **138** states that a certificate of merit pursuant to CPLR 3012-a has been attached the complaint, which does not require a response.

139.    Deny that plaintiff is entitled to any of the relief sought in the "WHEREFORE" paragraph of the complaint, or to any other form of relief in this action.

140.    Deny any allegation of the complaint not specifically responded to above.

<u>**DEFENSES**</u>

141.    The complaint fails to state a claim upon which relief can be granted.

142.    The Court lacks jurisdiction over plaintiff's causes of action for negligence, medical malpractice, and any claims arising under state law.

143.    The doctrine of *respondeat superior* does not apply in actions brought under 42 U.S.C. § 1983, and any claim that a defendant should be held liable under a theory of supervisory liability must be dismissed.

144.    At all relevant times the answering defendants acted under the reasonable belief that their conduct was in accordance with clearly established law.  They are, therefore, protected under the doctrine of qualified immunity.

145.    The answering defendants hereby demand a trial by jury.

Dated:  Albany, New York
       September 21, 2020

                        LETITIA JAMES
                        Attorney General of the State of New York
                        *Attorney for Defendants Elise M. Williams, Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack*
                        The Capitol
                        Albany, New York 12224

                        By: *s/ Ryan W. Hickey*
                        Ryan W. Hickey
                        Assistant Attorney General, of Counsel
                        Bar Roll No.  519020
                        Telephone: (518) 776-2616
                        Email: Ryan.Hickey@ag.ny.gov

TO:     Counsel of record (*Via ECF*)

13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

  J.M., as Administrator of the Estate of Her Son, C.B.,

                    Plaintiff,          **ANSWER TO AMENDED COMPLAINT**

          -against-

                                1:20-CV-91 (TJM/CFH)

ASHLEY SESSIONS; ELISA M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLAN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK

                    Defendants.
_____

      Defendant Ashley Sessions, by and through her attorneys, Capezza Hill, LLP, answer the Amended Complaint [Dkt. No. 25] ("the Complaint") as follows:

1. Defendant Sessions admits the allegations contained in Paragraph 1 of the Complaint.

2. Defendant Sessions denies the statements and allegations contained in paragraph 2 of the Plaintiff's Complaint.

3. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 of the Plaintiff's Complaint.

4. Defendant Sessions denies the statements and allegations contained in paragraph 4 of the Plaintiff's Complaint.

5. Defendant Sessions denies the statements and allegations contained in paragraph 5 of the Plaintiff's Complaint.

6. Defendant Sessions denies the statements and allegations contained in paragraph 6 of the Plaintiff's Complaint.

7.   Defendant Sessions denies the statements and allegations contained in paragraph 7 of the Plaintiff's Complaint.

8.   Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 of the Plaintiff's Complaint.

9.   Defendant Sessions admits that she was an OPWDD employee, that she was working on the overnight shift on April 8-9, 2018, and denies all remaining accusations and refers all questions of law to the Court.

10.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Plaintiff's Complaint.

11.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Plaintiff's Complaint.

12.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Plaintiff's Complaint.

13.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Plaintiff's Complaint.

14.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Plaintiff's Complaint.

15.  Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Plaintiff's Complaint.

16.  Statements and allegations contained in paragraph 16 do not require a response as they state a legal conclusion.

17.  Statements and allegation contained in paragraph 17 do not require a response as they state a legal conclusion.

18. Statements and allegation contained in paragraph 18 do not require a response as they state a legal conclusion.

19. Statements and allegation contained in paragraph 3 do not require a response as they are a jury demand.

20. Defendant Sessions admits the allegations contained in paragraph 20 of the Complaint.

21. Defendant Sessions admits the allegations contained in paragraph 21 of the Complaint.

22. Defendant Sessions admits the allegations contained in paragraph 22 of the Complaint.

23. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Plaintiff's Complaint.

24. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Plaintiff's Complaint.

25. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 of the Plaintiff's Complaint.

26. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26 of the Plaintiff's Complaint.

27. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Plaintiff's Complaint.

28. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28 of the Plaintiff's Complaint.

29. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Plaintiff's Complaint.

30. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 of the Plaintiff's Complaint.

31. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Plaintiff's Complaint.

32. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of the Plaintiff's Complaint.

33. Defendant Sessions admits the allegations contained in paragraph 33 of the Complaint.

34. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Plaintiff's Complaint.

35. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 of the Plaintiff's Complaint.

36. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Plaintiff's Complaint.

37. Defendant Sessions denies the statements and allegations contained in paragraph 37 of the Plaintiff's Complaint.

38. Defendant Sessions denies the statements and allegations contained in paragraph 38 of the Plaintiff's Complaint.

39. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Plaintiff's Complaint and denies all wrongdoing.

40. Defendant Sessions denies the statements and allegations contained in paragraph 40 of the Plaintiff's Complaint.

41. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of the Plaintiff's Complaint.

42. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 of the Plaintiff's Complaint and denies all wrongdoing.

43. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 of the Plaintiff's Complaint and denies all wrongdoing.

44. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44 of the Plaintiff's Complaint and denies all wrongdoing.

45. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 of the Plaintiff's Complaint and denies all wrongdoing.

46. Defendant Sessions denies the statements and allegations contained in paragraph 46 of the Plaintiff's Complaint.

47. Defendant Sessions denies the statements and allegations contained in paragraph 47 of the Plaintiff's Complaint.

48. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Plaintiff's Complaint and denies all wrongdoing.

49. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 49 of the Plaintiff's Complaint and denies all wrongdoing.

50. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of the Plaintiff's Complaint and denies all wrongdoing.

51. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Plaintiff's Complaint and denies all wrongdoing.

52. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 of the Plaintiff's Complaint and denies all wrongdoing.

53. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 of the Plaintiff's Complaint and denies all wrongdoing.

54. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the Plaintiff's Complaint and denies all wrongdoing.

55. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 55 of the Plaintiff's Complaint and denies all wrongdoing.

56. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Plaintiff's Complaint and denies all wrongdoing.

57. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Plaintiff's Complaint and denies all wrongdoing.

58. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Plaintiff's Complaint and denies all wrongdoing.

59. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Plaintiff's Complaint and denies all wrongdoing.

60. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60 of the Plaintiff's Complaint and denies all wrongdoing.

61. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 of the Plaintiff's Complaint and denies all wrongdoing.

62. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 of the Plaintiff's Complaint and denies all wrongdoing.

63. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63 of the Plaintiff's Complaint and denies all wrongdoing.

64. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64 of the Plaintiff's Complaint and denies all wrongdoing.

65. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Plaintiff's Complaint and denies all wrongdoing.

66. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 66 of the Plaintiff's Complaint and denies all wrongdoing.

67. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Plaintiff's Complaint and denies all wrongdoing.

68. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 68 of the Plaintiff's Complaint and denies all wrongdoing.

69. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 69 of the Plaintiff's Complaint and denies all wrongdoing.

70. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Plaintiff's Complaint and denies all wrongdoing.

71. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Plaintiff's Complaint and denies all wrongdoing.

72. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 72 of the Plaintiff's Complaint and denies all wrongdoing.

73. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 73 of the Plaintiff's Complaint and denies all wrongdoing.

74. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 74 of the Plaintiff's Complaint and denies all wrongdoing.

75. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 75 of the Plaintiff's Complaint and denies all wrongdoing.

76. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76 of the Plaintiff's Complaint and denies all wrongdoing.

77. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77 of the Plaintiff's Complaint and denies all wrongdoing.

78. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78 of the Plaintiff's Complaint and denies all wrongdoing.

79. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 79 of the Plaintiff's Complaint and denies all wrongdoing.

80. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Plaintiff's Complaint and denies all wrongdoing.

81. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 81 of the Plaintiff's Complaint and denies all wrongdoing.

82. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 82 of the Plaintiff's Complaint and denies all wrongdoing.

83. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 of the Plaintiff's Complaint and denies all wrongdoing.

84. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 84 of the Plaintiff's Complaint and denies all wrongdoing.

85. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 85 of the Plaintiff's Complaint and denies all wrongdoing.

86. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 86 of the Plaintiff's Complaint and denies all wrongdoing.

87. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 87 of the Plaintiff's Complaint and denies all wrongdoing.

88. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 of the Plaintiff's Complaint and denies all wrongdoing.

89. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 89 of the Plaintiff's Complaint and denies all wrongdoing.

90. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 90 of the Plaintiff's Complaint and denies all wrongdoing.

91. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 91 of the Plaintiff's Complaint and denies all wrongdoing.

92. Defendant Sessions admits the allegations contained in paragraph 92 of the Complaint.

93. Defendant Sessions admits the allegations contained in paragraph 93 of the Complaint.

94. Defendant Sessions admits the allegations contained in paragraph 94 of the Complaint.

95. Defendant Sessions admits the allegations contained in paragraph 95 of the Complaint.

96. Defendant Sessions admits the allegations contained in paragraph 96 of the Complaint.

97. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 of the Plaintiff's Complaint and denies all wrongdoing.

98. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 of the Plaintiff's Complaint and denies all wrongdoing.

99. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 of the Plaintiff's Complaint and denies all wrongdoing and refers all questions of law to the Court.

100. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 100 of the Plaintiff's Complaint and denies all wrongdoing.

101. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 of the Plaintiff's Complaint and denies all wrongdoing.

102. With respect to the allegations in paragraph 102 of the Complaint, Defendant Sessions admits that she indicated that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

103. With respect to the allegations in paragraph 103 of the Complaint, Defendant Sessions refers to the alleged sworn deposition referenced therein, which speaks for itself.

104. With respect to the allegations in paragraph 104 of the Complaint, Defendant Sessions admits that she did not check on C.B. at 3:00 a.m. and 5:00 a.m. and denies all other accusations and characterizations.

105. With respect to the allegations in paragraph 105 of the Complaint, Defendant Sessions admits that she corrected a prior statement that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

106. With respect to the allegations in paragraph 106 of the Complaint, Defendant Sessions admits that she made the statements similar or to the effect of those referenced therein.

107. With respect to the allegations in paragraph 107 of the Complaint, Defendant Sessions admits that she made the statements similar to or to the effect of those referenced therein.

108. With respect to the allegations in paragraph 108 of the Complaint, Defendant Sessions admits that she made the statements similar to or to the effect of those referenced therein.

109. With respect to the allegations in paragraph 109 of the Complaint, Defendant Sessions admits that she made the statements similar to or to the effect of those referenced therein and denies all other characterizations.

110. With respect to the allegations in paragraph 110 of the Complaint, Defendant Sessions admits that Jen Smith told her to indicate that she checked on C.B. in her paperwork.

111. With respect to the allegations in paragraph 111 of the Complaint, Defendant Sessions admits that she pleaded guilty to a minor offense and refers to the judgment of conviction as the best evidence of same.

112. Defendant Sessions denies the allegations contained in paragraph 112 of the Complaint.

113. Defendant Sessions denies the allegations contained in paragraph 113 of the Complaint.

114. Defendant Sessions denies the allegations contained in paragraph 114 of the Complaint.

115. Defendant Sessions denies the allegations contained in paragraph 115 of the Complaint.

116. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 116 of the Plaintiff's Complaint.

117. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 117 of the Plaintiff's Complaint.

118. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 118 of the Plaintiff's Complaint.

119. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 119 of the Plaintiff's Complaint.

120. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 120 of the Plaintiff's Complaint.

121. Defendant Sessions lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 121 of the Plaintiff's Complaint.

122. Defendant Sessions denies the allegations contained in paragraph 122 of the Complaint.

123. With respect to paragraph 123 of the Complaint, Defendant Sessions repeats all prior responses.

124. Defendant Sessions denies the allegations contained in paragraph 124 of the Complaint.

125. Defendant Sessions denies the allegations contained in paragraph 125 of the Complaint.

126. Defendant Sessions denies the allegations contained in paragraph 126 of the Complaint.

127. Defendant Sessions denies the allegations contained in paragraph 127 of the Complaint.

128. Defendant Sessions denies the allegations contained in paragraph 128 of the Complaint.

129. With respect to paragraph 129 of the Complaint, Defendant Sessions repeats all prior responses.

130. Defendant Sessions denies the allegations contained in paragraph 130 of the Complaint.

131. Defendant Sessions denies the allegations contained in paragraph 131 of the Complaint.

132. Defendant Sessions denies the allegations contained in paragraph 132 of the Complaint.

133. With respect to paragraph 133 of the Complaint, Defendant Sessions repeats all prior responses.

134. With respect to paragraph 134 of the Complaint, no response from Defendant Sessions is required.

135. With respect to paragraph 135 of the Complaint, no response from Defendant Sessions is required.

136. With respect to paragraph 136 of the Complaint, no response from Defendant Sessions is required.

137. With respect to paragraph 137 of the Complaint, no response from Defendant Sessions is required.

138. With respect to paragraph 138 of the Complaint, no response from Defendant Sessions is required.

139. Defendant Sessions denies that Plaintiff is entitled to any relief sought in the "WHEREFORE" clause.

140. Defendant Sessions denies any allegation of the complaint not specifically responded to above.

## AFFIRMATIVE DEFENSES

### AS AND FOR DEFENDANT'S FIRST AFFIRMATIVE DEFENSE

141. The Complaint fails to state a claim and/or cause of actions upon which relief can be granted.

## AS AND FOR DEFENDANT'S SECOND AFFIRMATIVE DEFENSE

142. Plaintiff has failed to exhaust necessary administrative remedies.

## AS AND FOR DEFENDANT'S THIRD AFFIRMATIVE DEFENSE

143. Plaintiff has failed to establish personal jurisdiction over Defendant Sessions.

## AS AND FOR DEFENDANT'S FOURTH  AFFIRMATIVE DEFENSE

144. The Complaint is barred, in whole or in part, under the Eleventh Amendment.

## AS AND FOR DEFENDANT'S FIFTH  AFFIRMATIVE DEFENSE

145. The Complaint is barred, in whole or in part, by the applicable Statute of Limitations.

## AS AND FOR DEFENDANT'S SIXTH AFFIRMATIVE DEFENSE

146. During all relevant times herein, Defendant Sessions acted under the reasonable belief that her conduct was in accordance with clearly established law.  She is, therefore, protected under the doctrine of qualified immunity.

## AS AND FOR DEFENDANT'S SEVENTH  AFFIRMATIVE DEFENSE

147. Defendant Sessions at no time acted willfully or maliciously in disregard of Plaintiff's constitutional rights.  Plaintiff therefore is not entitled to punitive damages or other relief against him.

## AS AND FOR DEFENDANT'S EIGHTH AFFIRMATIVE DEFENSE

148. No act or omission on the part of Defendant Sessions was the proximate cause of any injury suffered by any plaintiff.

**AS AND FOR DEFENDANT'S NINTH AFFIRMATIVE DEFENSE**

149. Any injuries suffered by any plaintiff resulted from the negligence, fault, duty, or want of care of other individuals, for whom Defendant Sessions is not responsible.

**AS AND FOR DEFENDANT'S TENTH AFFIRMATIVE DEFENSE**

150. Plaintiff failed to mitigate her damages.

**AS AND FOR DEFENDANT'S ELEVENTH  AFFIRMATIVE DEFENSE**

151. To the extent plaintiffs fail to state a claim under 42 USC § 1983 for alleged constitutional violations, or alleged violations of federal law, the Court should not exercise pendant jurisdiction over State or municipal law claims.

**AS AND FOR DEFENDANT'S TWELVTH AFFIRMATIVE DEFENSE**

152. Plaintiff lacks standing to bring this action.

**AS AND FOR DEFENDANT'S THIRTEENTH AFFIRMATIVE DEFENSE**

153. Defendant Sessions' actions were within the scope of her employment; therefore, she cannot be held individually liable.

**AS AND FOR DEFENDANT'S FOURTEENTH AFFIRMATIVE DEFENSE**

154. Plaintiff's claims are barred under the doctrine of primary jurisdiction.

**AS AND FOR DEFENDANT'S FIFTEENTH AFFIRMATIVE DEFENSE**

155. Plaintiff's claims are barred under the Rooker-Feldman doctrine.

**AS AND FOR DEFENDANT'S SIXTEENTH AFFIRMATIVE DEFENSE**

156. Plaintiff's claims, in whole or in part, are barred by the doctrine of res judicada and

collateral estoppel.

**WHEREFORE**, Defendant Sessions respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety, award defendant Sessions attorneys fees and costs, and grant such other and further relief as the Court deems just and proper.

DATED: November 20, 2020                     **CAPEZZA HILL, LLP**

**BENJAMIN W. HILL**
Bar Roll #514953
Attorneys for Defendant Ashley Sessions
30 South Pearl Street, P-110
Albany, New York 12207
Telephone No: 518-478-6065
Facsimile No.: 518-407-5661

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

J.M., as Administrator of the Estate of Her Son,
C.B.,

                          Plaintiff,

          -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                          Defendants.

---

20 Civ. 00091 (TJM)(CFH)

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend the Complaint and the Declaration of Samuel Shapiro, dated March 30, 2022, and the exhibits attached thereto, Plaintiff J.M. by her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, will move this Court, before the Honorable Christian F. Hummel in the Northern District of New York, 445 Broadway, Albany, New York 12207, at a date and time to be set at the convenience of the Court, for an Order, pursuant to Federal Rule of Civil Procedure 15(a)(2), granting Plaintiff leave to amend her complaint, and for such other and further relief as the Court deems just and proper.

1

**PLEASE TAKE FURTHER NOTICE THAT**, by Order of Judge Hummel any

response to this motion is due by April 22, 2022.


Dated: March 30, 2022
        New York, NY


                                    EMERY CELLI BRINCKERHOFF
                                    ABADY WARD & MAAZEL LLP


                                    By: _____/s/ Samuel Shapiro_____
                                        Ilann M. Maazel
                                        Samuel Shapiro

                                     600 Fifth Avenue, 10th Floor
                                    New York, New York 10020
                                    (212) 763-5000

                                    *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., | 20 Civ. 00091 (TJM)(CFH) |
| Plaintiff(s), | |
| -against- | |
| ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, | |
| Defendant(s). | |

### DECLARATION OF SAMUEL SHAPIRO

SAMUEL SHAPIRO, an attorney duly admitted to practice before this Court and the courts of the State of New York, declares under penalty of perjury:

1.    I am a partner in the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP, counsel to Plaintiff in this action. I submit this Declaration in support of Plaintiff's motion for leave to amend her complaint.

2.    Annexed hereto as Exhibit A is a true and correct copy of the Proposed Second Amended Complaint.

3.    Annexed hereto as Exhibit B is a true and correct copy of the Proposed Second Amended Complaint showing the changes between the First Amended Complaint and the Proposed Second Amended Complaint.

4.    Annexed hereto as Exhibit C is a true and correct copy of excerpts of the deposition of Katherina Cassata, taken on February 8, 2022.

5.      Annexed hereto as Exhibit D is a true and correct copy of excerpts of the deposition of Anita Baral, taken on February 8, 2022.

6.      Annexed hereto as Exhibit E is a true and correct copy of Defendants' Elise M. Williams, Joshua A. Buell, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata and Michael Novack Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1), dated September 23, 2020.

7.      I declare under the penalty of perjury that the foregoing is true and correct.


Dated: March 30, 2022
        New York, New York


                                        _____/s/_____
                                        SAMUEL SHAPIRO

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., <br><br> Plaintiff, <br><br> -against- <br><br> ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK; ANITA BARAL, <br><br> Defendants. | 20 Civ. 00091 (TJM)(CFH) <br><br> **SECOND AMENDED COMPLAINT & JURY DEMAND** |

**AN UNNECESSARY AND TRAGIC DEATH IN A NEW YORK STATE GROUP HOME**

1.      C.B. died on April 9, 2018 in his room at the Valley Ridge Center for Intensive Treatment ("Valley Ridge CIT"), a group home for developmentally disabled individuals that is run by New York State.

2.      C.B. died of heart failure at the age of thirty-four. Prior to his death, there were open and obvious signs that his heart had been failing—complaints by C.B. and his mother, objective medical evidence—but Defendants, all staff members at Valley Ridge CIT, ignored them.

3.      This case involves, in the words of the New York State Justice Center for the Protection of People With Special Needs, "substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed C.B. to harm or risk of harm."

4.      C.B.'s tragic death should never have happened. With basic care, C.B.'s heart condition would have been discovered and treated, and he would be alive today. But Defendants,

failed to help C.B. They did nothing when, the day before his death, he complained of trouble

breathing and his mother called to say C.B. was having trouble breathing. They failed to notice

or treat C.B.'s substantial edema. They failed to inquire why C.B. had gained 50 pounds in a

year, over 20 of those pounds in the last four months before his death, and they failed to address

that alarming weight gain.

5.     The night of C.B.'s death, staff including Defendant Ashley Sessions failed to

conduct required bed checks that would have saved his life. Staff then tried to cover up that

failure to the police. Sessions pled guilty to the crime of filing a false statement and lying—

twice—to the police.

6.     As a result of these failures, C.B. was left helpless in his room, his heart failing.

He died alone in his bed, slowly asphyxiating on fluid in his lungs.

7.     Valley Ridge CIT staff failed to do their most basic job: keeping a disabled

resident in their custody safe. Now they must be held accountable.

## **PARTIES**

8.     Plaintiff J.M. is a United States citizen; she currently resides in Glens Falls, New

York. Plaintiff is C.B.'s mother and the Administratrix of his estate.

9.     At all relevant times, Defendant Ashley Sessions was an employee of the New

York State Office for People with Developmental Disabilities ("OPWDD"), an agency of the

State of New York, acting in the capacity of agent, servant, and employee of the State of New

York, and within the scope of her employment as such, and under color of law. Sessions was

working the overnight shift at the Valley Ridge Center for Intensive Treatment ("Valley Ridge

CIT") on April 8-9, 2018. Sessions was required to check on C.B. every two hours during her

overnight shift on April 8-9, 2018, which she failed to do. Sessions is sued in her individual

capacity.

10.     At all relevant times, Defendant Elise M. Williams was an employee of OPWDD,

an agency of the State of New York, acting in the capacity of agent, servant, and employee of the

State of New York, and within the scope of her employment as such, and under color of law.

Williams is the nurse who examined C.B. on April 8, 2018 at the Valley Ridge CIT, and who

failed to do anything to address the clear signs that C.B. was in distress.  Williams is sued in her

individual capacity.

11.     At all relevant times, Defendant Joshua A. Buell was an employee of OPWDD, an

agency of the State of New York, acting in the capacity of agent, servant, and employee of the

State of New York, and within the scope of his employment as such, and under color of law.

Buell was the Valley Ridge CIT Head of Shift on April 8, 2018. He was physically present when

Williams examined C.B. on April 8, 2018, and like Williams, he too failed to do anything to

address the clear signs that C.B. was in distress. Buell is sued in his individual capacity.

12.     At all relevant times, Defendant Corey C. Behlen was an employee of OPWDD,

an agency of the State of New York, acting in the capacity of agent, servant, and employee of the

State of New York, and within the scope of his employment as such, and under color of law.

Behlen was the Valley Ridge CIT Head of Shift on the overnight shift of April 8-9, 2018. Behlen

is sued in his individual capacity.

13.     At all relevant times, Defendant Raymond J. McGinn was an employee of

OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and

employee of the State of New York, and within the scope of his employment as such, and under

color of law. In April 2018, McGinn was the Valley Ridge CIT employee responsible for

3

monitoring "acute and chronic medical problems," "medications," and seeing "individuals at the clinic for acute illnesses as well as admission history and complete annual physicals." McGinn is sued in his individual capacity.

14.     At all relevant times, Defendant Katherina L. Cassata was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such. In April 2018, Cassata was a Valley Ridge CIT staff member. On April 4, 2018, Cassata heard C.B. state, "I don't feel good, I can't breathe," and observed that C.B. could not finish vacuuming without taking a break. Cassata did not document any of C.B.'s behavior on April 4, 2018. Cassata is sued in her individual capacity.

15.     At all relevant times, Defendant Michael Novack was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such. Novack was the Approved Medication Administration Person working at the Valley Ridge CIT on April 8, 2018 and assigned to "E" house. On April 8, 2018, C.B.'s mother told Novack that C.B. could not breathe and needed medical attention. Novack did not report or memorialize his conversation with C.B.'s mother. Novack is sued in his individual capacity.

16.     At all relevant times, Defendant Anita Baral was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such, and under color of law. Baral was a nurse at the Valley Ridge CIT in March and April 2018. She failed to respond to reports that C.B. could not breathe, was having chest pains, and was having trouble completing household chores. Baral is sued in her individual capacity.

**JURISDICTION AND VENUE**

17.     This action arises under the Fourteenth Amendment to the United States

Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

18.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3),

1367(a), and the doctrine of supplemental jurisdiction.

19.     The acts complained of occurred in the Northern District of New York and venue

is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

**JURY DEMAND**

20.     Plaintiff demands trial by jury in this action.

**FACTUAL ALLEGATIONS**

**The Valley Ridge CIT**

21.     The Valley Ridge CIT is a 14-acre campus located in Norwich, NY operated by

New York State through OPWDD.

22.     The Valley Ridge CIT is a highly structured active treatment and facilitative

residential program within a secure setting.

23.     The Valley Ridge CIT provides services to approximately 43 individuals. Each

individual has their own bedroom with key card access entry.

**C.B.**

24.     C.B. was born in 1983.

25.     C.B. was a disabled individual. He was diagnosed with mild mental retardation,

among other disabilities.

26.     When C.B. was 10 years old, he was hit by a car and suffered a head injury.

27.     At age 18, C.B. was placed in the care of OPWDD at Broome Developmental Center.

28.     In 2015, C.B. moved to Valley Ridge CIT.

29.     Unlike many other residents at Valley Ridge CIT, C.B. was not sent there as part of a criminal conviction.

30.     Staff at Valley Ridge CIT reported that C.B. was social and loved interacting with staff and peers.

31.     C.B. worked a janitorial job at Valley Ridge CIT and was a punctual, diligent worker.

32.     C.B. loved music and singing. He discussed his goal to live in a less restrictive setting than Valley Ridge CIT.

33.     C.B. has a loving family, including his mother and siblings.

**C.B.'s Premature Death**

34.     C.B. died on April 9, 2018 at approximately 5 a.m. at Valley Ridge CIT. He was thirty-four years old.

35.     C.B.'s death was caused by either an idiopathic or viral cardiomyopathy.

36.     C.B. was in heart failure at the time of his death.

37.     On the night he died, C.B. was in pulmonary edema—*i.e.*, he had fluid in his lungs.

**Defendants Ignore the Significant Health Concerns that Led to C.B.'s Death**

38.     Defendants' deliberate indifference to C.B.'s health proximately caused his premature death.

6

39.    The heart failure that ultimately killed C.B. began 3-4 months before his death. During those months, New York State employees at Valley Ridge CIT ignored (i) C.B.'s extreme weight gain, (ii) significant swelling on C.B.'s arms and legs, (iii) C.B.'s fatigue, (iv) C.B.'s difficulties breathing and chest pains, and (v) C.B.'s difficulties using the bathroom.

40.    Rapid weight gain, edema/swelling, difficulty breathing, and difficulty voiding (*i.e.*, going to the bathroom) are all telltale signs of pulmonary edema. C.B. displayed all of these symptoms over the final month of his life. Defendants ignored them.

***Weight Gain***

41.    Defendants ignored C.B.'s significant weight gain during his time at the Valley Ridge CIT.

42.    In June 2015, just after his arrival at the Valley Ridge CIT, C.B. weighed 238 pounds. Less than three years later, when he died in April 2018, he weighed 294 pounds. C.B. gained ten pounds in just the final month of his life.

43.    OPWDD's Justice Center noted that "there was little in the record to explain or rectify [C.B.'s] significant weight gain over the course of several years prior to his death at the [Valley Ridge] CIT." The Justice Center explained that "further evaluation of his weight gain and whether [C.B.] demonstrated symptoms consistent with Metabolic Syndrome or some other medical condition should have been identified and addressed by [Valley Ridge] CIT medical staff." *Id.* But OPWDD staff, including Defendants, ignored C.B.'s alarming weight gain and took no action.

44.    Defendant McGinn in particular was responsible for monitoring C.B.'s "acute and chronic medical problems." But he recklessly ignored C.B.'s chronic weight gain and the significant heart issues that it portended.

*Swelling*

45.     The medical examiner reported that C.B.'s arms and legs showed "2+ pitting edema bilaterally" at the time of his death. Pitting edema means that, when a finger is pressed into the skin, an indentation remains. On the edema scale of 0 to 2+, 2+ reflects serious edema.

46.     Pitting edema is a clear sign of heart failure.

47.     The enormous amount of fluid in C.B.'s extremities was obvious to the naked eye.

48.     For days and even weeks prior to his death, OPWDD staff, including Defendants, failed to treat or even note the significant swelling in C.B.'s arms and legs.

49.     Defendant McGinn, who was responsible for monitoring C.B.'s "acute and chronic medical problems," was aware, or should have been aware, of the swelling in C.B.'s arms and legs.

50.     On April 8, 2018, the day before his death, C.B. was seen by Defendant Williams, a Valley Ridge CIT nurse. Defendant Buell, the Head of Shift at Valley Ridge CIT on April 8, 2018, was also present for the exam.

51.     Upon information and belief, Williams and Buell saw the significant swelling in C.B.'s arms and legs.

52.     Neither Williams nor Buell recorded or addressed the massive swelling in C.B.'s arms and legs.

*"I Can't Breathe" & Chest Pains*

53.     On April 4, 2018, just four days before C.B.'s death, Defendant Cassata observed that C.B. "could not complete vacuuming" without stopping to rest. C.B. told Cassata: "I don't feel good. I can't breathe."

8

54.     This was a cry for help, and strong evidence of a serious—even potentially life-threatening—medical issue.

55.     Cassata did not document C.B.'s breathing troubles on April 4, 2018.

56.     Upon information and belief, properly documenting medical complaints of Valley Ridge CIT residents is critical to ensuring the residents receive necessary medical care.

57.     Upon information and belief, Cassata did not take sufficient action to address or report the medical issue that was causing C.B.'s breathing problems.

58.     Defendant Baral was a nurse on duty at the Valley Ridge CIT on April 4, 2018 when C.B. told Cassata that he "can't breathe" and when Cassata observed that C.B. "could not complete vacuuming" without stopping to rest.

59.     Cassata claims she told Baral that C.B. reported to her (Cassata) that he "can't breathe" and that she observed that C.B. "could not complete vacuuming" without stopping to rest.

60.     No document exists reflecting Cassata's alleged report to Baral on April 4, 2018.

61.     Baral provided no medical care or treatment to C.B. on April 4, 2018.

62.     Baral did not examine C.B.'s lungs on April 4, 2018.

63.     Baral did not examine C.B.'s heart on April 4, 2018.

64.     Baral did not ask C.B. on April 4, 2018 how long he had been having trouble breathing.

65.     On April 6, 2018, C.B. again told Cassata that he was having trouble breathing.

66.     On April 6, 2018 C.B. told Cassata he was having chest pains.

67.     On April 6, 2018, C.B. was out of breath.

9

68.     On April 6, 2018, C.B. could not stand and vacuum; he had to sit in a chair to finish his vacuuming.

69.     On April 6, 2018, C.B. was sweating, was clammy to the touch, and looked physically sick.

70.     Baral was a nurse on duty at the Valley Ridge CIT on April 6, 2018.

71.     Cassata claims that she told Baral on April 6, 2018 that C.B. reported having trouble breathing and having chest pains.

72.     Cassata claims that she told Baral on April 6, 2018 that she (Cassata) observed C.B. having trouble completing vacuuming.

73.     Cassata claims that C.B. told Baral on April 6, 2018 that he could not breathe.

74.     No document exists reflecting Cassata's alleged report to Baral on April 6, 2018.

75.     Baral did not perform any medical examination on C.B. on April 6, 2018.

76.     Baral did not examine C.B.'s lungs on April 6, 2018.

77.     Baral did not examine C.B.'s heart on April 6, 2018.

78.     Baral did not ask C.B. on April 6, 2018 how long he had been having trouble breathing.

79.     Instead, on April 6, 2018, Baral—whose job was to respond to C.B.'s acute medical needs—simply put her hand on C.B.'s shoulder and told him he'd be ok.

80.     Another Valley Ridge CIT staff member confirmed that C.B.'s "breathing had been a little erratic" in the "last few weeks" before he died.

81.     On April 8, 2018, C.B. again complained to Valley Ridge CIT staff, including Defendant Novack, that he could not breathe.

82.     On April 8, Defendant Williams noticed that when C.B. arrived at the clinic, "he was breathing fairly heavily."

83.     Defendant Buell was present at the clinic with C.B. on April 8 and, upon information and belief, noticed that he was breathing fairly heavily.

84.     Defendant Behlen was also aware that C.B. "usually gets up a lot at night complaining of heart burn."

85.     None of these Defendants (Williams, Buell, Behlen, Baral, or Novack) took any action to address C.B.'s breathing difficulties. None sought medical intervention. Had these Defendants taken even minimal action, they would have uncovered the significant health problems of which C.B.'s breathing difficulties were a symptom. Their failure was a proximate cause of C.B.'s death.

***Fatigue***

86.     C.B. had been exhibiting signs of fatigue for nearly a month before he died.

87.     Nursing notes from March 15, 2018 indicate that C.B. "seem[ed] tired, 'not with it.'"

88.     Defendant McGinn, who was responsible for monitoring "acute and chronic medical problems," was aware that C.B. had made "some complaints" to his psychiatrist about being tired.

89.     McGinn did nothing to address C.B.'s fatigue or diagnose the serious health issues of which his fatigue was a clear symptom.

90.     McGinn's failure to address C.B.'s repeated complaints of fatigue was another proximate cause of C.B.'s death.

***Difficulty Voiding***

11

91.     On April 8, 2018, C.B. complained to Defendant Williams that he was having "difficulty voiding."

92.     Upon information and belief, Defendant Buell, who was present at the clinic with C.B. on April 8, heard C.B.'s complaint about having difficulty voiding.

93.     Defendant Williams examined C.B. on April 8, 2018, but did nothing to provide C.B. relief and ignored the obvious likelihood that his voiding problems—coupled with his breathing troubles, his fatigue, his swelling, and his weight gain—were symptomatic of more serious health concerns. Williams' failure to take any action to help C.B. was another proximate cause of C.B.'s death.

**Defendants Exacerbate the Health Issues that Led to C.B.'s Death**

94.     On at least three occasions, Valley Ridge CIT staff responded to C.B.'s health complaints by telling him to drink more fluids.

95.     Drinking fluids increases the likelihood of death in people suffering from pulmonary edema.

96.     On March 15, 2018, a Valley Ridge CIT nurse "encouraged . . . [C.B.] to drink plenty of fluids."

97.     On April 4, 2018, after C.B. complained to Defendant Cassata that he could not breathe and could not finish vacuuming the floor, Defendant Baral told him to drink water.

98.     On April 6, 2018, after C.B. after C.B. complained about not being able to breathe and could not finish vacuuming the floor without taking a rest, Defendant Baral told him to drink water.

99.     On April 8, 2018, after she finished examining C.B., Defendant Williams instructed him to "drink plenty of water."

100.     This was disastrous medical advice for someone with pulmonary edema.

101.     Staff's repeated instruction to C.B. to drink plenty of fluids was a proximate cause of C.B.'s death.

**C.B.'s Mother's Call for Help Is Ignored**

102.     On the morning of April 8, 2018 C.B. called his mother, J.M., and complained that he was having trouble breathing and could not urinate. During the call, C.B. was in obvious distress, crying on the phone. His mom was afraid.

103.     Shortly after that call, J.M. called Valley Ridge CIT.

104.     J.M. told a staff member, Defendant Novack, that her son could not breathe.

105.     J.M. also told Novack that C.B. could not urinate.

106.     J.M. told Novack that her son needed immediate medical attention.

107.     In response, Novack apparently did nothing.

108.     Novack did not note the alarming report from J.M. that C.B. could not breathe.

109.     Novack did not note that J.M. called at all.

110.     The nursing notes from April 8, 2018 do not mention J.M.'s call.

111.     The nursing notes from April 8, 2018 do not mention C.B.'s complaints about trouble breathing.

112.     No one at Valley Ridge CIT, including Novack, did anything in response to Plaintiff's report about her son.

113.     Novack's failure to take action to help C.B. was another proximate cause of his death.

114.     No one even called J.M. back to follow-up with her.

115.     J.M. never had the chance to speak with her son again.

13

**Defendants Sessions and Behlen Leave C.B. Alone to Die, then Sessions Lies About It**

116.     On the night of April 8-9, 2018, Defendant Sessions was responsible for checking on C.B. every two hours, starting at 11:00 p.m.

117.     On the night of April 8-9, 2018, Behlen was assigned to be the Head of Shift.

118.     Sessions was supposed to check on C.B. at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 5:00 a.m.

119.     Sessions did not check on C.B. at 3:00 a.m. on April 9.

120.     Sessions did not check on C.B. at 5:00 a.m. on April 9.

121.     Behlen was in Valley Ridge CIT's "E" house, where C.B. lived, from 3:00 a.m. to 5:30 a.m. on April 9.

122.     Behlen did not check on C.B. between 3:00 a.m. and 5:30 a.m. on April 9 to ensure he was safe.

123.     As the Head of Shift, Behlen was responsible for ensuring that Valley Ridge CIT staff working on April 8-9, 2018 did their jobs.

124.     Behlen did not ensure that Sessions or anyone else checked on C.B. every two hours on April 9.

125.     Behlen did not ensure that Sessions or anyone else protected C.B. on the night of April 8-9, 2018.

126.     After C.B. died, Sessions falsified Valley Ridge CIT documents, writing that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

127.     On the morning of April 9, 2018, Sessions signed a sworn supporting deposition, claiming (i) she saw C.B. walking to the bathroom at 1:00 a.m. and (ii) "I do nightly checks

every two hours, and check to make sure that each consumer is responsive and breathing. I checked on C.B. at 3AM and again at 5AM."

128.   These statements were lies.

129.   Later on April 9, 2018, Sessions admitted to police that she had lied.

130.   She stated, "I did not [check] C.B.'s door at 3 and 5 as I had stated," though she "was supposed to do bed checks at 11, 1, 3, and 5."

131.   In another police interview on April 11, 2018, Sessions admitted: "I falsified a document for work that said I saw C.B. up at around 1 AM."

132.   She also admitted that she *never* saw C.B. awake during her shift.

133.   Though Sessions still claimed she did bed checks at 11:00 p.m. and 1:00 a.m., she could not even "tell if C.B. was alive when [she] performed these checks."

134.   Sessions also admitted that her supervisor, OPWDD employee Jen Smith, had told her to lie to police and claim she had seen C.B. that night, when in fact she had not.

135.   Sessions eventually pleaded guilty to providing false statements.

136.   Had Sessions completed the bed checks she was required to complete on the night of April 8-9, 2018, she would have seen C.B. in increasing distress and called for assistance to save his life.

137.   Had Behlen ensured that Sessions was completing the bed checks she was required to complete on the night of April 8-9, 2018, Sessions would have seen C.B. in increasing distress and called for assistance to save his life.

138.   Sessions' failure check on C.B. on the night of April 8-9, 2018, as she required do, proximately caused C.B.'s death.

15

139.    Behlen's failure to ensure that Sessions did her job by checking on C.B. on the night of April 8-9, 2018 proximately caused C.B.'s death.

**OPWDD Substantiates Three Charges of Abuse and Neglect**

140.    The New York State Justice Center for the Protection of People with Special Needs ("Justice Center") investigated C.B.'s death.

141.    The Justice Center reported that its investigation "revealed substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed [C.B.] to harm or risk of harm."

142.    The Justice Center specifically cited Valley Ridge CIT's "failures: (1) to implement a procedure to require all communications from the house to nursing be documented in the individual resident record as well as house communication log; (2) to require shift notices [to] include any signs and symptoms of individual medical complaints."

143.    The Justice Center also substantiated charges of abuse and neglect due to Sessions's failure to conduct required bed checks and the State's falsification of documents to cover up those incomplete bed checks.

**C.B. Suffered Before He Died**

144.    The pulmonary edema that C.B. experienced leading up this death was immensely painful.

145.    For a significant period of time prior to his death, C.B., while conscious, was drowning in his own fluids and struggling to catch his breath.

146.    As a result, C.B. suffered severe physical and emotional injury, pre-death terror, pain and suffering, and was deprived of his life, and the lost enjoyment of life.

**FIRST CLAIM**
**42 U.S.C. § 1983, Substantive Due Process**
**(Against All Defendants)**

147.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

148.    As C.B.'s custodians, responsible for his safety and well-being, Defendants had an affirmative duty to care for and protect C.B. under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

149.    The Defendants breached that duty. The Defendants' actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice and standards, were grossly negligent, and amounted to deliberate indifference to C.B.'s health and welfare.

150.    The Defendants acted with deliberate indifference to, and callous disregard for, the significant health problems that led to C.B.'s death, about which he and others complained to Defendants repeatedly.

151.    The Defendants' complete failure to respond to C.B.'s evident and excessive weight gain; their disregard for the substantial swelling in his arms and legs in the days before his death; their failure to respond to his repeated complaints of fatigue and difficulty breathing; their instructions to C.B. that he keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; their failure to check on C.B. on the night of April 8-9, 2018, as required; and all their other conduct set forth above exhibited deliberate indifference to, and callous disregard for, the safety, well-being and civil rights of C.B., proximately causing him substantial and unnecessary physical and emotional harm, and proximately causing his death.

17

152.     By virtue of the foregoing, the Defendants deprived C.B. of clearly-established rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and C.B. sustained the damages hereinbefore alleged.

## SECOND CLAIM
**Negligence**
**(Against All Defendants)**

153.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

154.     Defendants had a duty to care for C.B., diagnose his health problems, check on him during the night, prevent him from suffering, and protect his life.

155.     Defendants breached those duties by the conduct set forth above, and by failing to respond to C.B.'s evident and excessive weight gain; disregarding the substantial swelling in his arms and legs in the days before his death; failing to respond to his repeated complaints of fatigue and difficulty breathing; instructing C.B. to keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; and failing to check on C.B. on the night of April 8-9, 2018, as they were required to do.

156.     As a direct and proximate result of Defendants' breaches of their duties, C.B. sustained the damages hereinbefore alleged.

## THIRD CLAIM
**Medical Malpractice**
**(Against Defendants Williams, McGinn, and Baral only)**

157.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

158.     Upon information and belief, and subject to further discovery, at all relevant times, Defendants Williams, McGinn, and Baral (the "Medical Defendants") undertook to

# JA115

provide medical care to residents of the Valley Ridge CIT, including C.B., and were legally obligated and had a special duty to do so effectively.

159.    Upon information and belief, and subject to further discovery, the Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and held themselves out as using reasonable care and diligence in the care and treatment of the residents of Valley Ridge CIT, including C.B.

160.    By their misconduct detailed above, the Medical Defendants acted contrary to sound medical practice and committed acts of medical malpractice against C.B.

161.    As a direct and proximate result of the Medical Defendants' negligence, C.B. endured the damages hereinbefore alleged.

162.    A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to Plaintiff's Second Amended Complaint.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.  Compensatory damages in an amount to be determined at trial.

B.  Punitive damages against each Defendant in an amount to be determined at trial.

C.  An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

D.  Such other and further relief as the Court may deem appropriate.

Dated: March __, 2022
       New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____
        Ilann M. Maazel
        Samuel Shapiro

 600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

20

# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., <br><br> Plaintiff, <br><br> -against- <br><br> ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLAEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK; ANITA BARAL, <br><br> Defendants. | 20 Civ. 00091 (TJM)(CFH) <br><br> **SECOND AMENDED COMPLAINT & JURY DEMAND** |

**AN UNNECESSARY AND TRAGIC DEATH IN A NEW YORK STATE GROUP HOME**

1.      C.B. died on April 9, 2018 in his room at the Valley Ridge Center for Intensive Treatment ("Valley Ridge CIT"), a group home for developmentally disabled individuals that is run by New York State.

2.      C.B. died of heart failure at the age of thirty-four. Prior to his death, there were open and obvious signs that his heart had been failing—complaints by C.B. and his mother, objective medical evidence—but Defendants, all staff members at Valley Ridge CIT, ignored them.

3.      This case involves, in the words of the New York State Justice Center for the Protection of People With Special Needs, "substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed C.B. to harm or risk of harm."

4.      C.B.'s tragic death should never have happened. With basic care, C.B.'s heart condition would have been discovered and treated, and he would be alive today. But Defendants,

failed to help C.B. They did nothing when, the day before his death, he complained of trouble

breathing and his mother called to say C.B. was having trouble breathing. They failed to notice

or treat C.B.'s substantial edema. They failed to inquire why C.B. had gained 50 pounds in a

year, over 20 of those pounds in the last four months before his death, and they failed to address

that alarming weight gain.

5.      The night of C.B.'s death, staff including Defendant Ashley Sessions failed to

conduct required bed checks that would have saved his life. Staff then tried to cover up that

failure to the police. Sessions pled guilty to the crime of filing a false statement and lying—

twice—to the police.

6.      As a result of these failures, C.B. was left helpless in his room, his heart failing.

He died alone in his bed, slowly asphyxiating on fluid in his lungs.

7.      Valley Ridge CIT staff failed to do their most basic job: keeping a disabled

resident in their custody safe. Now they must be held accountable.

**PARTIES**

8.      Plaintiff J.M. is a United States citizen; she currently resides in Glens Falls, New

York. Plaintiff is C.B.'s mother and the Administratrix of his estate.

9.      At all relevant times, Defendant Ashley Sessions was an employee of the New

York State Office for People with Developmental Disabilities ("OPWDD"), an agency of the

State of New York, acting in the capacity of agent, servant, and employee of the State of New

York, and within the scope of her employment as such, and under color of law. Sessions was

working the overnight shift at the Valley Ridge Center for Intensive Treatment ("Valley Ridge

CIT") on April 8-9, 2018. Sessions was required to check on C.B. every two hours during her

# JA120

overnight shift on April 8-9, 2018, which she failed to do. Sessions is sued in her individual capacity.

      10.    At all relevant times, Defendant Elise M. Williams was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such, and under color of law. Williams is the nurse who examined C.B. on April 8, 2018 at the Valley Ridge CIT, and who failed to do anything to address the clear signs that C.B. was in distress.  Williams is sued in his/her individual capacity.

      11.    At all relevant times, Defendant Joshua A. Buell was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. Buell was the Valley Ridge CIT Head of Shift on April 8, 2018. He was physically present when Williams examined C.B. on April 8, 2018, and like Williams, he too failed to do anything to address the clear signs that C.B. was in distress. Buell is sued in his individual capacity.

      12.    At all relevant times, Defendant Corey C. Behlaen was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. BehlanBehlen was the Valley Ridge CIT Head of Shift on the overnight shift of April 8-9, 2018. BehlanBehlen is sued in his individual capacity.

      13.    At all relevant times, Defendant Raymond J. McGinn was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such, and under color of law. In April 2018, McGinn was the Valley Ridge CIT employee responsible for

monitoring "acute and chronic medical problems," "medications," and seeing "individuals at the clinic for acute illnesses as well as admission history and complete annual physicals." McGinn is sued in his individual capacity.

14.     At all relevant times, Defendant Katherina L. Cassata was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such. In April 2018, Cassata was a Valley Ridge CIT staff member. On April 4, 2018, Cassata heard C.B. state, "I don't feel good, I can't breathe," and observed that C.B. could not finish vacuuming without taking a break. Cassata did not document any of C.B.'s behavior on April 4, 2018. Cassata is sued in her individual capacity.

15.     At all relevant times, Defendant Michael Novack was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of his employment as such. Novack was the Approved Medication Administration Person working at the Valley Ridge CIT on April 8, 2018 and assigned to "E" house. On April 8, 2018, C.B.'s mother told Novack that C.B. could not breathe and needed medical attention. Novack did not report or memorialize his conversation with C.B.'s mother. Novack is sued in his individual capacity.

15.16.  At all relevant times, Defendant Anita Baral was an employee of OPWDD, an agency of the State of New York, acting in the capacity of agent, servant, and employee of the State of New York, and within the scope of her employment as such, and under color of law. Baral was a nurse at the Valley Ridge CIT in March and April 2018. She failed to respond to reports that C.B. could not breathe, was having chest pains, and was having trouble completing household chores. Baral is sued in her individual capacity.

4

### JURISDICTION AND VENUE

16.17.   This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

17.18.   The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and the doctrine of supplemental jurisdiction.

18.19.   The acts complained of occurred in the Northern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

### JURY DEMAND

19.20.   Plaintiff demands trial by jury in this action.

### FACTUAL ALLEGATIONS

**The Valley Ridge CIT**

20.21.   The Valley Ridge CIT is a 14-acre campus located in Norwich, NY operated by New York State through OPWDD.

21.22.   The Valley Ridge CIT is a highly structured active treatment and facilitative residential program within a secure setting.

22.23.   The Valley Ridge CIT provides services to approximately 43 individuals. Each individual has their own bedroom with key card access entry.

**C.B.**

23.24.   C.B. was born in 1983.

24.25.   C.B. was a disabled individual. He was diagnosed with mild mental retardation, among other disabilities.

25.26.   When C.B. was 10 years old, he was hit by a car and suffered a head injury.

26.27.  At age 18, C.B. was placed in the care of OPWDD at Broome Developmental Center.

27.28.  In 2015, C.B. moved to Valley Ridge CIT.

28.29.  Unlike many other residents at Valley Ridge CIT, C.B. was not sent there as part of a criminal conviction.

29.30.  Staff at Valley Ridge CIT reported that C.B. was social and loved interacting with staff and peers.

30.31.  C.B. worked a janitorial job at Valley Ridge CIT and was a punctual, diligent worker.

31.32.  C.B. loved music and singing. He discussed his goal to live in a less restrictive setting than Valley Ridge CIT.

32.33.  C.B. has a loving family, including his mother and siblings.

**C.B.'s Premature Death**

33.34.  C.B. died on April 9, 2018 at approximately 5 a.m. at Valley Ridge CIT. He was thirty-four years old.

34.35.  C.B.'s death was caused by either an idiopathic or viral cardiomyopathy.

35.36.  C.B. was in heart failure at the time of his death.

36.37.  On the night he died, C.B. was in pulmonary edema—*i.e.*, he had fluid in his lungs.

**Defendants Ignore the Significant Health Concerns that Led to C.B.'s Death**

37.38.  Defendants' deliberate indifference to C.B.'s health proximately caused his premature death.

38.39.  The heart failure that ultimately killed C.B. began 3-4 months before his death. During those months, New York State employees at Valley Ridge CIT ignored (i) C.B.'s extreme weight gain, (ii) significant swelling on C.B.'s arms and legs, (iii) C.B.'s fatigue, (iv) C.B.'s difficulties breathing and chest pains, and (v) C.B.'s difficulties using the bathroom.

39.40.  Rapid weight gain, edema/swelling, difficulty breathing, and difficulty voiding (*i.e.*, going to the bathroom) are all telltale signs of pulmonary edema. C.B. displayed all of these symptoms over the final month of his life. Defendants ignored them.

***Weight Gain***

40.41.  Defendants ignored C.B.'s significant weight gain during his time at the Valley Ridge CIT.

41.42.  In June 2015, just after his arrival at the Valley Ridge CIT, C.B. weighed 238 pounds. Less than three years later, when he died in April 2018, he weighed 294 pounds. C.B. gained ten pounds in just the final month of his life.

42.43.  OPWDD's Justice Center noted that "there was little in the record to explain or rectify [C.B.'s] significant weight gain over the course of several years prior to his death at the [Valley Ridge] CIT." The Justice Center explained that "further evaluation of his weight gain and whether [C.B.] demonstrated symptoms consistent with Metabolic Syndrome or some other medical condition should have been identified and addressed by [Valley Ridge] CIT medical staff." *Id.* But OPWDD staff, including Defendants, ignored C.B.'s alarming weight gain and took no action.

43.44.  Defendant McGinn in particular was responsible for monitoring C.B.'s "acute and chronic medical problems." But he recklessly ignored C.B.'s chronic weight gain and the significant heart issues that it portended.

7

*Swelling*

44.45.  The medical examiner reported that C.B.'s arms and legs showed "2+ pitting edema bilaterally" at the time of his death. Pitting edema means that, when a finger is pressed into the skin, an indentation remains. On the edema scale of 0 to 2+, 2+ reflects serious edema.

45.46.  Pitting edema is a clear sign of heart failure.

46.47.  The enormous amount of fluid in C.B.'s extremities was obvious to the naked eye.

47.48.  For days and even weeks prior to his death, OPWDD staff, including Defendants, failed to treat or even note the significant swelling in C.B.'s arms and legs.

48.49.  Defendant McGinn, who was responsible for monitoring C.B.'s "acute and chronic medical problems," was aware, or should have been aware, of the swelling in C.B.'s arms and legs.

49.50.  On April 8, 2018, the day before his death, C.B. was seen by Defendant Williams, a Valley Ridge CIT nurse. Defendant Buell, the Head of Shift at Valley Ridge CIT on April 8, 2018, was also present for the exam.

50.51.  Upon information and belief, Williams and Buell saw the significant swelling in C.B.'s arms and legs.

51.52.  Neither Williams nor Buell recorded or addressed the massive swelling in C.B.'s arms and legs.

*"I Can't Breathe" & Chest Pains*

52.53.  On April 4, 2018, just four days before C.B.'s death, Defendant Cassata observed that C.B. "could not complete vacuuming" without stopping to rest. C.B. told Cassata: "I don't feel good. I can't breathe."

8

53.54.  This was a cry for help, and strong evidence of a serious—even potentially life-threatening—medical issue.

54.55.  Cassata did not document C.B.'s breathing troubles on April 4, 2018.

55.56.  Upon information and belief, properly documenting medical complaints of Valley Ridge CIT residents is critical to ensuring the residents receive necessary medical care.

57.     Upon information and belief, Cassata did not take sufficient action to address or report the medical issue that was causing C.B.'s breathing problems.

58.     Defendant Baral was a nurse on duty at the Valley Ridge CIT on April 4, 2018 when C.B. told Cassata that he "can't breathe" and when Cassata observed that C.B. "could not complete vacuuming" without stopping to rest.

59.     Cassata claims she told Baral that C.B. reported to her (Cassata) that he "can't breathe" and that she observed that C.B. "could not complete vacuuming" without stopping to rest.

60.     No document exists reflecting Cassata's alleged report to Baral on April 4, 2018.

61.     Baral provided no medical care or treatment to C.B. on April 4, 2018.

62.     Baral did not examine C.B.'s lungs on April 4, 2018.

63.     Baral did not examine C.B.'s heart on April 4, 2018.

64.     Baral did not ask C.B. on April 4, 2018 how long he had been having trouble breathing.

65.     On April 6, 2018, C.B. again told Cassata that he was having trouble breathing.

66.     On April 6, 2018 C.B. told Cassata he was having chest pains.

67.     On April 6, 2018, C.B. was out of breath.

68.    On April 6, 2018, C.B. could not stand and vacuum; he had to sit in a chair to finish his vacuuming.

69.    On April 6, 2018, C.B. was sweating, was clammy to the touch, and looked physically sick.

70.    Baral was a nurse on duty at the Valley Ridge CIT on April 6, 2018.

71.    Cassata claims that she told Baral on April 6, 2018 that C.B. reported having trouble breathing and having chest pains.

72.    Cassata claims that she told Baral on April 6, 2018 that she (Cassata) observed C.B. having trouble completing vacuuming.

73.    Cassata claims that C.B. told Baral on April 6, 2018 that he could not breathe.

74.    No document exists reflecting Cassata's alleged report to Baral on April 6, 2018.

75.    Baral did not perform any medical examination on C.B. on April 6, 2018.

76.    Baral did not examine C.B.'s lungs on April 6, 2018.

77.    Baral did not examine C.B.'s heart on April 6, 2018.

78.    Baral did not ask C.B. on April 6, 2018 how long he had been having trouble breathing.

56.79.  Instead, on April 6, 2018, Baral—whose job was to respond to C.B.'s acute medical needs—simply put her hand on C.B.'s shoulder and told him he'd be ok.

57.80.  Another Valley Ridge CIT staff member noticed confirmed that C.B.'s "breathing had been a little erratic" in the "last few weeks" before he died.

58.81.  On April 8, 2018, C.B. again complained to Valley Ridge CIT staff, including Defendant Novack, that he could not breathe.

59.82.  On April 8, Defendant Williams noticed that when C.B. arrived at the clinic, "he was breathing fairly heavily."

60.83.  Defendant Buell was present at the clinic with C.B. on April 8 and, upon information and belief, noticed that he was breathing fairly heavily.

61.84.  Defendant Behlan Behlen was also aware that C.B. "usually gets up a lot at night complaining of heart burn."

62.85.  None of these Defendants (Williams, Buell, or Behlean, Baral, or Novack) took any action to address C.B.'s breathing difficulties. None sought medical intervention. Had these Defendants taken even minimal action, they would have uncovered the significant health problems of which C.B.'s breathing difficulties were a symptom. Their failure was a proximate cause of C.B.'s death.

***Fatigue***

63.86.  C.B. had been exhibiting signs of fatigue for nearly a month before he died.

64.87.  Nursing notes from March 15, 2018 indicate that C.B. "seem[ed] tired, 'not with it.'"

65.88.  Defendant McGinn, who was responsible for monitoring "acute and chronic medical problems," was aware that C.B. had made "some complaints" to his psychiatrist about being tired.

66.89.  McGinn did nothing to address C.B.'s fatigue or diagnose the serious health issues of which his fatigue was a clear symptom.

67.90.  McGinn's failure to address C.B.'s repeated complaints of fatigue was another proximate cause of C.B.'s death.

***Difficulty Voiding***

68.91.  On April 8, 2018, C.B. complained to Defendant Williams that he was having "difficulty voiding."

69.92.  Upon information and belief, Defendant Buell, who was present at the clinic with C.B. on April 8, heard C.B.'s complaint about having difficulty voiding.

70.93.  Defendant Williams examined C.B. on April 8, 2018, but did nothing to provide C.B. relief and ignored the obvious likelihood that his voiding problems—coupled with his breathing troubles, his fatigue, his swelling, and his weight gain—were symptomatic of more serious health concerns. Williams' failure to take any action to help C.B. was another proximate cause of C.B.'s death.

**Defendants Exacerbate the Health Issues that Led to C.B.'s Death**

71.94.  On at least three occasions, Valley Ridge CIT staff responded to C.B.'s health complaints by telling him to drink more fluids.

72.95.  Drinking fluids increases the likelihood of death in people suffering from pulmonary edema.

73.96.  On March 15, 2018, a Valley Ridge CIT nurse "encouraged . . . [C.B.] to drink plenty of fluids."

97.     On April 4, 2018, after C.B. complained to Defendant Cassata that he could not about not feeling wellbreathe and could not finish vacuuming the floor without taking a rest, a Valley Ridge CIT staff memberDefendant Baral told him to drink plenty of fluidswater.

74.98.  On April 6, 2018, after C.B. after C.B. complained about not being able to breathe and could not finish vacuuming the floor without taking a rest, Defendant Baral told him to drink water.

75.99.  On April 8, 2018, after she finished examining C.B., Defendant Williams instructed him to "drink plenty of water."

76.100.	This was disastrous medical advice for someone with pulmonary edema.

77.101.	Staff's repeated instruction to C.B. to drink plenty of fluids was a proximate cause of C.B.'s death.

**C.B.'s Mother's Call for Help Is Ignored**

78.102.	On the morning of April 8, 2018 C.B. called his mother, J.M., and complained that he was having trouble breathing and could not urinate. During the call, C.B. was in obvious distress, crying on the phone. His mom was afraid.

79.103.	Shortly after that call, J.M. called Valley Ridge CIT.

80.104.	J.M. told a staff member, Defendant Novack, that her son could not breathe.

81.105.	J.M. also told Novack that C.B. could not urinate.

82.106.	J.M. told Novack that her son needed immediate medical attention.

83.107.	In response, Novack apparently did nothing.

84.108.	Novack did not note the alarming report from J.M. that C.B. could not breathe.

85.109.	Novack did not note that J.M. called at all.

86.110.	The nursing notes from April 8, 2018 do not mention J.M.'s call.

87.111.	The nursing notes from April 8, 2018 do not mention C.B.'s complaints about trouble breathing.

88.112.	No one at Valley Ridge CIT, including Novack, did anything in response to Plaintiff's report about her son.

13

89.113.        Novack's failure to take action to help C.B. was another proximate cause of his death.

90.114.        No one even called J.M. back to follow-up with her.

91.115.        J.M. never had the chance to speak with her son again.

**Defendants Sessions and ~~Behlan~~Behlen Leave C.B. Alone to Die, then Sessions Lies About It**

92.116.        On the night of April 8-9, 2018, Defendant Sessions was responsible for checking on C.B. every two hours, starting at 11:00 p.m.

93.117.        On the night of April 8-9, 2018, ~~Behlan~~Behlen was assigned to be the Head of Shift.

94.118.        Sessions was supposed to check on C.B. at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 5:00 a.m.

95.119.        Sessions did not check on C.B. at 3:00 a.m. on April 9.

96.120.        Sessions did not check on C.B. at 5:00 a.m. on April 9.

97.121.        ~~Behlan~~Behlen was in Valley Ridge CIT's "E" house, where C.B. lived, from 3:00 a.m. to 5:30 a.m. on April 9.

98.122.        ~~Behlan~~Behlen did not check on C.B. between 3:00 a.m. and 5:30 a.m. on April 9 to ensure he was safe.

99.123.        As the Head of Shift, ~~Behlan~~Behlen was responsible for ensuring that Valley Ridge CIT staff working on April 8-9, 2018 did their jobs.

100.124.        ~~Behlan~~Behlen did not ensure that Sessions or anyone else checked on C.B. every two hours on April 9.

101.125.       Behlan̶Behlen did not ensure that Sessions or anyone else protected C.B. on the night of April 8-9, 2018.

102.126.       After C.B. died, Sessions falsified Valley Ridge CIT documents, writing that she had checked on C.B. at 3:00 a.m. and 5:00 a.m.

103.127.       On the morning of April 9, 2018, Sessions signed a sworn supporting deposition, claiming (i) she saw C.B. walking to the bathroom at 1:00 a.m. and (ii) "I do nightly checks every two hours, and check to make sure that each consumer is responsive and breathing. I checked on C.B. at 3AM and again at 5AM."

104.128.       These statements were lies.

105.129.       Later on April 9, 2018, Sessions admitted to police that she had lied.

106.130.       She stated, "I did not [check] C.B.'s door at 3 and 5 as I had stated," though she "was supposed to do bed checks at 11, 1, 3, and 5."

107.131.       In another police interview on April 11, 2018, Sessions admitted: "I falsified a document for work that said I saw C.B. up at around 1 AM."

108.132.       She also admitted that she *never* saw C.B. awake during her shift.

109.133.       Though Sessions still claimed she did bed checks at 11:00 p.m. and 1:00 a.m., she could not even "tell if C.B. was alive when [she] performed these checks."

110.134.       Sessions also admitted that her supervisor, OPWDD employee Jen Smith, had told her to lie to police and claim she had seen C.B. that night, when in fact she had not.

111.135.       Sessions eventually pleaded guilty to providing false statements.

112.136.       Had Sessions completed the bed checks she was required to complete on the night of April 8-9, 2018, she would have seen C.B. in increasing distress and called for assistance to save his life.

113.137.    Had ~~Behlan~~Behlen ensured that Sessions was completing the bed checks she was required to complete on the night of April 8-9, 2018, Sessions would have seen C.B. in increasing distress and called for assistance to save his life.

114.138.    Sessions' failure check on C.B. on the night of April 8-9, 2018, as she was required do, proximately caused C.B.'s death.

115.139.    ~~Behlan~~Behlen's failure to ensure that Sessions did her job by checking on C.B. on the night of April 8-9, 2018 proximately caused C.B.'s death.

**OPWDD Substantiates Three Charges of Abuse and Neglect**

116.140.    The New York State Justice Center for the Protection of People with Special Needs ("Justice Center") investigated C.B.'s death.

117.141.    The Justice Center reported that its investigation "revealed substantial systemic problems, including inadequate management, training, and supervision at the facility that exposed [C.B.] to harm or risk of harm."

118.142.    The Justice Center specifically cited Valley Ridge CIT's "failures: (1) to implement a procedure to require all communications from the house to nursing be documented in the individual resident record as well as house communication log; (2) to require shift notices [to] include any signs and symptoms of individual medical complaints."

119.143.    The Justice Center also substantiated charges of abuse and neglect due to Sessions's failure to conduct required bed checks and the State's falsification of documents to cover up those incomplete bed checks.

**C.B. Suffered Before He Died**

120.144.    The pulmonary edema that C.B. experienced leading up this death was immensely painful.

121.145.      For a significant period of time prior to his death, C.B., while conscious, was drowning in his own fluids and struggling to catch his breath.

122.146.      As a result, C.B. suffered severe physical and emotional injury, pre-death terror, pain and suffering, and was deprived of his life, and the lost enjoyment of life.

## FIRST CLAIM
### 42 U.S.C. § 1983, Substantive Due Process
### (Against All Defendants)

123.147.      Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

124.148.      As C.B.'s custodians, responsible for his safety and well-being, Defendants had an affirmative duty to care for and protect C.B. under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

125.149.      The Defendants breached that duty. The Defendants' actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice and standards, were grossly negligent, and amounted to deliberate indifference to C.B.'s health and welfare.

126.150.      The Defendants acted with deliberate indifference to, and callous disregard for, the significant health problems that led to C.B.'s death, about which he and others complained to Defendants repeatedly.

127.151.      The Defendants' complete failure to respond to C.B.'s evident and excessive weight gain; their disregard for the substantial swelling in his arms and legs in the days before his death; their failure to respond to his repeated complaints of fatigue and difficulty breathing; their instructions to C.B. that he keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; their failure to

17

check on C.B. on the night of April 8-9, 2018, as required; and all their other conduct set forth above exhibited deliberate indifference to, and callous disregard for, the safety, well-being and civil rights of C.B., proximately causing him substantial and unnecessary physical and emotional harm, and proximately causing his death.

128.152.        By virtue of the foregoing, the Defendants deprived C.B. of clearly-established rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and C.B. sustained the damages hereinbefore alleged.

### SECOND CLAIM
**Negligence**
**(Against All Defendants)**

129.153.        Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

130.154.        Defendants had a duty to care for C.B., diagnose his health problems, check on him during the night, prevent him from suffering, and protect his life.

131.155.        Defendants breached those duties by the conduct set forth above, and by failing to respond to C.B.'s evident and excessive weight gain; disregarding the substantial swelling in his arms and legs in the days before his death; failing to respond to his repeated complaints of fatigue and difficulty breathing; instructing C.B. to keep drinking fluids despite the fact that drinking fluids increases the risk of death in people suffering from pulmonary edema; and failing to check on C.B. on the night of April 8-9, 2018, as they were required to do.

132.156.        As a direct and proximate result of Defendants' breaches of their duties, C.B. sustained the damages hereinbefore alleged.

### THIRD CLAIM
**Medical Malpractice**
**(Against Defendants Williams, McGinn, and Novack Baral only)**

18

133.157.      Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

134.158.      Upon information and belief, and subject to further discovery, at all relevant times, Defendants Williams, McGinn, and Novack Baral (the "Medical Defendants") undertook to provide medical care to residents of the Valley Ridge CIT, including C.B., and were legally obligated and had a special duty to do so effectively.

135.159.      Upon information and belief, and subject to further discovery, the Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and held themselves out as using reasonable care and diligence in the care and treatment of the residents of Valley Ridge CIT, including C.B.

136.160.      By their misconduct detailed above, the Medical Defendants acted contrary to sound medical practice and committed acts of medical malpractice against C.B.

137.161.      As a direct and proximate result of the Medical Defendants' negligence, C.B. endured the damages hereinbefore alleged.

138.162.      A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to Plaintiff's Second Amended Complaint.

19

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.     Compensatory damages in an amount to be determined at trial.

B.     Punitive damages against each Defendant in an amount to be determined at trial.

C.     An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

D.     Such other and further relief as the Court may deem appropriate.

Dated: ~~July 10, 2020~~March ___, 2022
          New York, New York

                                                       EMERY CELLI BRINCKERHOFF
                                                       ABADY WARD & MAAZEL LLP


                                                       _____
                                                             Ilann M. Maazel
                                                             Samuel Shapiro

                                                        600 Fifth Avenue, 10th Floor
                                                       New York, New York 10020
                                                       (212) 763-5000

                                                       *Attorneys for Plaintiff*

# Exhibit C

# JA139

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------x
J.M., as Administrator of the Estate
of Her Son, C.B.,

          Plaintiff,

      -against-     No.
                20 Civ. 00091
ASHLEY SESSIONS, ELISE M. WILLIAMS,    (TJM)(CFH)
JOSHUA A. BUELL, CORY C. BEHLAN,
RAYMOND J. McGINN, KATHERINA L.
CASSATA and MICHAEL NOVACK,
          Defendants.
------------------------------------x
         February 8, 2022
         2:09 p.m.

     Remote Deposition of KATHERINA CASSATA,
taken by Plaintiff, pursuant to Notice, held via
Zoom before Joseph R. Danyo, a Shorthand Reporter
and Notary Public within and for the State of
New York.

HUDSON COURT REPORTING & VIDEO (212) 273-9911

## Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4    EMERY CELLI BRINKERHOFF ABADY WARD & MAAZEL LLP
        Attorneys for Plaintiff
 5      600 Fifth Avenue
        10th Floor
 6      New York, New York 10020
 7    By:  SAM SHAPIRO, ESQ.
        sshapiro@ecbawm.com
 8
 9
10    CAPEZZA HILL LLP
        Attorneys for Defendant Ashley Sessions
11      30 S. Pearl Street
        Suite P-110
11      Albany, New York 12207
12
      By:  BENJAMIN HILL, ESQ.
13      ben@capezzahill.com
14
15    NEW YORK STATE ATTORNEY GENERAL - ALBANY
        Attorneys for all Defendants Except Ashley
16        Sessions
        The Capitol
17      Albany, New York 12224
18    By:  RYAN W. HICKEY, ESQ.
        ryan.hickey@ag.ny.com
19      KASEY K. HILDONEN, ESQ.
        kasey.hildonen@ag.ny.com
20
21            ~oOo~
22
23
24
25
```

## Page 3

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED, by and
 3   between counsel for the respective parties hereto,
 4   that the filing, sealing and certification of the
 5   within deposition shall be and the same are hereby
 6   waived;
 7        IT IS FURTHER STIPULATED AND AGREED that all
 8   objections, except as to form of the question, shall
 9   be reserved to the time of the trial;
10        IT IS FURTHER STIPULATED AND AGREED that the
11   within deposition may be signed before any Notary
12   Public with the same force and effect as if signed and
13   sworn to before the Court.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              CASSATA
 2        THE COURT REPORTER:  Will counsel please
 3   stipulate that, in lieu of formally swearing
 4   in the witness, the Court Reporter will
 5   instead ask the witness to acknowledge that
 6   the testimony will be true under the
 7   penalties of perjury, that counsel will not
 8   object to the admissibility of the
 9   transcript based on proceeding in this way
10   and that the witness has verified that she
11   is in fact Katherina Cassata.
12        THE WITNESS:  I am.
13        MR. SHAPIRO:  Sam Shapiro on behalf of
14   the plaintiff, I agree.
15        MR. HICKEY:  Ryan Hickey on behalf of
16   the defendants, I agree.
17        MS. HILDONEN:  Kasey Hildonen on behalf
18   of the defendants, I agree.
19        MR. HILL:  Benjamin Hill on behalf of
20   defendant Ashley Sessions, I agree.
21   K A T H E R I N A    C A S S A T A, having been
22   first duly sworn by Joseph R. Danyo, a Notary
23   Public, was examined and testified as follows:
24   EXAMINATION BY MR. SHAPIRO:
25        Q.  Good afternoon, Ms. Cassata.  My name is
```

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA140

Page 25

CASSATA

1
2    Q.   And were you trained at any time a
3  patient -- strike that.  Were you trained to
4  complete a DAR note any time a service recipient
5  raised a medical concern?
6    A.   No.
7    Q.   Tell me when as of April 2018 you
8  understood you were supposed to document medical
9  concerns in the DAR note?
10    A.   The day I spoke to OIA.
11    Q.   What do you mean by that?
12    A.   The day that I was interviewed by OIA
13  Olivia Hess informed me that, whenever a patient
14  has any kind of medical complaint, we're supposed
15  to document it in the DAR notes.
16    Q.   And prior to Ms. Hess telling you that,
17  no one had told you that before?
18    A.   No.  We would only do med changes or any
19  kind of reactions or how they handle any kind of
20  med change.  That would be in the MAR.
21    Q.   Information about medication and how the
22  service recipient was reacting to medication, that
23  would be documented in April 2018?
24    A.   Yes.
25    Q.   And you said that would be documented in

Page 26

CASSATA

1  the MAR?
2    A.   Yes.
3    Q.   But, as of the time of C.B.'s death,
4  your understanding was that you were not required
5  to document every time a service recipient had a
6  medical complaint.  Is that correct?
7    A.   Every time, no.  A lot of the other
8  individuals have chronic complaints that we
9  wouldn't document everything, if nursing was
10  notified, unless something arose from it like a
11  hospital visit or a clinic visit.
12    Q.   O, as of the time C.B. died, your
13  understanding was that you were not required to
14  document every time nursing was called in response
15  to a service recipient's medical complaint, is that
16  correct?
17    A.   Correct.
18    Q.   And tell me about the MAR.
19    A.   It is a list of the daily medications,
20  what time they take them, how much.
21    Q.   And that was true in April 2018?
22    A.   Yes.
23    Q.   And, aside from the information about
24  when service recipients were taking medication,
25

Page 27

CASSATA

1
2  what other information, if any, was included in the
3  MAR?
4    A.   Their diagnosis, medical conditions.
5    Q.   As of the time of C.B.'s death, what was
6  your understanding of what you as a DDSCTA was
7  supposed to put in a MAR?
8    A.   That we had given the meds, and I
9  believe -- at this time I'm going to say that's all
10  confidently.
11    Q.   And are you saying that because, based
12  on your understanding at the time of C.B.'s death,
13  that's all you understood you were required to put
14  in the MAR?
15    A.   I believe that's all that was required
16  at that time.
17    Q.   And you mentioned the communication log.
18  What is that?
19    A.   It's an in-house journal.  Every shift
20  will write, if anything has happened on the
21  previous shift, they would write a note, and then
22  evenings would read it if it was of importance.
23    Q.   And as of the time of C.B.'s death, were
24  you supposed to include in the communication log
25  any time nursing was called?

Page 28

CASSATA

1
2    A.   It was helpful.
3    Q.   And was it your practice to do that?
4    A.   Yes, if it was something significant.
5    Q.   And that was true as of the time of
6  C.B.'s death, that was your practice?
7    A.   Yes.
8    Q.   And what do you mean by significant?
9    A.   Anything that raised a red flag that the
10  following shift should pay attention to or be aware
11  of.
12    Q.   You mentioned the 24-hour transfer sheet
13  I believe?
14    A.   Yeah.  It's a paper that had everyone's,
15  all the individuals names on it.  Then there's a
16  column to the right of their names where you can
17  write any kind of remarks, behavioral issues or
18  anything like that.
19    Q.   And who was supposed to, as of the time
20  of C.B.'s death, who was supposed to fill out the
21  24-hour transfer sheet?
22    A.   The hallway person usually did the
23  paperwork.
24    Q.   Was it the hallway person working the
25  night shift who was responsible for filling out the

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

```
               CASSATA
 1
 2    24-hour transfer sheet?
 3        A.   No.  It was the hallway person for
 4    whatever shift.  It was every shift it was filled
 5    out.
 6        Q.   And it was a different form than the
 7    communication log, though?
 8        A.   Yes.
 9        Q.   At the time C.B. died, you were a
10    DDSCTA1, right?
11        A.   Correct.
12        Q.   And can you just describe briefly for me
13    your duties and responsibilities at that time as a
14    DDSCTA1?
15        A.   To provide active treatment to the
16    individuals, teach them life skills, engage with
17    them, make sure they're doing what they need to do
18    as far as showers, brushing their teeth, things
19    like that, eating.
20        Q.   Was one of your duties to help keep the
21    individuals safe?
22        A.   Yes.
23        Q.   Was one of your duties to help keep the
24    individuals healthy?
25        A.   Yes.
```

Page 30

```
               CASSATA
 1
 2        Q.   Was one of your duties to help when they
 3    had behavioral issues?
 4        A.   Yes.
 5        Q.   Was one of your duties to monitor their
 6    health diagnoses and report symptoms?
 7        A.   What do you mean by that?
 8        Q.   Was one of your duties to watch for
 9    potential symptoms of health issues that were
10    presenting in the service recipients?
11        A.   I don't believe so.  Unless they had a
12    complaint, I don't believe, no.
13        Q.   Have you worked at any other OPWDD
14    facilities aside from Valley Ridge?
15        A.   No.
16        Q.   In 2018, in April 2018, you were
17    assigned to E house.  Is that right?
18        A.   Yes.  Correct.
19        Q.   And, Ms. Cassata, if you want to take a
20    break at any time, just let me know.  Okay?
21        A.   I'm fine.
22        Q.   Did you work in any other houses aside
23    from E house?
24        A.   I worked in all of them.
25        Q.   What does it mean to be assigned to
```

Page 31

```
               CASSATA
 1
 2    E house?
 3        A.   When we bid, we bid on pass days, shift
 4    like 3 to 11 was mine, and the house.
 5        Q.   And how does that relate to your
 6    assignment to E house?
 7        A.   That was where I worked daily.
 8        Q.   And was that your choice?  Did you
 9    request to be assigned to E house?
10        A.   Yes.
11        Q.   Why was that?
12        A.   There was a rebid two years prior to
13    that, and they had closed down D house.  They
14    turned it into a clean house, and they moved all of
15    those individuals out.  So I wanted to get out of
16    that house.  So I chose to go to E.
17        Q.   And that was you said 2016?
18        A.   Yes.
19        Q.   So you were assigned to E house from
20    2016 through 2018?
21        A.   So currently I am in E house still, yes.
22        Q.   I see.  So, from 2016 to the present,
23    you've been assigned to E house, is that correct?
24        A.   Correct.
25        Q.   In April 2018, who was the E house
```

Page 32

```
               CASSATA
 1
 2    supervisor?
 3        A.   I don't know.
 4        Q.   Was it Mike Novack?
 5        A.   On day shift it was.  I don't know about
 6    evenings.  It could have been J.B., James Roberts
 7    possibly.
 8        Q.   Is the day shift supervisor considered
 9    the overall house supervisor?
10        A.   The house manager, yes.
11        Q.   To your knowledge, what are the duties
12    and responsibilities of the house manager?
13        A.   They do most of the work orders.  They
14    pay the individuals.  General oversight of how the
15    house is run.
16        Q.   And does that include recordkeeping as
17    well?
18        A.   Internal recordkeeping.
19        Q.   What do you mean by internal
20    recordkeeping?
21        A.   Like the books, the counting books for
22    the individuals, the sign in and out to ensure that
23    those forms are available to us.
24        Q.   And does internal recordkeeping include
25    the DAR notes that are in the house?
```

Page 49

CASSATA

1
2      doctor's care.
3          Q.   And is that something you were trained
4      to document in the DAR?
5          A.   With any kind of med change or if an
6      individual goes to the hospital or returns from the
7      hospital, we would write that in the DAR note.
8          Q.   What if an individual goes to the
9      on-site medical clinic at Valley Ridge?
10         A.   That would be in the nursing notes.
11         Q.   Are you familiar with the term "focused
12     charting"?
13         A.   No.
14         Q.   Over the last year of his life, did C.B.
15     gain weight?
16         A.   He did.
17         Q.   Did he gain a lot of weight?
18         A.   A noticeable amount.
19         Q.   Was that something that you recall
20     having a conversation with anyone about?
21         A.   The dietician.
22         Q.   And tell me about that conversation you
23     recall?
24         A.   They put him on a reduced calorie diet
25     and wanted us to watch what he was eating.

Page 50

CASSATA

1
2          Q.   Did C.B. adhere to that diet?
3          A.   Yes.  I would say C.B. didn't really
4      overindulge.  He didn't go out and eat excessive
5      amounts of fat or junk food or anything like that.
6      C.B. was a bigger guy.  I mean he was 6-1, I
7      believe.
8          Q.   Did you ever have any conversations with
9      anyone in nursing about his weight gain?
10         A.   Like if I was concerned about his weight
11     gain?
12         Q.   Just any conversations in general with
13     anyone in nursing.
14         A.   No.  They would just attribute a lot of
15     his health factors to being overweight.
16         Q.   Tell me what you mean by that.
17         A.   When he started making complaints of not
18     feeling well, they just said he has to lose some
19     weight.
20         Q.   And, when you say he started making
21     complaints about not feeling well, tell me what
22     you're referring to.
23         A.   The last couple of weeks leading up to
24     his death C.B. had a lot of complaints that he
25     didn't feel well.

Page 51

CASSATA

1
2          Q.   Alright.  Tell me what his -- and did he
3      make those complaints to you?
4          A.   To everyone.
5          Q.   And tell me what you remember C.B.
6      saying.
7          A.   That he couldn't breathe, that his chest
8      hurt.  He was tired all the time.
9          Q.   He said he couldn't breathe.  How many
10     times did you hear him say in the last couple of
11     his weeks of his life that he couldn't breathe?
12         A.   Twice that I recall.
13         Q.   How many times did you hear him say his
14     chest hurt in the last couple of weeks of his life?
15         A.   His complaints were made directly to me
16     twice.
17         Q.   And you also heard him say two times he
18     was tired?
19         A.   Correct.  He fell asleep one night.  We
20     were playing cards, and he fell asleep at the
21     table.
22         Q.   And did you report those complaints to
23     anyone?
24         A.   Absolutely.
25         Q.   And who did you report them to?

Page 52

CASSATA

1
2          A.   Nursing.
3          Q.   Well, let me be more specific.  When was
4      the first time he told you he couldn't breathe?
5          A.   The Wednesday before he passed away.
6          Q.   And would that be April 4, 2018?
7          A.   Yeah.  I don't have a calendar in front
8      of me, but it sounds about right.  He died on the
9      9th.
10         Q.   So on the Wednesday before C.B. died, he
11     told you he didn't feel well?
12         A.   Right.
13         Q.   On the Wednesday before he died, C.B.
14     told you he couldn't breathe?
15         A.   Right.
16         Q.   On the Wednesday before he died C.B.
17     told his chest hurt?
18         A.   Correct.
19         Q.   How many times did he tell you he
20     couldn't breathe on that Wednesday?
21         A.   Once, and then I notified nursing, and
22     they came down, and they checked him out, and then
23     he went to bed, and then that Friday he was not
24     himself at all.  He wasn't able to vacuum.  I
25     notified nursing.  He was sweating.  He couldn't

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA143

Page 53

CASSATA

1
2      stand up.  They came down.  Anita looked at him,
3      told him to have some water and relax and go lay
4      down.
5            Q.   Let me make sure I get this straight.
6      Let me first focus on the Wednesday.  Was that
7      Wednesday the day that C.B. had trouble finishing
8      vacuum?
9            A.   No.  That was Friday.  Wednesday he fell
10     asleep playing cards.
11           Q.   Let me just show you again your OIIA
12     transcript.  This is Plaintiff's Exhibit 79.  I'm
13     going to scroll down to page 2 here.  Ms. Hess
14     asked you, "Tell me about C.B.'s health."
15           Your answer, "Overall I thought he was
16     pretty healthy.  He never made any complaints until
17     recently."
18           Ms. Hess asks you, "What's recently?"
19           Your answer, "That I'm aware of, the
20     middle of last week Wednesday he started really
21     just, I don't feel good, I don't feel good, my
22     chest hurts, I can't breathe.  Came out to do
23     chores.  He couldn't complete the chore.  He had to
24     sit down in the middle of doing it."
25           A.   Correct.

Page 54

CASSATA

1            Q.   And what chore are you referring to
2      there?
3            A.   It was also vacuuming for the week, but
4      it wasn't in the excess that it was Friday.  Like
5      he just couldn't do it.  He said, "I can't do it."
6      He stopped doing it.
7            Q.   Okay.  Did he have to sit down on
8      Wednesday before he died while he was vacuuming?
9            A.   No.  He was just making complaints that
10     he didn't feel well.
11           Q.   And did he say he could not finish
12     vacuuming on the Wednesday before he died because
13     his chest hurt?
14           A.   He said he couldn't complete vacuuming
15     because he didn't feel good.  His chest hurt.  He
16     couldn't breathe.
17           Q.   Moving down to page 3, Ms. Hess asked
18     you, "What was his chore that day?"
19           Your answer, "Vacuuming."
20           Ms. Hess said, "And where did he have to
21     vacuum?"
22           Your answer, "He started vacuuming the
23     dining room area and then into the hallway, and he
24     had to sit in the hallway, and he sat several times

Page 55

CASSATA

1      in the dining room.  He said, 'I can't do it.'  I'm
2      like, come on, C.B., get up, just move around.  He
3      would just start sweating, and he was not in any
4      condition to.  You could visably see him not feel
5      well."
6            Do you see that?
7            A.   I do.
8            Q.   And so on Wednesday before he died, C.B.
9      was sweating while trying to vacuum.  Is that
10     correct?
11           A.   So those were two separate days.  The
12     day that he had to sit down is the Friday I believe
13     as previously I noted the day that Kim had the
14     hallway, whatever day that was.  I'm pretty sure
15     that was the Friday that he had to sit down and he
16     couldn't, he was sweating.
17           Wednesday he just said he couldn't
18     vacuum.  He wasn't feeling well.
19           Q.   Hold on one second.  So, just to be
20     clear, the Wednesday before he died complained
21     of chest pain, correct?
22           A.   Correct.
23           Q.   He complained that he couldn't breathe,
24     correct?

Page 56

CASSATA

1            A.   Correct.
2            Q.   And he said he can't vacuum.  Is that
3      correct?
4            A.   Right.
5            Q.   But he didn't sit down while trying to
6      vacuum on the Wednesday?
7            A.   No.
8            Q.   He just said, "I can't do it."
9            Is that fair to say?
10           A.   Correct.
11           Q.   And did it look to you on that Wednesday
12     like he did not feel well?
13           A.   It wasn't like C.B. to not want to do
14     something when we asked him to do it, but
15     physically he looked okay Wednesday.
16           Q.   Okay.  Now, shifting ahead then to
17     Friday, on the Friday before he died, did C.B. tell
18     you that he was having chest pains?
19           A.   He did.
20           Q.   Did C.B. tell you on the Friday before
21     he died that he couldn't breathe?
22           A.   He did.
23           Q.   Did C.B. have trouble finishing
24     vacuuming on the Friday before he died?

Pages 53 to 56

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 57

CASSATA

2  A.  He did.
3  Q.  Did you see C.B. sweating while trying
4  to vacuum on the Friday before he died?
5  A.  Yes.  C.B. looked physically sick on
6  Friday.
7  Q.  Describe to me how he looked on that
8  Friday.
9  A.  He had no color.  He was sweating.  He
10  was clammy to the touch.  He was out of breath.  He
11  couldn't -- he was sitting down in the chair trying
12  to vacuum sitting down in the chair like scooching
13  himself along.
14  Q.  And that was unlike him, right?
15  A.  Yes.
16  Q.  C.B. having to sit down to do a chore,
17  that was a dramatic change from his normal
18  behavior.  Is that fair to say?
19  A.  Very fair.
20  Q.  Okay.  Focusing back on Wednesday, when
21  C.B. complained to you about having chest pains and
22  not being able to breathe, what did you do?
23  A.  I notified nursing.
24  Q.  And how did you do that?
25  A.  I called them.

Page 58

CASSATA

2  Q.  Did you call the float phone?
3  A.  The cell phone.
4  Q.  And who picked up?
5  A.  I don't recall.  I believe it was Anita.
6  I know it was Anita on Friday.  I'm not sure who it
7  was on Wednesday.
8  Q.  And what did you say to nursing?
9  A.  That C.B. was complaining of head and
10  chest pains and was unable to breathe, and he
11  didn't feel well.
12  Q.  And what did the person who was on the
13  other end of the line say in response?
14  A.  That they would come down and check him
15  out.
16  Q.  And did someone from nursing come on
17  Wednesday?
18  A.  I believe so.  I don't recall having
19  meds on Wednesday, so the AMAC, the med person,
20  would have taken over at that point.
21  Q.  So I want to show you what I'm going to
22  mark as Plaintiff's Exhibit 77.
23  (Plaintiff's Exhibit 77, Assignment
24  book, was so marked for identification, as
25  of this date.)

Page 59

CASSATA

2  Q.  Do you recognize this document?
3  A.  I do.
4  Q.  And what is it?
5  A.  That is our assignment book.
6  Q.  Is it fair to say this is a schedule for
7  the evening shift?
8  A.  It's a schedule, yes.
9  Q.  And it's for the evening shift on
10  April 4, 2018, correct?
11  A.  Correct.
12  Q.  And do you see your name in E house?
13  A.  Yes.
14  Q.  And do you see an M next to your name?
15  A.  I do.  What does that say next to it in
16  the circle?
17  Q.  I'll zoom in.  I don't know.  Can you
18  tell what that says?
19  A.  I think it says OT.
20  Q.  Okay, and what would that indicate to
21  you?
22  A.  That would indicate overtime.  3 to 11
23  is my normal shift.  So I don't know why it would
24  say that.
25  Q.  Okay.  What is the M?  The M next to

Page 60

CASSATA

2  your name I believe you testified, what does that
3  indicate?
4  A.  That stands for meds, and K would be the
5  kitchen, and living room would be the LR, and the H
6  would be hallway.
7  Q.  Does this suggest to you that on April
8  4th you were the med person?
9  A.  That would suggest that, yes.
10  Q.  Okay.  So do you remember who from
11  nursing came to E house on the Wednesday before
12  C.B. died?
13  A.  Not on Wednesday, no.  Friday I remember
14  it was Anita.
15  Q.  Okay.  Let's look back at your OIIA
16  transcript, and I'm going, I'll scroll to page 11,
17  and do you see Ms. Hess asks, "How many times did
18  you contact Anita from last Wednesday until this
19  past Monday?
20  "Answer:  I would say three or four
21  times."
22  Ms. Hess says, "Question:  Three or four
23  times different days?"
24  Your answer:  "Different days.  I called
25  her twice on Wednesday, and then I believe it was

# JA145

Page 61

```
1                    CASSATA
2    either Thursday or Friday I called her."
3        A.  Okay.
4        Q.  Do you see that?
5        A.  Yes.
6        Q.  Does that refresh your recollection that
7    on Wednesday you spoke to Anita?
8        A.  Yes.
9        Q.  And Anita is Anita Baral, is that
10   correct?
11       A.  Correct.
12       Q.  And did Anita come to see C.B. on the
13   Wednesday before he died?
14       A.  I don't recall.
15       Q.  Looking again at your transcript at page
16   13, Ms. Hess asks you at the top of the page, "Did
17   he ever complain of shortness of breath to you?"
18       Your answer, "He did.  He said he
19   couldn't breathe."
20       Ms. Hess's question:  "Couldn't
21   breathe?"
22       Your answer, "Yeah."
23       Ms. Hess asks, "And when was that?"
24       Your answer:  "Wednesday, when I called
25   Anita."
```

Page 62

```
1                    CASSATA
2        Ms. Hess's question:  "When you called
3    Anita?"
4        Your answer:  "When he was vacuuming.
5    He couldn't."
6        Do you see that?
7        A.  Yes.
8        Q.  And then Ms. Hess asks, "Okay.  Okay.
9    When she came down because you called her the
10   second time, did she check his blood pressure?  Did
11   she do any breathing?"
12       Your answer:  "No, because I took the
13   vitals earlier, and I called her with the vitals.
14   She just came down.  He was at the memory door."
15       I'm not sure that's a correct
16   transcription.
17       A.  No.  That would have been the med door.
18       Q.  "The med door and she just looked at him
19   and patted him.  It was like you'll be okay, C.B.,
20   go get some water and lay down, and that's what he
21   did."
22       Do you see that?
23       A.  Okay.  Yes.
24       Q.  So does that help refresh your
25   recollection about what you did on the Wednesday
```

Page 63

```
1                    CASSATA
2    before he died?
3        A.  Yes.
4        Q.  So is it fair to say you spoke to Anita
5    Baral and reported C.B.'s complaints to her?
6        A.  Yes.
7        Q.  And did she then instruct you to take
8    C.B.'s vitals?
9        A.  When I called her the first time.
10       Q.  Okay, and what else did she say, if
11   anything, when you called her the first time?
12       A.  Nothing.  That's why I called her the
13   second time.
14       Q.  And why did you call her a second time?
15       A.  Because he was still complaining, and
16   the complaints he was making it wasn't like a
17   normal stomach ache.  They were severe enough where
18   I felt nursing needed to come and take a look at
19   him.
20       Q.  And describe why you felt they were
21   severe enough that you thought nursing had to come
22   and take a look at him?
23       A.  Because, when people have chest pains,
24   you take that pretty seriously.
25       Q.  When you called her the second time, was
```

Page 64

```
1                    CASSATA
2    that after you had taken C.B.'s vitals?
3        A.  Yes.
4        Q.  And did you report his vitals to Ms.
5    Baral?
6        A.  I did.
7        Q.  And then did Ms. Baral eventually come
8    down to see C.B.?
9        A.  I don't recall on Wednesday.
10       Q.  Did C.B. go to the medical clinic on
11   Wednesday?
12       A.  Not on evenings he wouldn't have.
13       Q.  Did you document C.B.'s complaints on
14   Wednesday anywhere?
15       A.  The end of the shift report.
16       Q.  What did you write in the end of the
17   shift report?
18       A.  That he had been seen by Anita.  I'm not
19   sure if it was the Wednesday or Friday.  The day
20   that Anita came down and saw him was the day I
21   wrote the note.
22       Q.  And did you write in your note that C.B.
23   had complained of chest pains?
24       A.  Yes, and what I physically saw him
25   presenting.
```

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

CASSATA

2  Q.  Meaning that you saw him being unable to
3  vacuum?
4  A.  Correct, and sweating and just not
5  himself at all.
6  Q.  And did you write that C.B. was having
7  trouble breathing?
8  A.  I did.
9  Q.  And that was in the 24-hour shift report
10 you say?
11 A.  It would have been in the DAR note at
12 the end of the shift that we wrote.
13 Q.  Showing you again Exhibit 55, would it
14 have been in one of these kind of notes?
15 A.  Yes.
16 Q.  Aside from calling nursing on Wednesday,
17 did you do anything else to try to help C.B.?
18 A.  I personally would stay out in the
19 common areas, the living room. I wanted him to
20 start engaging a little bit with us.
21 Q.  Did you call the nurse practitioner?
22 A.  No.
23 Q.  Did you call 911?
24 A.  No.
25 Q.  Did you call C.B.'s family?

Page 66

CASSATA

2  A.  No.  None of those things I'm permitted
3  to do within my job title.
4  Q.  Did you tell Ms. Baral when you spoke to
5  her on Wednesday that you thought his condition was
6  serious?
7  A.  Yes, and Friday when I called her, I
8  definitely told her it was serious.  I said this
9  isn't like him.  I said he's sitting here in the
10 med room door sweating.  She said, "I know, I know.
11 He has to lose weight.  Have some water.  Go lay
12 down."  That's what Ms. Baral told me.
13 Q.  So, on Friday, before C.B. died, C.B.
14 again complained to you about having chest pains.
15 Is that correct?
16 A.  Correct.
17 Q.  On the Friday before he died, C.B. again
18 complained to you that he couldn't breathe?
19 A.  Correct.
20 Q.  On the Friday before he died, C.B. again
21 could not finish vacuuming, is that correct?
22 A.  Correct.
23 Q.  And on the Friday before he died, you
24 saw him sweating while he was just vacuuming in the
25 house?

Page 67

CASSATA

2  A.  Correct.
3  Q.  Can you describe his appearance on that
4  Friday before he died?
5  A.  Yeah.  He was pale.  He was clammy.  He
6  couldn't keep his eyes open.  He looked physically
7  sick.
8  Q.  You mentioned playing cards with C.B.
9  Is that right?
10 A.  Correct.
11 Q.  Was that on the Friday before he died?
12 A.  Either the Friday or the Wednesday.  It
13 was prior.  Wednesday or Friday.  It was prior to
14 his passing away.
15 Q.  Let's look at your transcript again.
16 Drawing your attention to page 4, Ms. Hess asks,
17 "Was there any time after last Wednesday, which
18 would have been the 4th, that there was any," and
19 your answer, "That I witnessed or that I" --
20 Ms. Hess says, "That you witnessed."
21 Ms. Cassata says, "Not that I witnessed.
22 I mean throughout the week he was not out in the
23 common areas of the house."
24 Ms. Hess asks, "Is that unusual?"
25 Your answer, "That's unusual."

Page 68

CASSATA

2  Do you see that?
3  A.  Yes.
4  Q.  Is it correct that during that week
5  before he died C.B. was not spending much time in
6  the common areas of the house?
7  A.  Correct.
8  Q.  And that was very unusual for him?
9  A.  Very.
10 Q.  Going down a little bit, about a third
11 of the way down the page, you say, "He did come
12 out.  He played one game of cards.  I don't
13 remember if it was Thursday or Friday, but he came
14 out, and he couldn't remember how to play Pitch."
15 Is that correct?
16 A.  Correct.
17 Q.  "And we play it all the time."
18 Does that refresh your recollection that
19 the card game happened on Friday?
20 A.  Correct.  Yes.
21 Q.  So tell me about that incident.  What
22 happened there?
23 A.  So C.B. came out, and we were sitting at
24 the table, and he couldn't remember how to play the
25 game.  You know, he was throwing all the cards down

Pages 65 to 68

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 69

CASSATA

1
2  out of order.  So I had asked him at the beginning.
3  I'm like, "C.B., what are you doing," and he said,
4  "I don't know."  You know, he got upset, and I'm
5  like, "C.B., you know how to play this game.  You
6  know, we've been playing it for years," and he
7  goes, "I'm tired, I'm tired."
8        So at that point, he possibly could have
9  been.  They took his (inaudible) from 8 o'clock,
10 and he was sleeping up to 5 o'clock.  We had an
11 hour window.  So we got there between 4 and 5.  So
12 the meds may have kicked in making him drowsy.  So
13 that is a possibility.
14       Q.  Pitch is a game you had played
15 frequently with C.B.?
16       A.  Yes.  We usually played after dinner.
17       Q.  And he knew how to play, right?
18       A.  Yes.
19       Q.  Was he good at it?
20       A.  Very.
21       Q.  And on the Friday before he died, he
22 couldn't remember how to play?
23       A.  No.
24       Q.  On the Friday before he died, he
25 couldn't remember how to play, is that correct?

Page 70

CASSATA

1
2        A.  Correct.
3        Q.  On that Friday before he died, did you
4  call nursing again?
5        A.  I did.
6        Q.  Who did you speak to?
7        A.  Anita.
8        Q.  Did you call the cell phone again?
9        A.  I did.
10       Q.  What did you say to Anita?
11       A.  I told Anita C.B. was having difficulty
12 breathing.  He was sweating.  He couldn't vacuum.
13 She had to come down and look at him.
14       Q.  What was her response, if any?
15       A.  Okay.  You know, coming down, but she
16 did come down, and she came and looked at him, and
17 said that, you know, she patted him and, "Oh, C.B.,
18 you'll be alright.  Go lay down.  Just get some
19 rest."
20       Q.  When she looked at him on the Friday
21 before he died, did she take his vital signs?
22       A.  No.
23       Q.  Did she use a stethoscope?
24       A.  No.
25       Q.  Did she examine his lungs at all?

Page 71

CASSATA

1
2        A.  No.
3        Q.  Did she examine his chest at all?
4        A.  No.  She was standing in the med room,
5  and C.B. was on the other side of the door, and she
6  just put her hand up on his shoulder and said he
7  would be alright.
8        Q.  Aside from putting her hand on his
9  shoulder, did she touch him at all?
10       A.  No.
11       Q.  Did she take any history from C.B.?
12       A.  No, not that I'm aware of.
13       Q.  Were you there when Ms. Baral was
14 talking to C.B.?
15       A.  Yes.
16       Q.  Did she ask him if he was feeling short
17 of breath?
18       A.  Yes.
19       Q.  What did he say?
20       A.  Yes.  He said, "I can't breathe.  My
21 chest hurts."
22       Q.  Did she ask him how long he had been
23 feeling that way?
24       A.  No.
25       Q.  Did she ask him if he was having trouble

Page 72

CASSATA

1
2  breathing when he was lying down?
3        A.  No.
4        Q.  Did she ask him if he had been waking up
5  a lot in the middle of the night?
6        A.  No.  She did mention that he hadn't been
7  sleeping at night.  She had told me that.  She said
8  he's not really sleeping too good at night, and
9  that's why she told him to go get rest.
10       Q.  Did she explain why he hadn't been
11 sleeping?
12       A.  No.
13       Q.  Did she ask him if he had been feeling
14 tired recently?
15       A.  No.
16       Q.  Did she check to see if any of his
17 extremities were swollen?
18       A.  No.
19       Q.  Did you notice on that Friday before he
20 died whether any of his extremities were swollen?
21       A.  Not that I recall.
22       Q.  Did you look at his ankles or legs?
23       A.  No.  Like I said, just looking at C.B.
24 physically in front of me, I could tell that he
25 wasn't feeling well, so I didn't go any farther.

Pages 69 to 72

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA148

Page 73

```
 1                CASSATA
 2        Q.  Switching back for a moment to the
 3    Wednesday before he died, you took C.B.'s vital
 4    signs on that Wednesday?
 5        A.  Yes.
 6        Q.  Did you take C.B.'s vital signs on
 7    Friday before he died?
 8        A.  I believe, yes.
 9        Q.  On the Wednesday, did you document those
10    vital signs anywhere?
11        A.  No, I don't recall.
12        Q.  I want to show you going back to your
13    transcript from OIIA again, Exhibit 79.  Oh, I'm
14    sorry.  No.  I'm going to switch and mark as
15    Exhibit 80 the transcript from your second
16    interview with OIIA.
17            (Plaintiff's Exhibit 80, Transcript of
18            second OIIA interview, was so marked for
19            identification, as of this date.)
20        Q.  And I want to draw your attention to the
21    first page here.  You say, "Anita clicked into the
22    house shortly after I called."
23            Ms. Hess says, "Okay, but she came
24    down?"
25            Your answer, "She did come down."
```

Page 74

```
 1                CASSATA
 2            Ms. Hess says, "Okay.  Did she see
 3    C.B.?"
 4            Your answer, "Yeah, that was she rubbed
 5    him and said that he was okay, he had water and go
 6    lay down."
 7            Ms. Hess says, "Okay."
 8            You say, "Like she didn't do any vitals
 9    or physicals, but she did click into the house."
10            Ms. Hess says, "And she had you do the
11    vitals before?"
12            You say "Before."
13            Ms. Hess says, "Okay, and did you write
14    them down anywhere that day?"
15            You say, "Yup, yup."
16            Ms. Hess says, "Where?"
17            Your answer, "On a tri-fold, and she
18    took it with her."
19            Ms. Hess says, "Tri-fold?"
20            You say, "Yeah, just a paper towel."
21        A.  Right.
22        Q.  Ms. Hess says, "You just wrote them down
23    on a paper towel?"
24            You say, "Yeah, and then she took it
25    with her for her end of" --
```

Page 75

```
 1                CASSATA
 2            And Ms. Hess says, "And that was on the
 3    4th?"
 4            And you say, "Yup, that was the
 5    Wednesday before, whatever day that was."
 6            Do you see that?
 7        A.  Yes.
 8        Q.  So, focusing on that Wednesday, does
 9    that refresh your recollection that you took C.B.'s
10    vitals that day?
11        A.  Yes.
12        Q.  And you wrote them down on a paper
13    towel?
14        A.  Yes.
15        Q.  And you gave that to --
16        A.  Right.  I would have wrote them on a
17    paper towel to save them for my DAR note later, and
18    Anita took had taken them for her nursing notes.
19    So I didn't have a copy of them.  So they went to
20    the med clinic.
21        Q.  So you gave the paper towel where you
22    wrote down C.B.'s vitals on Wednesday before he
23    died to Anita Baral?
24        A.  Correct.
25        Q.  And is it fair to say then that you did
```

Page 76

```
 1                CASSATA
 2    not document his vital signs in a DAR note on that
 3    Wednesday?
 4        A.  Correct.
 5        Q.  And does that also help refresh your
 6    recollection that Ms. Baral came to see him on
 7    Wednesday?
 8        A.  Yes.
 9        Q.  And then on Friday you believe you took
10    his vital signs again?
11        A.  Yes.
12        Q.  Do you know whether his vital signs were
13    within normal limits on Friday?
14        A.  They were within normal.  Both days they
15    were within normal range.
16        Q.  Did you document his vital signs on
17    Friday?
18        A.  Yes.  Friday night I wrote the note
19    about his behavior and the vacuuming.  Friday is
20    the DAR note that I wrote.
21        Q.  And that would be Friday, April 6?
22        A.  Yes.
23        Q.  You had said in the OIIA interview you
24    called Anita three to four times.
25        A.  Correct.
```

Pages 73 to 76

Page 77

CASSATA
1
2     Q.  I just want to make sure I have all of
3  those calls.  You called her twice on Wednesday.
4  Is that correct?
5     A.  Right.
6     Q.  And then how many times on Friday?
7     A.  I called her once for C.B. on Friday,
8  and I believe I had to call her for another
9  individual.
10    Q.  Did you document anywhere the fact that
11 you had called Ms. Baral on the Wednesday before
12 C.B. died?
13    A.  Not on the Wednesday.
14    Q.  On the Friday, did you document in your
15 DAR note that you had called Ms. Baral?
16    A.  I did.
17    Q.  Back in 2018, did anyone ever tell you
18 that Ms. Baral denied that you had ever reported
19 anything to her about C.B.?
20    A.  No.
21    Q.  Would that surprise you?
22    A.  Yes, it does.  There were other staff in
23 the house that were there when I called Anita and
24 had also called Anita.
25    Q.  So okay.  On the Wednesday, were there

Page 78

CASSATA
1
2  other staff who heard C.B. complain about chest
3  pains?
4     A.  Cameron Houck.
5     Q.  Did Cameron Houck hear C.B. complain on
6  the Wednesday before he died that he couldn't
7  breathe?
8     A.  Yes.
9     Q.  Did Cameron Houck observe C.B. on the
10 Wednesday before he died having trouble vacuuming?
11    A.  Yes.
12    Q.  Did Cameron Houck call Anita Baral?
13    A.  No.  Cameron was there when Anita came
14 down.
15    Q.  What other staff heard C.B.'s complaints
16 on the Wednesday before he died?
17       MR. HICKEY:  Objection.
18    A.  Cameron Houck that I'm aware of.
19    Q.  Did you observe C.B. complaining to
20 Cameron Houck that he could not breathe?
21    A.  No.  He made a generalized statement.
22    Q.  What was that statement?
23    A.  That he couldn't breathe and that his
24 chest hurt.
25    Q.  And did he say that in the vicinity of

Page 79

CASSATA
1
2  you and Cameron Houck?
3     A.  Yes.
4     Q.  Did you discuss C.B.'s complaint with
5  Cameron Houck?
6     A.  I told him I was going to call nursing.
7     Q.  And Cameron Houck was present when Anita
8  Baral came to the E house?
9     A.  Correct.
10    Q.  Were any other staff present on the
11 Wednesday before C.B. died when Anita Baral came to
12 E house?
13    A.  Not that I can recall.
14    Q.  How about on the Friday, did C.B.
15 complain to any other staff about not feeling well
16 on the Friday before he died?
17    A.  Tammy was in the hallway when he sat
18 down and he couldn't vacuum.
19    Q.  Did you discuss C.B. with Tammy at all
20 on the Friday before he died?
21    A.  I did.  I told her that wasn't like him.
22 You know, that he had made complaints earlier in
23 the week . (Inaudible).
24    Q.  And what's Tammy's last name?
25    A.  At the time it was Boise.

Page 80

CASSATA
1
2     Q.  B-o-y-c-e?
3     A.  B-o-i-s-e.
4     Q.  B-o-i-s-e.  Was Tammy present when C.B.
5  complained about having chest pains on the Friday
6  before he died?
7     A.  When he was in the back hallway, yes.
8     Q.  Was Tammy present when C.B. said he
9  couldn't breathe on the Friday before he died?
10    A.  Yes, when he made all those complaints.
11    Q.  And, to your knowledge, did Tammy call
12 Anita on that Friday?
13    A.  I don't recall.
14    Q.  Are you aware of any other staff member
15 calling nursing in regards to C.B. on the Wednesday
16 before he died?
17    A.  No.  Carol Weaver called, but I don't
18 believe it was Wednesday.
19    Q.  When did Carol Weaver call?
20    A.  Sometime during that week.
21    Q.  While you were present in the house?
22    A.  No.  We had talked about it.  She had
23 told me that C.B. hadn't been feeling well and what
24 was going on.
25       MR. HICKEY:  Sam, the next time we can,

Pages 77 to 80

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

# Exhibit D

Page 1

```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------x
J.M., as Administrator of the Estate
of Her Son, C.B.,

                    Plaintiff,

            -against-        No.
                             20 Civ. 00091
ASHLEY SESSIONS, ELISE M. WILLIAMS,     (TJM)(CFH)
JOSHUA A. BUELL, CORY C. BEHLAN,
RAYMOND J. McGINN, KATHERINA L.
CASSATA and MICHAEL NOVACK,
                    Defendants.
---------------------------------------x
                    February 8, 2022
                    9:33 a.m.


        Remote Deposition of ANITA BARAL, taken
by Plaintiff, pursuant to Notice, held via Zoom
before Joseph R. Danyo, a Shorthand Reporter
and Notary Public within and for the State of
New York.




HUDSON COURT REPORTING & VIDEO (212) 273-9911
```

Page 2

```
 1
 2    A P P E A R A N C E S :
 3
 4      EMERY CELLI BRINKERHOFF ABADY WARD & MAAZEL LLP
        Attorneys for Plaintiff
 5      600 Fifth Avenue
        10th Floor
 6      New York, New York 10020
 7      By:  SAM SHAPIRO, ESQ.
             sshapiro@ecbawm.com
 8
 9
        CAPEZZA HILL LLP
10      Attorneys for Defendant Ashley Sessions
        30 S. Pearl Street
11      Suite P-110
        Albany, New York 12207
12
        By:  BENJAMIN HILL, ESQ.
13           ben@capezzahill.com
14
15      NEW YORK STATE ATTORNEY GENERAL - ALBANY
        Attorneys for all Defendants Except Ashley
16      Sessions
        The Capitol
17      Albany, New York 12224
18      By:  KASEY K. HILDONEN, ESQ.
             kasey.hildonen@ag.ny.gov
19
20               ~oOo~
21
22
23
24
25
```

Page 3

```
 1
 2
 3        IT IS HEREBY STIPULATED AND AGREED, by and
 4   between counsel for the respective parties hereto,
 5   that the filing, sealing and certification of the
 6   within deposition shall be and the same are hereby
 7   waived;
 8        IT IS FURTHER STIPULATED AND AGREED that all
 9   objections, except as to form of the question, shall
10   be reserved to the time of the trial;
11        IT IS FURTHER STIPULATED AND AGREED that the
12   within deposition may be signed before any Notary
13   Public with the same force and effect as if signed
14   and sworn to before the Court.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    BARAL
 2        THE COURT REPORTER:  Will counsel please
 3   stipulate that, in lieu of formally swearing
 4   in the witness, the Court Reporter will
 5   instead ask the witness to acknowledge that
 6   the testimony will be true under the
 7   penalties of perjury, that counsel will not
 8   object to the admissibility of the
 9   transcript based on proceeding in this way
10   and that the witness has verified that she
11   is in fact Anita Baral?
12        THE WITNESS:  Yes, I am.
13        MR. SHAPIRO:  Sam Shapiro on behalf of
14   plaintiff, I agree.
15        MS. HILDONEN:  Kasey Hildonen on behalf
16   of defendants, I agree.
17        MR. HILL:  Benjamin Hill on behalf of
18   Defendant Ashley Sessions, I agree.
19   EXAMINATION BY MR. SHAPIRO:
20   A N I T A    B A R A L, having been first duly
21   sworn by Joseph R. Danyo, a Notary Public, was
22   examined and testified as follows:
23        Q.  Good morning, Ms. Baral.  Could you just
24   state your address, your current address, please,
25   for the record?
```

Pages 1 to 4

# JA152

Page 9

BARAL

2    Q.  And was that explanation given to you by
3  someone at OPWDD?
4    A.  No.  It is from the office.
5    Q.  Which office?
6    A.  The Attorney General.
7    Q.  Do you remember who it was who gave you
8  that explanation?
9    A.  What is his name?  Yes.  Mr. Doug.
10    Q.  Was it Doug Squire?
11    A.  I don't remember the first name, but it
12  was Doug.
13    Q.  I couldn't quite understand.  Is it Doug
14  you are saying?
15    A.  Yeah.  Yes.  Something.  It was Doug.  I
16  know it is a little hard with my accent.  You know
17  I'm not from here.
18    Q.  No, that's fine.  I just want to make
19  sure I am understanding you correctly.  Were you
20  saying Doug like D-o-u-g?
21    A.  Yes.
22    Q.  Great.  Thank you.  I should also add,
23  Ms. Baral, do you have any cell phone with you in
24  the room you are in?
25    A.  Yes, I do.

Page 10

BARAL

2    Q.  Would you mind just turning that off so
3  we just make sure there are no disturbances.
4    A.  Hold on.  Yes.  Okay.  I am done.
5    Q.  Thank you, and similarly I would just
6  ask that you close any other programs or
7  applications that are running on your computer if
8  that's okay.
9    A.  Yeah.  I do not have anything running,
10  so we're good.
11    Q.  Perfect.  Thank you so much.  So you
12  mentioned you currently work for OPWDD, correct?
13    A.  Correct.
14    Q.  And what facility do you work at now?
15    A.  I still work for OPWDD.  Now I changed
16  from Broome to Queens.  Bernard Fineson.
17    Q.  What kind of facility is Bernard
18  Fineson?
19    A.  It is the same like Valley Ridge.  It is
20  still ICF.  It still take care of individuals like
21  developmental disability individual.  Similar in
22  kind, but it was like intensive care unit, ICF, up
23  there, Valley Ridge, and this is extended treatment
24  unit.
25    Q.  And you said Bernard Fineson is within

Page 11

BARAL

2  the Queens DDSO?  Is that correct?
3    A.  Correct.
4    Q.  When did you start working for the
5  Queens DDSO?
6    A.  Right exactly like at the peak of
7  pandemic.  March.
8    Q.  Okay.  Prior to March 2020, were you
9  working at the Valley Ridge CIT?
10    A.  Yes.
11    Q.  How long did you work at the Valley
12  Ridge CIT?
13    A.  I worked at CIT from 2016, so I worked
14  like three, three and a half years.
15    Q.  Approximately 2016 through March 2020?
16    A.  '19.
17    Q.  From 2016 to 2019, you were working at
18  Valley Ridge.  Is that right?
19    A.  Yes.
20    Q.  Are you currently licensed as a
21  registered nurse?
22    A.  Yes, I am.
23    Q.  When did you become licensed as a
24  registered nurse?
25    A.  Licensed as a registered nurse 2014 or

Page 12

BARAL

2  '15.  Well, '15.
3    Q.  Since you became licensed, have you ever
4  let your license lapse?
5    A.  No.
6    Q.  Are you also a nurse practitioner, Ms.
7  Baral?
8    A.  No, I'm not.  I'm just registered nurse.
9    Q.  Have you taken any classes toward
10  becoming a nurse practitioner?
11    A.  No.
12    Q.  Did you receive a degree -- well, strike
13  that.  Can you tell me about your educational
14  history?
15    A.  My educational history?  I was
16  registered nurse back in my country.  I'm from
17  Nepal, and I come to this country, and I went to
18  LaGuardia Community College.  They have a program
19  for immigrants like me where they train us, and we
20  get our license, and we go for their training like
21  for eight months.  There are professors, and there
22  are so many nurses from different countries.  They
23  train us how to be nurse here.  They give us the
24  communication and all the skills and training and
25  all that, so we get our license, and we start

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA153

Page 33

BARAL

1
2 Is that fair to say?
3     A.  Yes.
4     Q.  And you did tell them everything you
5 knew, right?
6     A.  Yes.
7     Q.  Okay.  If you look at page 1 of this
8 transcript about the middle of the page, the
9 interviewer whose name is Olivia Hess asks you,
10 "How about this?  What do you know about C.B.?  Did
11 you know anything specifically about C.B. and his
12 medical needs?  Did he have a lot of medical
13 needs?"  You answered, "No, I wouldn't know about
14 that."
15     Do you see that?
16     A.  No.  Yes, I see that.
17     MS. HILDONEN:  Let me just note on the
18 record, my apologies, I didn't mean to
19 interrupt, can you just note my objection
20 because I don't see that it's a certified
21 transcript, but we can discuss it later.  I
22 just wanted to note my objection on the
23 record.
24     MR. SHAPIRO:  Well, let's just talk
25 about that for one second, Kasey.  I mean

Page 34

BARAL

1
2 fair enough.  If you look later and think
3 there is something inaccurate about this
4 transcript, that's fine.  As you know, using
5 the audio is unwieldy, and Ms. Baral's audio
6 is particularly quiet.  So I think it's just
7 hard to do that, which is why I am using
8 this transcript, which as you can see was
9 done by a court reporting agency,
10 TransPerfect.
11     So I understand your objection, and if
12 you think there is something inaccurate in
13 the transcript, obviously you have preserved
14 your right to make that objection, but,
15 beyond that, I mean I don't want to use the
16 audio.
17     Is there any other objection you have
18 here?
19     MS. HILDONEN:  No.  We had this with the
20 last transcript as well, and I note on this
21 one that you did put on here that it has
22 been done by TransPerfect.  I just didn't
23 see that it was, you know, certified by a
24 court reporter, and so I'm just going to put
25 my objection on the record, and if we have

Page 35

BARAL

1
2 an issue with it later, then I'll note it
3 later.
4     MR. SHAPIRO:  Fair enough.
5     MS. HILDONEN:  Thank you.
6     Q.  Okay.  Does looking at Exhibit 78, does
7 that refresh your recollection that in 2018 you
8 didn't know about C.B.'s specific medical needs?
9     MR. HILL:  Objection.
10     A.  Yes, I mean I did not know that.  Like I
11 said, I was not his assigned nurse for that house.
12 So I did not know about his specific needs.  Like
13 general diagnosis and all that, but we were not,
14 like I said, again we were not assigned to that
15 house, so we did not know.
16     Q.  And so you weren't monitoring him on a
17 monthly basis or anything like that because you
18 weren't assigned to E house, right?
19     A.  Right.
20     Q.  And you didn't prepare his plan of
21 nursing services, right?
22     A.  Right.
23     Q.  And you didn't do his nursing
24 assessments, right?
25     A.  Right.

Page 36

BARAL

1
2     Q.  Your job was to respond if he had an
3 acute medical need, but not -- is that right?
4     A.  Yes, if he had any acute medical needs,
5 that's my job to go down there and address that.
6     Q.  But your job was not to monitor his
7 health overall.  Is that right?
8     A.  Yes.  Overall like --
9     MR. HILL:  Objection.
10     A.  -- like the nursing assessments and all
11 that, I was not assigned for him.
12     Q.  That was the job of the nurse that was
13 assigned to E house, correct?
14     A.  Correct.
15     Q.  Is it also true that you did not have
16 occasion to treat C.B. for any acute medical
17 condition in 2018?
18     A.  I don't remember that.
19     Q.  So let's take a look again at Exhibit
20 78, and I want to draw your attention to page 2.
21     A.  Okay.
22     Q.  About two-thirds of the way down the
23 page, Ms. Hess says, "Have you ever had to treat
24 C.B. medically for anything?  I mean has he ever
25 had any issues that you've had to see him for

Page 37

```
         BARAL
1
2    recently within the last month or so?"
3         Your answer, "No, not medically.  I had
4    to do his body check once when he assaulted one of
5    the staff in the van.  I had to do his body check
6    of his hands.
7         "Ms. Hess:  Okay, and that's the only
8    time you've had to see him for anything medical?"
9         Your answer:  "Recently.
10        "Ms. Hess:  Recently?"
11        Your answer:  "Yeah, recently."
12        "Ms. Hess:  Yeah.  Do you remember when
13   that was when you had to do his body check?"
14        Your answer:  "Maybe March, February,
15   March."
16        "Ms. Hess:  February, March?"
17        Your answer:  "Yeah.  I don't remember
18   the exact date."
19        Do you see that?
20   A.   Yes, I see it.
21   Q.   Okay.  Does that refresh your
22   recollection that you did a body check on C.B. in
23   February or March of 2018?
24   A.   Yeah.  I still don't remember the month,
25   but I had to go and do his body check because he
```

Page 38

```
         BARAL
1
2    assaulted the staff on the van.  I do remember
3    that.
4    Q.   Aside from that body check, did you see
5    C.B. for any other medical need in 2018?
6    A.   Like I said there, I don't remember it.
7    Q.   And back in your interview you said
8    you -- well, let me ask you.  In your interview,
9    did you say you did not see him for any medical
10   need aside from the body check in 2018?
11   A.   I mean recently those months, yes.  I'll
12   have to go back and see the chart.  If I've seen
13   him, it would be in the note.  So I don't remember
14   it.
15   Q.   Okay.  Over the course of your time at
16   Valley Ridge, you did have an occasion to see C.B.
17   for medical needs at some point.  Is that fair to
18   say?
19   A.   Yes.  I don't remember how many times or
20   for what I've seen him, but like we see a lot of
21   them.  Sometimes they have complaints of this and
22   that, so maybe I've seen him, so I don't remember
23   again.
24   Q.   Okay, and if you saw C.B. for a medical
25   complaint, you would document that in the nursing
```

Page 39

```
         BARAL
1
2    notes, right?
3    A.   That's right.  Yes.
4    Q.   Would you document it anywhere else?
5    A.   No.  I would document it in my nursing
6    notes.
7    Q.   I want to show you another document.
8    I'm going to mark this as Exhibit 81.  It's a
9    one-page document Bates stamped OPWDD 650.
10        (Plaintiff's Exhibit 81, Document Bates
11        stamped OPWDD 650, was so marked for
12        identification, as of this date.)
13   Q.   Are you able to open that, Ms. Baral?
14   A.   Yes.
15   Q.   This is an e-mail dated June 27, 2017.
16   Is that correct?
17   A.   Correct.
18   Q.   And it's an e-mail that you sent.  Is
19   that correct?
20   A.   Yes.  That's correct.
21   Q.   And the subject is evening shift report
22   6/27/17.  Right?
23   A.   Right.
24   Q.   Tell me what this e-mail is if you can,
25   please.
```

Page 40

```
         BARAL
1
2    A.   It looks like he complained me of
3    trouble breathing, so I must have gone and seen
4    him.  He might have come to the clinic, and I took
5    his vital signs because I wrote here "vital signs
6    within normal limits."  Every time they complain of
7    chest pain or anything, we do their vital signs.
8    So I must have taken his vital signs, and those
9    were within normal limits, and I've written here
10   lungs clear.  That means I must have listened to
11   his lungs if he was wheezing or anything in his
12   lungs.  It looks like I didn't hear anything.  So
13   his lungs were clear, and he denied shortness of
14   breath.  That's what I wrote here.  And I wrote "no
15   signs/symptoms of respiratory distress," so it
16   looks like I did not see any distress, respiratory
17   distress, and also I wrote it down that "seen by
18   medical for URI flare-up."  That means he was seen
19   by the medical provider for upper respiratory
20   flare-up and I had encouraged him to drink plenty
21   of fluids.
22   Q.   Was it your practice when you saw an
23   individual for a medical complaint to document that
24   in that shift report like Exhibit 81?
25   A.   Yes.  We write everything we do so the
```

# JA155

Page 45

BARAL

1
2    complaint?
3        A.   I mean, if you're working there for a
4    long time, you would know.  I mean, and we would
5    generally ask how he's feeling and if he had felt
6    like that before.
7        Q.   And might you also look in the nursing
8    notes to see if he had prior complaints that were
9    relevant?
10       A.   Yes, if you see something, of course you
11   would go and check back.
12           (Recess taken from 10:33 a.m. to 10:42
13   a.m.)
14   BY MR. SHAPIRO:
15       Q.   Ms. Baral, I am going to put in the chat
16   a document that has been previously marked as
17   Exhibit 31.  It's a one-page document Bates stamped
18   defendants 8657.
19       A.   Yes.
20       Q.   Do you recognize Exhibit 31?
21       A.   This is our schedule.
22       Q.   And when you say "our schedule," it is
23   the nursing schedule.  Is that right?
24       A.   That's right.
25       Q.   At Valley Ridge, correct?

Page 46

BARAL

1
2        A.   Correct.
3        Q.   And it is the schedule for March 29
4    through April 11, 2018.  Is that correct?
5        A.   Correct.
6        Q.   And you see your name on this exhibit?
7        A.   Yes, I do.
8        Q.   Am I correct that the X's indicate days
9    where you are not working?
10       A.   Correct.
11       Q.   Okay.  So am I correct that you worked
12   April 4th, 2018?
13       A.   Yes.
14       Q.   And you worked April 5th, 2018 too,
15   right?
16       A.   Yes.
17       Q.   And you worked April 6th, 2018, right?
18       A.   Correct.
19       Q.   And then you were off April 7th,
20   April 8th and April 9th, correct?
21       A.   Correct.
22       Q.   And you were working the evening shift
23   back at this time.  Is that right?
24       A.   That's right.
25       Q.   And what is that shift?

Page 47

BARAL

1
2        A.   My shift is from 2 p.m. to midnight.
3        Q.   And that was true back in 2018 at Valley
4    Ridge?
5        A.   Yes.
6        Q.   Who is Rob?
7        A.   Rob is my co-worker.
8        Q.   He was also a registered nurse?
9        A.   Yes.
10       Q.   And he worked with you on the evening
11   shift on April 4th, is that right?
12       A.   Let me see the schedule.  I don't
13   remember.  April 4th.  Hold on.  Yes.  It looks
14   like he was working with me.
15       Q.   And he worked with you on April 5th as
16   well, correct?
17       A.   Yes.  It looks like.
18       Q.   What is Rob's last name, if you know?
19       A.   His last name was Rob -- his first name
20   I think is Robert, I believe Gesslin.
21       Q.   Do you see the letter S on this schedule
22   in some places?
23       A.   Yes.
24       Q.   Do you know what that refers to?
25       A.   Yes, it looks like he called out sick.

Page 48

BARAL

1
2        Q.   S refers to sick?
3        A.   Yes.  Sick call.  Yes.
4        Q.   Do you know who someone named Katherina
5    Cassata is?
6        A.   Yes.  She was one of the dietary staff.
7        Q.   And in 2018, specifically April of 2018,
8    was she working primarily in E house?
9        A.   Yes.
10       Q.   In April of 2018, did Ms. Cassata report
11   to you that C.B. was not feeling well?
12       A.   No, I don't remember.  No.
13       Q.   In April of 2018, did Ms. Cassata report
14   to you that C.B. was having trouble breathing?
15       A.   No.
16       Q.   In April of 2018, did Ms. Cassata report
17   to you that C.B. was having chest pains?
18       A.   No.
19       Q.   In April of 2018, did Ms. Cassata report
20   to you that C.B. could not stand up to finish
21   vacuuming?
22       A.   No.
23       Q.   In April of 2018, did Ms. Cassata report
24   to you that C.B. was having trouble finishing his
25   chores?

Pages 45 to 48

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA156

Page 49

```
             BARAL
 1
 2      A.  No.
 3      Q.  Did Ms. Cassata report to you at any
 4  time that C.B. was not feeling well?
 5      A.  I don't remember who complained about
 6  C.B., but I don't see my notes, and I don't
 7  remember, so it's no.
 8      Q.  If Ms. Cassata had reported to you that
 9  C.B. was having trouble breathing, you would have
10  documented that in a nursing note, correct?
11      MS. HILDONEN:  Objection.
12      A.  Yes.
13      Q.  If Ms. Cassata had reported to you that
14  C.B. was having chest pains, you would have
15  documented that in a nursing note, correct?
16      MS. HILDONEN:  Objection.
17      A.  Document it and assessed him.
18      Q.  And you would have documented whatever
19  assessment you did in a nursing note too, right?
20      A.  Yes.
21      Q.  If Ms. Cassata had reported to you that
22  C.B. was having trouble completing his chores, you
23  would have documented that in a nursing note,
24  correct?
25      A.  Correct.
```

Page 50

```
             BARAL
 1
 2      MS. HILDONEN:  Objection.
 3      Q.  You can answer.
 4      A.  Yes.  If anything, complaints regarding
 5  their health, anything we would go and check them
 6  and report it in our nursing report, our nursing
 7  note.
 8      Q.  And you also would have reported it in a
 9  shift report too, right?
10      A.  Yes.
11      Q.  So, if Ms. Cassata had told you C.B. was
12  having trouble breathing, that would have been
13  included in a shift report, correct?
14      A.  Correct.
15      MS. HILDONEN:  Objection.
16      Q.  If Ms. Cassata had reported to you that
17  C.B. was having chest pains, that would have been
18  included in the shift report, correct?
19      MS. HILDONEN:  Objection.
20      Q.  You can answer, Ms. Baral.
21      A.  Correct.  If she had reported it, I
22  would go check him and chart it in a chart.
23      Q.  In April of 2018, did you instruct Ms.
24  Cassata to take C.B.'s vital signs?
25      A.  If there was no complaints, I would not
```

Page 51

```
             BARAL
 1
 2  instruct her to check vital signs.
 3      Q.  If Ms. Cassata had taken C.B.'s vital
 4  signs and reported that to you, would you have
 5  documented it in the nursing notes?
 6      MS. HILDONEN:  Objection.
 7      A.  Yes.
 8      Q.  In April 2018, did Ms. Cassata ever hand
 9  you a paper towel with C.B.'s vital signs written
10  on it?
11      A.  No.
12      Q.  Was there something called a doctor's
13  list that was kept at Valley Ridge in 2018?
14      A.  Yes.  We had a list where we kept like
15  over the weekend when there's no doctor, we would,
16  if somebody had complained something and if it's
17  not emergency, we would put them in the list to be
18  seen by the doctor.  Yes.
19      Q.  And where was that doctor's list kept?
20      A.  It was in the nursing, I mean clinic.
21  It was in the clinic.
22      Q.  What kind of form was the doctor's list
23  on, if any?
24      A.  We would write the individual's name and
25  their complaint.
```

Page 52

```
             BARAL
 1
 2      Q.  And when a list was completely filled
 3  out, what would happen to it?
 4      A.  I mean that never happens.  I mean the
 5  doctor would be there Monday or Tuesday, so over
 6  the weekend, they will come and check according
 7  to the list, so we would cross out the names who
 8  were seen by the doctor already in the clinic.
 9      Q.  And then what would happen to that list
10  after all the names were crossed out?
11      A.  After the names were crossed out?
12      Q.  Let me ask a different question.  Would
13  the list be kept somewhere at Valley Ridge even
14  after all the names were crossed out?
15      A.  I don't remember what we did, because,
16  if the doctor sees an individual, he will put his
17  note.  So there would be the doctor's note.
18      MR. SHAPIRO:  Kasey, I will call for the
19  production of any doctor's lists from April
20  2018.
21      MS. HILDONEN:  Noted.  If you could just
22  send a request after the deposition.
23      MR. SHAPIRO:  Yeah, I will.
24      MS. HILDONEN:  Thank you.
25      A.  Sorry.  For the question, we had our
```

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# JA157

Page 53

BARAL

1
2  nurse practitioner there who would see them.  It's
3  not the doctor, he was nurse practitioner.
4      Q.   In April of 2018 there was no doctor
5  that worked at Valley Ridge, right?
6      A.   We had our nurse practitioner.
7  Sometimes like if we had a new admission, the
8  doctor had to come and do his assessment for the
9  new admissions, and he would come from Rome or
10  somewhere.
11      Q.   The nurse practitioner in April 2018 at
12  Valley Ridge was Raymond McGinn.  Is that correct?
13      A.   Yes.
14      Q.   Would you put an individual on a
15  doctor's list -- strike that.  You worked the
16  evening shift, right?
17      A.   Right.
18      Q.   What shift did Raymond McGinn work in
19  2018?
20      A.   His shift was like regular time 8 to 4,
21  8 to 5.  Somewhere like that.  Day shift, you know.
22      Q.   So if you saw an individual after Mr.
23  McGinn had left the facility for the day, even if
24  it was a weekday, might you put that individual on
25  the doctor's list if you thought there was a need

Page 54

BARAL

1
2  for him to see the doctor?
3      A.   Yes.
4      Q.   So any time you learned about a medical
5  condition that you thought required treatment from
6  the nurse practitioner, you would put that
7  individual on the doctor's list if the nurse
8  practitioner was not present at the facility, is
9  that fair to say?
10      A.   Yeah.  I mean, if he's not there and we
11  know he's coming soon if it's not emergency, we
12  would put them in the list.
13      Q.   But, if it was an emergency, then what
14  would you do?
15      A.   If it's an emergency, we would send them
16  to the hospital.
17      Q.   Did you as a nurse 2 at Valley Ridge
18  have the authority to send someone directly to the
19  hospital?
20      A.   Yes.
21      Q.   Was there an on-call nurse practitioner
22  even during nonbusiness hours?
23      A.   Yes, we did have on-call nurse, yes,
24  on-call medical providers, yes.
25      Q.   And, if there was an emergency situation

Page 55

BARAL

1
2  at Valley Ridge, would you call the on-call medical
3  provider immediately?
4      A.   If it is life-threatening or anything,
5  we would call 911 immediately, and if we could
6  wait, we would call them and see what they say, and
7  we would go according to that.
8      Q.   Was C.B. someone who you knew to make a
9  lot of medical complaints?
10      A.   C.B., I don't remember.  I mean he had
11  his days sometimes, and, like I said, in the
12  beginning he was a nice guy, but he had his bad
13  days sometimes.
14      Q.   What do you mean by bad days?
15      A.   Like he had his bad days.  Sometimes
16  he's very, I mean he's assaulting staff, very
17  agitated and all that.
18      Q.   Understood, but was he someone who you
19  knew to frequently ask to see a nurse because of
20  medical complaints?
21      A.   I would not say him like that, but
22  sometimes in the house if one individual complains
23  of something and they figure out we send them out
24  to the hospital, and it's like if the other
25  individuals also find out that, okay, this one is

Page 56

BARAL

1
2  going out from the house, the other one would also
3  come with some complaints.  They have their days.
4      Q.   Were there some individuals at Valley
5  Ridge who made a lot of medical complaints?
6      A.   Yeah.  Sometimes we did have those kind
7  of individuals.
8      Q.   And were there some individuals who made
9  medical complaints as a way of seeking attention?
10      A.   Yes.
11      Q.   Was C.B. one of those individuals?
12      A.   Like I said, he had his bad days
13  sometimes.  That's why we did their vital signs.
14  We assessed them.  Yes.  So I can't say.
15      Q.   Sitting here today, can you recall an
16  occasion when C.B. made a medical complaint just
17  for the purpose of seeking attention?
18      A.   Like I said --
19          MS. HILDONEN:  Objection.
20      A.   It's a long time.  I don't remember.
21      Q.   Did you ever speak to anyone in C.B.'s
22  family?
23      A.   No, I did not.  I don't remember.  No, I
24  did not.
25      Q.   Do you recall any occasion when someone

Pages 53 to 56

# Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son, C.B.,

|  |  |
|---|---|
| *Plaintiff*, | **RULE 26 INITIAL DISCLOSURE** |
| -against- | 20-CV-00091 |
| ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLAN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, | (TJM)(CFH) |
| *Defendants*. |  |

Defendants Elise M. Williams, Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack, by their attorney, Letitia James, Attorney General of the State of New York, Ryan W. Hickey, Assistant Attorney General, of counsel, provide the following information pursuant to Federal Rule of Civil Procedure 26(a)(1), upon information and belief:

1. Pursuant to FRCP 26(a)(1)(A)(i), at this time it is anticipated that the plaintiff, the defendants, and the following individuals have discoverable information as described:

   a. **Anita Baral**, RN II, Valley Ridge CIT, Norwich, New York.  It is anticipated that Ms. Baral may have discoverable information relating to the events of April 8-9, 2018;

   b. **Stephanie Bowers,** RN II, Valley Ridge CIT, Norwich, New York.  It is anticipated that Ms. Bowers may have discoverable information relating to the events of April 8-9, 2018;

   c. **Cameron Houck,** DDSCTA I, Valley Ridge CIT, Norwich, New York.  It is anticipated that Mr. Houck may have discoverable information relating to the events of April 8-9, 2018;

    d. **Laureen Joy,** DDSCTA I, Valley Ridge CIT, Norwich, New York.  It is anticipated that Ms. Joy may have discoverable information relating to the events of April 8-9, 2018;

    e. **Leisa McKown**, DDSCTA I, Valley Ridge CIT, Norwich, New York.  It is anticipated that Ms. McKown may have discoverable information relating to the events of April 8-9, 2018;

    f. **Jennifer Smith**, DDSCTA I, Valley Ridge CIT, Norwich, New York. It is anticipated that Ms. Smith may have discoverable information relating to the events of April 8-9, 2018;

    g. Any individuals identified in the Amended Complaint;

    h. Any and all individuals that have heretofore been disclosed in this action by plaintiff or that are disclosed during the course of discovery.

2.  Pursuant to FRCP 26(a)(1)(A)(ii), defendant is in the possession, custody, or control of the following documents, electronically stored information, and/or tangible things, which may be used to support their claims or defenses:  ;

    a. Records relating to the autopsy of C.B [ attached at DEF 000001 – DEF 000008];

    b. C.B.'s Certificate of Death [attached at DEF 000009];

    c. Medical/Burial Death Correction Report dated June 12, 2018 [attached at DEF 000010 – DEF 000012];

    d. Documents relating to the New York State Police investigation of C.B.'s death [attached at DEF 000013 -DEF 000021];

    e. Broome DDSOO Policy and Procedures, "Bed Safety: Bed Checks and Bed Rails," dated May 2012 [attached at DEF 000022 – DEF 000024];

    f. Broome DDSOO Policy and Procedures, "Death of an Individual," dated June 2013 [attached at DEF 000025 – DEF 000028];

g.  C.B.'s OPWDD medical records [To be disclosed upon completion of a Court-approved protective order].

h.  Any and all documents, electronically stored information, and/or tangible things that have heretofore been disclosed by plaintiff or that are disclosed during the course of discovery in this action.

3.  The disclosing defendants do not claim any damage.  *See* FRCP 26(a)(1)(A)(iii).

4.  There is no applicable insurance agreement.  *See* FRCP 26(a)(1)(A)(iv).

**Conclusion:**  Defendants state that these disclosures are based upon information reasonably available to them at the time this initial disclosure was prepared, and defendants specifically reserve the right to supplement these disclosures should additional information become available during the course of discovery and up through the trial of this matter, in accordance with the Court's Discovery Order and the Federal Rules of Civil Procedure. Defendants' Initial Disclosures contained herein constitute a good faith effort to identify information contemplated by F.R.C.P. 26(a)(1).

Dated: Albany, New York
       September 23, 2020

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

By: *s/ Ryan W. Hickey*
Ryan W. Hickey
Assistant Attorney General, of Counsel
Bar Roll No. 519020
Telephone:  (518) 776-2616
Fax:  (518) 915-7738 (Not for service of papers)
Email: ryan.hickey@ag.ny.gov

TO:   Sam Shapiro, Esq. (*via email*)

3

Sshapiro@ecbawm.com

Ilann M. Maazel, Esq. (*via email*0
Imaazel@ecbawm.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                  Plaintiff,

    -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                Defendants.

20 Civ. 00091 (TJM)(CFH)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL, LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................................ii-iii

NATURE OF AMENDMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 3

     I.     GOVERNING STANDARD: LEAVE SHOULD BE "FREELY GIVE[N]"........ 3

     II.    DEFENDANTS CANNOT SHOW PREJUDICE.................................................. 4

     III.   PLAINTIFF'S PROPOSED AMENDMENT IS NOT FUTILE ........................... 5

     IV.   PLAINTIFF DID NOT ACT IN BAD FAITH...................................................... 7

     V.    PLAINTIFF DID NOT ACT WITH UNDUE DELAY ....................................... 7

CONCLUSION........................................................................................................ 8

TABLE OF AUTHORITIES

**Cases**

*Block v. First Blood Assocs.*,
    988 F.2d 344 (2d Cir. 1993)..........................................................3, 4

*Chimarev v. TD Waterhouse Investor Svcs., Inc.*,
    233 F. Supp. 2d 615 (S.D.N.Y. 2002)..................................................5

*D.K. by L.K. v. Teams*,
    260 F. Supp. 3d 334 (S.D.N.Y. 2017)..................................................5

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017)................................................................5

*Foman v. Davis*,
    371 U.S. 178 (1962)..........................................................................4

*Fox v. Bd. of Trustees of State Univ. of N.Y.*,
    764 F. Supp. 747 (N.D.N.Y. 1991)....................................................4

*Lerman v. Chuckleberry Publ'g., Inc.*,
    544 F. Supp. 966 (S.D.N.Y. 1982)......................................................5

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984)................................................................5

*Mann v. United States*,
    300 F. Supp. 3d 411 (N.D.N.Y. 2018)..............................................6

*McChesney v. Hogan*,
    No. 08 Civ. 0563, 2010 WL 3613806 (N.D.N.Y. Aug. 11, 2010)....................5

*P.C. v. McLaughlin*,
    913 F.2d 1033 (2d Cir. 1990)............................................................5

*Pasternack v. Lab'y Corp. of Am. Holdings*,
    807 F.3d 14 (2d Cir. 2015)................................................................6

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
    46 F.3d 230 (2d Cir. 1995)................................................................4

*Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*,
    737 F.2d 1239 (2d Cir. 1984)............................................................5

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)..........................................................................5

**Statutes & Rules**

42 U.S.C. § 1983 ................................................................................................ 3, 5

**Rules**

Fed. R. Civ. P. 15(a)(2) ........................................................................................ 3

Having recently learned new facts in discovery, Plaintiff moves for leave to amend her First Amended Complaint filed in July 2020. The proposed Second Amended Complaint ("Proposed SAC") is annexed as Exhibit A to the accompanying Declaration of Samuel Shapiro ("Shapiro Declaration"). The proposed amendments add a new defendant, Anita Baral, and set forth allegations concerning Baral's liability. Exhibit B to the Shapiro Declaration shows the proposed changes between the First Amended Complaint and the Proposed SAC.

Plaintiff's motion should be granted because the amendment causes no prejudice, is not futile, is not the product of bad faith, and results in no undue delay.

### NATURE OF AMENDMENT

Plaintiff seeks leave to amend her complaint to add Anita Baral as a defendant and to plead new allegations concerning Baral's liability. On February 8, 2022, Plaintiff deposed Baral and Defendant Katherina Cassata. At the time of C.B.'s death in April 2018, Cassata was working as a direct care staff at the Valley Ridge Center for Intensive Treatment ("Valley Ridge CIT"). Ex. C at 29.[1] Cassata was assigned to "E house," where C.B. was living. *Id.* at 30. Baral was working as a nurse at the Valley Ridge CIT in April 2018. Ex. D at 11.

Cassata testified that C.B. reported medical complaints to her during the week before his death. Cassata testified that on April 4, 2018, C.B. told her that he "couldn't breathe," that his "chest hurt," and that he was "tired all the time." Ex. C at 51-52. She also testified that C.B. told her on April 4, 2018 that he could not vacuum—he told her, "I can't do it." *Id.* at 54-56. Cassata explained that it "wasn't like C.B. to not want to do something when [staff] asked him to do it." *Id.* at 56.

Cassata further testified that on April 6, 2018, C.B. told her he "couldn't breathe" and that "he was having chest pains." *Id*. Cassata testified that C.B. "looked physically sick" on April

---

[1] All exhibits cited herein are attached to the accompanying Shapiro Declaration.

6, 2018: "He had no color. He was sweating. He was clammy to the touch. He was out of breath. He couldn't—he was sitting down in the chair trying to vacuum sitting down in the chair like scooching himself along." *Id.* at 57. For C.B., having to sit down to do a chore was a "dramatic change" from his normal behavior. *Id.*

Cassata testified that on both April 4 and April 6, she notified Baral that C.B. could not breathe, was having chest pains, and did not feel well. *Id.* at 62-63, 70. Cassata testified that C.B.'s complaints "were severe enough where [she] felt nursing needed to come and take a look at him." *Id.* at 63. According to Cassata, on April 4, Baral instructed Cassata to take C.B.'s vitals, *id.*, but Cassata could not recall whether Baral actually came to see C.B., *id.* at 64. Cassata testified that on April 6, Baral "came and looked at [C.B.], and said that, you know, she patted him and, 'Oh, C.B., you'll be alright. Go lay down. Just get some rest.'" *Id.* at 70. Cassata testified that when Baral saw C.B. on April 6, C.B. said to Baral, "'I can't breathe. My chest hurts.'" *Id.* at 71. Nonetheless, according to Cassata, Baral did not take C.B.'s vital signs, examine C.B.'s lungs, or examine C.B.'s chest on April 6. *Id.*

Cassata testified that she documented C.B.'s complaints in a shift report and in what is referred to as "DAR" notes—notes that are supposed to be kept by Valley Ridge CIT direct care staff. *Id.* at 64, 77. In the DAR note, Cassata claims to have documented her call to Baral. *Id.* at 77. No shift report or DAR note has been produced corroborating Cassata's testimony.

Baral disputed Cassata's testimony. Baral testified that Cassata did not report to her in April 2018 that C.B. had trouble breathing, that C.B. had chest pains, that C.B. could not stand up to finish vacuuming, or that C.B. was having trouble finishing his chores. Ex. D at 48-49. If Cassata had made such reports, Baral testified, she would have documented them in nursing notes and 24-hour shift reports. *Id.* at 49-50. Baral also testified that the nurses at Valley Ridge

CIT kept a "doctor's list" where they would write the name of any resident who made a non-emergent medical complaint while a medical provider was not present at the facility. As Baral explained, "if [the medical provider is] not there and we know he's coming soon if it's not [an] emergency, we would put them in the list." *Id.* at 54.

Following Baral's deposition, Plaintiff requested all 24-hour transfer sheets from E house and the medical clinic for January 1, 2018 through April 9, 2018, and all "doctor's lists" from March 1, 2018 through April 9, 2018. On February 16, 2022, the Office of the Attorney General ("OAG") responded to Plaintiff's requests, indicating that OPWDD does not have any "doctor's lists" from the period of time in question and that the 24-hour transfer sheets are in fact bed check forms, which had previously been produced and which do not contain any notation from either Cassata or Baral about C.B.'s April 2018 medical complaints.

Based on Cassata's testimony—which included previously unknown details about C.B.'s complaints to her, her observations of C.B., what she reported to Baral, and what Baral did in response to those reports—Plaintiff seeks leave to amend her complaint to detail the facts that were uncovered in the depositions of Cassata and Baral and assert against Baral a constitutional substantive due process claim under 42 U.S.C. § 1983, a negligence claim, and a medical malpractice claim.

**ARGUMENT**

**I.    GOVERNING STANDARD: LEAVE SHOULD BE "FREELY GIVE[N]"**

Leave to amend a complaint should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in [the Second] Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). Refusal to grant leave to amend must be justified by grounds such as undue delay, bad faith, or futility. *Foman v. Davis*, 371 U.S. 178,

3

182 (1962). "[R]efusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules,'" *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) (quoting *Foman*, 371 U.S. at 182), and "the party opposing the amendment has the burden of showing prejudice," *Fox v. Bd. of Trustees of State Univ. of N.Y.*, 764 F. Supp. 747, 757 (N.D.N.Y. 1991), *modified on reconsideration,* 148 F.R.D. 474 (N.D.N.Y. 1993), *aff'd,* 42 F.3d 135 (2d Cir. 1994).

Applying these standards, the Court should grant Plaintiff's motion to amend.

## II.   DEFENDANTS CANNOT SHOW PREJUDICE

Defendants will not be prejudiced by the proposed amendment. In evaluating potential prejudice to a defendant, courts consider whether the amendments will: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350. None of these considerations bar amendment here.

Plaintiff's proposed amendment will cause, at most, only minimal additional discovery. Baral has already been deposed and Plaintiff will not seek to take her deposition again. Plaintiff has already requested documents described by Baral and Cassata at their depositions, and Defendants have responded to those requests. Aside from seeking Baral's personnel file, Plaintiff does not anticipate needing any additional discovery as a result of the proposed amendment. The proposed amendment will not unduly prolong the discovery period or delay trial.

III.    **PLAINTIFF'S PROPOSED AMENDMENT IS NOT FUTILE**

Plaintiff's proposed amendment is neither frivolous nor legally deficient. *See Chimarev v. TD Waterhouse Investor Svcs., Inc.*, 233 F. Supp. 2d 615, 617 (S.D.N.Y. 2002). "Unless a proposed amendment is clearly frivolous or legally insufficient on its face, the substantive merits of a claim or defense should not be considered on a motion to amend." *Lerman v. Chuckleberry Publ'g., Inc.*, 544 F. Supp. 966, 968 (S.D.N.Y. 1982), *rev'd on other grounds sub nom Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984).

The Proposed SAC asserts three claims against Baral: a constitutional substantive due process claim under 42 U.S.C. § 1983, a negligence claim, and a medical malpractice claim. Developmentally disabled individuals "in the custody of state officials have constitutionally protected rights to adequate food, shelter, clothing and medical care, to safe living conditions, and to freedom from undue bodily restraint." *P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir. 1990) (citations omitted); *accord Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1243 (2d Cir. 1984) (elaborating this principle in the context of a residence for people with developmental disabilities). To establish a substantive due process violation against Baral, Plaintiff must establish that Baral engaged in conduct that "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982); *accord Soc'y for Good Will*, 737 F.2d at 1246.[2]

---

[2]    Some courts have applied the "deliberate indifference" standard to substantive due process claims arising from a state employee's failure to protect a developmentally disabled individual. *See, e.g., McChesney v. Hogan*, No. 08 Civ. 0563, 2010 WL 3613806, at *6 (N.D.N.Y. Aug. 11, 2010), *report and recommendation adopted,* 2010 WL 3522513 (N.D.N.Y. Sept. 2, 2010). Under the "deliberate indifference" standard, Plaintiff "must show only that 'the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [individual] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.'" *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 354-55 (S.D.N.Y. 2017) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)). No matter what standard is applied, Plaintiff's proposed claims against Baral are not futile.

Plaintiff's proposed negligence and medical malpractice claims carry a lower burden than her proposed § 1983 claim. "The elements of a negligence claim under New York law are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (cleaned up). "Under New York law, a medical malpractice plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Mann v. United States*, 300 F. Supp. 3d 411, 419 (N.D.N.Y. 2018) (cleaned up).

The deposition testimony of Cassata and Baral is more than enough to establish that Plaintiff's claims against Baral are not futile. Baral acknowledged in her deposition that "if [C.B.] had any acute medical needs, that's my job to go down there and address that." Ex. D at 36. But according to Cassata, Baral did nothing in response to C.B.'s serious medical complaints. Cassata testified that, in the week prior to C.B.'s death, she called Baral three times about C.B. Ex. C at 76-77. In those calls, Cassata testified, she reported to Baral that C.B. could not breathe, that C.B. was having chest pains, that C.B. could not complete his chores, and that C.B. looked physically sick. *Id.* at 63-65. In response to those reports, Cassata claims Baral visited C.B. only once, that she did not examine C.B. at all, and that she did not ask him any questions about how long he had been experiencing his symptoms. *Id.* at 70-71.

The factfinder will resolve the conflict between Cassata and Baral. If the factfinder credits Cassata's testimony, it would support a finding that Baral ignored her duty to respond to C.B.'s medical complaints in the days prior to his death and that Baral violated C.B.'s substantive due process rights, was negligent, and committed medical malpractice.

## IV.    PLAINTIFF DID NOT ACT IN BAD FAITH

Plaintiff did not act in bad faith in not previously bringing a claim against Baral. Until Cassata and Baral were deposed on February 8, 2022, Plaintiff did not know the full scope of the complaints C.B. made to Cassata or the details of Cassata's observations of C.B.'s clear distress. Nor did Plaintiff know what Cassata purportedly reported to Baral or the extent to which Cassata claims Baral utterly failed to respond to C.B.'s medical needs.

## V.    PLAINTIFF DID NOT ACT WITH UNDUE DELAY

Rule 15 sets forth no deadline by which motions to amend must be filed. Here, Plaintiff acted quickly to amend the Complaint to add Baral once Plaintiff learned of the extent of Baral's alleged misconduct during Cassata's deposition.

Cassata and Baral were deposed on February 8, 2022; Plaintiff did not receive their deposition transcripts until February 21, 2022. Following the depositions, Plaintiff requested documents that had been referenced during the depositions as supposedly containing notes about Cassata's and Baral's interactions with C.B. on April 4, 2018 and April 6, 2018. Defendants responded to Plaintiff's document requests on February 16, 2022.

On February 22, 2022, Plaintiff's counsel emailed Defendants' counsel, stating that Plaintiff intended to seek to add Baral as a defendant in this case and asking if Defendants would consent to the amendment. The OAG responded on February 25, 2022, stating it would not consent to the amendment. Counsel for Defendant Ashley Sessions stated that he is not taking a position at this time, but reserved his right to oppose this motion to amend. Plaintiff filed a letter seeking leave to make this motion two business days after receiving Defendants' counsel's responses.

It is immaterial that Defendants listed Baral on their Rule 26 disclosures. Those disclosures merely stated that Baral "may have discoverable information relating to the events of

April 8-9, 2018." Ex. E at 1. They said nothing about what Cassata claims occurred on April 4 or April 6, 2018, and thus provided no factual basis for the claims Plaintiff now proposes to bring in the Proposed SAC.

**CONCLUSION**

One of the Defendants in this case testified under oath that Baral ignored reports of C.B.'s medical complaints and distress. That testimony is more than sufficient to support Plaintiff's claims against Baral in the Proposed SAC. Plaintiff's motion for leave to file the Proposed SAC should therefore be granted.

Dated: March 30, 2022
      New York, NY

                                EMERY CELLI BRINCKERHOFF
                                ABADY WARD & MAAZEL LLP

                                By: _____/s/ Samuel Shapiro_____
                                      Ilann M. Maazel
                                      Samuel Shapiro

                               600 Fifth Avenue, 10th Floor
                               New York, New York 10020
                               (212) 763-5000
                               *Attorneys for Plaintiff*

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

  J.M., as Administrator of the Estate of Her Son, C.B.,

                           Plaintiff,

          -against-

ASHLEY SESSIONS; ELISA M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLAN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                 Defendants.
_____

**MEMORANDUM OF LAW**

1:20-CV-91 (TJM/CFH)

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ASHLEY SESSIONS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND HER AMENDED COMPLAINT</u>**

**CAPEZZA HILL, LLP**
**BENJAMIN W. HILL, ESQ.**
Bar Roll No.: 514953
Attorneys for Defendant Ashley Sessions
30 South Pearl Street, P-110
Albany, NY 12207
(518) 478-6065 (phone)
Ben@capezzahill.com

## INTRODUCTION

Defendant Ashley Sessions submits this Memorandum of Law in Opposition to Plaintiff's Motion to Amend her Amended Complaint. There are two bases for Ms. Sessions' opposition: (1) the addition of another defendant in Anita Baral will significantly delay the final resolution of this case thereby causing prejudice to Ms. Sessions; and (2) Plaintiff's proposed causes of action against Ms. Baral are time-barred under the applicable statutes of limitations and do not relate back to the Complaint and/or Amended Complaint and are therefore frivolous. For all the reasons herein, Plaintiff's Motion to Amend should be denied so that this case can proceed to a final resolution.

**POINT I:     The Addition of Ms. Baral Will Prejudice Ashley Sessions**

At the outset, it must be acknowledged that Plaintiff's proposed claims against Ms. Baral do not directly concern Defendant Sessions or the claims brought against her.  For that reason, the undersigned did not immediately indicate an opposition to the instant Motion.   However, having reviewed Plaintiff's Motion and the attachments thereto, which sets forth the theory of liability against Ms. Baral, it is clear that were Ms. Baral added as a defendant, she would be entitled to separate counsel under N.Y. Public Officers Law § 17, which will necessarily require a significant extension of the discovery deadline in order for Ms. Baral to retain outside counsel, and to provide her with the opportunity to conduct discovery necessary to defend the new claims against her.

As set forth in her Memorandum of Law, Plaintiff's theory of liability against Ms. Baral is based on inconsistencies between her testimony and testimony from Katherina Cassata, a defendant who is represented by the New York Attorney General's Office ("OAG"). Plaintiff's acknowledgement that a factfinder will be called on to "resolve the conflict between Cassata and Baral" is a clear indication that Baral, were she added, could not be represented by OAG, who

currently represents Ms. Cassata.  *See* Model Rule 1.7.  Notably, Plaintiff's Amended Complaint and proposed Second Amended Complaint seek punitive damages against each defendant individually.  The conflict is obvious and, while it is not the undersigned's duty to evaluate any such conflict, neither can we ignore the prejudice to Ms. Sessions, via Plaintiff's ninth inning motion to amend, that this conflict will create.

Plaintiff's breezy assessment that there is no prejudice because she does not "anticipate needing any additional discovery as a result of the proposed amendment" does not take into account the due process rights of Ms. Baral.  In that regard, it is likely that any attorney retained to represent her would be entitled to seek discovery, to review the discovery to date (including over 10,000 pages of documents and approximately ten deposition transcripts) and finally, to determine what discovery *Ms. Baral* may seek that is relevant to the claims or defenses.  Such discovery could include the re-opening of depositions given that Ms. Baral has not had the opportunity to ask questions of any party or non-party witness to date.

In short, Plaintiff's proposed amendment would place the discovery of this case back at square one, and the consequential delay in the resolution of this matter will be a significant prejudice to Ms. Sessions, who is no longer employed by OPWDD and seeks a final resolution of this matter that goes back to April 2018.

**POINT II: Plaintiff's Proposed Claims Against Ms. Baral are Time-Barred**

The events that give rise to this lawsuit occurred no later than April 8, 2018, the date of C.B.'s death.  What plaintiff has labeled negligence and malpractice causes of action are properly categorized as wrongful death claims, which are subject to a two-year statute of limitations in New York.  Plaintiff's Section 1983 claims are subject to a three-year statute of limitations.  Thus, it is

clear that Plaintiff's proposed claims against Ms. Baral are untimely unless they are deemed to "relate back" to the initial Complaint filed on January 27, 2020. Dkt. No. 1.

Under the FRCP, a new party can be added, changed, or substituted by satisfying the conditions of Rule 15(c)(1)(C): (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the [timely] original complaint. *See, e.g. Girau v. Europower, Inc.*, 317 F.R.D. 414, 420 (S.D.N.Y. 2016).

In this case, Ms. Sessions concedes that the proposed allegations against Ms. Baral arise out of conduct that is described, albeit generally, in the original Complaint.  However, Plaintiff cannot meet the remaining aforementioned relation-back criteria.  First, there is no indication that Ms. Baral received notice of this lawsuit until she was subpoenaed for testimony as a non-party witness in or about January 2022 prior to her February 8, 2022 deposition.  At her deposition, Ms. Baral was not represented and had not reviewed any documents or otherwise prepared for the deposition on her own or with counsel.  Ms. Baral has not had the opportunity to participate in the extensive discovery to date, which includes several party and non-party depositions and over ten thousand pages of relevant documents including medical records.

Adding Ms. Baral as a party after having deposed her, without the benefit of counsel, as a non-party, would be highly prejudicial, especially considering that the statute of limitations against her ran even prior to her being subpoenaed for deposition testimony.  Plaintiff was aware from the paper discovery that Ms. Baral provided care to the decedent and could have sought to interview and/or depose Ms. Baral at any time after discovery began in 2020, but it did not.  Indeed, Plaintiff

has provided no indication that Ms. Baral knew of the lawsuit prior to the subpoena being issued

in January 2022.

     Second, there is no mistake of identity issue here. Plaintiff simply did not name Ms. Baral

as a defendant within the statute of limitations. Third, notice of the intention to sue Ms. Baral was

not accomplished within 120 days of the original complaint being filed.  Therefore, Plaintiff's

proposed Amended Complaint does not relate back to the original complaint under Rule 15 and is

therefore futile because her claims against Ms. Baral are time-barred absent any relation back to

the original Complaint.

## **CONCLUSION**

     For all the above reasons, Plaintiff's Motion to Amend at this late stage of the litigation

should be denied.

Dated: May 6, 2022

 

**CAPEZZA HILL, LLP**

_____
Benjamin W. Hill, Esq.
Attorneys for Defendant Ashley Sessions
30 South Pearl Street, P1
Albany, New York 12207
(518) 478-6065
Ben@capezzahill.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

J.M., as Administrator of the Estate of Her Son, C.B.,

                                    Plaintiff,
                                                          20-CV-00091

              -against-
                                                          (TJM)(CFH)
ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLAN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

                                    Defendants.

_____

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE
TO AMEND THE COMPLAINT**

                          LETITIA JAMES
                          Attorney General
                          State of New York
                          *Attorney for Defendants Elise Williams, Joshua
                              A. Buell, Corey C. Behlan, Raymond J.
                              McGinn, Katherine L. Cassata, and Michael
                              Novack*
                          The Capitol
                          Albany, New York 12224-0341

Ryan W. Hickey
Assistant Attorney General, of Counsel
Bar Roll No. 519020
Telephone: (518) 776-2616
Fax: (518) 915-7738 (Not for service of papers)
Ryan.Hickey@ag.ny.gov                          Date: May 6, 2022

# JA181

**Table of Contents**

PRELIMINARY STATEMENT ................................................. 1

ARGUMENT ..................................................................... 1

    POINT I ..................................................................... 1

        PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT SHOULD BE DENIED BECAUSE IT IS FUTILE .............................................. 1

    POINT II ................................................................... 4

        PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT SHOULD BE DENIED BECAUSE OF UNDUE DELAY, AND BECAUSE IT IS UNDULY PREJUDICIAL TO THE STATE DEFENDANTS ........................ 4

CONCLUSION ................................................................. 8

## PRELIMINARY STATEMENT

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn, Katherine L. Cassata, and Michael Novack (hereinafter collectively "the State Defendants") submit this memorandum of law in opposition to plaintiff's motion for leave to amend the complaint.  [Dkt. No. 25].  As set forth below, plaintiff's motion should be denied as futile because the claims are barred by the statute of limitations, and therefore could not withstand a motion to dismiss.  Further, plaintiff's delay in adding Baral as a party is unduly prejudicial to the State Defendants.

## ARGUMENT

## POINT I

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT SHOULD BE DENIED BECAUSE IT IS FUTILE

"A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *See Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003).  Therefore, where the defect in the complaint is substantive, and "better pleading will not cure it," leave to re-plead should be denied.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  A proposed amended complaint seeking to assert claims barred by the statute of limitations is futile and must be denied.  *Malesko v. Correctional Servs. Corp.*, 229 F.3d 374, 382-84 (2d Cir. 2000), *rev'd on other grounds*, 534 U.S. 61 (2001).

In Section 1983 actions, the applicable statute of limitations is the "general or residual statute [of limitations] for personal injury actions" under the law of the state in which the federal court sits. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)).  Under New York law, the statute of limitations for personal injury actions is three years.  *See* N.Y. C.P.L.R. § 214(5).  Accordingly, the "applicable statute of limitations for

Section 1983 claims arising in New York requires claims to be brought within three years." *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995).

Furthermore, "[w]hile state law supplies the statute of limitations for claims under §1983, federal law determines when a federal claim accrues. [Under federal law,] [t]he claim accrues when the plaintiff knows or has reason to know of the harm." *See Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (citation omitted); *see also Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) ("Federal law, however, governs the determination of when the statute of limitations begins to run."); *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) ("[T]he claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm."); *Pendleton v. Goord*, 849 F. Supp. 2d 324, 329 (E.D.N.Y. 2012) ("The limitations period begins to run, or accrue, when the plaintiff knows or has reason to know of the harm.").

The proposed second amended complaint alleges that on or about April 4, 2018 to April 6, 2018, Baral failed to properly address reports that C.B. was having medical issues leading up to his death on April 9, 2018. ECF No. 93-3 at ¶¶ 59 – 79. Plaintiff's proposed Section 1983 claim against Baral accrued, at the very latest, three years later, in April 2021 and therefore is untimely by more than a year.

Plaintiff may not invoke the so-called "relation back" doctrine to bring these untimely claims. A motion to amend which seeks to assert an otherwise time-barred claim may be granted where the proposed amendment "relates back" to the date the plaintiff filed the original complaint. Fed. R. Civ. P. 15(c)(1). However, an amended complaint that names additional defendants will "relate back" to the date of the original complaint only if: (1) the new claim arises "out of the conduct, transaction, or occurrence set out . . . in the original pleading"; (2) within the time for

serving the original pleading under Rule 4(m), the new parties "received such notice of the action that [they] will not be prejudiced in defending on the merits"; and (3) within the time for serving the original pleading under Rule 4(m), the new parties "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper part[ies'] identit[ies]." Fed. R. Civ. P. 15(c)(1)(C); *see also VKK Corp. v. National Football League*, 244 F.3d 114, 128 (2d Cir. 2001); *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996).

"Courts in this Circuit have held relation back is only permitted where plaintiff named the wrong party in the original complaint, and not where plaintiff named one but not all of the right defendants." *Pikos v. Liberty Maint., Inc.*, 2015 U.S. Dist. LEXIS 151123, at *9 (E.D.N.Y. Nov. 6, 2015) (proposed claims did not relate back where plaintiff "attempt[ed] to add . . . additional parties while maintaining" the original defendant); *see also Hogan v. Fischer*, 738 F.3d 509, 517-18 (2d Cir. 2013) ("This Circuit has interpreted [Rule 15(c)] to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because plaintiff did not know their identities."); *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) (lack of knowledge of a John Doe defendant's name does not constitute a "mistake of identity" under Rule 15(c)); *Hahn v. Office & Prof'l Emps. Int'l Union*, 107 F. Supp. 3d 379, 384-86 (S.D.N.Y. 2015) (finding no mistake where "[t]he plaintiff has sued [what he believes is] the right defendant, and simply neglected to sue another defendant who might also be liable" (alteration in original) (internal quotations marks omitted)).  Rule 15(c) "does not apply to the addition of a new party defendant after the limitations period has run," because "[s]uch an amendment is tantamount to the assertion of a new cause of action, and to permit relation back under these circumstances would be to subvert the policies of the statute of limitations." *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 553 (S.D.N.Y. 1977) (internal citations omitted).

3

Here, the addition of Baral as a defendant after the expiration of the limitations period is not permitted under Rule 15. The addition of Baral does not fall within the narrow circumstance contemplated by Rule 15 in which there has been a mistake of identity. Plaintiff is seeking to maintain the existing defendants and add Baral as a party. This is plainly a scenario in which plaintiff believes she has named "one but not all of the right defendants." *Pikos*, 2015 U.S. Dist. LEXIS 151123, at *9. The relation back doctrine does not apply.

Plaintiff also does not satisfy the requirements for "relation back" under New York state law pursuant to Rule 15(c)(1)(A). *See* Fed. R. Civ. P. 15(c)(1)(A). Under New York state law, a claim against a new party in an amended pleading relates back to the date of the original pleading where: (1) the new claim arose out of the same "conduct, transaction or occurrence" as the original allegations; (2) "the new party is "united in interest" with the original defendant"; and (3) "the new party knew or should have known that," but for a "mistake by plaintiff as to the identity of the proper parties, the action would have been brought against him as well." *See Buran v. Coupal*, 87 N.Y.2d 173, 178 (1995) (*quoting Brock v. Bua*, 443 N.Y.S.2d 407, 412 (2d Dep't 1981)). Just as under the federal standard, plaintiff does meet New York's requirements for "relation back" because the untimely claims against Baral were not the result of a mistake of identity, but rather are plaintiff's attempt to add a new defendant after the expiration of the limitations period.

**POINT II**

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT SHOULD BE DENIED BECAUSE OF UNDUE DELAY, AND BECAUSE IT IS UNDULY PREJUDICIAL TO THE STATE DEFENDANTS**

The Court may deny leave to amend for "[r]easons [of] . . . undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *State Teachers Ret. Bd. v. Fluor Corp*, 654 F.2d 843, 856 (2d Cir. 1981) (citing *Foman v. Davis*, 371 U.S.

4

178, 182, (1962)).  "Prejudice to the opposing party and undue delay are the 'touchstones' of a court's discretion to deny leave to file amended pleadings." *Green v. Schmelzle*, 210 F. Supp. 3d 454, 464 (W.D.N.Y. 2016), quoting *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998).

In instances where a considerable amount of time has passed between filing the complaint and the motion to amend, courts have placed the burden on the movant to show some valid reason for the delay.  *See Kenney v. Clay*, 172 F. Supp. 3d 628, 643 (N.D.N.Y. 2016); *McGee v. Dunn*, 940 F. Supp. 2d 93, 108 (S.D.N.Y. 2013); *Phaneuf v. Tenneco, Inc.*, 938 F. Supp. 112, 115 (N.D.N.Y. 1996).

Further, in determining whether an amendment would be prejudicial, courts consider whether the assertion of a new claim would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Plaintiff seeks leave to file a Second Amended Complaint ("SAC") to add a new defendant, Anita Baral, and to add factual allegations relating to Baral.  ECF No. 93-3.  As of the filing of this memorandum, it has been over two years since this action was commenced.  ECF No. 1 (Complaint filed January 27, 2020).  The parties have engaged in extensive, and largely cooperative, written discovery, depositions, and a site inspection.  The discovery schedule has been extended at several points, in response to joint requests by counsel, to accommodate the discovery needs of the action, including the scheduling of several non-party depositions. *See* ECF Nos. 60, 72, 75, 82.  Under the current court-ordered pre-trial schedule, fact discovery was to be completed by February 28, 2022, and dispositive motions are to be filed in just over a month, on June 10, 2022.  ECF No. 82

5

According to Plaintiff, the proposed amendments are appropriate because they are based upon recently learned new facts. ECF No. 93-7 at 5. Specifically, Plaintiff points to the testimony of Anita Baral and defendant Katherina Cassata at their respective depositions on February 8, 2022 as the source of newly learned facts which justify leave to amend. At their depositions, Cassata and Baral offered accounts of alleged medical complaints made by C.B., and Baral's response to those complaints. But Cassata and Baral's accounts concerning the response to C.B.'s medical complaints was not new information at the time of the February 8, 2022 depositions. On January 19, 2021, as part of their response to Plaintiff's request for production, defendants served plaintiff with records relating to OPWDD's internal investigation into C.B.'s death. *See* Declaration of Ryan W. Hickey ("Hickey Decl.") at ¶¶ 3-4. Among those records are summaries of the internal investigators interviews of Cassata and Baral. *Id.* at ¶ 4.

The summary of Cassata's interview states:

- That on April 4, 2018, C.B. complained to Cassata that "I don't feel good, I can't breathe.";

- That on April 4, 2019, Cassata called Baral to notify her of these complaints and that when Baral came to see C.B. she "patted [C.B.] on his back and told him to drink plenty of fluids and get some rest."

Hickey Decl. Exhibit B (DEF 008989).

The summary of Baral's interview states:

- That Baral "denies at any time she was notified by DDSCTA I Cassata or any other staff that [C.B.] was having difficulty breathing or needed medical treatment."

- That the last time Baral observed C.B. was on April 6, 2018 and that "he did not complain that he did not feel well or that he was having difficulty breathing" nor did

6

Baral "observe him to be having any medical concerns."

*Id.* (DEF 008990 – DEF 008991).

These are the exact same facts that Plaintiff states were newly learned at Cassata and Baral's February 2022 depositions and which she contends warrant leave to amend. But the information which Plaintiff characterizes as newly learned is not new at all -- it was disclosed to her in the January 19, 2021 production, nearly a year and a half ago. Even if Plaintiff solicited additional details about Cassata and Baral's accounts at their eventual depositions, that is not a basis for Plaintiff to delay in naming Baral as a party. It is never the case that a plaintiff knows every detail of the testimony of an opposing party at the time they name them as a defendant. If Plaintiff wished to name Baral as a defendant based on the purported discrepancies between her account and Cassata's account of the events of April 2018, she had more than enough information to do so as of January 2021.

The belated addition of Baral as a defendant is unduly prejudicial to the State Defendants, who have been actively defending this matter for over two years. Amending the compliant to add Baral will surely cause substantial delay in the resolution of this action for at least two reasons. First, although the proposed claims against Baral concern her conduct as an employee of OPWDD, it is not a foregone conclusion that she will be represented by the Office of the Attorney General ("OAG"). Given the nature of the proposed allegations against Baral, and the existing testimony of defendant Cassata, OAG will need to undertake a conflict review to determine whether it may represent both Cassata and Baral. Assuming, *arguendo*, that OAG determines it cannot represent Baral, she will need to retain conflict counsel. As the Court is aware from the prior conflict issue involving defendant Sessions, the retention of conflict counsel can be a time-consuming process.

Second, if Baral is added as a defendant it will likely require fact discovery to be re-opened

7

and thereby delay the progress of this case significantly.  Plaintiff states that she has minimal discovery to request from Baral, and so not much more time will be needed.  But that is only part of the equation.  Beyond her non-party deposition, at which she was not represented by counsel, Baral has had no participation in this action, and certainly no opportunity to pursue discovery.  At minimum, Baral's counsel will need to review the thousands of pages of paper discovery and deposition transcripts that have already been exchanged to get up to date on this action, and then could seek additional discovery from Plaintiff or from the other defendants.  Given the scope of discovery in this case, that process could easily take several more months.

Given the futility of the proposed amendment and the unjustified delay in requesting that amendment, the Court should deny leave to amend.

### CONCLUSION

For all of the reasons discussed above, plaintiff's motion to amend should be denied.

Dated: Albany, New York
         May 6, 2022

> LETITIA JAMES
> Attorney General of the State of New York
> *Attorney for Defendants Elise Williams, Joshua A.*
>     *Buell, Corey C. Behlan, Raymond J. McGinn,*
>     *Katherine L. Cassata, and Michael Novack*
> The Capitol
> Albany, New York 12224-0341
>
> By: <u>*s/ Ryan W. Hickey*</u>
> Ryan W. Hickey
> Assistant Attorney General, of Counsel
> Bar Roll No. 519020
> Telephone:  (518) 776-2616
> Fax:  (518) 915-7738 (Not for service of papers)
> Email: ryan.hickey@ag.ny.gov

To:      Counsel of record (*Via ECF*)

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────

J.M., as Administrator of the Estate of Her Son, C.B.,

                                *Plaintiff*,

                 -against-

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

                               *Defendants*.

─────────────────────────────────────────

**DECLARATION**

20-CV-00091

(TJM)(CFH)

       Ryan W. Hickey, on the date noted below and pursuant to §1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

       1.     I am an Assistant Attorney General and appear in this action on behalf of Letitia James, Attorney General of the State of New York, attorney for defendants Elise Williams, Joshua A. Buell, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack in this action.

       2.     I make this declaration to submit certain records that were disclosed by defendants to plaintiff in this action, and which support defendants' opposition to plaintiff's motion for leave to amend the complaint [ECF. No. 93] for the reasons set forth in the accompanying memorandum of law.

       3.     On January 19, 2021, I produced to plaintiff's counsel, via upload to the OAG Secure Cloud share drive being used for exchange of records in this action, a copy of OPWDD

1

# JA191

records concerning the agency's internal investigation of C.B.'s death.  These records are bates stamped DEF 008695 – DEF 009005.  A copy of my January 19, 2021 email to plaintiff's counsel, in which I advised him, and counsel for defendant Sessions, that this production had been uploaded to the share drive for their review, is attached hereto as **Exhibit A**.  I have redacted from this exhibit a discussion of ESI custodians as it is not relevant to the instant motion.

4.      The January 19, 2021 production contains, at DEF 008989 – DEF 008991, a summary of the interviews that were conducted by OPWDD's internal investigator of defendant Cassata, and Anita Baral.  I have marked DEF 008989 – DEF 08991 as **Exhibit B**, but have not filed it herewith because these records are designated as confidential pursuant to the Confidentiality Agreement and Order in this action [ECF. No. 47].  Pursuant to paragraph 12 of the Order, I must seek the Court's leave to file these confidential documents under seal.  Filed herewith is a letter requesting permission to file Exhibit B under seal.

Dated: May 6, 2022
     Albany, New York

                                            *s/ Ryan W. Hickey*
                                            Ryan W. Hickey

| From: | Hickey, Ryan |
|---|---|
| To: | Sam Shapiro; Ben Hill |
| Subject: | RE: J.M. v. Sessions, et al. |
| Date: | Tuesday, January 19, 2021 9:56:00 PM |

Sam,

I have uploaded the first of two parts of the OPWDD's investigation records. (DEF 008695 – DEF 009005).  I am awaiting some input from the clients as to any necessary redactions for the second part.  Expecting to get that tomorrow and upload the second part thereafter.  As discussed, these records are designated confidential.

Also, following up on our phone call last week, I have compiled, with assistance from OPWDD, the following list of potential ESI custodians:

- All defendants
- Members of Mr. Blair's treatment team (as of the date of his death):
  - Dave Truesdail (Treatment Team Leader)
  - Nancy Fitzgerald (DA3)
  - Corey Behlen (DA3)
  - Mike Novack (House Director)
  - Mellisa Grant (Hab Spec)
  - Keith Benedict  (Nurse)
  - Michelle Ferguson-Yaroush (OT)
  - Kevin Hawley (PT)
  - Sue Wanamaker (Speech)
  - Margaret Fassett (Dietician)
  - Ray McGinn (Family Nurse Practicioner)
  - Roy Spina (Psychologist)
- Additional potential custodians:
  - Jennifer Toti (Valley Ridge Director at time of Mr. Blair's death)
  - Teresa Quain (Valley Ridge human resources)
  - Jill Pettinger (Deputy Commissioner, Division of Service Delivery)
  - Mike Feeney (Associate Deputy Commissioner for State Operations)
  - Jeanne Wilson (State Operations Office Director, Region 2 at time of Mr. Blair's death)
  - James Skrzeczkowski (Current State Operations Office Director, Region 2)
  - Catherine Frobel (Director, Quality Improvement for State Operations – Broome at time of Mr. Blair's death)
  - Leslie Fuld (Deputy Commissioner, Division of Quality Improvement)
  - Karisa Capone (Director, Incident Management Unit)
  - Peter Scalise (Director, OIIA)
  - Olivia Hess (Investigator OIIA)

My initial thought on the ESI protocol is that it looks ok, but may be a little overkill for what we are trying to accomplish.  OPWDD indicates that the universe of ESI here is really limited to emails, since other documents responsive to your demands, if maintained in electronic form, were complied and

produced previously.  So, that really limits our task here to searching emails.

I'd like to get some input from some other folks in my office, as well as the client, to get a better sense of what our technology capabilities are before I commit to some of the specifics here regarding the formats of the files, etc.  Otherwise, the dates you have proposed in paragraph 2 seem workable to me (see above for our response to 2(a)).

Thanks,

Ryan

**Ryan W. Hickey**
Assistant Attorney General | Litigation Bureau
New York State Office of the Attorney General
The Capitol | Justice Building | Albany, NY 12224-0341
<u>Tel</u>: (518) 776-2616 | <u>Fax</u>: (518) 915-7738
<u>Email</u>: Ryan.Hickey@ag.ny.gov

**From:** Sam Shapiro <sshapiro@ecbawm.com>
**Sent:** Friday, January 15, 2021 10:22 AM
**To:** Hickey, Ryan <Ryan.Hickey@ag.ny.gov>; Ben Hill <Ben@Capezzahill.com>
**Subject:** J.M. v. Sessions, et al.

**[EXTERNAL]**
Ryan/Ben,

Thanks for the call yesterday. As discussed, attached, please find a proposed ESI protocol. Please let me know if you'd like to propose any edits.

Thanks,
Sam

Sam Shapiro
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
phone: 212-763-5000
fax: 212-763-5001
sshapiro@ecbawm.com
www.ecbawm.com

This electronic message contains information from the law firm of Emery Celli Brinckerhoff Abady Ward & Maazel LLP that may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (212-763-5000) or

by email (sshapiro@ecbawm.com) immediately.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

—————————————————————

J.M., as Administrator of the Estate of Her Son, C.B.,

*Plaintiff*,

-against-

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

*Defendants*.

—————————————————————

20-CV-00091

(TJM)(CFH)

**[SEALED EXHIBIT B]**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

               Plaintiff,

    -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,
              Defendants.

20 Civ. 00091 (TJM)(CFH)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

# JA197

**TABLE OF CONTENTS**

PG NO.

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT ............................................................................................2

   I.     DEFENDANTS CANNOT SHOW UNDUE PREJUDICE..................2

   II.    DEFENDANTS CONCEDE PLAINTIFF DID NOT ACT IN BAD FAITH..............4

   III.   PLAINTIFF DID NOT ACT WITH UNDUE DELAY ................................4

   IV.   PLAINTIFF'S PROPOSED AMENDMENT IS NOT FUTILE ..................6

    A.    Plaintiff's Claims Against Baral Relate Back...............................6

      1.   Plaintiff's Claims Against Baral Relate Back Under the Federal Standard............7

         a.   Baral Had Constructive Notice of this Action ............................... 8

         b.   Baral Should Have Known the Action Would Be Brought Against Her but for a Mistake......................................... 9

      2.   Plaintiff's Claims Against Baral Relate Back Under the New York State Standard .....................................................13

    B.    Plaintiff's Claims Against Baral Are Timely Under the Discovery Rule.................14

    C.    Equitable Tolling Is Warranted..............................................16

   CONCLUSION.........................................................................................18

**TABLE OF AUTHORITIES**

PG NO.

**CASES**

*A.Q.C. ex rel. Castillo v. United States*,
    656 F.3d 135 (2d Cir. 2011)................................................................. 16

*A.V. by Versace, Inc. v. Gianni Versace S.p.A.*,
    87 F. Supp. 2d 281 (S.D.N.Y. 2000).................................................... 3

*Abdell v. City of New York*,
    759 F. Supp. 2d 450 (S.D.N.Y. 2010).......................................... 10, 13

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016).............................................. 2, 3

*Badamo v. Chevron U.S.A., Inc.*,
    No. 20 Civ. 5847, 2022 WL 1450764 (S.D.N.Y. May 9, 2022).......... 16

*Barrett v. United States*,
    689 F.2d 324 (2d Cir. 1982)............................................................. 15

*Barrow v. Wethersfield Police Dep't*,
    66 F.3d 466 (2d Cir. 1995)......................................................... 11, 12

*Bell v. Saunders*,
    No. 20 Civ. 00256, 2021 WL 1699860 (N.D.N.Y. Apr. 29, 2021) ........ 8

*Bodum Holding AG v. Starbucks Corp.*,
    No. 19 Civ. 4280, 2020 WL 6135714 (S.D.N.Y. Oct. 16, 2020) .......... 6

*Buran v. Coupal*,
    87 N.Y.2d 173 (1995) ..................................................................... 14

*Ceara v. Deacon*,
    916 F.3d 208 (2d Cir. 2019)................................................... 7, 11, 12

*DaCosta v. City of New York*,
    296 F. Supp. 3d 569 (E.D.N.Y. 2017) ............................................. 13

*Diaz v. City of New York*,
    No. 13 Civ. 8281, 2015 WL 6125586 (S.D.N.Y. Oct. 7, 2015) ........... 8

*Doe v. Whelan*,
    No. 08 Civ. 846, 2010 WL 5093102 (D. Conn. Dec. 8, 2010) ............ 11

*Francisco v. Abengoa, S.A.*,
    559 F. Supp. 3d 286 (S.D.N.Y. 2021)................................................ 6

*Hahn v. Off. & Pro. Emps. Int'l Union, AFL-CIO*,
    107 F. Supp. 3d 379 (S.D.N.Y. 2015) ................................................................ 11, 12

*Haidt v. Kurnath*,
    86 A.D.3d 935 (4th Dep't 2011) ........................................................................ 14

*Hogan v. Fischer*,
    738 F.3d 509 (2d Cir. 2013) .......................................................................... 11, 12

*In re Vitamin C. Antitrust Litigation*,
    995 F. Supp. 2d 125 (E.D.N.Y. 2014) ............................................................ 12, 13

*Jellow v. Abbot Labs.*,
    895 F. Supp. 569 (E.D.N.Y. 1995) ................................................................. 14, 16

*Jewell v. Cnty. of Nassau*,
    917 F.2d 738 (2d Cir. 1990) ............................................................................ 17

*Joseph v. Elan Motorsports Techs. Racing Corp.*,
    638 F.3d 555 (7th Cir. 2011) ........................................................................... 12

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
    No. 08 Civ. 9116, 2009 WL 1357946 (S.D.N.Y. May 12, 2009) ...................... 3

*Kay v. Lavry Eng'g, Inc.*,
    19 Civ. 05059, 2020 WL 2415661 (S.D.N.Y. May 12, 2020) .......................... 15

*Krupski v. Costa Crociere S. p. A.*,
    560 U.S. 538 (2010) ................................................................................... *passim*

*Leonard v. Gen. Motors L.L.C.*,
    504 F. Supp. 3d 73 (D. Conn. 2020) ............................................................... 10, 11

*Marsh-Godreau v. Suny Coll. at Potsdam*,
    No. 15 Civ. 0437, 2016 WL 1049004 (N.D.N.Y. Mar. 11, 2016) ...................... 8

*Miller v. Int'l Tel. & Tel. Corp.*,
    755 F.2d 20 (2d Cir. 1985) ............................................................................. 16

*Moses v. Westchester Cnty. Dep't of Corr.*,
    951 F. Supp. 2d 448 (S.D.N.Y. 2013) .............................................................. 17

*Oneida Indian Nation of New York State v. Cnty. of Oneida, N.Y.*,
    199 F.R.D. 61 (N.D.N.Y. 2000) ........................................................................ 2

*Pikos v. Liberty Maint., Inc.*,
    No. 09 Civ. 4031, 2015 WL 6830670 (E.D.N.Y. Nov. 6, 2015) ...................... 11, 12

*Pipitone v. City of New York*,
  57 F. Supp. 3d 173 (E.D.N.Y. 2014) .................................................... 15

*Roe v. Johnson*,
  No. 07 Civ. 2143, 2011 WL 8189861 (E.D.N.Y. Aug. 12, 2011) ..................................... 8, 11

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*,
  No. 10 Civ. 7547, 2013 WL 1234937 (S.D.N.Y. Mar. 26, 2013) ..................................... 7, 10

*Smith v. Rochester Tel. Bus. Mktg. Corp.*,
  786 F. Supp. 293 (W.D.N.Y. 1992), *aff'd*, 40 F.3d 1236 (2d Cir. 1994) .......................... 7, 13

*Tapp v. Shaw Envt'l, Inc.*,
  401 F. App'x 930 (5th Cir. 2010) ....................................................... 12

*Twine v. Four Unknown New York Police Officers*,
  No. 10 Civ. 6622, 2012 WL 6184014 (S.D.N.Y. Dec. 12, 2012)............................................ 8

*U.S. for & on Behalf of Mar. Admin. v. Cont'l Illinois Nat'l Bank & Tr. Co. of Chicago*,
  889 F.2d 1248 (2d Cir. 1989)........................................................... 3

*UMG Recordings, Inc. v. Frawley*,
  No. 08 Civ. 0765, 2011 WL 13234394 (N.D.N.Y. July 21, 2011)......................................... 16

*Xavier v. RY Mgmt. Co., Inc.*,
  45 A.D.3d 677 (2d Dep't 2007) ........................................................ 14

**STATUTES**

42 U.S.C. § 1983 .................................................................... 13

**RULES**

Fed. R. Civ. P. 15 ..................................................................... *passim*

Fed. R. Civ. P. 4 ...................................................................... 7, 12, 13

iv

**PRELIMINARY STATEMENT**

Justice and the law both require granting Plaintiff leave to amend her complaint to add Anita Baral as a defendant. C.B. died in the middle of the night due to cardiomyopathy. Two days before he died, C.B. told Baral, a registered nurse who was responsible for his care, that he could not breathe and that his chest hurt. When Baral saw C.B. two days before he died, C.B. "looked physically sick"—"no color," "sweating," and "clammy to the touch." In response, Baral did not perform any tests on C.B., send him to a doctor, or provide him with any medical care. A jury should hear these facts and decide whether Baral is liable for causing C.B.'s death.

Defendants' fail to establish any grounds for denying Plaintiff's motion. Defendants' claimed prejudice—delay because Baral *may* wish to take additional discovery and *may* need to find conflict counsel to represent her—is speculative and is not, as a matter of law, the kind of undue prejudice that justifies denying a motion to amend. Defendants' arguments about Plaintiff's purported delay in filing this motion misstate the information available to Plaintiff previously and, in any event, fail as a matter of law in the absence of bad faith (which Defendants do not even allege) and undue prejudice.

Defendants' eleventh hour futility arguments—which they failed to raise in response to Plaintiff's pre-motion letter or at the pre-motion conference—are also meritless. Plaintiff's claims against Baral relate back to the filing of her Amended Complaint because they arise from the same facts, Baral had constructive notice of this case, and Plaintiff's lack of knowledge about Baral's role in causing C.B.'s injuries constitutes a mistake of identity under Rule 15 (c)(1)(C)(ii). Plaintiff's claims against Baral are also timely under the "discovery rule" and the equitable tolling doctrine.

Plaintiff's motion to amend should be granted.

**ARGUMENT**

A "court should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Under this liberal standard, a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). None of these justifications for denying a motion to amend are present here.

**I.      DEFENDANTS CANNOT SHOW UNDUE PREJUDICE**

Defendants fail to satisfy their "burden of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Id.* at 454 (explaining that non-moving party bears the burden of showing undue prejudice) (cleaned up). "Prejudice alone is insufficient to justify a denial of leave to amend; rather the necessary showing is undue prejudice to the opposing party." *Oneida Indian Nation of New York State v. Cnty. of Oneida, N.Y.*, 199 F.R.D. 61, 76 (N.D.N.Y. 2000) (cleaned up). "This inquiry involves a balancing process, weighing any potential prejudice to the opposing party against the prejudice that the moving party would experience if the amendment were denied." *Agerbrink*, 155 F. Supp. 3d at 454 (cleaned up).

Here, Plaintiff would experience substantial prejudice if the amendment were denied. Plaintiff recently learned that C.B. complained directly to Baral in the week before he died about not being able to breathe and that Cassata told Baral that C.B. was having trouble completing routine household work. Plaintiff also only recently learned that Baral, a RN, did not examine C.B. or provide him with any medical care in response to these complaints and reports. Cassata will testify to these facts at trial, and if the jury credits her testimony, Plaintiff will be severely prejudiced if Baral is not a Defendant against whom the jury could find.

2

In stark contrast, Defendants will not suffer any undue prejudice if leave to amend is granted. All Defendants can muster are hypothetical arguments about additional discovery Baral may wish to seek. But they point to no document or information that has been withheld in discovery or that Baral may reasonably request that has not already been produced.

In any event, even if some additional discovery were needed, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *U.S. for & on Behalf of Mar. Admin. v. Cont'l Illinois Nat'l Bank & Tr. Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989). This is particularly true where, as here, "discovery is still underway, and neither a summary judgment briefing schedule nor a trial date has been set."[1] *Agerbrink*, 155 F. Supp. 3d at 455; *see also JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116, 2009 WL 1357946, at *5 (S.D.N.Y. May 12, 2009) (allowing amendment and citing lack of pending dispositive motions or trial date). Moreover, the proposed amendment raises factual claims closely related to the allegations in the Amended Complaint, reducing the burden of any additional discovery that may be needed. *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (granting leave to amend where trial date had not been set, discovery had not been completed, and claims against new defendants did "not raise factual claims unrelated to the events in [the] original [ ] complaint").

Defendants' speculation about the time it may take for Baral to find conflict counsel if the Attorney General's office determines it cannot represent her does not rise to the level of undue prejudice either. "Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice.'" *Id.* (cleaned up).

---

[1] Defendants' reliance on the most recent pre-trial schedule is incorrect. During the March 11, 2022 conference, the Court stated that it would extend the discovery and dispositive motion schedule while this motion to amend is decided. No new schedule has been set.

Defendants have therefore failed to show they will be unduly prejudiced by the proposed amendment.

## II.      DEFENDANTS CONCEDE PLAINTIFF DID NOT ACT IN BAD FAITH

Defendants do not argue that Plaintiff acted in bad faith. This factor thus weighs in favor of allowing the amendment.

## III.     PLAINTIFF DID NOT ACT WITH UNDUE DELAY

Plaintiff did not delay in filing this motion. Defendants' arguments to the contrary misstate the information available to Plaintiff and improperly seek to capitalize on Defendants' own substantial delay in producing discovery. Defendants' delay arguments also fail as a matter of law.

The investigation report Defendants produced in January 2021 did not provide Plaintiff with sufficient information to bring a claim against Baral. *See* Declaration of Ryan Hickey ("Hickey Decl.") Ex. B.[2] The report includes mere summaries of interviews conducted by the New York State Office for People with Developmental Disabilities ("OPWDD") in the wake of C.B.'s death. Those summaries lack the crucial details upon which Plaintiff's proposed claims against Baral rest. They do not say anything about: (1) what Cassata told Baral on April 4, 2018 (that C.B. could not breathe and was having chest pains, *see* Ex. C at 62-63, 70), (2) whether Baral provided any medical care for C.B. on April 4, 2018 (she did not, *see id.* at 64), (3) C.B.'s physical appearance on April 6, 2018 ("no color," "sweating," "clammy to the touch," *id.* at 57), (4) C.B.'s complaints to Cassata on April 6, 2018 (he told her he "couldn't breathe" and that "he was having chest pains," *see id.* at 56), (5) what Cassata told Baral on April 6, 2018 (that C.B.

_____

[2] Citations to "Hickey Decl. Ex. B" refer to Exhibit B to the Declaration of Ryan Hickey, filed on May 6, 2022. Citations to "Ex. A-E" refer to the exhibits attached to the Declaration of Samuel Shapiro, filed on March 30, 2022. Citations to "Ex. F" refer to the exhibit attached to the Reply Declaration of Samuel Shapiro, filed herewith.

could not breathe and was having chest pains, *see id.* at 62-63, 70), or (6) whether Baral provided any medical care for C.B. on April 6, 2018 (she did not, *id.* at 71).

The investigation summaries state only that C.B. told *Cassata* on April 4, 2018 that he could not breathe, Cassata called Baral, Baral instructed Cassata to take C.B.'s vitals, and Baral saw C.B., patted him on the back, and told him to drink plenty of fluids. *See* Hickey Decl. Ex. B at DEF 008989. They do not say anything about what Cassata reported to Baral on April 4, whether Baral did anything beyond patting C.B. on the back on April 4, or what happened on April 6. *See id.* In addition, the summary of Baral's interview states that Baral denied ever receiving any reports about C.B. not feeling well or not being able to breathe. *See id.* at DEF 008990-91. Based on these summaries alone, Plaintiff lacked a good faith basis to allege that Baral knew C.B. was having trouble breathing and having chest pains on April 4 (let alone on April 6), that Baral observed C.B. on April 6 when he "looked physically sick," Ex. C at 57, or that Baral failed to provide C.B. with any medical care in response to his complaints. Plaintiff cannot have been expected to *infer* these facts from a document that does not state them and that summarizes interviews that had not been provided to Plaintiff. Had she attempted to do so, Defendants surely would have argued there was no basis for her allegations.

Of course, if Defendants had timely produced discovery, perhaps Plaintiff could have moved to amend sooner. The audio recording of Cassata's interview included crucial details that were lacking in the interview summary and that provided a basis for Plaintiff's claims against Baral. Plaintiff requested that audio recording in her initial document requests to Defendants, which Plaintiff served on October 6, 2020. *See* Ex. F at Req. 23 ("All documents concerning any investigation by OPWDD into C.B.'s death, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations . . .").

5

Defendants did not produce the recording (or any transcript thereof) until January 4, *2022*, at which point Cassata's deposition was scheduled to take place imminently. Plaintiff chose to conduct that deposition before moving quickly to amend her complaint. Any delay was thus of Defendants' own making.

In any event, Defendants' delay arguments are no basis to deny Plaintiff's motion to amend. "In this Circuit, mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 312 (S.D.N.Y. 2021) (cleaned up). "In opposing a motion for leave to amend a complaint, simply alleging that the plaintiff could have moved to amend earlier than she did is insufficient to demonstrate undue delay." *Bodum Holding AG v. Starbucks Corp.*, No. 19 Civ. 4280, 2020 WL 6135714, at *9 (S.D.N.Y. Oct. 16, 2020) (cleaned up). "Indeed, courts in this District have noted that a party need not prove that it uncovered new facts or law in order for a court to grant leave to amend." *Francisco*, 559 F. Supp. 3d at 312 (cleaned up). Even if Defendants' delay arguments had merit—which they do not—they would be insufficient to justify denying Plaintiff's motion in the absence of bad faith or undue prejudice. *See supra*.

## IV. PLAINTIFF'S PROPOSED AMENDMENT IS NOT FUTILE

Plaintiff's proposed amendment is timely and not futile. The amendment relates back to the filing of the Amended Complaint under both federal and New York law; it is timely under the "discovery rule"; and equitable tolling is appropriate given Defendants' belated disclosure of Cassata's OPWDD interview.

### A. Plaintiff's Claims Against Baral Relate Back

Plaintiff's claims against Baral relate back to July 10, 2020, the date of the filing of the Amended Complaint. Plaintiff satisfies both the federal relation back standard under Rule 15(c)(1)(C), and New York's relation back standard, which also applies here under Rule

15(c)(1)(A). Though both standards are relevant, "courts typically apply whichever law is more generous" to the plaintiff. *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*, No. 10 Civ. 7547, 2013 WL 1234937, at *3 n.5 (S.D.N.Y. Mar. 26, 2013); *accord Smith v. Rochester Tel. Bus. Mktg. Corp.*, 786 F. Supp. 293, 309 (W.D.N.Y. 1992), *aff'd*, 40 F.3d 1236 (2d Cir. 1994).

### 1.   Plaintiff's Claims Against Baral Relate Back Under the Federal Standard

Rule 15(c)(1)(C) allows for an amended pleading to relate back to the date of the original pleading if four conditions are met: (1) "the claim must have arisen out of conduct set out in the original pleading"; (2) "the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense"; (3) "that party knew or should have known that, but for a mistake of identity, the original action would have been brought against it"; and (4) "the second and third criteria are fulfilled within the period provided by Rule 4(m) for serving the summons and complaint, and the original complaint was filed within the limitations period." *Ceara v. Deacon*, 916 F.3d 208, 211 (2d Cir. 2019) (cleaned up). The purpose of the relation back doctrine under federal law is "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010).

Defendants do not dispute that the claims against Baral arise out of conduct set out in the Amended Complaint. Their arguments that Plaintiff fails to satisfy the remaining conditions are without merit.

##### a.    Baral Had Constructive Notice of this Action

Baral had constructive notice of this case because the Attorney General's office knew or should have known she would be named as a defendant.

"Under the doctrine of constructive notice, knowledge of a lawsuit can be imputed to a previously unnamed government official through the attorney who would represent him, as long as that attorney also represented the government entities or officials already sued and knew or should have known that the new defendant would be named." *Marsh-Godreau v. Suny Coll. at Potsdam*, No. 15 Civ. 0437, 2016 WL 1049004, at *8 (N.D.N.Y. Mar. 11, 2016) (cleaned up); *accord Diaz v. City of New York*, No. 13 Civ. 8281, 2015 WL 6125586, at *2 (S.D.N.Y. Oct. 7, 2015); *Twine v. Four Unknown New York Police Officers*, No. 10 Civ. 6622, 2012 WL 6184014, at *15 (S.D.N.Y. Dec. 12, 2012), *report and recommendation adopted*, 2013 WL 314447 (S.D.N.Y. Jan. 25, 2013); *Roe v. Johnson*, No. 07 Civ. 2143, 2011 WL 8189861, at *3 (E.D.N.Y. Aug. 12, 2011), *report and recommendation adopted*, 2012 WL 2575340 (E.D.N.Y. July 3, 2012).

Baral has been a state employee since the Amended Complaint was filed on July 19, 2020. *See* Ex. D at 10-11. She has therefore at all times been "entitled to representation by the Attorney General's office."[3] *Marsh-Godreau*, 2016 WL 1049004, at *8. A single conversation with Cassata—who is represented by the Attorney General's office and who the Attorney General's office spoke (or should have spoken) to about the case within the Rule 4(m) period—would have revealed Baral's exposure in this case and made the Attorney General's office aware

---

[3] Whether the Attorney General's office ultimately represents Baral is immaterial. *See* Defs. Br. at 7. Courts "have not looked favorably" on efforts by the Attorney General's office to avoid constructive notice "in cases where government counsel otherwise responsible for representation assigns outside counsel." *Bell v. Saunders*, No. 20 Civ. 00256, 2021 WL 1699860, at *3 (N.D.N.Y. Apr. 29, 2021).

she would be named as a defendant. Indeed, in their initial disclosures, which were served within 90 days of the Amended Complaint, the Attorney General's office listed Baral as one of only six individuals who had information concerning this case. *See* Ex. E. The Attorney General's office's knowledge of Cassata's testimony against Baral put them on notice that Baral would be named as a defendant, which in turns places Baral on constructive notice of this lawsuit.[4]

Tellingly, the Attorney General's office does not even dispute that it was aware that Baral would be a defendant or that Baral had constructive notice of this case. This condition is thus satisfied.

> **b.      Baral Should Have Known the Action Would Be Brought
> Against Her but for a Mistake**

The "mistake" requirement for relation back is satisfied as well: Plaintiff made a mistake about a party's identity because she lacked knowledge about Baral's liability.

The starting point for any analysis of Rule 15's "mistake" requirement is the Supreme Court's decision in *Krupski* (a case Defendants conspicuously fail to cite). There, the Supreme Court explained that a "mistake is an error, misconception, or misunderstanding; an erroneous belief." *Krupski*, 560 U.S. at 548 (cleaned up). In determining whether there has been a mistake, the only relevant inquiry is whether the new defendant "knew or should have known that it would have been named as a defendant but for an error." *Id.* "That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity." *Id.* at 549. The Court explained:

> a plaintiff might know that the prospective defendant exists but
> nonetheless harbor *a misunderstanding about his status or role in*

---

[4] Moreover, OPWDD's counsel, which represents Baral as well since she is an OPWDD employee, has been aware of this lawsuit since at least 2020. *See, e.g.*, Dkt. 18 (OPWDD's May 15, 2020 response to Plaintiff's motion for early discovery). Any reasonable investigation into the claims by OPWDD's counsel would have revealed Baral's exposure and caused OPWDD to make her aware of this lawsuit.

*the events giving rise to the claim at issue*, and she may mistakenly choose to sue a different defendant based on that misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.

*Id.* (emphasis added).

"After *Krupski*, it is clear that a mistake concerning the proper party's identity under Rule 15(c) includes lack of knowledge regarding the conduct or liability of that party." *Abdell v. City of New York*, 759 F. Supp. 2d 450, 457 (S.D.N.Y. 2010); *accord S.A.R.L. Galerie Enrico Navarra,* 2013 WL 1234937, at *6 (Rule 15's mistake element is satisfied where the plaintiff "lacked knowledge regarding the conduct or liability of the newly added party."); *Roe,* 2011 WL 8189861, at *4 ("*Krupski* makes clear that a mistake concerning the proper party's identity under Rule 15(c) includes lack of knowledge regarding the conduct or liability of that party." (cleaned up)).

Here, Plaintiff lacked knowledge regarding Baral's liability. Cassata and her counsel knew facts giving rise to Baral's liability, but Plaintiff did not learn those facts until she received the audio recording of Cassata's OPWDD interview on January 4, 2022 and deposed Cassata on February 8, 2022. The allegations in the Amended Complaint bear this out. Plaintiff does not make any allegations with respect to what Cassata told Baral or what Baral did in response. *See* Am. Compl., Dkt. 25, ¶¶ 52-62. Nor could Plaintiff have discovered the facts giving rise to Baral's liability. Baral maintains she did not receive any reports that C.B. was sick or having trouble breathing, *see* Ex. D at 48-49, and thus a conversation with Baral would not have yielded any information on which to base a claim. Plaintiff's "deliberate but mistaken choice" to sue only Cassata and not Baral "does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied." *Krupski*, 560 U.S. at 549; *see also Leonard v. Gen. Motors L.L.C.*, 504 F. Supp. 3d 73, 92 (D. Conn. 2020) (applying relation back doctrine to the addition of "other entities in the

corporate family that were more directly responsible for his injuries and whose involvement only recently came to light").

Defendants' cases do not compel a different result. First, cases involving "John Doe" defendants do not apply here. *See Hogan v. Fischer*, 738 F.3d 509, 517-18 (2d Cir. 2013); *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466 (2d Cir. 1995). The Second Circuit recently distinguished its "John Doe" relation back cases from *Krupski*. *See Ceara*, 916 F.3d at 213. *Krupski*, the Second Circuit explained, involved a plaintiff who "made a mistake as to which of two parties to sue—parties whose identities she knew—because of her factual misunderstanding of the roles each played in the underlying events." *Id.* It did not concern "an amendment to replace a John Doe defendant," which is still subject to the rules announced in the Second Circuit's *Barrow* decision and its progeny. *Id.* Plaintiff is not seeking to replace a "John Doe" defendant, and thus *Krupski* applies. Plaintiff knew Baral existed but "nonetheless harbor[ed] a misunderstanding about [her] status or role in the events giving rise to the claim at issue." *Krupski*, 560 U.S. at 549. Under *Krupski*, such a mistake satisfies Rule 15. *See id.*

Defendants also cite cases that incorrectly limit *Krupski* to only those amendments seeking to *substitute* a party, rather than *add* a party. *See Pikos v. Liberty Maint., Inc.*, No. 09 Civ. 4031, 2015 WL 6830670, at *4 (E.D.N.Y. Nov. 6, 2015); *Hahn v. Off. & Pro. Emps. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 385 (S.D.N.Y. 2015). But this limitation has been rejected by courts in this Circuit as "too restrictive" and as failing "to apply the lessons of *Krupski*." *Leonard*, 504 F. Supp. 3d at 92; *accord Roe*, 2011 WL 8189861, at *4 (*Krupski*'s holding "applies equally to cases where the mistake concerning the proper party's identity results in the substitution or addition of defendants" (cleaned up)); *Doe v. Whelan*, No. 08 Civ. 846, 2010 WL 5093102, at *2 n.3 (D. Conn. Dec. 8, 2010) ("Regardless of whether [*Krupski*]

involved the addition or substitution of defendants, the rationale expressed therein for permitting the relation back, namely the preference for enabling decisions on the merits by permitting the correction of errors, supports a finding that it is appropriate here as well."). Other Circuit Courts have rejected this limitation as well. *See, e.g.*, *Joseph v. Elan Motorsports Techs. Racing Corp.,* 638 F.3d 555, 559-60 (7th Cir. 2011) (noting that Rule 15(c) allows for the substitution or addition of parties); *Tapp v. Shaw Envt'l, Inc.*, 401 F. App'x 930, 933-34 (5th Cir. 2010) (allowing relation back as to new defendant).

Nowhere does *Krupski* draw a distinction between amendments that seek to add a party and amendments that seek to substitute a party. The authority *Pikos* and *Hahn*—Defendants' cases—cite in favor of drawing such a distinction is entirely unpersuasive. *Barrow* and *Hogan*, which the *Pikos* court cites (*Pikos*, 2015 WL 6830670, at *3) do not apply here because they are John Doe cases. *See Ceara*, 916 F.3d at 213.

*In re Vitamin C. Antitrust Litigation*, 995 F. Supp. 2d 125 (E.D.N.Y. 2014), a District Court opinion, which is cited in both *Pikos* and *Hahn*, should not be followed because its reasoning runs contrary to the holding in *Krupski*. *Krupski* could not be clearer: "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski*, 560 U.S. at 548 (emphasis in *Krupski*). Ignoring this mandate entirely, the *Vitamin C* court focused on whether the *plaintiff* "mistakenly sued the wrong party" in the original pleading. *Vitamin C*, 995 F. Supp. 2d at 130. It then compounded its error by suggesting that the answer to that irrelevant question—*i.e.*, whether the plaintiff is seeking to substitute an original defendant who was wrongly named or simply add a new defendant—determines whether an amendment relates back under Rule 15. By focusing on whether the plaintiff sued the wrong

party or merely failed to sue the correct party, the *Vitamin C* court—and the other courts that relied on *Vitamin C*—ran afoul of *Krupski*'s clear instruction to focus on what the defendant, *not* the plaintiff, knew or should have known.

Here, Plaintiff's mistake was a lack of knowledge regarding Baral's conduct and liability. Under *Krupski*, regardless of whether she seeks to add or substitute a defendant, her mistake qualifies as "a mistake concerning the proper party's identity under Rule 15(c)." *Abdell*, 759 F. Supp. 2d at 457 (cleaned up).

### 2. Plaintiff's Claims Against Baral Relate Back Under the New York State Standard

Plaintiff's claims against Baral also satisfy New York State's relation back standard. An amended pleading relates back when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A). Plaintiff asserts three claims against Baral: a Section 1983 claim and two New York state law claims. *See* Ex. A (proposed Second Amended Complaint). For all three claims, New York law provides the applicable statute of limitations.[5]

New York's relation back doctrine is similar to, and "more generous" than, its federal counterpart. *S.A.R.L. Galerie Enrico Navarra*, 2013 WL 1234937, at *6. Under New York law, amendments relate back to timely filed pleadings when:

> (1) both claims arose out of same conduct, transaction or occurrence, (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining its defense on the merits, and (3) the new party knew or should have known that, but for a mistake by the plaintiff as to the identity of the proper parties, the action would have been brought against that party as well.

---

[5] "For a claim brought pursuant to 42 U.S.C. § 1983, the law that provides the applicable statute of limitations is the law of the state in the jurisdiction in which the federal district court sits because there is no federal statute of limitations." *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 584 (E.D.N.Y. 2017) (cleaned up).

*Xavier v. RY Mgmt. Co., Inc.*, 45 A.D.3d 677, 678 (2d Dep't 2007). Defendants do not dispute that the claims against Baral arose out of the same conduct or that they are united in interest with Baral.

Plaintiff's failure to bring claims against Baral was a mistake "as to the identity of the proper parties." *Id.* The New York Court of Appeals has explained that New York's relation back test is "patterned largely after the federal relation back rule." *Buran v. Coupal*, 87 N.Y.2d 173, 179 (1995). In *Buran*, the New York Court of Appeals even jettisoned a previous requirement that the plaintiff's mistake be "excusable" in order to bring New York's rule into line with the Federal rule, *id.*, and to focus courts on "the primary question of whether the new party had actual notice of the claim," *id.* at 180, the same focus the Supreme Court prescribed in *Krupski*. Thus, under New York law, a mistake about the new defendant's role in the conduct that gives rise to the claims is sufficient to invoke the relation back doctrine. *See Haidt v. Kurnath*, 86 A.D.3d 935, 936 (4th Dep't 2011) (finding mistake to satisfy standard for relation back when based on plaintiff's lack of "sufficient knowledge of defendant's role" in the alleged conduct).

Here, Plaintiff made just such a mistake. She did not know Baral's role in the conduct that gives rise to her claims, and thus mistakenly did not identify Baral as a proper defendant. Under New York law, Plaintiff's mistake warrants applying the relation back doctrine.

**B.      Plaintiff's Claims Against Baral Are Timely Under the Discovery Rule**

The Court need not even resolve the relation back issue, because the "discovery rule" renders Plaintiff's claims against Baral timely.

Under the discovery rule, a claim does not begin to accrue until a plaintiff discovers or reasonably should have discovered both "her injury *and* its human cause." *Jellow v. Abbot Labs.*, 895 F. Supp. 569, 571 (E.D.N.Y. 1995) (emphasis added). The rule affords a more liberal accrual

standard to any "plaintiff who is blamelessly ignorant of the existence *or* cause of his injury." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982) (emphasis added). In *Barrett*, for example, the Second Circuit held that the plaintiff's claims did not accrue until she learned the "critical facts about causation," which had been "very difficult [ ] to obtain." *Id.* at 329; *see also Pipitone v. City of New York*, 57 F. Supp. 3d 173, 189 (E.D.N.Y. 2014) (applying the discovery rule because there was no reason for the plaintiff "to speculate" that NYPD detectives may have been involved in the conduct giving rise to the claims). "The Second Circuit has recognized the applicability of the discovery rule to Section 1983 claims." *Kay v. Lavry Eng'g, Inc.*, 19 Civ. 05059, 2020 WL 2415661, at *3 (S.D.N.Y. May 12, 2020).

Here, Plaintiff had no way of knowing the facts that give rise to Baral's liability until Defendants produced Cassata's OPWDD interview on January 4, 2022. Plaintiff's allegations against Baral all come from Cassata. They are not memorialized in any contemporaneous record—*e.g.*, notes written by staff or medical providers—that was kept at Valley Ridge CIT (Defendants do not dispute this). Before January 4, 2022, the only information Plaintiff had about Cassata's version of what took place in the days leading up to C.B.'s death came from OPWDD's summary of its interview with Cassata. But as discussed earlier, that summary did not contain the key facts on which Baral's liability rests. *See supra*, Section III. No amount of due diligence could have uncovered Cassata's statements either. Plaintiff could not speak to Cassata since she is a Defendant, and any conversation with Baral would have been fruitless since she denied having any knowledge of C.B.'s medical complaints, both to OPWDD and at her deposition in this action.

As a result, Plaintiff could only have discovered the critical facts about Baral's role in causing C.B.'s injuries on January 4, 2022.[6] Under the discovery rule, that is when Plaintiff's claims against Baral accrued. Because this motion was filed less than two months after the claims accrued, the claims are timely.

### C.     Equitable Tolling Is Warranted

Finally, and alternatively, the Court should equitably toll the statute of limitations on Plaintiff's claims against Baral.

Federal courts allow equitable tolling of statutes of limitations "as a matter of fairness" where a plaintiff has been "prevented in some extraordinary way from exercising [her] rights." *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985). A plaintiff's claims may be equitably tolled upon a showing "(1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011). Equitable tolling is appropriate where defendants frustrate a plaintiff's ability to learn facts that would allow her to file a timely claim. *See UMG Recordings, Inc. v. Frawley*, No. 08 Civ. 0765, 2011 WL 13234394, at *13 (N.D.N.Y. July 21, 2011) (holding that "Defendant's consistent efforts to frustrate Plaintiffs' attempts at learning her identity" qualify as "extraordinary circumstances" warranting the application of equitable tolling).

Equitable tolling is appropriate here because Defendants waited well over one year to produce Cassata's OPWDD interview. Had Defendants timely produced Cassata's OPWDD

---

[6] To the extent there are any fact questions about when Plaintiff discovered or should have discovered Baral's role in causing C.B.'s death, that is not a basis to deny Plaintiff's motion to amend. To the contrary, those questions should be resolved by a jury. *See, e.g.*, *Badamo* v. *Chevron U.S.A., Inc.*, No. 20 Civ. 5847, 2022 WL 1450764, at *8 (S.D.N.Y. May 9, 2022) ("This question [of accrual] . . . is reserved for the factfinder."); *Jellow*, 895 F. Supp at 571 ("[A] jury will have to determine when [plaintiff] discovered, or should have discovered her injury and its human cause.").

16

interview in response to Plaintiff's October 6, 2020 document requests, *see* Ex. F at Req. 23,

Plaintiff would have learned of Baral's role in C.B.'s death in late 2020, well within three years

of C.B.'s death for purposes of Plaintiff's Section 1983 claim.[7] Because Defendants withheld

Cassata's OPWDD interview until January *2022*, Plaintiff could not learn about Baral's

misconduct until more than three years had elapsed since C.B.'s death. Plaintiff pursued her

rights diligently, while also trying to work with Defendants as much as possible to allow

discovery to proceed smoothly. *See Moses v. Westchester Cnty. Dep't of Corr.*, 951 F. Supp. 2d

448, 455-56 (S.D.N.Y. 2013) ("The diligence required for equitable tolling purposes is

reasonable diligence, not maximum feasible diligence." (cleaned up)). It would be severely

inequitable to punish Plaintiff because Defendants produced discovery more than a year after it

was requested.

     The Court should therefore equitably toll the statute of limitations on Plaintiff's claims

against Baral until January 4, 2022, the date on which Defendants produced the information that

gives rise to the claims. With equitable tolling, Plaintiff's claims against Baral are timely.

---

[7] The statute of limitations on Plaintiff's Section 1983 claims is three years. *See Jewell v. Cnty. of Nassau*, 917 F.2d 738, 740 (2d Cir. 1990) ("New York's three year statute of limitations . . . governs § 1983 actions brought in federal district court in New York.").

**CONCLUSION**

For all the foregoing reasons, as well as the reasons set forth in Plaintiff's opening brief,

Plaintiff's motion for leave to file the Proposed Second Amended Complaint should be granted.

Dated: May 12, 2022
       New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

/s
_____
Ilann M. Maazel
Samuel Shapiro

600 Fifth Avenue, 10th Floor
New York, New York 10020
imaazel@ecbawm.com
sshapiro@ecbawm.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                   Plaintiff(s),

    -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                 Defendant(s).

20 Civ. 00091 (TJM)(CFH)

**REPLY DECLARATION OF SAMUEL SHAPIRO**

       SAMUEL SHAPIRO, an attorney duly admitted to practice before this Court and the courts of the State of New York, declares under penalty of perjury:

       1.     I am a partner in the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP, counsel to Plaintiff in this action. I submit this Reply Declaration in further support of Plaintiff's motion for leave to amend her complaint.

       2.     Annexed hereto as Exhibit F is a true and correct copy of Plaintiff's First Consolidated Set of Interrogatories and Requests for Production of Documents, dated October 6, 2020.

       I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 12, 2022
      New York, New York

                                       /s/
                                 SAMUEL SHAPIRO

# Exhibit F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                Plaintiff,

     -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

              Defendants.

20 Civ. 00091 (TJM)(CFH)

## PLAINTIFF'S FIRST CONSOLIDATED SET OF
## INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

        PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules

of Civil Procedure, Plaintiff J.M. requests that Defendants Elise M. Williams, Joshua A.

Buell, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack

(collectively "Defendants") answer under oath, within thirty days, the following

interrogatories. Plaintiff further requests, pursuant to Rule 34 of the Federal Rules of

Civil Procedure, that Defendants produce for copying and inspection at the office of

Emery Celli Brinckerhoff Abady Ward & Maazel LLP, 600 Fifth Avenue, 10th Floor,

New York, New York 10020, within thirty days, all documents and materials described

herein.

**JA222**

## DEFINITIONS

1.      The term "Plaintiff" means Plaintiff J.M.

2.      The term "C.B." refers to Plaintiff's son, who died at the Valley Ridge CIT on April 9, 2018.

3.      The term "Defendants" or "you" means Elise M. Williams, Joshua A. Buell, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack, collectively.

4.      The term "Sessions" means Ashley Sessions.

5.      The term "OPWDD" means New York State Office for People with Developmental Disabilities.

6.      The term "Justice Center" means the New York State Justice Center for the Protection of People with Special Needs.

7.      The term "Valley Ridge CIT" refers to the Valley Ridge Center for Intensive Treatment in Norwich, NY.

8.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

9.      The term "document" means, without limitation, the following items which are in the possession, custody or control of Defendants, their agents, representatives and/or attorneys, whether printed or recorded or reproduced by any other mechanical or electronic process, or written or produced by hand: agreements, communications, reports, memo book entries, state and federal governmental hearings and reports, correspondence, telegrams, electronic mail,  memoranda, summaries or records of telephone conversation, summaries or records of personal conversation or

interviews, drawings, sketches, maps, summaries or records of meetings or conferences, summaries or reports of investigation or negotiation, opinions or reports of consultants, photographs, motion picture film, video, audio recordings, brochures, pamphlets, advertisements, circulars, press releases, drafts, letters, any marginal comments appearing on any document and all other writings.

10.     When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

11.     When referring to documents, to "identify" means to give, to the extent known, the (i) type of document, (ii) general subject matter, (iii) date of the document, and (iv) author(s), addressee(s) and recipient(s), or, alternatively to produce such document(s) for inspection if not called for in the Document Request.

12.     A request to "identify" a communication means: (i) to state whether it was written or oral, and if written, to identify each document comprising or evidencing such communication; (ii) to state the date and place of such communication; (iii) to identify each individual participating therein and each individual who was present at the place or places of such communication; (iv) to state what was said by each participant in the course of such communication, or if now known, the substance of such communication.

13.     The term "person" is defined as any natural person or any business, legal or governmental entity, corporation or association.

14.     The term "concerning" means relating to, referring to, describing, evidencing or constituting.

15.     The terms "all," "each" and "any" shall be construed as all, each and any.

16.     The use of the singular form of any words includes the plural and vice versa.

## INSTRUCTIONS

1.     In answering the following interrogatories and responding to the following document requests (collectively the "requests"), you shall furnish all information that is available to you, including information in the possession, custody, or control of your attorneys, investigators, experts, representatives or other agents.

2.     If, in answering the following interrogatories, you are unable to answer fully, after exercising due diligence to obtain the information to do so, you shall answer said interrogatory to the fullest extent possible, specifying your inability to answer the remainder, describing the efforts taken by you to obtain the information to fully answer said interrogatory, and stating whatever information or knowledge you have concerning the unanswered portion thereof.

3.     If, in answering the following interrogatories, you state in whole or in part that "I do not know" or "unknown" or otherwise indicate any similar lack of knowledge, you shall state in detail all efforts made to obtain the information requested,

**JA225**

the nature of any continuing efforts in that regard, and by whom any such efforts were and are being made.

        4.    If any document responsive to the requests has been lost, destroyed, or is otherwise unavailable, describe and identify each such document by stating in writing: (i) the name(s) of the authors(s), the name(s) of the person(s) who received the original and all copies, and the date and subject matter, (ii) the last known custodian of the document, (iii) the incident, event, or occurrence during which such document was lost, destroyed, or otherwise became unavailable, (iv) each person having knowledge of the circumstances of it being lost, discarded, or destroyed, and (v) your efforts to locate each such document.

        5.    If a claim of privilege is asserted with respect to any document, or you refuse to disclose any document requested herein on any other ground, state the basis for your claim that such document need not be disclosed with such specificity as will permit the Court to determine the legal sufficiency of your objection or position, and, for each such document, identify:

        a.    whether the document contains a request for legal advice and, if so, identify the person who requested the legal advice;

        b.    whether the document contains advice as to the meaning or application of particular laws or rules in response to such request;

        c.    any further information to explain and support the claim of privilege and to permit the adjudication of the propriety of that claim;

        d.    the nature of the privilege (including work product) that is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked;

5

       e.      the type of document, e.g., letter or memorandum; the general subject matter of the document; and such other information as is sufficient to identify the document for a subpoena *duces tecum*, including, where appropriate, the author, addressee and any other recipient of the document, and, where not apparent, the relationship of the author, addressee and other recipient to each other.

      6.     If in answering these requests you claim any ambiguity in interpreting either the request or a definition instruction applicable thereto, such claim shall not be utilized by you as a basis for refusing to respond; rather you shall set forth in a part of your response to such a request the language deemed to be ambiguous and the interpretation chosen or used in responding to the request.

      7.     Defendants shall respond separately and completely to each interrogatory and document request, or subdivision thereof, setting forth the question in full followed by each answer.

      8.     With respect to the documents requested, these requests seek production of all documents described, in their entirety, along with any attachments, drafts and non-identical copies.

      9.     Questions regarding the interpretation of these requests should be resolved in favor of the broadest possible construction.

      10.    The documents produced in response to these requests shall be: (i) organized and designated to correspond to the categories in the requests, or (ii) produced in a form that accurately reflects how they are maintained by you in the normal course of business, including but not limited to the following:

      a.      that all associated file labels, file headings and file folders be produced with the responsive documents from each file,

and that each file be identified as to its owner(s) or custodian(s);

      b.     that all pages now stapled or fastened together be produced stapled or fastened together; and

      c.     that all documents which cannot legibly be copied be produced in their original form.

11.     This request is to be considered as continuing and defendant is requested to provide, by way of supplementary responses hereto, such additional information as it or any persons acting on its behalf may hereafter obtain that will augment, clarify or otherwise modify the responses now given to this request. Such supplementary responses are to be filed and served upon counsel for plaintiff as soon as practicable after receipt of such information or documents.

12.     Unless otherwise stated, the timeframe applicable to these requests is June 1, 2015 to the present.

## INTERROGATORIES

1.     Identify every person, including without limitation every New York State employee and/or contractor, who has knowledge or information concerning the death of C.B.

2.     Identify every person, including without limitation every New York State employee and/or contractor, who has knowledge or information concerning C.B.

3.     Identify any and all persons who were questioned, either formally or informally, by OPWDD, the Justice Center, the New York State Inspector General's Office, and/or any federal, state, or local law enforcement agency about the death of C.B.

4.      Identify every person who was reported to, investigated by, or disciplined by OPWDD, any other New York State agency, and/or any federal, state, or local law enforcement agency for any conduct related to the death of C.B.

5.      Identify every New York State employee and/or contractor who provided medical care or treatment to C.B. between January 1, 2018 and April 9, 2018.

6.      Identify every New York State employee and/or contractor who was responsible for supervising, monitoring, checking on, or providing care to C.B. between January 1, 2018 and April 9, 2018.

7.      Identify every New York State employee and/or contractor who was working in Valley Ridge CIT's "E" house between April 1, 2018 and April 9, 2018. For each person identified, specify the shift(s) s/he worked between April 1, 2018 and April 9, 2018.

8.      Identify—by the parties' names, the court, the docket or index number, and the lawyer representing the plaintiff(s)—each and every lawsuit brought since October 1, 2010 against any of the Defendants or Sessions arising out of injuries, up to and including death, allegedly sustained at Valley Ridge CIT.

9.      Identify the location of any video cameras in Valley Ridge CIT's "E" house.

### DOCUMENTS TO BE PRODUCED

1.      All documents concerning C.B., including but not limited to, Individual Protective Oversight Plans, Behavior Support Plans, clinical meeting minutes, and notes.

2.     All correspondence sent or received in connection with, or concerning, C.B.

3.     All telephone logs, telephone records and summaries of telephone conversations concerning C.B., including any and all records of Novack's call with Plaintiff on April 8, 2018.

4.     Telephone logs, telephone records and summaries of telephone conversations concerning C.B.'s telephone calls on April 8, 2018.

5.     All documents concerning C.B.

6.     All summaries and reports of all meetings, conferences and conversations held in connection with, or concerning, C.B.

7.     All documents concerning C.B.'s care at Valley Ridge CIT.

8.     Documents sufficient to show C.B.'s weight and any changes thereto during the time he was at Valley Ridge CIT.

9.     All bed check forms or other similar documents from January 1, 2018 through April 9, 2018 reflecting when Valley Ridge CIT staff checked on C.B. during the night.

10.     All medical records concerning C.B.

11.     All documents concerning Cassata's interactions with C.B. on April 4, 2018, as detailed in paragraphs 52-56 of the Amended Complaint.

12.     All documents concerning C.B. having trouble breathing.

13.     All documents concerning C.B. having heart burn.

14.     All documents concerning C.B. being tired.

15.     All documents concerning C.B. having difficulty voiding.

16.     All documents concerning Valley Ridge CIT staff's advice to C.B. to drink more fluids.

17.     All documents concerning policies, practices, memoranda, directives, bulletins, policy statements and other administrative guidelines in place at the Valley Ridge CIT in April 2018, including, without limitation, policies and practices concerning providing medical care to residents, monitoring the health of residents, and checking on residents overnight.

18.     All documents reflecting Valley Ridge CIT's policies concerning Valley Ridge CIT's staff's obligation to document medical conditions and/or complaints of Valley Ridge CIT residents.

19.     All documents concerning prior complaints, allegations or reports of medical malpractice or medical neglect at Valley Ridge CIT between April 9, 2013 and April 9, 2018.

20.     Documents sufficient to show who was working in Valley Ridge CIT's "E" house on the night of April 8-9, 2018.

21.     All video footage recorded between April 1, 2018 and April 9, 2018 that shows either the door to C.B.'s room at Valley Ridge CIT or C.B.

22.     A complete, unredacted copy of any and all investigative reports generated by OPWDD and/or the Justice Center concerning C.B.'s death.

23.     All documents concerning any investigation by OPWDD into C.B.'s death, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes

made by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

24.     All documents concerning any law enforcement or police investigation into C.B.'s death, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes made by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

25.     All documents concerning any investigation by the New York State Inspector General's Office into C.B.'s death, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

26.     All documents concerning any investigation by the Justice Center into C.B.'s death, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

27.     Documents sufficient to show which New York State employees provided medical care or treatment to C.B. between January 1, 2018 and April 9, 2018.

11

28.     Documents sufficient to show which New York State employees provided care or assistance to C.B., or were tasked with checking on C.B., at any time between January 1, 2018 and April 9, 2018.

29.     All documents concerning Williams' employment with the State of New York.

30.     All documents concerning Buell's employment with the State of New York.

31.     All documents concerning Behlen's employment with the State of New York.

32.     All documents concerning McGinn's employment with the State of New York.

33.     All documents concerning Cassata's employment with the State of New York.

34.     All documents concerning Novack's employment with the State of New York.

35.     All documents concerning Sessions's employment with the State of New York.

36.     All documents concerning any disciplinary action taken by the State of New York against Williams.

37.     All documents concerning any disciplinary action taken by the State of New York against Buell.

38.     All documents concerning any disciplinary action taken by the State of New York against Behlen.

39.     All documents concerning any disciplinary action taken by the State of New York against McGinn.

40.     All documents concerning any disciplinary action taken by the State of New York against Cassata.

41.     All documents concerning any disciplinary action taken by the State of New York against Novack.

42.     All documents concerning any disciplinary action taken by the State of New York against Sessions.

43.     All documents concerning Williams's duties and responsibilities as an OPWDD employee as of April 2018.

44.     All documents concerning Buell's duties and responsibilities as an OPWDD employee as of April 2018.

45.     All documents concerning Behlen's duties and responsibilities as an OPWDD employee as of April 2018.

46.     All documents concerning McGinn's duties and responsibilities as an OPWDD employee as of April 2018.

47.     All documents concerning Cassata's duties and responsibilities as an OPWDD employee as of April 2018.

48.     All documents concerning Novack's duties and responsibilities as an OPWDD employee as of April 2018.

49.     All documents concerning Sessions's duties and responsibilities as an OPWDD employee as of April 2018.

50.     All documents concerning the employment duties and responsibilities of Jen Smith, Sessions's supervisor at the Valley Ridge CIT, as of April 2018.

51.     Documents concerning any disciplinary action taken by the State of New York against Jen Smith arising from alleged advice she gave to Sessions in the wake of C.B.'s death, as alleged in paragraph 110 of the Amended Complaint.

52.     All documents concerning any investigation by OPWDD into Sessions's failure to check on C.B. on the night of April 8-9, 2018, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes made by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

53.     All documents concerning any law enforcement or police investigation into Sessions's failure to check on C.B. on the night of April 8-9, 2018, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes made by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

54.     All documents concerning any investigation by the New York State Inspector General's Office into Sessions's failure to check on C.B. on the night of April 8-9, 2018, including, without limitation, the complete investigation packets,

audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

55.     All documents concerning any investigation by the Justice Center into Sessions's failure to check on C.B. on the night of April 8-9, 2018, including, without limitation, the complete investigation packets, audiotapes or other recordings of interviews and interrogations, transcripts of interviews and interrogations, documents reviewed by investigators, handwritten or other notes by investigators, investigation reports, drafts of investigation reports, emails and correspondence to or from investigators, and video recordings.

56.     All documents concerning any discrimination complaint filed with the New York State Division of Human Rights against any of the Defendants and/or Sessions concerning the Valley Ridge CIT.

57.     All documents concerning any lawsuits brought since October 1, 2010 against any of the Defendants and/or Sessions arising out of injuries, up to and including death, allegedly sustained at Valley Ridge CIT.

58.     All New York State Police documents concerning any investigation arising out of C.B.'s death.

59.     All oral or written statements or testimony given by anyone, in any forum, concerning C.B.'s death

60.     All documents identified in Defendants' initial disclosures.

15

61.     All documents reviewed by or relied upon by any expert retained by any of the Defendants in connection with this action.

62.     All documents on which Defendants intend to rely at the trial of this action.

Dated: October 6, 2020
       New York, New York

                                    EMERY CELLI BRINCKERHOFF
                                    ABADY WARD & MAAZEL LLP


                                    By:  _____/s/_____
                                         Ilaan M. Maazel
                                         Samuel Shapiro
                                         600 Fifth Avenue, 10th Floor
                                         New York, NY 10020
                                         (212) 763-5000

                                         *Attorneys for Plaintiff*


TO:     Ryan W. Hickey
        Assistant Attorney General
        New York State Office of the Attorney General
        The Capitol, Justice Building
        Albany, NY 12224
        Phone: 518-776-2616
        ryan.hickey@ag.ny.gov

# Sealed Dkt 102

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                    Plaintiff,

     -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                Defendants.

20 Civ. 00091 (TJM)(CFH)

**NOTICE OF OBJECTIONS TO
MAGISTRATE JUDGE
HUMMEL'S DECISION**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in

Support of Plaintiff's Objections to Magistrate Judge Hummel's Decision Denying Plaintiff

Leave to Amend Her Complaint, and the following record:

- The docket in this case;

- Plaintiff's Amended Complaint, Dkt. 25;

- Plaintiff's Letter Motion requesting a pre-motion conference to address Plaintiff's proposed motion for leave to amend the complaint, Dkt. 88;

- Plaintiff's Notice of Motion for Leave to Amend the Complaint, Dkt. 93;

- Declaration of Samuel Shapiro and accompanying exhibits, Dkt. 93-1 – 93-6;

- Plaintiff's Memorandum of Law in Support of Motion for Leave to Amend the Complaint, Dkt. 93-7;

- Memorandum of Law in Support of Defendant Ashley Sessions' Opposition to Plaintiff's Motion to Amend Her Complaint, Dkt. 96;

- Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Amend the Complaint, Dkt. 97;

- Declaration of Ryan W. Hickey and accompanying exhibits, Dkt. 97-1 – 97-4;

1

- Reply Memorandum of Law in Further Support of Plaintiff's Motion for Leave to Amend Complaint, Dkt. 100;

- Reply Declaration of Samuel Shapiro and accompanying exhibit, Dkt. 101 – 101-1;

- Decision & Order of Magistrate Judge Hummel, dated December 19, 2022, Dkt. 102,

Plaintiff J.M. by her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, hereby

objects, pursuant to Federal Rule of Civil Procedure 72, to the December 19, 2022 Decision and

Order of Magistrate Judge Hummel, which denied Plaintiff's motion for leave to amend her

complaint and struck Plaintiff's reply papers. Plaintiff seeks an Order reversing Magistrate Judge

Hummel's Decision and Order, granting Plaintiff leave to amend her complaint, and for such

other and further relief as the Court deems just and proper.

Dated: December 30, 2022
         New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


_____/s_____
Ilann M. Maazel
Samuel Shapiro

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

2

**JA240**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**J.M., as Administrator of the Estate of her Son, C.B.,**

                                **Plaintiff,**

       **vs.**                                      **1:20-CV-91**
                                                   **(TJM/CFH)**

**ASHLEY SESSIONS, et al.,**

                                **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

**ORDER**

      This case involves claims concerning the death of C.B., son of J.M., who sued the

Defendants in her capacity as Administrator of C.B.'s estate.  At the time of his death, C.B.

was a resident at the Valley Ridge Center for Intensive Treatment ("CIT"), a group home

for persons with developmental disabilities in Norwich, New York.  The State of New York

operates the facility, and the Defendants are persons employed at that facility at the time

of C.B.'s death.  C.B. died of heart issues.  Plaintiff contends that Defendants violated

Plaintiff's substantive due process rights through deliberate indifference to C.B.'s medical

condition, including his complaints of difficulty breathing.

      On March 30, 2022, Plaintiff filed a motion for leave to file an amended complaint.

See dkt. # 93.  Plaintiff sought leave to add allegations to her Complaint and claims

against Anita Baral, a nurse who treated C.B. at the relevant times.  Id.  Plaintiff claimed

1

that she had only recently discovered that Baral was aware that C.B. was suffering from symptoms of heart failure and other heart issues shortly before he died, and that Baral did not act.  Defendants opposed the motion.  They argued that the motion was untimely, that they would suffer prejudice, and that amendment to include Baral would in any case be futile because the statute of limitations had run.

On December 19, 2022, Magistrate Judge Christian F. Hummel denied Plaintiff's motion.  See dkt. # 102.  Noting that "'the weight of authority' in this Circuit and District holds that a motion to amend a complaint is nondispositive," Judge Hummel struck a reply brief that Plaintiff had filed because the local rules do not permit reply briefs to non-dispositive motions without leave of court.  Id. at 8-9 (quoting Fielding v. Tollaksen, 510 F.3d 175, 178 (2d Cir. 2007)).  Judge Hummel then considered whether "good cause" existed to permit amendment.  He rejected Plaintiff's contention that she had good cause to wait until after discovery had closed to seek leave to amend to add Baral.  Judge Hummel concluded that Plaintiff had knowledge of Baral's potential for liability at an early point in the litigation, well over a year before she sought to amend.  Id. at 13-14.  An investigative report disclosed in January 2021 "put plaintiff on notice that [a coworker] alleged to have informed Baral that plaintiff['s decedent] was feeling unwell or appeared unwell," and that Baral and this coworker "had conflicting versions of events."  Id. at 14. All of the information available at an early stage informed Plaintiff of potential liability, and "plaintiff's failure to act sooner amounts to a lack of diligence."  Id.  Given Plaintiff's knowledge, Judge Hummel concluded, she should not have waited another year to depose Baral or seek to add her as a defendant.  "As plaintiff did not seek leave to amend until March 20, 2022, over a year after defendants disclosed the investigative report and

2

two years after the expiration deadline for amended pleadings," Judge Hummel found, "plaintiff has failed to meet Rule 16's good cause requirement." Id. at 15.  Though this failure to act with diligence meant, Judge Hummel found, that he could decide the matter without considering other factors, the Judge nonetheless found that Defendants would suffer undue prejudice from an amendment.  Baral would likely seek to reopen discovery, extending the time span of discovery in an unreasonable way. Id. at 16.  Judge Hummel therefore denied the motion to amend.

Plaintiff objected to this finding.  She filed an appeal of what Judge Hummel characterized as a non-dispositive ruling from a Magistrate Judge.  Under those circumstances, the Court ordinarily applies a particular standard.  A district court judge reviewing a magistrate judge's non-dispositive pretrial order may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law.  Labarge v. Chase Manhattan Bank, N.A., 1997 U.S. Dist. LEXIS 13803, 1997 WL 5853122, at *1 (N.D.N.Y. Sept. 3, 1997) (citing 28 U.S.C. § 636(b)(1)); FED. R. CIV. P. 72(a); Mathias v. Jacobs, 167 F.Supp.2d 606, 621-23 (S.D.N.Y. 2001); Dubnoff v. Goldstein, 385 F.2d 717, 721 (2d Cir. 1967) (court's decision "not to disqualify himself is ordinarily reviewable only upon appeal from a final decision on the cause in which the application . . . was filed.").  Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error.  Lanzo v. City of New York, 1999 U.S. Dist. LEXIS 16569, 1999 WL 1007346, *2-3 (E.D.N.Y. Sept. 21, 1999).  This standard imposes a heavy burden on the objecting party, and only permits reversal where the district court determines the magistrate judge "abused his broad discretion over resolution of discovery matters." Labarge, 1997 U.S. Dist. LEXIS 13803, 1997 WL 583122 at *1.

The parties disagree about whether the Court should apply this standard.  They agree that the Court of Appeals has not ruled definitely on whether denial of a motion for leave to amend a complaint is dispositive.  Plaintiff argues that the finding is dispositive and the Court should treat her "appeal" as an objection to a report-recommendation from a magistrate judge.  When objections to a magistrate judge's Report-Recommendation are lodged, the Court reviews the record de novo.  See 28 U.S.C. § 636(b)(1).  After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions."  Id. Since her motion was dispositive, Plaintiff also claims that Judge Hummel erred by striking her reply brief.  Defendants contend that Judge Hummel's findings were not dispositve, since he did not conclude that raising such a claim was futile, but instead ruled that Plaintiff's lack of diligence in naming Baral in the Complaint precluded her from including that defendant now.  Under those circumstances, Defendants claim, the Court should use the standard for non-dispositive motions.

The Court will not resolve the issue of whether Judge Hummel's ruling was dispositive or non-dispositive because the Court finds that Judge Hummel's findings were correctly evaluated under either standard.  The Court finds that Plaintiff has not presented sufficient grounds for leave to amend her complaint at this late date in the litigation and adopts Judge Hummel's findings for the reasons stated in his detailed and reasoned memorandum.  The Court has considered Plaintiff's reply brief, dkt. #s 101-102, and finds that the brief would not have altered decision on this matter in any case.

4

As such:

The Plaintiff's objections to Judge Hummel's findings, docketed as an appeal of a non-dispositive decision, dkt. # 103, are hereby **OVERRULED**.  Judge Hummel's decision is **AFFIRMED**.

**IT IS SO ORDERED**

Dated: April 24, 2023

Thomas J. McAvoy
Senior, U.S. District Judge

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

J.M., as Administrator of the Estate of Her Son, C.B.,

                                   *Plaintiff*,

                   -against-                                        1:20-CV-00091 (TJM/CFH)

ASHLEY SESSIONS, et al.

_____

                                   *Defendants*.
_____

### NOTICE OF MOTION TO DISMISS THE PLAINTIFF'S
### AMENDED COMPLAINT AGAINST THE DEFENDANT ASHLEY SESSIONS
### PURSUANT TO FRCP 56

        **PLEASE TAKE NOTICE** that upon the accompanying the Declaration of Benjamin W.

Hill with Exhibits, Statement of Material Facts, and Memorandum of Law in Support of

Defendant Ashley Sessions's Motion For Summary Judgment Pursuant to Fed. R. Civ. P. 56

Defendant, Ashley Sessions, will move this Court, before the Honorable Thomas McEvoy, in the

United States District Court, Northern District of New York, James T. Foley Courthouse, 445

Broadway, Albany New York, 12207 on a date and time to be designated by the Court, for

dismissal of the Amended Complaint insofar as against her pursuant to Rule 56 of the Federal

Rules of Civil Procedure upon the grounds that there are no material questions of fact with

respect to Plaintiff's claims against Sessions as set forth in the Amended Complaint such that

judgment should be entered against Plaintiff as a matter of law.

Dated:  November 15, 2023

Respectfully submitted,


**CAPEZZA HILL, LLP**


_____
**BENJAMIN W. HILL, ESQ.**
Bar Roll No.: 514953
*Attorneys for Defendant Sessions*
30 South Pearl Street, P-110
Albany, NY 12207
518-478-6065
Ben@capezzahill.com


TO:     SAM SHAPIRO, ESQ.
        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
        600 Fifth Avenue, 10th Floor
        New York, NY 10020

        RYAN HICKEY, ESQ.
        ASSISTANT ATTORNEY GENERAL
        Attorneys for Defendants Williams, Buell, Behlen, McGinn, Cassata, Novack
        Litigation Bureau – Third Floor
        The Capitol
        Albany, New York 12224

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

J.M., as Administrator of the Estate of Her Son, C.B.,

                            Plaintiff,                    **DECLARATION OF BENJAMIN W. HILL**

      – against –                         1:20-CV-00091 (TJM/CFH)

ASHLEY SESSIONS, et al.

                        Defendants.

_____

    I, Benjamin W. Hill, Esq. under penalty of perjury under the law of the United States of America and pursuant to 28 U.S.C. § 1746, state that the following is true:

1. I am a partner at Capezza Hill, LLP, attorneys for Defendant Ashley Sessions in this action. As such I am familiar with all the facts and circumstances of this matter.

2. I submit this Declaration in Support of Defendant Ashely Sessions's Motion for Summary Judgement pursuant to Fed. R. Civ. Proc. 56.

3. Attached hereto as **Exhibit A** is a true and accurate copy of Ashley Sessions's deposition transcript.

4. Attached hereto as **Exhibit B** is a true and accurate copy of Elise M. Williams's deposition transcript.

5. Attached hereto as **Exhibit C** is a true and accurate copy of Katherina Cassata's deposition transcript.

6. Attached hereto as **Exhibit D** is a copy of Plaintiff's expert report from Bruce D. Charash, M.D.

1

7.  Attached hereto collectively as Exhibit E is a compendium of true and accurate copies of

    exhibits marked during depositions:

       a.  Deposition Exhibit 16, Autopsy report

       b.  Deposition Exhibit 17, Nursing Notes

       c.  Deposition Exhibit 19, Bed Check Policy

       d.  Deposition Exhibit 20, Bed Check Forms

       e.  Deposition Exhibit 41, Schedule

       f.  Deposition Exhibit 46, Sessions Termination Letter

       g.  Deposition Exhibit 55, Valley Ridge Staff Observation Notes

       h.  Deposition Exhibit 63, Jennifer Smith OAII Interview Transcription

8.  For the reasons stated in Defendant Sessions's Memorandum of Law and those set forth

    in co-Defendants' moving papers which are hereby incorporated herein, Defendant

    Sessions's Motion for Summary Judgment should be granted.

Dated:  November 15, 2023

                                      **CAPEZZA HILL, LLP**

                     By: _____

                          **BENJAMIN W. HILL, ESQ.**
                          *Attorney for Defendant Sessions*
                          Bar Roll #514953
                          30 South Pearl Street, Suite P-110
                          Albany, NY 12207
                          ben@capezzahill.com
                          (518) 478-6065

# **<u>Exhibit A</u>**

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

J.M., as Administrator

of the Estate of

Her son, C.B.,

          Plaintiff

             No. 20 Civ. 00091(TJM)(CFH)

     -against-


ASHLEY SESSIONS, ELISE M. WILLIAMS,

JOSHUA A. BUELL, CORY C. BEHLAN,

RAYMOND J, MCGINN,

KATHERINA L. CASSATA and

MICHAEL NOVACK,


         Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x


    Oral deposition of ASHLEY SESSIONS was
held via Zoom, commencing December 21st,
2021, at 10:00 a.m., before NICOLE LEBOVIC, a
Court Reporter and Notary Public in and for
the State of New York.


HUDSON COURT REPORTING & VIDEO   (212) 273-9911

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

2

```
 1
 2     A P P E A R A N C E S:
 3
 4         EMERY CELLI BRINKERHOFF ABADY
           WARD & MAAZEL, LLP
 5                 Attorneys for Plaintiffs
                   600 Fifth Avenue
 6                 10th Floor
                   New York, New York 10020
 7
           BY:   SAM SHAPIRO, ESQ.
 8                 sshapiro@ecbawm.com
 9
10
11         CAPEZZA HILL, LLP
                   Attorneys for Defendant
12                 ASHLEY SESSIONS
                   30 S Pearl Street
13                 Suite P-110
                   Albany, New York 12207
14
           BY:   BENJAMIN HILL, ESQ.
15                 ben@capezzahill.com
16
17
18         NEW YORK STATE ATTORNEY GENERAL- ALBANY
                   Attorneys for Defendants
19                 ELISE M. WILLIAMS, JOSHUA A.
                   BUELL, CORY C. BEHLAN, RAYMOND J,
20                 MCGINN, KATHERINA L. CASSATA
                   and MICHAEL NOVACK
21                 The Capitol
                   Albany, New York 12224
22
           BY:   RYAN W. HICKEY, ESQ.
23                 ryan.hickey@ag.ny.com
24                 KASEY K. HILDONEN, ESQ.
                   kasey.hildonen@ag.ny.com
25
```

3

```
 1

 2            S T I P U L A T I O N S

 3

 4            IT IS HEREBY STIPULATED AND AGREED

 5   by and between the attorneys for the

 6   respective parties herein, that filing,

 7   sealing and certification be and the

 8   same are hereby waived.

 9

10            IT IS FURTHER STIPULATED AND

11   AGREED that all objections, except as to the

12   form of the question shall be reserved

13   to the time of the trial.

14

15            IT IS FURTHER STIPULATED AND

16   AGREED that the within deposition may be

17   signed and sworn to before any officer

18   authorized to administer an oath, with

19   the same force and effect as if signed

20   and sworn to before the Court.

21

22

23

24

25
```

4

1

2    A S H L E Y   S E S S I O N S, having first

3    been duly sworn by a Notary Public of the

4    State of New York, was examined and testified

5    as follows:

6              THE COURT REPORTER:  The

7         attorneys participating in this

8         deposition acknowledge that I am not

9         physically present in the deposition

10        room and that I will be reporting this

11        deposition remotely.

12             They further acknowledge that, in

13        lieu of an oath administered in person,

14        the witness will verbally declare his

15        testimony in this matter under penalty

16        of perjury.  The parties and their

17        counsel consent to this arrangement and

18        waive any objections to this manner of

19        reporting.

20             Please indicate your agreement by

21        stating your name and your agreement on

22        the record.

23        MR. SHAPIRO:  On behalf of the

24        plaintiff, I agree.

25        MR. HILL:  Benjamin Hill on

5

 1

 2         behalf of Ms. Sessions, I agree.

 3               MR. HICKEY:  Ryan Hickey on

 4         behalf of the remaining defendants, I

 5         agree.

 6               MS. HILDONEN:  Kasey Hildonen, on

 7         behalf of the remaining defendants, I

 8         agree.

 9    EXAMINATION BY

10    MR. SHAPIRO:

11         Q.    Good morning, Ms. Sessions.  My

12    name is Sam Shapiro.  I am an attorney

13    representing J.M., who is the plaintiff in

14    this case.

15               Do you understand that you're

16    here for a deposition today?

17         A.    Yes.

18         Q.    Have you ever been deposed

19    before?

20         A.    No.

21         Q.    You've never had your deposition

22    taken any time before today?

23         A.    Not for anything like this, no.

24         Q.    Have you ever been a defendant in

25    a lawsuit other than this case?

6

1                        ASHLEY SESSIONS

2          A.     No.

3          Q.     The court reporter just

4    administered an oath to you, do you recall

5    that?

6          A.     Yes.

7          Q.     Do you understand that that means

8    that you're testifying today under penalty

9    of perjury?

10         A.     Yes.

11         Q.     And that your answers today have

12   the same effect as if they were given in a

13   courtroom, do you understand that?

14         A.     Yes.

15         Q.     Is there any reason you cannot

16   testify truthfully today?

17         A.     No.

18         Q.     You're not taking any medications

19   or anything that would interfere with your

20   ability to testify truthfully?

21         A.     No, I'm not.

22         Q.     Just a couple of quick ground

23   rules.  One, is something I think we've

24   already sort of started to do, which is

25   let's try to avoid talking over each other.

1                   ASHLEY SESSIONS
2     I will do my best to avoid talking over you
3     and I just ask that you allow me to finish
4     my question so that Nicole, the court
5     reporter, can get everything down and we can
6     have a clean transcript.
7               Is that fair?
8          A.    Yes.
9          Q.    When you answer the question, the
10    answer needs to be verbal.  So, we can't do
11    nods or hmm-hmm, that can't be reflected in
12    the transcript.  Does that make sense?
13         A.    Yes.
14         Q.    If you don't understand a
15    question I ask, if I ask a bad question,
16    which will happen from time to time, just
17    let me know and I will try to rephrase it
18    and ask it in a different way.
19              Does that make sense?
20         A.    Yep.
21         Q.    But if you answer my question
22    without asking for clarification, I'm going
23    to take that to mean that you understood the
24    question and you're answering truthfully to
25    the best of your ability; is that fair?

8

1                    ASHLEY SESSIONS

2        A.    Yes.

3        Q.    From time to time your counsel

4   may object.  If you do not receive an

5   instruction not to answer the question, then

6   after your counsel makes his objection, you

7   can go ahead and answer the question if it's

8   clear to you.  Okay?

9        A.    Okay.

10        Q.    Just lastly, if you need to take

11   a break at any point, let me know.  I'll be

12   happy to accommodate that.  I just ask that

13   we don't take a break while there's a

14   question pending.

15             Does that make sense?

16        A.    Yes.

17        Q.    What did you do to prepare for

18   today's deposition?

19        A.    I spoke with my lawyer.

20        Q.    And did you meet with him in

21   person?

22        A.    I did, today.

23        Q.    For about how long did you meet?

24        A.    About an hour.

25        Q.    Did you speak with him before

9

1              ASHLEY SESSIONS

2   today as well?

3        A.    Yes, over the phone.

4        Q.    How long was that phone call,

5   approximately?

6        A.    40 minutes to an hour.

7        Q.    Did you review any documents to

8   prepare for today?

9        A.    I was shown one.

10        Q.    What was that?

11        A.    This was a DAR note.

12        Q.    That you had written?

13        A.    Yes.

14        Q.    Did you speak to anyone other

15   than your counsel to prepare for today?

16        A.    No, I did not.

17        Q.    Have you ever spoken with any of

18   the other defendants in this case about this

19   case?

20        A.    No.

21        Q.    Have you had any conversations

22   with anyone from the Attorney General's

23   Office about this case?

24        A.    No.

25        Q.    Did someone from the Attorney

                    ASHLEY SESSIONS

 1

 2   General's Office ever inform you that they

 3   wouldn't be representing you in connection

 4   with this case?

 5        A.    Yes.

 6        Q.    When was that?

 7        A.    Quite a while ago, I don't recall

 8   the date.

 9        Q.    Was that a phone conversation?  A

10   meeting?  How did that happen?

11        A.    It was an e-mail and a letter.

12        Q.    Did you ever speak to anyone from

13   the Attorney General's Office?

14        A.    No.

15        Q.    Did the e-mail or letter explain

16   why the Attorney General's Office would not

17   be representing you?

18        A.    I'm sure, but I don't recall

19   though.

20        Q.    Have you ever looked for

21   documents in connection with this case?

22        A.    I did.

23        Q.    When did you do that?

24        A.    When I was informed to do so by

25   my lawyer.

                        ASHLEY SESSIONS

1

2        Q.     And where did you look for

3    document?

4        A.     E-mails, text messages.

5        Q.     Anywhere else?

6        A.     No, e-mails, text messages on my

7    phone.

8        Q.     And let me start with text

9    messages, did you look at your personal cell

10   phone?

11       A.     Yes, I did.

12       Q.     And do you have the same cell

13   phone that you used back in April of 2018

14   today?

15       A.     No, I do not.

16       Q.     Do you have -- are you able to

17   access on your phone that you used today

18   text messages that you sent and received

19   back in April of 2018?

20       A.     Yes.

21       Q.     Did you locate any text messages

22   concerning C.B.?

23       A.     No, I did not.

24       Q.     Did you locate any text messages

25   concerning this case?

# JA261

12

1                    ASHLEY SESSIONS

2        A.    No, I did not.

3        Q.    When you were working at Valley

4   Ridge for OPWDD, did you ever communicate

5   with your co-workers via text?

6        A.    No.

7        Q.    Did you have any of their

8   personal cell phone numbers?

9        A.    No, I did not.

10        Q.    You said you searched your e-mail

11   as well, right?

12        A.    Yes.

13        Q.    And was that your personal e-mail

14   account?

15        A.    It was.

16        Q.    And what -- do you have a Gmail

17   account?  A Yahoo account?

18        A.    I had a Yahoo account.

19        Q.    Is that the same account you had

20   back in April of 2018?

21        A.    Yes.

22        Q.    And did you locate any e-mails

23   concerning C.B.?

24        A.    No, I did not.

25        Q.    Did you locate any e-mails

ASHLEY SESSIONS

1

2      concerning this case at all?

3          A.    No.

4          Q.    Did you ever communicate with

5      your co-workers at Valley Ridge through your

6      personal Yahoo e-mail account?

7          A.    No.

8          Q.    Were there any other personal

9      e-mail accounts that you used back in April

10     of 2018?

11         A.    No.

12         Q.    You had an OPWDD e-mail account

13     in April of 2018, didn't you?

14         A.    I believe so, yes.

15         Q.    Was that something you were able

16     to access on your personal cell phone?

17         A.    No.

18         Q.    Was it something you could access

19     on your personal computer?

20         A.    No.

21         Q.    Now, on the night of April 8th

22     into April 9, 2018, you were an employee of

23     OPWDD, correct?

24         A.    Yes.

25         Q.    And your title was Developmental

14

1                    ASHLEY SESSIONS

2      Disabilities Secure Care Treatment Aide

3      Trainee, correct?

4           A.    Yes.

5           Q.    And you were assigned to work at

6      the Valley Ridge Center for Intensive

7      Treatment, correct?

8           A.    Yes.

9           Q.    And that's in Norwich, New York,

10     right?

11          A.    Yep.

12          Q.    And that night you were

13     specifically assigned to the E-House at

14     Valley Ridge, correct?

15          A.    Yes.

16          Q.    And one of your jobs that night

17     was to perform bed checks on C.B., correct?

18          A.    Yes.

19          Q.    And you were supposed to perform

20     bed checks on C.B. every two hours, correct?

21          A.    Yes.

22          Q.    And the bed checks were supposed

23     to be done a 11:00 p.m., 1:00 a.m.,

24     3:00 a.m. and 5:00 a.m., correct?

25          A.    Yes.

```
 1                  ASHLEY SESSIONS
 2       Q.    And you did not perform a bed
 3  check on C.B. at 3:00 a.m. that evening,
 4  correct?
 5       A.    Correct.
 6       Q.    And you did not perform a bed
 7  check on C.B. at 5:00 a.m. that evening,
 8  correct?
 9       A.    Correct.
10       Q.    Now, in April 2018, you were
11  charged with the misdemeanor of making a
12  false statement, correct?
13       A.    Yes.
14       Q.    And you pleaded guilty to that
15  charge, am I right?
16       A.    I did.
17       Q.    Do you understand that that means
18  that you admitted to making a false
19  statement, right?
20       A.    Yes.
21       Q.    And what was the sentence you
22  received as a result of that?
23       A.    I had to pay a fine.
24       Q.    Anything else?
25       A.    No.
```

1                    ASHLEY SESSIONS

2       Q.    Did you also receive a one year

3   conditional discharge?

4       A.    I don't recall.

5       Q.    Have you been arrested since that

6   incident?

7       A.    No, I have not.

8             MR. SHAPIRO:  I want to just

9       mark -- I'm marking as Exhibit 35, a

10      six-page document that's Bates stamped

11      Plaintiff 10421 through 10426.

12            (Bates stamped Plaintiff

13      10421-10426 was marked as Plaintiff

14      Exhibit 35 for identification;

15      12/20/21.)

16      Q.    Are you able to open that, Ms.

17  Sessions?

18            MR. HILL:  Hold on one second,

19      Sam, I'm just going to grab the exhibit

20      folder.

21            MR. SHAPIRO:  No problem.

22            MR. HILL:  Okay, we're in the

23      document.  But actually, once it's

24      open, we can't see you, but we see the

25      document.

```
 1                    ASHLEY SESSIONS
 2            MR. SHAPIRO:  Okay, fair enough.
 3       Q.    So what I'm going to direct you
 4   to is page 3 of the document towards the
 5   bottom and I'll just ask you to read -- you
 6   can read it to yourself -- the statement of
 7   Judge Fox that starts at the bottom of page
 8   3 and continues on to page 4?
 9            MR. HILL:  Is that beginning
10       with, "Is there any restitution
11       required here?"
12            MR. SHAPIRO:  Sure, I was
13       actually talking, "Okay, Ms. Sessions,
14       you understand that with a sentence" --
15            MR. HILL:  Oh, okay.
16            This is Bates 104 -- Plaintiff
17       10423.
18       Q.    Let me know when you've had a
19   chance to read that?
20       A.    Yes.
21       Q.    So my question is, does that
22   refresh your recollection that in addition
23   to a fine you also received a sentence of a
24   one year conditional discharge?
25       A.    Yes.
```

18

1                    ASHLEY SESSIONS

2            MR. HILL:  Just note my

3       objection.  It actually says there was

4       no fine, there was a surcharge.

5        Q.    Is it your memory, Ms. Sessions,

6  that you had to pay a fine in connection

7  with your guilty plea?

8        A.    I don't know if it was a fine.  I

9  did have to make payments to the court

10  though.

11        Q.    And how much was that?

12        A.    I don't recall.

13        Q.    How many payments did you have to

14  make?

15        A.    I don't remember.

16        Q.    More than one?

17        A.    Yes.

18        Q.    Did you use a check to pay?

19        A.    No, I paid in cash.

20        Q.    Was it more than $1,000?

21        A.    I don't believe so.

22        Q.    Was this guilty plea the first

23  time that you had been convicted of a crime?

24        A.    Yes.

25            MR. SHAPIRO:  I'm going to mark

```
 1                    ASHLEY SESSIONS

 2        as Plaintiff's Exhibit 36, a one-page

 3        document that's Bates stamped Plaintiff

 4        10593.

 5                (Bates stamped Plaintiff 10593

 6        was marked as Plaintiff Exhibit 36 for

 7        identification; 12/20/21.)

 8        Q.    Tell me when you've had a chance

 9   to open that, please?

10                MR. HILL:  We have that open.

11        Q.    Do you recognize that document,

12   Ms. Sessions?

13        A.    I do.

14        Q.    What is it?

15        A.    It looks like my statement to the

16   police officer that morning.

17        Q.    Okay.  And you see your signature

18   on this document?

19        A.    I do.

20        Q.    And you see your initials on the

21   document as well?

22        A.    Yes.

23        Q.    And your initials are next to a

24   notice regarding Penal Law Section 210.45,

25   do you see that?
```

```
 1                    ASHLEY SESSIONS
 2        A.    Yes.
 3        Q.    And the date next to your
 4   signature, what is that?
 5        A.    It's 4/9/2018.
 6        Q.    I want to just go through this
 7   document here with you.
 8              So, I am looking now at -- well,
 9   let me back up for one second.
10              Do you recall having a
11   conversation with a state trooper on
12   April 9, 2018?
13        A.    Yes.
14        Q.    And did that trooper ask you
15   questions about C.B.'s death?
16        A.    Yes.
17        Q.    Do you remember what questions he
18   asked you?
19        A.    I don't.
20        Q.    Fair to say though you provided
21   him some information, right?
22        A.    Most likely.
23        Q.    And the information -- and did he
24   then type up the information that you
25   provided to him?
```

```
1                   ASHLEY SESSIONS

2        A.    Yes.

3        Q.    And that's Exhibit 36 that we're

4   looking at here, right?

5        A.    Yes.

6        Q.    So that was typed by the trooper,

7   not you, am I understanding that correctly?

8        A.    It was.

9        Q.    But it was based on information

10  you provided, correct?

11       A.    Yes.

12       Q.    And then you had a chance to

13  review the typed up statement, correct?

14       A.    Yes.

15       Q.    And then you signed it, correct?

16       A.    Yes.

17       Q.    So looking at the statement, I'm

18  looking at the second sentence, it says, "I

19  was working a night shift from 11:00 p.m. to

20  7:00 a.m. on Sunday, April 8, 2018, into the

21  morning of Monday, April 9, 2018, at the

22  Valley Ridge CIT facility located at 276

23  County Road 46 located in the Town of

24  Norwich," do you see that?

25       A.    Yes.
```

22

                        ASHLEY SESSIONS

1

2       Q.    And was that true?

3       A.    Yes.

4       Q.    The next sentence says, "I am

5  currently employed as a DDSCTA trainee," is

6  that true?

7       A.    Yes.

8       Q.    The next sentence says, "Early

9  this morning at about 1:00 a.m. I was

10  sitting in the office located down the hall

11  from C.B.'s room located in E-House," do you

12  see that?

13       A.    Yes.

14       Q.    Was that true?

15       A.    Yes.

16       Q.    The next sentence says, "I heard

17  his door open and saw him walk down the hall

18  and into the bathroom," do you see that?

19       A.    Hmm-hmm, yes.

20       Q.    Was that true?

21       A.    From what I can recall, yes.

22       Q.    The next sentence says, "He was

23  in the bathroom for a couple of minutes,"

24  was that true?

25       A.    From what I can recall.

```
 1                    ASHLEY SESSIONS
 2        Q.    Is that a yes, that was true?
 3        A.    From what I can recall, yes.
 4        Q.    The next sentence says, "He said,
 5   'Hi' to me and mumbled as he walked back to
 6   his room," was that true?
 7        A.    Yes.
 8        Q.    The next sentence says, "I led
 9   him back into his room during my bed
10   checks," was that true?
11        A.    Yes.
12        Q.    The next sentence says, "C.B. did
13   not complain of any pain or discomfort at
14   this time," was that true?
15        A.    As far as I can recall, yes.
16        Q.    The next sentence says, "I do
17   nightly checks every two hours and check to
18   make sure that each consumer is responsive
19   and breathing," was that true?
20        A.    Yep.
21        Q.    The next sentence says, "I
22   checked on C.B. at 3:00 a.m. and again at
23   5:00 a.m.," was that true?
24        A.    No.
25        Q.    The neck sentence says, "I
```

1                    ASHLEY SESSIONS

2    observed C.B. breathing on both my checks,"

3    was that true?

4         A.    No.

5         Q.    The next sentence says, "C.B. was

6    sleeping on his back during both of my

7    checks," was that true?

8         A.    No.

9         Q.    And the last sentence says,

10   "Nothing seemed out of the ordinary in his

11   room," was that true?

12        A.    Yes.

13             MS. HILDONEN:  For the record,

14        I'm stepping off for a few minutes.  My

15        colleague, Ryan, will remain, thank

16        you.

17             MR. SHAPIRO:  Thanks, Kasey.

18        Q.    Do you recall discussing anything

19   else with the state trooper on April 9th

20   that's not reflected in this statement,

21   Exhibit 36?

22        A.    No.

23             MR. HILL:  Sam, I'm sorry, we

24        can't see you, so I would like to pull

25        this document down if you're done with

25

ASHLEY SESSIONS

1
2          it.  If you're not, we can --
3                    MR. SHAPIRO:  Yes, I am done with
4          it, sorry.
5                    MR. HILL:  That's all right,
6          thanks.
7                    MR. SHAPIRO:  That's fair, Ben,
8          that's a good reminder.  I'll try to
9          let you know when I'm done using the
10         document so you can put it down.
11                   MR. HILL:  All right, thanks.
12         Q.    Was this interview that you did
13    with this trooper conducted at the Valley
14    Ridge facility?
15         A.    Yes.
16         Q.    How did it come about that the
17    trooper asked to speak with you?
18         A.    I believe they spoke with
19    everyone that morning.
20         Q.    When you say, "Everyone," who do
21    you mean?
22         A.    Anyone that was in the house.
23         Q.    Did you see them speaking with
24    other people in the house?
25         A.    No.

1                    ASHLEY SESSIONS

2        Q.    Where did the interview take

3    place?

4        A.    In the parking lot in the police

5    car.

6        Q.    So you were in the police car

7    when you were talking to the trooper?

8        A.    Yes.

9        Q.    Did he have a computer in that

10   car with him that he typed this statement up

11   on?

12       A.    Something like that, it was on

13   their dashboard.

14       Q.    And he was able to print it out

15   in the car too?

16       A.    Yes.

17       Q.    Was anyone else in the car aside

18   from you and Trooper Holden?

19       A.    No.

20       Q.    Were you sitting in the front

21   seat with him?

22       A.    Yes.

23       Q.    Was he in the driver's side, you

24   in the passenger?

25       A.    Yes.

# JA276

27

1                    ASHLEY SESSIONS

2        Q.    You weren't handcuffed or

3    anything like that?

4        A.    No.

5        Q.    Did he ask you to put your

6    initials next to the notice at the bottom

7    about Penal Law Section 210.45?

8        A.    Yes.

9        Q.    Did he explain to you why he

10   wanted you to do that?

11       A.    I don't remember.

12       Q.    Was it your understanding that

13   you were signing this statement under

14   penalty of perjury?

15       A.    Yes.

16       Q.    And at the time you signed it,

17   you knew it contained things that were not

18   true, right?

19       A.    Yes.

20       Q.    And you signed it any way, right?

21       A.    Yes.

22       Q.    Now, did you voluntarily correct

23   this statement?

24       A.    I did.

25       Q.    Tell me how that came about?

28

                      ASHLEY SESSIONS

1

2       A.    I was called back to the state

3    trooper's car.  Someone came and picked me

4    up from my house that day and they asked me

5    about my statement and everything in it.

6       Q.    I'm sorry, I missed some of that.

7             MR. SHAPIRO:  Could you just read

8        it back for me, Nicole.

9             (The requested portion was read.)

10      Q.    After you gave this statement to

11   the trooper in the car in the parking lot at

12   Valley Ridge, did you go back home?

13      A.    Yes.

14      Q.    And approximately how long after

15   you got home did you get a call from the

16   trooper?

17      A.    A few hours.

18      Q.    What did they say to you?

19      A.    They said that they were -- they

20   wanted me to come back to the sheriff's

21   office -- or the trooper's office, I'm sorry

22   and they had someone come and pick me up

23   from my house.

24      Q.    Did they tell you why they needed

25   to speak with you again?

1                     ASHLEY SESSIONS

2          A.    No.

3          Q.    Did they tell you it concerned

4    your statement?

5          A.    No.

6          Q.    Did they tell you it concerned

7    C.B.'s death?

8          A.    No.

9          Q.    And then, was it the same trooper

10   who you had spoken to earlier that morning

11   who came and picked you up at our house?

12         A.    Not that I could recall.

13         Q.    Did they come in a marked cop

14   car?

15         A.    Yes.

16         Q.    And were you sitting in the back

17   this time as you rode to the trooper's

18   station?

19         A.    No.

20         Q.    You stayed in the front seat?

21         A.    Yes.

22         Q.    You weren't handcuffed, right?

23         A.    No.

24         Q.    Tell me about what happened when

25   you got to the trooper's station?

```
 1                  ASHLEY SESSIONS
 2        A.    They reviewed my statement with
 3   me.
 4        Q.    Okay.  Did you -- were you
 5   brought into a room?
 6        A.    Yes.
 7        Q.    Was it a room with a one-sided
 8   window?
 9        A.    I don't remember.
10        Q.    Was there a table in the room?
11        A.    Yes.
12        Q.    And were you handcuffed or
13   restrained in any way within that room?
14        A.    No, I was not.
15        Q.    And how many troopers were at the
16   questioning?
17        A.    I believe one.
18        Q.    And did he tell you that he had
19   concerns about what you had said in your
20   statement earlier that morning?
21        A.    Yep.
22        Q.    What did he tell you about that?
23        A.    He just said he had a couple of
24   questions for me about it and then asked if
25   I wanted to make any changes to it.
```

1                    ASHLEY SESSIONS

2        Q.    Did he tell you that he thought

3    you had lied in the statement?

4        A.    No.

5        Q.    Did he remind you that you had

6    submitted the statement -- that you had

7    signed the statement under penalty of

8    perjury?

9        A.    I don't remember.

10       Q.    Did he tell you that lying in a

11   written statement could be a crime?

12       A.    I don't remember.

13       Q.    Did he tell you specifically

14   which parts of the statement he was

15   concerned about?

16       A.    I don't remember.

17       Q.    Do you remember how long you

18   spoke with the trooper that afternoon?

19       A.    I don't.

20       Q.    And this was the same day, this

21   is April 9th when you were at the trooper's

22   station, correct?

23       A.    Yes.

24             MR. SHAPIRO:  I am going to mark

25             as Plaintiff's Exhibit 37, a five-page