# 24-1997

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

J. M., AS ADMINISTRATOR OF THE ESTATE OF HER SON, C.B.,

*Plaintiff-Appellant,*

—against—

ASHLEY SESSIONS, ELISE M. WILLIAMS, JOSHUA A. BUELL, COREY C. BEHLEN, RAYMOND J. MCGINN, KATHERINA L. CASSATA, MICHAEL NOVACK,

*Defendants-Appellees,*

DOES 1-6,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME III OF X
## (Pages JA561 to JA840)
## [REDACTED]

ALEXANDRA VON STACKELBERG
BENJAMIN W. HILL
CAPEZZA HILL, LLP
30 South Pearl Street, Suite P-110
Albany, New York 12207
(518) 478-6065

*Attorneys for Defendant-Appellee
  Ashley Sessions*

ILANN MARGALIT MAAZEL
LAURA KOKOTAILO
SAMUEL SHAPIRO
EMERY CELLI BRINCKERHOFF
  ABADY WARD & MAAZEL, LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff-Appellant
  J. M., as Administrator of
  the Estate of Her Son, C.B*

(*Counsel continued on inside cover*)

ALEXANDRIA TWINEM
BARBARA D. UNDERWOOD
NEW YORK STATE ATTORNEY
   GENERAL'S OFFICE
The Capitol
Albany, New York 12224
(518) 776-2010

*Attorneys for Defendants-Appellees*
   *Elise M. Williams, Joshua A. Buell,*
   *Corey C. Behlen, Raymond J.*
   *McGinn, Katherina L. Cassata,*
   *and Michael Novack*

# TABLE OF CONTENTS

PAGE

District court docket sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1

Complaint, dated January 27, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA26

Amended Complaint, dated July 10, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . JA43

Answer by Defendants Elise Williams, Joshua A. Buell,
    Corey C. Behlan, Raymond J. McGinn, Katherine L. Cassata,
    and Michael Novack, dated September 21, 2020 . . . . . . . . . . . . . . . . . . . JA61

Answer by Defendant Ashley Sessions, dated November 20, 2020 . . . . . . . JA74

Plaintiff's Motion to Amend Complaint, dated March 30, 2022 . . . . . . . . . JA92

Declaration of Samuel Shapiro in support of Motion to Amend,
    dated March 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA94

    Exhibit A to Shapiro Declaration—
    Proposed Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . JA96

    Exhibit B to Shapiro Declaration—
    Proposed Second Amended Complaint showing the changes
    between the First Amended Complaint and Proposed Second
    Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA117

    Exhibit C to Shapiro Declaration—
    Excerpts of the deposition of Katherina Cassata,
    taken on February 8, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA138

    Exhibit D to Shapiro Declaration—
    Excerpts of the deposition of Anita Baral,
    taken on February 8, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA150

ii

PAGE

Exhibit E to Shapiro Declaration—
Defendants' Elise M. Williams, Joshua A. Buell, Corey C.
Behlen, Raymond J. McGinn, Katherina L. Cassata and Michael
Novack Initial Disclosures, dated September 23, 2020 . . . . . . . . . . . JA158

Plaintiff's Memorandum of Law in support of Motion to Amend,
dated March 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA163

Defendant Ashley Sessions' Memorandum of Law in Opposition
to Motion to Amend, dated May 6, 2022 . . . . . . . . . . . . . . . . . . . . . JA175

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
Raymond J. McGinn, Katherine L. Cassata, and Michael
Novack's Memorandum of Law in Opposition to Motion
to Amend, dated May 6, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA180

Declaration of Ryan W. Hickey, for Defendants Elise Williams,
Joshua A. Buell, Corey C. Behlan, Raymond J. McGinn,
Katherine L. Cassata, and Michael Novack, in Opposition
to Motion to Amend, dated May 6, 2022 . . . . . . . . . . . . . . . . . . . . . JA190

Exhibit A to Hickey Declaration—
January 19, 2021 email to Plaintiff's counsel . . . . . . . . . . . . . . . . . . . JA192

Exhibit B to Hickey Declaration—
Summary of Interviews
[filed under seal, see volume 6, page 1141] . . . . . . . . . . . . . . . . . . . . JA195

Plaintiff's Reply Memorandum of Law in Further Support of Motion
to Amend, dated May 12, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA196

Reply Declaration of Samuel Shapiro in Further Support of Motion
to Amend, dated May 12, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA219

Exhibit F to Shapiro Declaration—
Plaintiff's First Consolidated Set of Interrogatories and Requests
for Production of Documents, dated October 6, 2020 . . . . . . . . . . . . JA220

iii

PAGE

Decision and Order of Magistrate Judge Hummel denying Motion
    to Amend  [filed under seal, see volume 6, page 1145]............ JA237

Notice of Appeal of Magistrate Judge Decision to District Court,
       dated December 30, 2022 ....................................... JA238

Decision and Order of the District Court affirming Order,
       dated April 24, 2023 ........................................... JA240

Motion for Summary Judgment filed by Defendant Ashley Sessions,
       dated November 15, 2023 ...................................... JA245

Declaration of Benjamin W. Hill, for Defendant Ashley Sessions, in
    Support of Motion for Summary Judgment,
       dated November 15, 2023 ...................................... JA247

    Exhibit A to Hill Declaration—
    Deposition Transcript of Ashley Sessions,
    dated December 21, 2021 ....................................... JA249

    Exhibit B to Hill Declaration—
    Deposition Transcript of Elise M. Williams,
    dated December 20, 2021 ....................................... JA409

    Exhibit C to Hill Declaration—
    Deposition Transcript of Katherina Cassata,
    dated February 8, 2022........................................... JA537

    Exhibit D to Hill Declaration—
    Expert Disclosure of Bruce Charash
    [filed under seal, see volume 6, page 1163] ..................... JA686

    Exhibit E to Hill Declaration—
    Compendium of Exhibits marked during Depositions
    [filed under seal, see volume 6, page 1180] ..................... JA687

    Statement of Material Facts in support of Motion for Summary
    Judgment by Defendant Ashely Sessions ,
    dated November 15, 2023 ....................................... JA688

iv

PAGE

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
Raymond J. McGinn, Katherine L. Cassata, and Michael
Novack's Motion for Summary Judgment,
dated November 15, 2023 ........................................ JA694

Declaration of Raymond McGinn in Support of Motion
for Summary Judgment, dated November 14, 2023 .............. JA696

    Exhibit A to McGinn Declaration—
    Unit Physician Notes
    [filed under seal, see volume 6, page 1233] ................. JA701

    Exhibit B to McGinn Declaration—
    Unit Physician Notes
    [filed under seal, see volume 6, page 1238] ................. JA702

    Exhibit C to McGinn Declaration—
    C.B.'s "Physicians Order Form"
    [filed under seal, see volume 6, page 1243] ................. JA703

Declaration of Elise Williams in Support of Motion for Summary
Judgment, dated November 13, 2023........................... JA704

Declaration of Ryan W. Hickey in Support of Motion
for Summary Judgment, dated November 15, 2023 .............. JA707

    Exhibit A to Hickey Declaration—
    Stipulation and Proposed Order for a Conditional Dismissal,
    dated December 11, 2020 .................................. JA709

    Exhibit B to Hickey Declaration—
    Deposition Transcript of Elisa M. Williams,
    dated December 20, 2021
    [filed under seal, see volume 6, page 1248] ................. JA715

    Exhibit C to Hickey Declaration—
    Deposition Transcript of Joshua Buell,
    dated January 13, 2022
    [filed under seal, see volume 7, page 1591] ................. JA716

v

PAGE

Exhibit D to Hickey Declaration—
Deposition Transcript of Corey Behlen,
dated January 13, 2022
[filed under seal, see volume 7, page 1699] . . . . . . . . . . . . . . . . . JA717

Exhibit E to Hickey Declaration—
Deposition Transcript of Raymond McGinn,
dated February 11, 2022
[filed under seal, see volume 8, page 1866] . . . . . . . . . . . . . . . . . JA718

Exhibit F to Hickey Declaration—
Deposition Transcript of Katherina Cassata,
dated February 8, 2022
[filed under seal, see volume 8, page 1926] . . . . . . . . . . . . . . . . . JA719

Exhibit G to Hickey Declaration—
Deposition Transcript of Michael Novack,
dated January 10, 2022
[filed under seal, see volume 9, page 2074] . . . . . . . . . . . . . . . . . JA720

Declaration of Cassaundra Murray, dated October 31, 2023 . . . . . . . JA721

Exhibit A to Murray Declaration—
C.B.'s May 19, 2015 Application for Voluntary Admission
[filed under seal, see volume 9, page 2236] . . . . . . . . . . . . . . . . . JA724

Statement of Material Facts in support of Motion for Summary
Judgment by Defendants Elise Williams, Joshua A. Buell, Corey
C. Behlan, Raymond J. McGinn, Katherine L. Cassata, and
Michael Novack, dated November 15, 2023 . . . . . . . . . . . . . . . . . . . JA725

Plaintiff's Statement of Material Facts in Opposition to Motions for
Summary Judgment December 22, 2023 . . . . . . . . . . . . . . . . . . . . . . JA732

Plaintiff's Counter-Statement of Material Facts in Opposition to
Defendant Ashley Sessions, dated December 22, 2023 . . . . . . . . . . . JA749

vi

PAGE

Plaintiff's Counter-Statement of Material Facts in Opposition
    Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
    Raymond J. McGinn, Katherine L. Cassata, and Michael Novack,
    dated December 22, 2023 ........................................ JA755

Declaration of Samuel Shapiro, for Plaintiff, in Opposition to
    Motions for Summary Judgment, dated December 22, 2023 ....... JA767

    Exhibit A to Shapiro Declaration—
    C.B.'s Death Certificate
    [filed under seal, see volume 9, page 2239] ...................... JA772

    Exhibit B to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Plaintiff J.M.
    [filed under seal, see volume 9, page 2242] ...................... JA773

    Exhibit C to Shapiro Declaration—
    C.B.'s Behavioral Support Program
    [filed under seal, see volume 9, page 2254] ...................... JA774

    Exhibit D to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of  Defendant
    Michael Novack, dated January 10, 2022......................... JA775

    Exhibit E to Shapiro Declaration—
    Broome DDSO's Nursing and Policy Procedure on focus
    charting, dated August 2008..................................... JA794

    Exhibit F to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Defendant
    Elise M. Williams, dated December 20, 2021..................... JA797

    Exhibit G to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Defendant
    Raymond J. McGinn, dated February 11, 2022 ................... JA851

    Exhibit H to Shapiro Declaration—
    Expert Report of Georgia Persky, RN, BSN, MBA, PhD, NEA-
    BC, dated June 28, 2023 ........................................ JA890

vii

PAGE

Exhibit I to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Katherina L. Cassata, dated February 8, 2022 .................... JA919

Exhibit J to Shapiro Declaration—
C.B.'s Staff Observations/Notes from February 23, 2018, through
April 9, 2018 [filed under seal, see volume 10, page 2265]........ JA930

Exhibit K to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Anita Baral,
dated February 8, 2022......................................... JA931

Exhibit L to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Ashley Sessions, dated December 21, 2021...................... JA937

Exhibit M to Shapiro Declaration—
C.B.'s bed check charts
[filed under seal, see volume 10, page 2270] .................... JA954

Exhibit N to Shapiro Declaration—
Defendant Ashley M. Sessions' statement to the New York State
Police, dated April 9, 2018
[filed under seal, see volume 10, page 2277] .................... JA955

Exhibit O to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Corey C. Behlen, dated January 13, 2022 ....................... JA956

Exhibit P to Shapiro Declaration—
Defendant Corey C.  Behlen's OPWDD OIIA interview
[filed under seal, see volume 10, page 2279] .................... JA978

Exhibit Q to Shapiro Declaration—
email message from Laurie Miller dated April 17, 2018
[filed under seal, see volume , page 2283]...................... JA979

Exhibit R to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Defendant
Joshua A. Buell, dated January 13, 2022 ....................... JA980

viii

PAGE

Exhibit S to Shapiro Declaration—
Broome DDSOO's Policy and Procedures for Resident
Documentation and Charting, issued August 2018 ................ JA994

Exhibit T to Shapiro Declaration—
C.B.'s Plan of Nursing Services dated January 30, 2018
and March 27, 2018  [filed under seal, see volume 10, page 2285].  JA998

Exhibit U to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Jennifer Smith,
dated January 12, 2022 ........................................... JA999

Exhibit V to Shapiro Declaration—
Excerpts from the Transcript of the deposition of Leisa
McKown, dated January 12, 2022 ............................... JA1014

Exhibit W to Shapiro Declaration—
C.B.'s Weight Chart is attached
[filed under seal, see volume 10, page 2288] .................... JA1027

Exhibit X to Shapiro Declaration—
email from Margaret Fassett, RD II, to Defendant Raymond
McGinn dated April 21, 2017
[filed under seal, see volume 10, page 2291] .................... JA1028

Exhibit Y to Shapiro Declaration—
C.B.'s Unit Physician Notes
[filed under seal, see volume __, page 2293] .................... JA1029

Exhibit Z to Shapiro Declaration—
Expert Report of Dr. Bruce D. Charash, M.D.
[filed under seal, see volume 10, page 2295] .................... JA1030

Exhibit AA to Shapiro Declaration—
call log of Plaintiff J.M. from April 8, 2018 .................... JA1031

Exhibit BB to Shapiro Declaration—
Excerpts from the Transcript of the Deposition of Samantha
Feliciano, dated August 16, 2023 ............................... JA1033

ix

PAGE

Exhibit CC to Shapiro Declaration—
Excerpts from a Transcript of Leisa McKown's interview with
OIIA  [filed under seal, see volume 10, page 2312] . . . . . . . . . . . . . .  JA1038

Exhibit DD to Shapiro Declaration—
C.B.'s Nursing Notes
[filed under seal, see volume 10, page 2315] . . . . . . . . . . . . . . . . . .  JA1039

Exhibit EE to Shapiro Declaration—
excerpts from a transcript of Elise M. Williams's interview with
OIIA  [filed under seal, see volume 10, page 2322] . . . . . . . . . . . . . .  JA1040

Exhibit FF to Shapiro Declaration—
photograph of the exterior of buildings at Valley Ridge CIT . . . . .  JA1041

Exhibit GG to Shapiro Declaration—
Notice to Provider of C.B.'s Investigation Determination
[filed under seal, see volume 10, page 2325] . . . . . . . . . . . . . . . . . .  JA1043

Exhibit HH to Shapiro Declaration—
Medical Examiner's Report for C.B., dated June 12, 2018
[filed under seal, see volume 10, page 2328] . . . . . . . . . . . . . . . . . .  JA1044

Defendant Ashley Sessions' Reply Statement of Material Facts,
dated January 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1045

Defendants Behlen et al.'s Reply Statement of Material Facts,
dated January 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1071

Defendants Elise Williams, Joshua A. Buell, Corey C. Behlan,
Raymond J. McGinn, Katherine L. Cassata, and Michael
Novack's Response to Statement of Material Facts,
dated January 18, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1090

Decision and Order of the District Court granting Defendants' Motion
for Summary Judgment, dated July 11, 2024 . . . . . . . . . . . . . . . . . . .  JA1118

Judgment, dated July 11, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1137

Plaintiff's Notice of Appeal, dated July 25, 2024 . . . . . . . . . . . . . . . . . . .  JA1139

x

PAGE

**FILED UNDER SEAL**

Exhibit B to Hickey Declaration—
    Summary of Interviews ......................................... JA1141

Decision and Order of Magistrate Judge Hummel denying Motion to
    Amend ...................................................... JA1145

Exhibit D to Hill Declaration—
    Expert Disclosure of Bruce Charash ........................... JA1163

Exhibit E to Hill Declaration—
    Compendium of Exhibits marked during Depositions ............ JA1180

Exhibit A to McGinn Declaration—
    Unit Physician Notes .......................................... JA1233

Exhibit B to McGinn Declaration—
    Unit Physician Notes .......................................... JA1238

Exhibit C to McGinn Declaration—
    C.B.'s "Physicians Order Form" ............................... JA1243

Exhibit B to Hickey Declaration—
    Deposition Transcript of Elisa M. Williams, dated December 20,
    2021 ....................................................... JA1248

Exhibit C to Hickey Declaration—
    Deposition Transcript of Joshua Buell, dated January 13, 2022 ... JA1591

Exhibit D to Hickey Declaration—
    Deposition Transcript of Corey Behlen, dated January 13, 2022 .. JA1699

Exhibit E to Hickey Declaration—
    Deposition Transcript of Raymond McGinn, dated February 11,
    2022 ....................................................... JA1866

xi

PAGE

Exhibit F to Hickey Declaration—
    Deposition Transcript of Katherina Cassata, dated February 8,
    2022 ...................................................... JA1926

Exhibit G to Hickey Declaration—
    Deposition Transcript of Michael Novack, dated January 10,
    2022 ...................................................... JA2074

Exhibit A to Murray Declaration—
    C.B.'s May 19, 2015 Application for Voluntary Admission ...... JA2236

Exhibit A to Shapiro Declaration—
    C.B.'s Death Certificate....................................... JA2239

Exhibit B to Shapiro Declaration—
    Excerpts from the Transcript of the Deposition of Plaintiff J.M. . JA2242

Exhibit C to Shapiro Declaration—
    C.B.'s Behavioral Support Program............................ JA2254

Exhibit J to Shapiro Declaration—
    C.B.'s Staff Observations/Notes from February 23, 2018, through
    April 9, 2018 ................................................ JA2265

Exhibit M to Shapiro Declaration—
    C.B.'s bed check charts ....................................... JA2270

Exhibit N to Shapiro Declaration—
    Defendant Ashley M. Sessions' statement to the New York State
    Police, dated April 9, 2018 ................................... JA2277

Exhibit P to Shapiro Declaration—
    Defendant Corey C. Behlen's OPWDD OIIA interview.......... JA2279

Exhibit Q to Shapiro Declaration—
    email message from Laurie Miller dated April 17, 2018 ......... JA2283

xii

PAGE

Exhibit T to Shapiro Declaration—
   C.B.'s Plan of Nursing Services dated January 30, 2018 and
   March 27, 2018 ................................................. JA2285

Exhibit W to Shapiro Declaration—
   C.B.'s Weight Chart is attached ................................ JA2288

Exhibit X to Shapiro Declaration—
   email from Margaret Fassett, RD II, to Defendant Raymond
   McGinn dated April 21, 2017 ................................... JA2291

Exhibit Y to Shapiro Declaration—
   C.B.'s Unit Physician Notes .................................... JA2293

Exhibit Z to Shapiro Declaration—
   Expert Report of Dr. Bruce D. Charash, M.D. ................... JA2295

Exhibit CC to Shapiro Declaration—
   Excerpts from a Transcript of Leisa McKown's interview with
   OIIA ......................................................... JA2312

Exhibit DD to Shapiro Declaration—
   C.B.'s Nursing Notes .......................................... JA2315

Exhibit EE to Shapiro Declaration—
   excerpts from a transcript of Elise M. Williams's interview with
   OIIA ......................................................... JA2322

Exhibit GG to Shapiro Declaration—
   Notice to Provider of C.B.'s Investigation Determination ........ JA2325

Exhibit HH to Shapiro Declaration—
   Medical Examiner's Report for C.B., dated June 12, 2018 ....... JA2328

# JA561

24

1                        CASSATA

2    are things we would have filled out.

3            Q.    Did you also say MARs?

4            A.    The MARs.  Yes.

5            Q.    And you said that was at the time, and

6    were you referring to April 2018?

7            A.    Yes.

8            Q.    And let's start with the DAR notes.

9    Prior to April 2018, had you received training on

10   what should be included in the DAR note?

11           A.    When I was hired, yes.

12           Q.    And what was your understanding as of

13   April 2018 as to what should be included in a DAR?

14           A.    The date, the time, the individual's

15   name, your observation, anyone you were contacted

16   or anyone you contacted, so basically the

17   situation.

18           Q.    Were you trained on when you should

19   complete a DAR?

20           A.    Yes.  As soon as possible, you should be

21   completing the DAR.

22           Q.    And let me ask it a slightly different

23   way.  Were you trained on what event should be

24   documented in the DAR notes?

25           A.    Medical issues or behavioral issues.

1                          CASSATA

2          Q.    And were you trained at any time a

3    patient -- strike that.  Were you trained to

4    complete a DAR note any time a service recipient

5    raised a medical concern?

6          A.    No.

7          Q.    Tell me when as of April 2018 you

8    understood you were supposed to document medical

9    concerns in the DAR note?

10          A.    The day I spoke to OIA.

11          Q.    What do you mean by that?

12          A.    The day that I was interviewed by OIA

13    Olivia Hess informed me that, whenever a patient

14    has any kind of medical complaint, we're supposed

15    to document it in the DAR notes.

16          Q.    And prior to Ms. Hess telling you that,

17    no one had told you that before?

18          A.    No.  We would only do med changes or any

19    kind of reactions or how they handle any kind of

20    med change.  That would be in the MAR.

21          Q.    Information about medication and how the

22    service recipient was reacting to medication, that

23    would be documented in April 2018?

24          A.    Yes.

25          Q.    And you said that would be documented in

1                              CASSATA

2      the MAR?

3              A.    Yes.

4              Q.    But, as of the time of C.B.'s death,

5      your understanding was that you were not required

6      to document every time a service recipient had a

7      medical complaint.  Is that correct?

8              A.    Every time, no.  A lot of the other

9      individuals have chronic complaints that we

10     wouldn't document everything, if nursing was

11     notified, unless something arose from it like a

12     hospital visit or a clinic visit.

13             Q.    O, as of the time C.B. died, your

14     understanding was that you were not required to

15     document every time nursing was called in response

16     to a service recipient's medical complaint, is that

17     correct?

18             A.    Correct.

19             Q.    And tell me about the MAR.

20             A.    It is a list of the daily medications,

21     what time they take them, how much.

22             Q.    And that was true in April 2018?

23             A.    Yes.

24             Q.    And, aside from the information about

25     when service recipients were taking medication,

1                          CASSATA

2    what other information, if any, was included in the

3    MAR?

4         A.    Their diagnosis, medical conditions.

5         Q.    As of the time of C.B.'s death, what was

6    your understanding of what you as a DDSCTA was

7    supposed to put in a MAR?

8         A.    That we had given the meds, and I

9    believe -- at this time I'm going to say that's all

10   confidently.

11        Q.    And are you saying that because, based

12   on your understanding at the time of C.B.'s death,

13   that's all you understood you were required to put

14   in the MAR?

15        A.    I believe that's all that was required

16   at that time.

17        Q.    And you mentioned the communication log.

18   What is that?

19        A.    It's an in-house journal.  Every shift

20   will write, if anything has happened on the

21   previous shift, they would write a note, and then

22   evenings would read it if it was of importance.

23        Q.    And as of the time of C.B.'s death, were

24   you supposed to include in the communication log

25   any time nursing was called?

1                              CASSATA

2          A.     It was helpful.

3          Q.     And was it your practice to do that?

4          A.     Yes, if it was something significant.

5          Q.     And that was true as of the time of

6    C.B.'s death, that was your practice?

7          A.     Yes.

8          Q.     And what do you mean by significant?

9          A.     Anything that raised a red flag that the

10   following shift should pay attention to or be aware

11   of.

12         Q.     You mentioned the 24-hour transfer sheet

13   I believe?

14         A.     Yeah.  It's a paper that had everyone's,

15   all the individuals names on it.  Then there's a

16   column to the right of their names where you can

17   write any kind of remarks, behavioral issues or

18   anything like that.

19         Q.     And who was supposed to, as of the time

20   of C.B.'s death, who was supposed to fill out the

21   24-hour transfer sheet?

22         A.     The hallway person usually did the

23   paperwork.

24         Q.     Was it the hallway person working the

25   night shift who was responsible for filling out the

                              CASSATA

1

2    24-hour transfer sheet?

3         A.    No.   It was the hallway person for

4    whatever shift.   It was every shift it was filled

5    out.

6         Q.    And it was a different form than the

7    communication log, though?

8         A.    Yes.

9         Q.    At the time C.B. died, you were a

10   DDSCTA1, right?

11        A.    Correct.

12        Q.    And can you just describe briefly for me

13   your duties and responsibilities at that time as a

14   DDSCTA1?

15        A.    To provide active treatment to the

16   individuals, teach them life skills, engage with

17   them, make sure they're doing what they need to do

18   as far as showers, brushing their teeth, things

19   like that, eating.

20        Q.    Was one of your duties to help keep the

21   individuals safe?

22        A.    Yes.

23        Q.    Was one of your duties to help keep the

24   individuals healthy?

25        A.    Yes.

# JA567

30

1                        CASSATA

2          Q.    Was one of your duties to help when they

3    had behavioral issues?

4          A.    Yes.

5          Q.    Was one of your duties to monitor their

6    health diagnoses and report symptoms?

7          A.    What do you mean by that?

8          Q.    Was one of your duties to watch for

9    potential symptoms of health issues that were

10   presenting in the service recipients?

11         A.    I don't believe so.  Unless they had a

12   complaint, I don't believe, no.

13         Q.    Have you worked at any other OPWDD

14   facilities aside from Valley Ridge?

15         A.    No.

16         Q.    In 2018, in April 2018, you were

17   assigned to E house.  Is that right?

18         A.    Yes.  Correct.

19         Q.    And, Ms. Cassata, if you want to take a

20   break at any time, just let me know.  Okay?

21         A.    I'm fine.

22         Q.    Did you work in any other houses aside

23   from E house?

24         A.    I worked in all of them.

25         Q.    What does it mean to be assigned to

**JA568**

31

1                          CASSATA

2    E house?

3          A.    When we bid, we bid on pass days, shift

4    like 3 to 11 was mine, and the house.

5          Q.    And how does that relate to your

6    assignment to E house?

7          A.    That was where I worked daily.

8          Q.    And was that your choice?  Did you

9    request to be assigned to E house?

10         A.    Yes.

11         Q.    Why was that?

12         A.    There was a rebid two years prior to

13   that, and they had closed down D house.  They

14   turned it into a clean house, and they moved all of

15   those individuals out.  So I wanted to get out of

16   that house.  So I chose to go to E.

17         Q.    And that was you said 2016?

18         A.    Yes.

19         Q.    So you were assigned to E house from

20   2016 through 2018?

21         A.    So currently I am in E house still, yes.

22         Q.    I see.  So, from 2016 to the present,

23   you've been assigned to E house, is that correct?

24         A.    Correct.

25         Q.    In April 2018, who was the E house

# JA569

32

1                           CASSATA

2    supervisor?

3          A.   I don't know.

4          Q.   Was it Mike Novack?

5          A.   On day shift it was.  I don't know about

6    evenings.  It could have been J.B., James Roberts

7    possibly.

8          Q.   Is the day shift supervisor considered

9    the overall house supervisor?

10          A.   The house manager, yes.

11          Q.   To your knowledge, what are the duties

12    and responsibilities of the house manager?

13          A.   They do most of the work orders.  They

14    pay the individuals.  General oversight of how the

15    house is run.

16          Q.   And does that include recordkeeping as

17    well?

18          A.   Internal recordkeeping.

19          Q.   What do you mean by internal

20    recordkeeping?

21          A.   Like the books, the counting books for

22    the individuals, the sign in and out to ensure that

23    those forms are available to us.

24          Q.   And does internal recordkeeping include

25    the DAR notes that are in the house?

## JA570

33

1                          CASSATA

2          A.    No.   They were taken off.   A 147 gets

3     filed.   People come in.   They would take the notes

4     and copy them.   The DAR notes were somewhat of a

5     mess back then.   Now we have EHR.   It's a little

6     bit more organized.

7          Q.    Yeah.   I want to ask about that.   I'm

8     going to show you a transcript from your OIA

9     interview.   Before I do, let me just ask you.   You

10    reviewed the transcripts from your two April 2018

11    OIIA interviews, right?

12         A.    Correct.

13         Q.    And, during those interviews, you told

14    the truth, is that right?

15         A.    Correct.

16         Q.    And you told OIIA investigators

17    everything you could remember at the time.   Is that

18    fair to say?

19         A.    Yes.

20         Q.    And you understood that those interviews

21    were being done in connection with an investigation

22    into C.B.'s death, right?

23         A.    Correct.

24         Q.    And you understood the importance of

25    telling the investigators everything you knew,

1                          CASSATA

2    right?

3            A.    Yes.

4            Q.    I'm going to show you what I'm going to

5    mark as Exhibit 79, which is a transcript of your

6    first OIIA interview.

7                  (Plaintiff's Exhibit 79, Transcript of

8                  first OIIA interview dated April 12, 2018,

9                  was so marked for identification, as of this

10                 date.)

11           Q.    And you can see at the top this

12   interview was conducted on April 12, 2018.  Is that

13   right?

14           A.    Yes.

15           Q.    And it started at approximately 2:56 in

16   the afternoon, right?

17           A.    Correct.

18           Q.    Okay.  I'm going to scroll down to page

19   10 of this document and draw your attention to

20   these questions and answers here in the middle of

21   the page.  Ms. Hess asks you, "Where are those

22   notes kept?"

23                 Do you see that?

24           A.    I do.

25           Q.    And you answer, "In the DAR.  Okay.  We

1                        CASSATA

2    had a change in supervisor.  So our DAR notes came

3    out of the green charts, and he wanted them put in

4    the DAR book.  So, for a little while, we had a DAR

5    book, and everybody had a section, and then they

6    ended up coming out of the DAR book and put back in

7    the green charts unless it's a medical note, and

8    then it's in a MAR.  So the DARs having to do with

9    medical issues are kept in the MAR."

10                   Do you see that?

11        A.   I do.

12        Q.   Okay.  I want to just unpack that for a

13   minute.  First, you said you had a change in

14   supervisor.

15        A.   Yes.  That was when J.B. came to our

16   house and became our supervisor.

17        Q.   Okay, and J.B. is James Roberts?

18        A.   Correct.

19        Q.   And when you say the DAR notes came out

20   of the green charts, what do you mean?

21        A.   Okay.  The green chart, okay, at the

22   time, the house had everybody's individual green

23   chart.  It was a book that had all of the personal

24   records, their behavior support plan, their medical

25   history, their personal history, the DAR notes.

1                          CASSATA

2    Everything was in that green chart.

3              And then, when J.B. came, he wanted to

4    organize the DARs differently, so he had a DAR book

5    separate from the green chart.

6         Q.    And, on April 8, 2018, was there that

7    separate DAR book in place?

8         A.    It could have been a transition.  I'm

9    not 100 percent sure.

10        Q.    Okay.  You then say that "For a little

11   while, we had a DAR book, and everybody had a

12   section, and then they ended up coming out of the

13   DAR book and put back in the green charts."

14             Do you see that?

15        A.    Yes.

16        Q.    So at some point were the DARs put back

17   in these green charts?

18        A.    There was a miscommunication between

19   evening shift and day shift supervisors regarding

20   the DAR notes.  One wanted them in the green chart.

21   One wanted them in the DAR book.  Mike Novack runs

22   the house.  He's the house manager.  They ended up

23   going back in the green charts.

24        Q.    So Mike Novack wanted the DARs to be

25   kept in the green charts.  Is that fair to say?

```
 1                           CASSATA
 2        A.    Yes.
 3        Q.    And he ended up prevailing on that
 4   issue?
 5        A.    Correct.
 6        Q.    And do you know approximately when these
 7   transitions took place?
 8        A.    I don't.
 9        Q.    Given that this interview was done on
10   April 12, 2018, is it fair to say this all happened
11   prior to April 12, 2018?
12        A.    Around that time.  They could have even
13   been during that time.
14        Q.    And you also say, "Unless it's a medical
15   note, and then it's in a MAR, so the DARs having to
16   do with medical issues are kept in the MAR."
17              Do you see that?
18        A.    Correct.  Yes.
19        Q.    And tell me what you meant by that.
20        A.    The change of medications and their
21   effectiveness on the individual.
22        Q.    But you were not referring to a medical
23   complaint made by an individual?
24        A.    No.
25        Q.    Or a call to nursing on behalf of an
```

38

1                         CASSATA

2    individual?

3         A.   No.

4         Q.   Those would still be in the DARs, is

5    that right?

6         A.   Correct.

7         Q.   Okay.  Let's talk for a moment about the

8    documents that helped you do your job as a DDSCTA

9    back in 2018.  First, I want to ask you about did

10   you ever review nursing notes for individuals?

11        A.   No.

12        Q.   Are you familiar with a document called

13   plan of nursing services?

14        A.   No.  That was something kept in the

15   clinic.

16        Q.   I'm going to show you what has been

17   previously marked as Exhibit 6.  It's a four-page

18   document entitled "Plan of Nursing Service C.B."

19             Do you see that?

20        A.   I do.

21        Q.   Are you familiar with this document?

22        A.   These are all of the diagnoses from C.B.

23   The diagnoses are in the MAR, and it's not called a

24   plan of nursing, I don't believe.  It's called

25   something else in the MAR.

**JA576**

39

1                          CASSATA

2          Q.   And, if you look at the column on the

3    right that says "Monitoring/Reporting," do you see

4    that?

5          A.   I do.

6          Q.   And looking at the row that says

7    "obesity" on the left, do you see that?

8          A.   I do.

9          Q.   There it says, "Report to nurse and

10   dietician individual's monthly weight and blood

11   pressure."

12              Do you see that?

13         A.   Yes.  That's common protocol for all

14   individuals.

15         Q.   And who do you understand that direction

16   to be to?

17         A.   We have a weight chart in the houses

18   that we take monthly weights and their monthly

19   vitals, and that's reported to nursing monthly from

20   whoever has the meds on the 1st of the month.

21         Q.   And the "we" in that answer, you're

22   referring to the direct care staff?

23         A.   Correct.

24         Q.   And, if you look at the second bullet

25   point, it says, "Report to nurse and dietician if

## JA577

40

1                              CASSATA

2    individual has increased difficulty with tolerating

3    activity, shortness of breath, fatigue or

4    weakness."

5              Do you see that?

6        A.    Correct.

7        Q.    And do you understand that to be

8    something that direct care staff was supposed to

9    report to the nurse and the dietician if they

10   observed it?

11       A.    Yes.

12       Q.    And turning to page 4 on hypertension,

13   it says, "Report to nurse if complaints of chest

14   pain, shortness of breath, nausea, pain in arms,

15   neck or back."

16             Do you see that?

17       A.    Yes.

18       Q.    And do you understand that that was

19   something that direct care staff was supposed to

20   report to a nurse if they observed in C.B.?

21       A.    Yes.

22       Q.    Is it your testimony, though, that this

23   is not a document that you recall seeing in 2018?

24       A.    No, I don't remember seeing this.  I

25   still don't.  This is something that could possibly

**JA578**

41

1                           CASSATA

2    be on the E MARs today, but I don't recall that

3    being in the house in 2018.

4           Q.   Do you understand that, if you observed

5    C.B. displaying any of the symptoms we just

6    discussed, shortness of breath, fatigue, weakness,

7    that was something you were supposed to report to a

8    nurse?

9           A.   Yes.

10          Q.   And how did you have that understanding?

11          A.   That's almost a common sense thing.  If

12   one of the guys can't breathe, you would call the

13   nurse.

14          Q.   Was there any document you recall

15   reviewing that instructed you about when you should

16   call a nurse with respect to C.B.?

17          A.   No.

18               MR. HICKEY:  Objection.

19          Q.   As part of your work as a DDSCTA, did

20   you typically review DAR notes?

21          A.   Yes, I did.

22          Q.   And when would you do that?

23          A.   Coming onto the shift, I would usually

24   come in early and read them prior just to see what

25   was going on with the guys before or how their day

42

1                              CASSATA

2      went.

3           Q.    And, back in 2018, was a DAR note

4      completed for each individual during every shift?

5           A.    No.

6           Q.    Was a DAR note completed for each

7      individual at least once a day?

8           A.    I don't know if that was happening in

9      2018 or not.  I don't recall.

10          Q.    Would it be surprising to you if no DAR

11     notes were written for C.B. during the whole month

12     of March 2018?

13          A.    No.

14          Q.    Why not?

15          A.    I wasn't in the house.  Okay.  I don't

16     know what happened when I wasn't there, but, when I

17     left, we had a different supervisor, and, when I

18     came back, things were a little bit different.  You

19     know, transition period.  A lot of new people were

20     coming into the house that had not worked in this

21     environment before.  So it wouldn't surprise me.

22     Nothing really surprises me.

23          Q.    So you mentioned you left.  Tell me

24     about what you mean by that.

25          A.    I believe I was out of the house on the

43

1                                CASSATA

2       147 allegation.

3              Q.    What was that allegation?

4              A.    I don't recall.

5              Q.    Was it made by someone other than C.B.?

6              A.    Yes.

7              Q.    And how long were you out of E house

8       for?

9              A.    Two months.

10             Q.    And this was in early 2018?

11             A.    Correct.

12             Q.    And, when you returned to E house, James

13      Roberts had joined as the supervisor?

14             A.    Yes.

15             Q.    And you said nothing would surprise you.

16      Tell me what you mean by that?

17             A.    Just because it was a very chaotic time.

18      Like I said a lot of new hires were here.  The flow

19      wasn't there.

20             Q.    And was it the house manager's

21      responsibility to ensure that DAR notes were being

22      kept as they were supposed to be?

23             A.    No.  It was a shift thing again.  Every

24      shift has a supervisor.  They should have been

25      overseeing how things were going.

**JA581**

44

1                          CASSATA

2          Q.    And the shift supervisor would be

3     responsible for ensuring that DAR notes were being

4     kept.  Is that fair to say?

5          A.    Correct, but at the time I believe they

6     were only to be done for behaviors.  I'm not

7     100 percent sure, but I know after C.B.'s death

8     there was a whole retraining and a new process for

9     DAR notes.

10              MR. HILL:  Sam, can we take a break

11         whenever convenient for you?

12              MR. SHAPIRO:  Yeah.  Very shortly we can

13         do that.

14         Q.    Was it also the shift supervisor's

15    responsibility to ensure that MARs were completed

16    appropriately?

17         A.    No.  Nursing does audits.  The

18    overnight, they would do them.  So that was

19    nursing.

20         Q.    Aside from the DARs, were there any

21    other documents that the shift supervisor was

22    responsible for ensuring were completed

23    appropriately?

24         A.    No.

25              MR. SHAPIRO:  Okay.  We can take a

45

1                              CASSATA

2           break.  Off the record.

3                   (Recess taken from 3:04 p.m. to 3:16

4           p.m.)

5     BY MR. SHAPIRO:

6           Q.   Ms. Cassata, you said you were not

7     working in E house for a couple of months at the

8     beginning of 2018.  Is that right?

9           A.   Correct.

10          Q.   Do you know when you returned to

11    E house?

12          A.   End of March.

13          Q.   Safe to say that as of April 1st, 2018

14    you were back in E house?

15          A.   Yes.

16          Q.   Did you receive any discipline in

17    connection with that 147?

18          A.   No.

19          Q.   As of April 2018, was it your

20    understanding that you were supposed to document in

21    the DAR notes any time you took a service

22    recipient's vital signs?

23          A.   Yes, in the MAR.

24          Q.   In the MAR?

25          A.   In the MAR note.  Okay.  Technically, we

# JA583

46

1                           CASSATA

2   only took their vital signs for the med changes,

3   and we would put that in the MAR.

4          Q.   That's a helpful clarification.  Let me

5   show you, I'm going to show you what previously has

6   been marked as Plaintiff's Exhibit 58.

7          A.   Okay.

8          Q.   Is this a MAR?

9          A.   It is.

10         Q.   Okay, and I'm just going to scroll

11  through and tell me where you would put, where you

12  would note vital signs when you took them, if you

13  could.

14         A.   Okay.  So it would be filled out on the

15  DAR note paper itself and placed in the MAR.

16         Q.   Okay.  Then let me show you what has

17  been previously marked as Plaintiff's Exhibit 55.

18  Is this an example of a DAR note?

19         A.   Yes.

20         Q.   So at the time of C.B.'s death, if you

21  had taken C.B.'s vital signs, would you document

22  that in one of these DAR notes?

23         A.   Yes, and that DAR note would be placed

24  in the MAR.

25         Q.   Got it.  Okay.  Do you know if there was

1                          CASSATA

2  any written policy in effect at the time of C.B.'s

3  death concerning what was supposed to be documented

4  in a DAR note?

5          A.   No.

6          Q.   Are you saying you don't know one way or

7  the other, or there was not?

8          A.   There was not any -- the policy on the

9  DAR notes was, if there is behavior, you wrote a

10  DAR note.

11          Q.   And was that policy written somewhere?

12          A.   It was in my training when I was hired.

13  We had a DAR note class, and that was covered in

14  there.

15          Q.   You had a DAR note class as part of your

16  training?

17          A.   Correct.  How to write a DAR note.

18          Q.   Were there any written materials as part

19  of that class?

20          A.   No.  We just practiced writing DAR

21  notes, and it focused on not putting our opinion in

22  the DAR note.  Just writing facts.

23          Q.   I'm going to show you what has been

24  previously marked as Plaintiff's Exhibit 29.  Ms.

25  Cassata, do you recognize this document that has

**JA585**

48

1                    CASSATA

2   been marked as Exhibit 29?

3        A.    No.

4        Q.    It's not something you've ever seen

5   before?

6        A.    No.  I think those are the procedures

7   that we have gone over in training, but I don't

8   recall ever seeing those.

9        Q.    And, when you're referring to those

10  procedures, you're referring to the procedures on

11  the bottom of the first page of Exhibit 29?

12       A.    Correct.

13       Q.    And then drawing your attention, and you

14  see it says, "Responsibility:  Direct care staff,"

15  correct?

16       A.    Correct.

17       Q.    And that includes the DDSCTA1s?

18       A.    Correct.

19       Q.    And, just looking at page 2 of the

20  exhibit, the third bullet point down says, "Any

21  acute health concerns shall be continuously

22  documented until they are resolved."

23            Do you see that?

24       A.    Correct.  Usually the individuals are

25  being seen by clinical as I said earlier or under

**JA586**

49

```
1                          CASSATA
2    doctor's care.
3         Q.   And is that something you were trained
4    to document in the DAR?
5         A.   With any kind of med change or if an
6    individual goes to the hospital or returns from the
7    hospital, we would write that in the DAR note.
8         Q.   What if an individual goes to the
9    on-site medical clinic at Valley Ridge?
10        A.   That would be in the nursing notes.
11        Q.   Are you familiar with the term "focused
12   charting"?
13        A.   No.
14        Q.   Over the last year of his life, did C.B.
15   gain weight?
16        A.   He did.
17        Q.   Did he gain a lot of weight?
18        A.   A noticeable amount.
19        Q.   Was that something that you recall
20   having a conversation with anyone about?
21        A.   The dietician.
22        Q.   And tell me about that conversation you
23   recall?
24        A.   They put him on a reduced calorie diet
25   and wanted us to watch what he was eating.
```

50

```
  1                        CASSATA
  2        Q.   Did C.B. adhere to that diet?
  3        A.   Yes.  I would say C.B. didn't really
  4   overindulge.  He didn't go out and eat excessive
  5   amounts of fat or junk food or anything like that.
  6   C.B. was a bigger guy.  I mean he was 6-1, I
  7   believe.
  8        Q.   Did you ever have any conversations with
  9   anyone in nursing about his weight gain?
 10        A.   Like if I was concerned about his weight
 11   gain?
 12        Q.   Just any conversations in general with
 13   anyone in nursing.
 14        A.   No.  They would just attribute a lot of
 15   his health factors to being overweight.
 16        Q.   Tell me what you mean by that.
 17        A.   When he started making complaints of not
 18   feeling well, they just said he has to lose some
 19   weight.
 20        Q.   And, when you say he started making
 21   complaints about not feeling well, tell me what
 22   you're referring to.
 23        A.   The last couple of weeks leading up to
 24   his death C.B. had a lot of complaints that he
 25   didn't feel well.
```

**JA588**

51

1                          CASSATA

2          Q.    Alright.  Tell me what his -- and did he

3     make those complaints to you?

4          A.    To everyone.

5          Q.    And tell me what you remember C.B.

6     saying.

7          A.    That he couldn't breathe, that his chest

8     hurt.  He was tired all the time.

9          Q.    He said he couldn't breathe.  How many

10    times did you hear him say in the last couple of

11    his weeks of his life that he couldn't breathe?

12         A.    Twice that I recall.

13         Q.    How many times did you hear him say his

14    chest hurt in the last couple of weeks of his life?

15         A.    His complaints were made directly to me

16    twice.

17         Q.    And you also heard him say two times he

18    was tired?

19         A.    Correct.  He fell asleep one night.  We

20    were playing cards, and he fell asleep at the

21    table.

22         Q.    And did you report those complaints to

23    anyone?

24         A.    Absolutely.

25         Q.    And who did you report them to?

1                              CASSATA

2          A.    Nursing.

3          Q.    Well, let me be more specific.  When was

4    the first time he told you he couldn't breathe?

5          A.    The Wednesday before he passed away.

6          Q.    And would that be April 4, 2018?

7          A.    Yeah.  I don't have a calendar in front

8    of me, but it sounds about right.  He died on the

9    9th.

10         Q.    So on the Wednesday before C.B. died, he

11   told you he didn't feel well?

12         A.    Right.

13         Q.    On the Wednesday before he died, C.B.

14   told you he couldn't breathe?

15         A.    Right.

16         Q.    On the Wednesday before he died C.B.

17   told his chest hurt?

18         A.    Correct.

19         Q.    How many times did he tell you he

20   couldn't breathe on that Wednesday?

21         A.    Once, and then I notified nursing, and

22   they came down, and they checked him out, and then

23   he went to bed, and then that Friday he was not

24   himself at all.  He wasn't able to vacuum.  I

25   notified nursing.  He was sweating.  He couldn't

1                          CASSATA

2    stand up.  They came down.  Anita looked at him,

3    told him to have some water and relax and go lay

4    down.

5         Q.   Let me make sure I get this straight.

6    Let me first focus on the Wednesday.  Was that

7    Wednesday the day that C.B. had trouble finishing

8    vacuum?

9         A.   No.  That was Friday.  Wednesday he fell

10   asleep playing cards.

11        Q.   Let me just show you again your OIIA

12   transcript.  This is Plaintiff's Exhibit 79.  I'm

13   going to scroll down to page 2 here.  Ms. Hess

14   asked you, "Tell me about C.B.'s health."

15             Your answer, "Overall I thought he was

16   pretty healthy.  He never made any complaints until

17   recently."

18             Ms. Hess asks you, "What's recently?"

19             Your answer, "That I'm aware of, the

20   middle of last week Wednesday he started really

21   just, I don't feel good, I don't feel good, my

22   chest hurts, I can't breathe.  Came out to do

23   chores.  He couldn't complete the chore.  He had to

24   sit down in the middle of doing it."

25        A.   Correct.

# JA591

54

1                        CASSATA

2          Q.    And what chore are you referring to

3     there?

4          A.    It was also vacuuming for the week, but

5     it wasn't in the excess that it was Friday.  Like

6     he just couldn't do it.  He said, "I can't do it."

7     He stopped doing it.

8          Q.    Okay.  Did he have to sit down on

9     Wednesday before he died while he was vacuuming?

10         A.    No.  He was just making complaints that

11    he didn't feel well.

12         Q.    And did he say he could not finish

13    vacuuming on the Wednesday before he died because

14    his chest hurt?

15         A.    He said he couldn't complete vacuuming

16    because he didn't feel good.  His chest hurt.  He

17    couldn't breathe.

18         Q.    Moving down to page 3, Ms. Hess asked

19    you, "What was his chore that day?"

20               Your answer, "Vacuuming."

21               Ms. Hess said, "And where did he have to

22    vacuum?"

23               Your answer, "He started vacuuming the

24    dining room area and then into the hallway, and he

25    had to sit in the hallway, and he sat several times

# JA592

55

1                              CASSATA

2    in the dining room.  He said, 'I can't do it.'  I'm

3    like, come on, C.B., get up, just move around.  He

4    would just start sweating, and he was not in any

5    condition to.  You could visably see him not feel

6    well."

7              Do you see that?

8         A.   I do.

9         Q.   And so on Wednesday before he died, C.B.

10   was sweating while trying to vacuum.  Is that

11   correct?

12        A.   So those were two separate days.  The

13   day that he had to sit down is the Friday I believe

14   as previously I noted the day that Kim had the

15   hallway, whatever day that was.  I'm pretty sure

16   that was the Friday that he had to sit down and he

17   couldn't, he was sweating.

18              Wednesday he just said he couldn't

19   vacuum.  He wasn't feeling well.

20        Q.   Hold on one second.  So, just to be

21   clear, the Wednesday before he died he complained

22   of chest pain, correct?

23        A.   Correct.

24        Q.   He complained that he couldn't breathe,

25   correct?

```
 1                        CASSATA
 2        A.    Correct.
 3        Q.    And he said he can't vacuum.  Is that
 4   correct?
 5        A.    Right.
 6        Q.    But he didn't sit down while trying to
 7   vacuum on the Wednesday?
 8        A.    No.
 9        Q.    He just said, "I can't do it."
10              Is that fair to say?
11        A.    Correct.
12        Q.    And did it look to you on that Wednesday
13   like he did not feel well?
14        A.    It wasn't like C.B. to not want to do
15   something when we asked him to do it, but
16   physically he looked okay Wednesday.
17        Q.    Okay.  Now, shifting ahead then to
18   Friday, on the Friday before he died, did C.B. tell
19   you that he was having chest pains?
20        A.    He did.
21        Q.    Did C.B. tell you on the Friday before
22   he died that he couldn't breathe?
23        A.    He did.
24        Q.    Did C.B. have trouble finishing
25   vacuuming on the Friday before he died?
```

# JA594

1                            CASSATA

2          A.    He did.

3          Q.    Did you see C.B. sweating while trying

4    to vacuum on the Friday before he died?

5          A.    Yes.  C.B. looked physically sick on

6    Friday.

7          Q.    Describe to me how he looked on that

8    Friday.

9          A.    He had no color.  He was sweating.  He

10   was clammy to the touch.  He was out of breath.  He

11   couldn't -- he was sitting down in the chair trying

12   to vacuum sitting down in the chair like scooching

13   himself along.

14         Q.    And that was unlike him, right?

15         A.    Yes.

16         Q.    C.B. having to sit down to do a chore,

17   that was a dramatic change from his normal

18   behavior.  Is that fair to say?

19         A.    Very fair.

20         Q.    Okay.  Focusing back on Wednesday, when

21   C.B. complained to you about having chest pains and

22   not being able to breathe, what did you do?

23         A.    I notified nursing.

24         Q.    And how did you do that?

25         A.    I called them.

# JA595

58

1                              CASSATA

2          Q.   Did you call the float phone?

3          A.   The cell phone.

4          Q.   And who picked up?

5          A.   I don't recall.  I believe it was Anita.

6    I know it was Anita on Friday.  I'm not sure who it

7    was on Wednesday.

8          Q.   And what did you say to nursing?

9          A.   That C.B. was complaining of head and

10   chest pains and was unable to breathe, and he

11   didn't feel well.

12         Q.   And what did the person who was on the

13   other end of the line say in response?

14         A.   That they would come down and check him

15   out.

16         Q.   And did someone from nursing come on

17   Wednesday?

18         A.   I believe so.  I don't recall having

19   meds on Wednesday, so the AMAC, the med person,

20   would have taken over at that point.

21         Q.   So I want to show you what I'm going to

22   mark as Plaintiff's Exhibit 77.

23              (Plaintiff's Exhibit 77, Assignment

24              book, was so marked for identification, as

25              of this date.)

```
 1                        CASSATA

 2        Q.    Do you recognize this document?

 3        A.    I do.

 4        Q.    And what is it?

 5        A.    That is our assignment book.

 6        Q.    Is it fair to say this is a schedule for

 7   the evening shift?

 8        A.    It's a schedule, yes.

 9        Q.    And it's for the evening shift on

10   April 4, 2018, correct?

11        A.    Correct.

12        Q.    And do you see your name in E house?

13        A.    Yes.

14        Q.    And do you see an M next to your name?

15        A.    I do.  What does that say next to it in

16   the circle?

17        Q.    I'll zoom in.  I don't know.  Can you

18   tell what that says?

19        A.    I think it says OT.

20        Q.    Okay, and what would that indicate to

21   you?

22        A.    That would indicate overtime.  3 to 11

23   is my normal shift.  So I don't know why it would

24   say that.

25        Q.    Okay.  What is the M?  The M next to
```

# JA597

60

1                              CASSATA

2     your name I believe you testified, what does that

3     indicate?

4          A.    That stands for meds, and K would be the

5     kitchen, and living room would be the LR, and the H

6     would be hallway.

7          Q.    Does this suggest to you that on April

8     4th you were the med person?

9          A.    That would suggest that, yes.

10         Q.    Okay.  So do you remember who from

11    nursing came to E house on the Wednesday before

12    C.B. died?

13         A.    Not on Wednesday, no.  Friday I remember

14    it was Anita.

15         Q.    Okay.  Let's look back at your OIIA

16    transcript, and I'm going, I'll scroll to page 11,

17    and do you see Ms. Hess asks, "How many times did

18    you contact Anita from last Wednesday until this

19    past Monday?

20              "Answer:  I would say three or four

21    times."

22              Ms. Hess says, "Question:  Three or four

23    times different days?"

24              Your answer:  "Different days.  I called

25    her twice on Wednesday, and then I believe it was

```
 1                        CASSATA
 2   either Thursday or Friday I called her."
 3        A.    Okay.
 4        Q.    Do you see that?
 5        A.    Yes.
 6        Q.    Does that refresh your recollection that
 7   on Wednesday you spoke to Anita?
 8        A.    Yes.
 9        Q.    And Anita is Anita Baral, is that
10   correct?
11        A.    Correct.
12        Q.    And did Anita come to see C.B. on the
13   Wednesday before he died?
14        A.    I don't recall.
15        Q.    Looking again at your transcript at page
16   13, Ms. Hess asks you at the top of the page, "Did
17   he ever complain of shortness of breath to you?"
18              Your answer, "He did.  He said he
19   couldn't breathe."
20              Ms. Hess's question:  "Couldn't
21   breathe?"
22              Your answer, "Yeah."
23              Ms. Hess asks, "And when was that?"
24              Your answer:  "Wednesday, when I called
25   Anita."
```

CASSATA

1

2          Ms. Hess's question:  "When you called

3    Anita?"

4          Your answer:  "When he was vacuuming.

5    He couldn't."

6          Do you see that?

7     A.   Yes.

8     Q.   And then Ms. Hess asks, "Okay.  Okay.

9    When she came down because you called her the

10   second time, did she check his blood pressure?  Did

11   she do any breathing?"

12         Your answer:  "No, because I took the

13   vitals earlier, and I called her with the vitals.

14   She just came down.  He was at the memory door."

15         I'm not sure that's a correct

16   transcription.

17    A.   No.  That would have been the med door.

18    Q.   "The med door and she just looked at him

19   and patted him.  It was like you'll be okay, C.B.,

20   go get some water and lay down, and that's what he

21   did."

22         Do you see that?

23    A.   Okay.  Yes.

24    Q.   So does that help refresh your

25   recollection about what you did on the Wednesday

# JA600

63

1                          CASSATA

2    before he died?

3          A.    Yes.

4          Q.    So is it fair to say you spoke to Anita

5    Baral and reported C.B.'s complaints to her?

6          A.    Yes.

7          Q.    And did she then instruct you to take

8    C.B.'s vitals?

9          A.    When I called her the first time.

10         Q.    Okay, and what else did she say, if

11   anything, when you called her the first time?

12         A.    Nothing.  That's why I called her the

13   second time.

14         Q.    And why did you call her a second time?

15         A.    Because he was still complaining, and

16   the complaints he was making it wasn't like a

17   normal stomach ache.  They were severe enough where

18   I felt nursing needed to come and take a look at

19   him.

20         Q.    And describe why you felt they were

21   severe enough that you thought nursing had to come

22   and take a look at him?

23         A.    Because, when people have chest pains,

24   you take that pretty seriously.

25         Q.    When you called her the second time, was

64

1                      CASSATA

2    that after you had taken C.B.'s vitals?

3         A.   Yes.

4         Q.   And did you report his vitals to Ms.

5    Baral?

6         A.   I did.

7         Q.   And then did Ms. Baral eventually come

8    down to see C.B.?

9         A.   I don't recall on Wednesday.

10        Q.   Did C.B. go to the medical clinic on

11   Wednesday?

12        A.   Not on evenings he wouldn't have.

13        Q.   Did you document C.B.'s complaints on

14   Wednesday anywhere?

15        A.   The end of the shift report.

16        Q.   What did you write in the end of the

17   shift report?

18        A.   That he had been seen by Anita.  I'm not

19   sure if it was the Wednesday or Friday.  The day

20   that Anita came down and saw him was the day I

21   wrote the note.

22        Q.   And did you write in your note that C.B.

23   had complained of chest pains?

24        A.   Yes, and what I physically saw him

25   presenting.

# JA602

65

1                          CASSATA

2          Q.    Meaning that you saw him being unable to

3     vacuum?

4          A.    Correct, and sweating and just not

5     himself at all.

6          Q.    And did you write that C.B. was having

7     trouble breathing?

8          A.    I did.

9          Q.    And that was in the 24-hour shift report

10    you say?

11         A.    It would have been in the DAR note at

12    the end of the shift that we wrote.

13         Q.    Showing you again Exhibit 55, would it

14    have been in one of these kind of notes?

15         A.    Yes.

16         Q.    Aside from calling nursing on Wednesday,

17    did you do anything else to try to help C.B.?

18         A.    I personally would stay out in the

19    common areas, the living room.  I wanted him to

20    start engaging a little bit with us.

21         Q.    Did you call the nurse practitioner?

22         A.    No.

23         Q.    Did you call 911?

24         A.    No.

25         Q.    Did you call C.B.'s family?

# JA603

66

CASSATA

1

2    A.   No.  None of those things I'm permitted

3    to do within my job title.

4        Q.   Did you tell Ms. Baral when you spoke to

5    her on Wednesday that you thought his condition was

6    serious?

7        A.   Yes, and Friday when I called her, I

8    definitely told her it was serious.  I said this

9    isn't like him.  I said he's sitting here in the

10   med room door sweating.  She said, "I know, I know.

11   He has to lose weight.  Have some water.  Go lay

12   down."  That's what Ms. Baral told me.

13       Q.   So, on Friday, before C.B. died, C.B.

14   again complained to you about having chest pains.

15   Is that correct?

16       A.   Correct.

17       Q.   On the Friday before he died, C.B. again

18   complained to you that he couldn't breathe?

19       A.   Correct.

20       Q.   On the Friday before he died, C.B. again

21   could not finish vacuuming, is that correct?

22       A.   Correct.

23       Q.   And on the Friday before he died, you

24   saw him sweating while he was just vacuuming in the

25   house?

**JA604**

67

1                          CASSATA

2          A.    Correct.

3          Q.    Can you describe his appearance on that

4    Friday before he died?

5          A.    Yeah.  He was pale.  He was clammy.  He

6    couldn't keep his eyes open.  He looked physically

7    sick.

8          Q.    You mentioned playing cards with C.B.

9    Is that right?

10         A.    Correct.

11         Q.    Was that on the Friday before he died?

12         A.    Either the Friday or the Wednesday.  It

13   was prior.  Wednesday or Friday.  It was prior to

14   his passing away.

15         Q.    Let's look at your transcript again.

16   Drawing your attention to page 4, Ms. Hess asks,

17   "Was there any time after last Wednesday, which

18   would have been the 4th, that there was any," and

19   your answer, "That I witnessed or that I" --

20               Ms. Hess says, "That you witnessed."

21               Ms. Cassata says, "Not that I witnessed.

22   I mean throughout the week he was not out in the

23   common areas of the house."

24               Ms. Hess asks, "Is that unusual?"

25               Your answer, "That's unusual."

1          CASSATA

2          Do you see that?

3     A.   Yes.

4     Q.   Is it correct that during that week

5  before he died C.B. was not spending much time in

6  the common areas of the house?

7     A.   Correct.

8     Q.   And that was very unusual for him?

9     A.   Very.

10    Q.   Going down a little bit, about a third

11 of the way down the page, you say, "He did come

12 out.  He played one game of cards.  I don't

13 remember if it was Thursday or Friday, but he came

14 out, and he couldn't remember how to play Pitch."

15         Is that correct?

16    A.   Correct.

17    Q.   "And we play it all the time."

18         Does that refresh your recollection that

19 the card game happened on Friday?

20    A.   Correct.  Yes.

21    Q.   So tell me about that incident.  What

22 happened there?

23    A.   So C.B. came out, and we were sitting at

24 the table, and he couldn't remember how to play the

25 game.  You know, he was throwing all the cards down

# JA606

69

1                          CASSATA

2   out of order.  So I had asked him at the beginning.

3   I'm like, "C.B., what are you doing," and he said,

4   "I don't know."  You know, he got upset, and I'm

5   like, "C.B., you know how to play this game.  You

6   know, we've been playing it for years," and he

7   goes, "I'm tired, I'm tired."

8            So at that point, he possibly could have

9   been.  They took his (inaudible) from 8 o'clock,

10  and he was sleeping up to 5 o'clock.  We had an

11  hour window.  So we got there between 4 and 5.  So

12  the meds may have kicked in making him drowsy.  So

13  that is a possibility.

14       Q.   Pitch is a game you had played

15  frequently with C.B.?

16       A.   Yes.  We usually played after dinner.

17       Q.   And he knew how to play, right?

18       A.   Yes.

19       Q.   Was he good at it?

20       A.   Very.

21       Q.   And on the Friday before he died, he

22  couldn't remember how to play?

23       A.   No.

24       Q.   On the Friday before he died, he

25  couldn't remember how to play, is that correct?

# JA607

70

1                          CASSATA

2          A.    Correct.

3          Q.    On that Friday before he died, did you

4    call nursing again?

5          A.    I did.

6          Q.    Who did you speak to?

7          A.    Anita.

8          Q.    Did you call the cell phone again?

9          A.    I did.

10          Q.    What did you say to Anita?

11          A.    I told Anita C.B. was having difficulty

12    breathing.  He was sweating.  He couldn't vacuum.

13    She had to come down and look at him.

14          Q.    What was her response, if any?

15          A.    Okay.  You know, coming down, but she

16    did come down, and she came and looked at him, and

17    said that, you know, she patted him and, "Oh, C.B.,

18    you'll be alright.  Go lay down.  Just get some

19    rest."

20          Q.    When she looked at him on the Friday

21    before he died, did she take his vital signs?

22          A.    No.

23          Q.    Did she use a stethoscope?

24          A.    No.

25          Q.    Did she examine his lungs at all?

CASSATA

2     A.   No.

3     Q.   Did she examine his chest at all?

4     A.   No.  She was standing in the med room, and C.B. was on the other side of the door, and she just put her hand up on his shoulder and said he would be alright.

8     Q.   Aside from putting her hand on his shoulder, did she touch him at all?

10    A.   No.

11    Q.   Did she take any history from C.B.?

12    A.   No, not that I'm aware of.

13    Q.   Were you there when Ms. Baral was talking to C.B.?

15    A.   Yes.

16    Q.   Did she ask him if he was feeling short of breath?

18    A.   Yes.

19    Q.   What did he say?

20    A.   Yes.  He said, "I can't breathe.  My chest hurts."

22    Q.   Did she ask him how long he had been feeling that way?

24    A.   No.

25    Q.   Did she ask him if he was having trouble

CASSATA

2    breathing when he was lying down?

3        A.    No.

4        Q.    Did she ask him if he had been waking up

5    a lot in the middle of the night?

6        A.    No.  She did mention that he hadn't been

7    sleeping at night.  She had told me that.  She said

8    he's not really sleeping too good at night, and

9    that's why she told him to go get rest.

10        Q.    Did she explain why he hadn't been

11    sleeping?

12        A.    No.

13        Q.    Did she ask him if he had been feeling

14    tired recently?

15        A.    No.

16        Q.    Did she check to see if any of his

17    extremities were swollen?

18        A.    No.

19        Q.    Did you notice on that Friday before he

20    died whether any of his extremities were swollen?

21        A.    Not that I recall.

22        Q.    Did you look at his ankles or legs?

23        A.    No.  Like I said, just looking at C.B.

24    physically in front of me, I could tell that he

25    wasn't feeling well, so I didn't go any farther.

1                          CASSATA

2        Q.    Switching back for a moment to the

3  Wednesday before he died, you took C.B.'s vital

4  signs on that Wednesday?

5        A.    Yes.

6        Q.    Did you take C.B.'s vital signs on

7  Friday before he died?

8        A.    I believe, yes.

9        Q.    On the Wednesday, did you document those

10  vital signs anywhere?

11        A.    No, I don't recall.

12        Q.    I want to show you going back to your

13  transcript from OIIA again, Exhibit 79.  Oh, I'm

14  sorry.  No.  I'm going to switch and mark as

15  Exhibit 80 the transcript from your second

16  interview with OIIA.

17              (Plaintiff's Exhibit 80, Transcript of

18              second OIIA interview, was so marked for

19              identification, as of this date.)

20        Q.    And I want to draw your attention to the

21  first page here.  You say, "Anita clicked into the

22  house shortly after I called."

23              Ms. Hess says, "Okay, but she came

24  down?"

25              Your answer, "She did come down."

1                          CASSATA

2                Ms. Hess says, "Okay.  Did she see

3      C.B.?"

4                Your answer, "Yeah, that was she rubbed

5      him and said that he was okay, he had water and go

6      lay down."

7                Ms. Hess says, "Okay."

8                You say, "Like she didn't do any vitals

9      or physicals, but she did click into the house."

10               Ms. Hess says, "And she had you do the

11     vitals before?"

12               You say "Before."

13               Ms. Hess says, "Okay, and did you write

14     them down anywhere that day?"

15               You say, "Yup, yup."

16               Ms. Hess says, "Where?"

17               Your answer, "On a tri-fold, and she

18     took it with her."

19               Ms. Hess says, "Tri-fold?"

20               You say, "Yeah, just a paper towel."

21     A.    Right.

22     Q.    Ms. Hess says, "You just wrote them down

23     on a paper towel?"

24               You say, "Yeah, and then she took it

25     with her for her end of" --

# JA612

75

1                        CASSATA

2              And Ms. Hess says, "And that was on the

3    4th?"

4              And you say, "Yup, that was the

5    Wednesday before, whatever day that was."

6              Do you see that?

7        A.    Yes.

8        Q.    So, focusing on that Wednesday, does

9    that refresh your recollection that you took C.B.'s

10   vitals that day?

11       A.    Yes.

12       Q.    And you wrote them down on a paper

13   towel?

14       A.    Yes.

15       Q.    And you gave that to --

16       A.    Right.  I would have wrote them on a

17   paper towel to save them for my DAR note later, and

18   Anita took had taken them for her nursing notes.

19   So I didn't have a copy of them.  So they went to

20   the med clinic.

21       Q.    So you gave the paper towel where you

22   wrote down C.B.'s vitals on Wednesday before he

23   died to Anita Baral?

24       A.    Correct.

25       Q.    And is it fair to say then that you did

1                          CASSATA

2      not document his vital signs in a DAR note on that

3      Wednesday?

4           A.    Correct.

5           Q.    And does that also help refresh your

6      recollection that Ms. Baral came to see him on

7      Wednesday?

8           A.    Yes.

9           Q.    And then on Friday you believe you took

10     his vital signs again?

11          A.    Yes.

12          Q.    Do you know whether his vital signs were

13     within normal limits on Friday?

14          A.    They were within normal.  Both days they

15     were within normal range.

16          Q.    Did you document his vital signs on

17     Friday?

18          A.    Yes.  Friday night I wrote the note

19     about his behavior and the vacuuming.  Friday is

20     the DAR note that I wrote.

21          Q.    And that would be Friday, April 6?

22          A.    Yes.

23          Q.    You had said in the OIIA interview you

24     called Anita three to four times.

25          A.    Correct.

1                           CASSATA

2          Q.    I just want to make sure I have all of

3     those calls.  You called her twice on Wednesday.

4     Is that correct?

5          A.    Right.

6          Q.    And then how many times on Friday?

7          A.    I called her once for C.B. on Friday,

8     and I believe I had to call her for another

9     individual.

10         Q.    Did you document anywhere the fact that

11    you had called Ms. Baral on the Wednesday before

12    C.B. died?

13         A.    Not on the Wednesday.

14         Q.    On the Friday, did you document in your

15    DAR note that you had called Ms. Baral?

16         A.    I did.

17         Q.    Back in 2018, did anyone ever tell you

18    that Ms. Baral denied that you had ever reported

19    anything to her about C.B.?

20         A.    No.

21         Q.    Would that surprise you?

22         A.    Yes, it does.  There were other staff in

23    the house that were there when I called Anita and

24    had also called Anita.

25         Q.    So okay.  On the Wednesday, were there

1                    CASSATA

2    other staff who heard C.B. complain about chest

3    pains?

4         A.   Cameron Houck.

5         Q.   Did Cameron Houck hear C.B. complain on

6    the Wednesday before he died that he couldn't

7    breathe?

8         A.   Yes.

9         Q.   Did Cameron Houck observe C.B. on the

10   Wednesday before he died having trouble vacuuming?

11        A.   Yes.

12        Q.   Did Cameron Houck call Anita Baral?

13        A.   No.  Cameron was there when Anita came

14   down.

15        Q.   What other staff heard C.B.'s complaints

16   on the Wednesday before he died?

17             MR. HICKEY:  Objection.

18        A.   Cameron Houck that I'm aware of.

19        Q.   Did you observe C.B. complaining to

20   Cameron Houck that he could not breathe?

21        A.   No.  C.B. made a generalized statement.

22        Q.   What was that statement?

23        A.   That he couldn't breathe and that his

24   chest hurt.

25        Q.   And did he say that in the vicinity of

# JA616

79

1                          CASSATA

2      you and Cameron Houck?

3           A.    Yes.

4           Q.    Did you discuss C.B.'s complaint with

5      Cameron Houck?

6           A.    I told him I was going to call nursing.

7           Q.    And Cameron Houck was present when Anita

8      Baral came to the E house?

9           A.    Correct.

10          Q.    Were any other staff present on the

11     Wednesday before C.B. died when Anita Baral came to

12     E house?

13          A.    Not that I can recall.

14          Q.    How about on the Friday, did C.B.

15     complain to any other staff about not feeling well

16     on the Friday before he died?

17          A.    Tammy was in the hallway when he sat

18     down and he couldn't vacuum.

19          Q.    Did you discuss C.B. with Tammy at all

20     on the Friday before he died?

21          A.    I did.  I told her that wasn't like him.

22     You know, that he had made complaints earlier in

23     the week . (Inaudible).

24          Q.    And what's Tammy's last name?

25          A.    At the time it was Boise.

**JA617**

80

```
 1                        CASSATA
 2        Q.   B-o-y-c-e?
 3        A.   B-o-i-s-e.
 4        Q.   B-o-i-s-e.  Was Tammy present when C.B.
 5   complained about having chest pains on the Friday
 6   before he died?
 7        A.   When he was in the back hallway, yes.
 8        Q.   Was Tammy present when C.B. said he
 9   couldn't breathe on the Friday before he died?
10        A.   Yes, when he made all those complaints.
11        Q.   And, to your knowledge, did Tammy call
12   Anita on that Friday?
13        A.   I don't recall.
14        Q.   Are you aware of any other staff member
15   calling nursing in regards to C.B. on the Wednesday
16   before he died?
17        A.   No.  Carol Weaver called, but I don't
18   believe it was Wednesday.
19        Q.   When did Carol Weaver call?
20        A.   Sometime during that week.
21        Q.   While you were present in the house?
22        A.   No.  We had talked about it.  She had
23   told me that C.B. hadn't been feeling well and what
24   was going on.
25             MR. HICKEY:  Sam, the next time we can,
```

# JA618

81

```
 1                         CASSATA
 2          let's take a break.
 3                  MR. SHAPIRO:  Yes.  I just want to
 4          finish this.
 5          Q.   Was that conversation you had with Carol
 6    in the week before C.B. died?
 7          A.   Yes.
 8          Q.   Did Carol tell you what she observed of
 9    C.B.?
10          A.   Yes.
11          Q.   What did she say?
12          A.   That he was having difficulty breathing.
13    She said he said he had chest pains and that he
14    wasn't really being himself.  He wasn't active.
15          Q.   And this was on, this was on a day when
16    you were not working that C.B. had made these
17    complaints to Carol?
18          A.   Correct.
19          Q.   Did Carol work evening shift with you?
20          A.   Yes.  She was part time.
21          Q.   And did Carol tell you who at nursing
22    she spoke to?
23          A.   No.
24          Q.   Do you know --
25          A.   She had said that she made the
```

1                          CASSATA

2    complaints to nursing.

3         Q.   Did Carol tell you that nursing saw C.B.

4    in response to those complaints?

5         A.   No.  We didn't -- I didn't ask.

6         Q.   So you don't know one way or the other

7    whether nursing came?

8         A.   I don't know.  Right.  Yes.  I don't

9    know.

10        Q.   Are you aware of C.B. making medical

11   complaints to any other staff in the week before he

12   died?

13        A.   Was I there for them or --

14        Q.   Are you aware of them?

15        A.   I'm aware of it.

16        Q.   And tell me who he made complaints to?

17        A.   Mike Novack on the Sunday prior to his

18   death.

19        Q.   And tell me what -- well, okay.

20   Alright.  Aside from Mike Novack, are you aware of

21   him making complaints to anyone else?

22        A.   His peers.  I know a lot of his peers

23   had told me that when I came back in.

24        Q.   Any other staff that you know of?

25        A.   No, not that I'm aware of.

# JA620

83

1                           CASSATA

2          Q.    And, aside from Carol Weaver, do you

3    know whether any other staff called nursing in the

4    week before he died with regard to C.B.?

5          A.    I don't know if Tammy Boise had called

6    or not.  I don't know one way or another.

7                MR. SHAPIRO:  Okay.  We can take a

8          break.

9                (Recess taken from 4:08 p.m. to 4:21

10         p.m.)

11   BY MR. SHAPIRO:

12         Q.    Ms. Cassata, I just want to make sure I

13   have the whole universe here.  You mentioned that

14   in the week prior to C.B.'s death you became aware

15   that C.B. had complained about having chest pains

16   and being unable to breathe to Cameron Houck,

17   correct?

18         A.    Well, he made the statement when Cameron

19   was there.  He didn't make it directly to Cameron.

20         Q.    Okay.  You had indicated that someone

21   named Carol Weaver had told you that C.B. had

22   complained about having chest pains and not being

23   able to breathe in the week prior to his death?

24         A.    Yes.

25         Q.    You had mentioned that someone named

# JA621

84

1                         CASSATA

2    Tammy Boise was present when C.B. had complained

3    about having have chest pains and being unable to

4    breathe in the week prior to his death?

5         A.   Correct.

6         Q.   You also mentioned that you were aware

7    that C.B. had complained about not feeling well to

8    Mike Novack.  Is that correct?

9         A.   Correct.  I was not there for that, but

10   I was made aware of it.

11        Q.   And tell me what you were made aware of.

12        A.   That C.B. had made complaints to Mike

13   Novack and then called his mom, and his mom had

14   called Mike requesting C.B. to go to the hospital.

15        Q.   Were you -- who did you hear this from?

16        A.   I heard it from staff that had worked in

17   the house that Sunday.

18        Q.   Which staff?

19        A.   I don't recall.

20        Q.   Did you hear that C.B. had told Mike

21   Novack he was having trouble breathing?

22        A.   I heard that.  Yes.

23        Q.   Did you hear C.B. had told Mike Novack

24   he had chest pains?

25        A.   Correct.  Mike Novack had also notified

1                         CASSATA

2    nursing, to my knowledge, that Sunday.

3         Q.    And where did you hear that?

4         A.    From Mike Novack.

5         Q.    Did you ask Mike Novack about what C.B.

6    had said to him?

7         A.    I did.

8         Q.    What did Mike Novack tell you?

9         A.    He told me that he had notified nursing

10   and that they came down and looked at him.

11        Q.    Did you ask Mr. Novack what C.B. had

12   said to him?

13        A.    Yes.

14        Q.    And what did Mr. Novack say C.B. had

15   said?

16        A.    That he said the same thing, that he

17   couldn't breathe and that his chest hurt.

18        Q.    When did Mr. Novack tell you that

19   approximately?

20        A.    That Monday.

21        Q.    The Monday after he died?

22        A.    Correct.

23        Q.    Is there any other staff member that I

24   haven't mentioned that you are aware became --

25   strike that.  Is there any other staff member that

```
 1                    CASSATA
 2    I have not mentioned that, to your knowledge,
 3    became aware of C.B.'s complaints about chest pain
 4    and not being able to breathe?
 5         A.   No.
 6         Q.   Did you ever talk -- do you now who
 7    Elise Williams is?
 8         A.   Yes.
 9         Q.   Was she the nurse assigned to E house in
10    April 2018?
11         A.   I believe Anita was.
12         Q.   Did you ever talk to Elise Williams
13    about --
14         A.   Periodically.  Not to my knowledge about
15    C.B.
16         Q.   Did you ever talk to Josh Buell about
17    C.B.'s complaints?
18         A.   No.
19         Q.   Did you ever talk to Cory Behlan about
20    C.B.'s complaints?
21         A.   No.
22         Q.   Did you ever talk to Jennifer Smith
23    about C.B.'s complaints?
24         A.   No.  I try not to talk to Jennifer Smith
25    at all.
```

## JA624

87

1                              CASSATA

2          Q.    Why is that?

3          A.    We just don't jibe at work very well.

4          Q.    Did you ever talk to Ashley Sessions

5     about C.B.'s complaints?

6          A.    No.

7          Q.    Do you know who Ashley Sessions is?

8          A.    I do.

9          Q.    Who do you know her to be?

10         A.    She was the new night shift staff at

11    E house.

12         Q.    Was there someone who worked at Valley

13    Ridge in 2018 named M.A.?

14         A.    He didn't work there.  He was an

15    individual.

16         Q.    When you got back to E house after your

17    absence from the 147, did M.A. tell you that C.B.

18    hadn't been feeling well?

19         A.    Yes.  M.A. told me, he was like junior

20    staff everybody called him, because he was very in

21    tune with what happened and what went on at the

22    houses.  So I feel he was the reason I was out

23    actually.  So, when I came back, he was very happy

24    I was back.

25         Q.    When you say he was the reason you were

1                         CASSATA

2    out, was the 147 related to him?

3         A.   Yes.

4         Q.   And was M.A. capable of describing, you

5    know, what had happened at the house?

6         A.   Yes.  He was very high-functioning.

7         Q.   And, in your experience, was he a

8    reliable reporter?

9         A.   Yes.

10             MS. HILDONEN:  Objection.

11        Q.   When you came back after the 147, what

12   did M.A. tell you about C.B.?

13        A.   He said that he has been making

14   complaints that he didn't feel good.

15        Q.   Did M.A. tell you what the nature of

16   those complaints were?

17        A.   No.

18        Q.   Did M.A. tell you that C.B. had been

19   complaints about having chest pains?

20        A.   No, not that I can recall.

21        Q.   Did M.A. tell you that C.B. had been

22   complaining about being short of breath?

23        A.   Not that I can recall.  I don't

24   remember.

25        Q.   For purposes of the transcript, do you

1                          CASSATA

2    know the first letter of M.A.'s last name?

3         A.    A.

4               MR. SHAPIRO:  So, for the record, we'll

5         refer to him in the transcript as M.A. to

6         help protect his confidentiality.

7         Q.    Okay?  Is that fair, Ms. Cassata?

8         A.    Yes.

9         Q.    Before you left E house for the 147, had

10   C.B. been complaining about chest pains?

11        A.    No.

12        Q.    Before you left E house for the 147, had

13   C.B. been complaining about shortness of breath?

14        A.    During rec, I believe, and then the team

15   had implemented a smoking restriction, so he wasn't

16   allowed to smoke anymore.

17        Q.    AND, when you say the team, who are you

18   referring to?

19        A.    His treatment team.

20        Q.    AND who was on C.B.'s treatment team?

21        A.    His psychologist, his social worker,

22   nursing, DTLs.  At the time, I don't recall who

23   they were.

24        Q.    When did you leave E house because of

25   the 147?

## JA627

90

1                              CASSATA

2         A.    I believe it was January something.

3         Q.    Of 2018?

4         A.    Yes.

5         Q.    When you got back after the 147 in late

6    MAR of 2018, did any other individuals aside from

7    M.A. tell you that C.B. hadn't been feeling well?

8         A.    All of them.

9         Q.    And can you give me their names?

10        A.    At the time, it would have been AW, MS.

11   They're not, MS I would call him credible, but the

12   rest, you know, it's hit or miss with credibility.

13   They could have been jumping on board with what

14   M.A. and MS were saying.

15        Q.    But in your experience, M.A. was a

16   credible reporter?

17        A.    Yes.

18        Q.    And M.S. was as well?

19        A.    Yes.

20        Q.    And what did M.S. say to you when you

21   got back from the 147?

22        A.    He was very upset.  He just said,

23   "Nobody is doing anything.  Nobody cares," and that

24   was, to my knowledge, accurate.

25        Q.    Did M.S. tell you that C.B. had been

91

1                           CASSATA

2    complaining of chest pains?

3           A.    Yes.

4           Q.    Did M.S. tell you that C.B. had been

5    complaining of shortness of breath?

6           A.    Yes.  He said they would go to rec in

7    the afternoon, and he said C.B. had stopped going

8    up to rec.

9           Q.    Did M.S. tell you who C.B. had been

10   complaining to?

11          A.    No.

12          Q.    Did M.A. tell you who C.B. had been

13   complaining to?

14          A.    No.

15          MR. HILL:  Note my objections.  What are

16          we talking about with the time frame here?

17          MR. SHAPIRO:  She testified this was

18          after she got back from the 147 in late

19          March.

20          MR. HILL:  No.  I think she testified

21          that it was after she got back from the 147,

22          but it's not clear to me at all whether that

23          was after or before C.B.'s death, for

24          example.

25          Q.    Fair enough.  Was this before or after

# JA629

92

CASSATA

1
2    C.B.'s death?

3         A.    It was before.

4         Q.    And this is in late March of 2018?

5         A.    Yes.  It was immediately upon my arrival

6    back to the house.

7         Q.    Did you talk to any staff about what

8    M.A. told you?

9         A.    No.

10        Q.    Did you talk to any staff about what

11   M.S. told you?

12        A.    No.

13        Q.    Why not?

14        A.    Because sometimes the credibility of an

15   individual is questioned, so, if you don't witness

16   it for yourself, you don't want to go on hearsay

17   unless it's an allegation of abuse, and it wasn't.

18        Q.    When you got back to E house in late

19   March, did you ask any staff if C.B. had been

20   having medical issues?

21        A.    No.  I just noticed C.B. had been

22   withdrawn and in his room a lot.

23        Q.    Did you ask any staff about that?

24        A.    I did, and they just said that that's

25   what he has been doing lately, that he was getting

Case 1:20-cv-00091-GTS-CFH    Document 118-4    Filed 11/15/23    Page 94 of 149

93

1                          CASSATA

2    lazy, and then they had attributed it to his med

3    change from 8 o'clock to 5 o'clock.

4         Q.   Was the Wednesday before he died the

5    first time you heard C.B. complain about chest

6    pains?

7         A.   Yes.

8         Q.   Was that the first time you became aware

9    of any complaint by C.B. about chest pains?

10        A.   Yes, aside from what M.A. had told me

11   upon arrival back to the house.

12        Q.   Prior to April 2018, was C.B. someone

13   who made a lot of complaints about medical

14   condition?

15        A.   No.

16        Q.   He wasn't someone who faked medical

17   issues?

18        A.   No.  He thought he was superhuman.

19        Q.   So he didn't like to complain about his

20   health frequently.  Is that fair to say?

21        A.   Right.

22             MS. HILDONEN:  Objection.

23             MR. HILL:  Objection.

24        Q.   In the months before C.B. died, was C.B.

25   having trouble urinating?

# JA631

94

1                        CASSATA

2        A.    Not that I recall.

3        Q.    Were you aware of C.B. having trouble

4   sleeping in the months before he died?

5        A.    No.

6        Q.    Ever hear any report that he had woken

7   up in the middle of the night and had troubling

8   breathing?

9        A.    No, not that I can recall.

10       Q.    Prior to C.B.'s death, had you ever

11  spoken to anyone in C.B.'s family?

12       A.    No.  If I had answered the phone just in

13  passing, but nothing intimate about his life.

14       Q.    Can you recall any occasions when

15  someone from C.B.'s family called Valley Ridge

16  concerning C.B.'s medical condition?

17       A.    The Sunday before he died, his mom

18  called.

19       Q.    Aside from that call, are you aware of

20  any other calls?

21       A.    No.  His sister would call just to check

22  on him, but nothing more that I'm aware of.

23       Q.    Are you aware of his sister ever calling

24  Valley Ridge to say C.B. isn't feeling well?

25       A.    Not that I'm aware of no.

1                              CASSATA

2          Q.   You learned about C.B.'s death on the

3     morning of April 9th.  Is that right?

4          A.   Correct.

5          Q.   Were you working that morning?

6          A.   No.

7          Q.   How did you hear about it?

8          A.   My boyfriend at the time he worked here,

9     so he told me.

10         Q.   Who was your boyfriend at the time?

11         A.   Joel Winans.

12         Q.   Did he work in E house ever?

13         A.   No.  He worked in B house at the time.

14    He was the supervisor in B house.

15         Q.   B like boy?

16         A.   Correct.  I think he did work in E.  He

17    would get floated to cover supervisor spots, but

18    not regularly.

19         Q.   Did you work the evening of C.B.'s

20    death?

21         A.   I did.

22         Q.   That evening shift on April 9th, did you

23    talk to anyone about C.B.'s death?

24         A.   Yes.

25         Q.   And who did you talk to?

1                          CASSATA

2          A.     Leisa McKown, Mike Novack, they were

3    there in the morning.  They had come in at 7, so

4    they were there for most of the day.

5          Q.     And you spoke to Mike Novack about what

6    had happened the day before on Sunday, right?

7          A.     Right.

8          Q.     And you told us about that conversation.

9    What did you -- tell us about your conversation

10   with Leisa McKown.

11         A.     She was very upset.  It was emotional.

12         Q.     Did you talk to her about whether C.B.

13   had been showing signs of illness?

14         A.     Not at that time.  No.

15         Q.     At any time did you have that

16   conversation with her?

17         A.     Later on, you know, I just told her I

18   said, you know, he has been complaining about this,

19   and, you know, it's unfortunate.

20         Q.     When you say he has been complaining

21   about this, what do you mean?

22         A.     That he had been complaining of chest

23   pains.  At that time, we assumed that he had had a

24   heart attack.

25         Q.     Did Leisa McKown say that she had been

1                         CASSATA

2    aware that he had been complaining of chest pains?

3         A.    Not that I can recall, no.

4         Q.    Did she say she had been aware of him

5    being short of breath?

6         A.    No, not that I recall.

7         Q.    Did you speak to any other staff on

8    April 9th or any time thereafter about C.B.'s

9    death?

10        A.    No.  Just Katie I had mentioned earlier

11   we went out that night, but nothing about his

12   death, no.

13        Q.    Did you talk to Katie about any signs of

14   illness that he had been displaying?

15        A.    Yes.

16        Q.    Did Katie say she had seen any signs

17   from him?

18        A.    No.  I think it's possible Katie had

19   either gone to Glenwood or was on vacation at that

20   time or had gone to another house to work when he

21   had passed away.

22        Q.    So Katie didn't mention anything about

23   hearing that C.B. had had chest pains?

24        A.    No.

25        Q.    Or mention anything about hearing that

# JA635

98

1                         CASSATA

2    C.B. had been short of breath?

3          A.    No.

4          Q.    On April 9th or any time thereafter, did

5    you speak to any of the individuals about C.B.'s

6    death?

7          A.    No.  They were all pretty distraught

8    over the situation.  M.S. had expressed his

9    displeasure with the nursing department and how he

10   felt that they didn't do anything for him and he

11   was worried about the same thing happening to him.

12         Q.    Did any individual tell you that C.B.

13   had asked to go to the hospital on the Sunday

14   before he died?

15         A.    They did.

16         Q.    Who told you that?

17         A.    M.A. and M.S.

18         Q.    Did you ask Mr. Novack whether C.B. had

19   asked to go to the hospital?

20         A.    I did.

21         Q.    And what did he say?

22         A.    He said that he had notified nursing

23   after he talked to his mom.  He didn't tell me

24   either way if C.B. had.

25         Q.    Do you know someone named Melanie Vil or

1                          CASSATA

2    Marlene Vil?

3        A.    I don't.

4        Q.    Let me show you Exhibit 79 again.  Well,

5    before I do that, let me ask you, did you speak to

6    a staff member aside from Mr. Novack about a

7    conversation with C.B.'s mother on the Sunday

8    before he died?

9        A.    I don't recall.

10       Q.    So I'm going to show you the transcript

11   from the first OIIA interview and direct your

12   attention to page 14.

13            Ms. Hess asks, "Anything else?

14   Anything you think I missed?"

15            Angie Roberts, who's another

16   investigator, says, "No, I'm good."

17            Ms. Hess says, "Anything you think I

18   should know that I haven't asked you?"

19            Your answer, "I mean just secondhand

20   information one day from when I came in.  Marlena

21   Knight had received a phone call from his mom

22   because he called his mom on Sunday."

23       A.    I think that's supposed to be Michael

24   Novack.

25       Q.    Okay.  Ms. Hess asks, "What time does

# JA637

100

1                           CASSATA

2    she work?"

3              Your answer, "She worked evenings into

4    the overnight, I believe.  Marlene Bill," and

5    that's phonetic.  We're not sure that's correct.

6              Ms. Roberts says, "No?"

7              Ms. Hess says, "She was here on

8    Sunday?"

9              Your answer:  "She was here either on

10   days or evenings, but she's normally night shift."

11             Ms. Hess asks, "Okay, so maybe she

12   works Sunday morning."

13             Your answer:  "Okay.  Yeah.  I just know

14   that she was telling me that" --

15             Ms. Roberts says "That she spoke with

16   mom, that mom called and talked to her?"

17             Ms. Cassata says, "No, she spoke with

18   him, and then she had directed Novack.  She handed

19   Novack the phone because he was here as house

20   supervisor."

21             Do you see that?

22        A.   I'm having trouble -- yeah.  Do you have

23   the roster, because it's not Marlene.  We've never

24   had a Marlene work here.

25        Q.   Yeah.  Hold on on -- give me just one

## JA638

101

1                              CASSATA

2    second.  Showing you what I've previously marked as

3    Plaintiff's Exhibit 26, and if you see, this is the

4    schedule for the day shift on April 8th, 2018.

5    Correct?

6         A.    Correct.

7         Q.    So there is someone that appears to be

8    assigned to E house with the name M, the first

9    initial M and then the last name V-i-l.  Do you see

10   that?

11        A.    I do.

12        Q.    Do you know who that person is?

13        A.    No.

14        Q.    Okay.  Sitting here today, you have no

15   memory talking with her about the Sunday before

16   C.B.'s death?

17             MR. HICKEY:  Sorry.  Talking with who?

18        Q.    M. Vil.  Ms. Vil.

19        A.    I don't know who that is.  Even looking

20   at the roster, I don't know who that would be.  Do

21   you have the overnight?  Because that's a volunteer

22   person.

23        Q.    Yeah.  You mean the overnight, the night

24   he died into April 9th?

25        A.    Yeah, either the night before or the

# JA639

102

1                         CASSATA

2    night after.

3         Q.    Yeah.  Hold on.  Let me show you,

4    showing you what I've previously marked as

5    Plaintiff's Exhibit 28.  I'm not sure this is going

6    to be helpful, but this is Exhibit 28 the schedule

7    from the night of April 9, 2018, correct?

8         A.    Right.

9         Q.    Does this help you identify who M. Vil

10   is?

11        A.    Michael DaSilva, but he was not a woman.

12   I can't, I don't know, I don't recall if that's,

13   no, I don't recall.

14        Q.    Okay.  Let's move on.  I might be able

15   to show you one other document that could help, but

16   let's move on, and then I will just come back to

17   that.

18              You had mentioned I think earlier that

19   some policies were amended following C.B.'s death.

20   Can you tell me about that?

21        A.    Correct.  We have a new the EHR program.

22   Everything is electronic.  Everything is to be

23   documented.  Any time you call nursing, you

24   document that.  Any time there's medical concerns

25   where they -- complaints of any kind, you document

# JA640

103

1                         CASSATA

2   that.  Everything goes in an EHR, so.

3         Q.   Was EHRs implemented right after C.B.'s

4   death?

5         A.   It has been on for about two years.

6         Q.   So since about 2019 or 2020?

7         A.   Correct.

8         Q.   What about back in 2018 right after his

9   death?  You had mentioned that you learned about

10  documenting calls to nursing from Ms. Hess, is that

11  correct?

12        A.   Correct.

13        Q.   Tell us about that.

14        A.   So, after C.B. died, even we just made

15  sure to notify, whenever we would notify nursing

16  about anything, we wrote a DAR note about it more

17  so to cover our own butts at that point.

18        Q.   And that had not previously been your

19  practice prior to C.B.'s death?

20        A.   Correct.

21        Q.   And Mike Novack as the house manager had

22  never directed you to write a DAR note every time

23  you called nursing?

24        A.   Correct.

25        Q.   No one on Valley Ridge staff had

# JA641

104

```
 1                        CASSATA
 2    directed you to write a DAR note any time you
 3    called nursing prior to C.B.'s death?
 4        A.   No.
 5        Q.   Prior to C.B.'s death, no one at Valley
 6    Ridge had directed you to write a DAR note any time
 7    you called nursing, is that correct?
 8        A.   Correct.
 9        Q.   Were there any other policy changes
10    implemented as a result of C.B.'s death?
11        A.   Yes.  When an individual complains of
12    chest pains, they go to the emergency room
13    immediately now.
14        Q.   Was that policy change implemented
15    directly after C.B. died?
16        A.   Yes.
17        Q.   Any other policy changes after C.B.
18    died?
19        A.   Not that I can recall, no.  Not that I'm
20    aware of right now.
21        Q.   Did you ever have to do bed checks as
22    part of your job?
23        A.   Yes.
24        Q.   And can you describe to me what your
25    practice is when doing a bed check?
```

**JA642**

105

1                           CASSATA

2          A.    To make sure the individual is in their

3    room, not in distress.

4          Q.    And how do you do that?

5          A.    There's a light outside the door you can

6    click on and visualize the individual.

7          Q.    Do you go check if the individual is

8    breathing?

9          A.    No.  You don't go in the rooms

10   typically.  Now there is also a policy in place

11   now.  At 2 a.m. it's a sign of life check where you

12   have to visually see that the individual is

13   breathing.

14         Q.    When was that put into place?

15         A.    Right after C.B.'s died.

16         Q.    Around the time of C.B.'s death, was

17   Valley Ridge suffering from a staff shortage?

18         A.    We still are.

19         Q.    And you had mentioned I think previously

20   there was a lot of new people in E house around the

21   time of C.B.'s death, is that right?

22         A.    Correct.

23         Q.    And can you describe how, if at all,

24   that impacted your work?

25         A.    So a lot of the stuff comes with

1                         CASSATA

2    on-the-job training, you know, so you have to be

3    there to learn the job the best way, and new people

4    come in here and have no idea what to expect, so

5    they might not be as diligent as some of the older

6    staff.

7         Q.   And when you say they might not be as

8    diligent, tell me what you mean by that.

9         A.   In tune with the individuals.  They'll

10   come in and not really get to know the guys as

11   quickly as you would expect, and a lot of the new

12   people would float around to cover staff issues in

13   other houses, so they didn't really get time to

14   know the individuals, so they wouldn't have picked

15   up on C.B. sleeping all evening as being out of

16   character for him.

17        Q.   Did you observe any particular staff in

18   March or April of 2018 who were not as diligent?

19        A.   No.  Like I said, I wasn't in the house,

20   so.

21        Q.   When you got back to E house though, in

22   late March, did you observe any staff who worked

23   there who you observed were not as diligent?

24        A.   No.  I focused on the guys more than the

25   staff.

**JA644**

107

1                          CASSATA

2          Q.    Aside from Anita Baral, did you discuss

3    C.B.'s complaints in the last week of his life with

4    any other nurse?

5          A.    Not that I can recall.

6          Q.    Any other medical staff?

7          A.    No.

8                MR. SHAPIRO:  Okay.  If we could just

9          take five minutes, Ms. Cassata, I'm sorry,

10         let me just look at my notes.  I'm nearly

11         done.

12               (Recess taken from 4:55 p.m. to 5:00

13         p.m.)

14   BY MR. SHAPIRO:

15         Q.    Just a couple more questions, Ms.

16   Cassata.  I'm going to mark as Plaintiff's Exhibit

17   82 a 21-page document.  It is Bates stamped

18   Defendants 8658 through 8678.

19               (Plaintiff's Exhibit 82, Document Bates

20         stamped Defendants 8658 through 8678, was so

21         marked for identification, as of this date.)

22         Q.    It's a series of schedules I will

23   represent to you.  Does that appear correct to you?

24         A.    Yes.

25         Q.    So I just want to ask.  I'm scrolling

# JA645

108

1                         CASSATA

2    down to look again at the evening shift at April 4,

3    2018.  Do you see that?

4         A.    Yes.

5         Q.    And you see your name there, right?

6         A.    Yes.

7         Q.    And it appears Mike Novack was working

8    in E house as well on that shift.  Is that right?

9         A.    See, I don't know, I don't recall him

10   being there, but I'm not sure why they're both

11   under hall.

12        Q.    There seems to be a note written next to

13   Mike Novack's name.  Do you see that?

14        A.    I do.

15        Q.    Does that mean anything to you?

16        A.    Possibly that they moved him to B house.

17        Q.    Okay, and we're looking for the record

18   at defendants 8667.  On April, Wednesday,

19   April 4th, did you talk to Mike Novack at all about

20   C.B.'s complaints?

21        A.    No, not that I recall.

22        Q.    On Wednesday, April 4th did you talk to

23   Mike Novack about C.B. having chest pains?

24        A.    No.

25        Q.    On April 4th, did you talk to James

                              CASSATA

1
2  Roberts about C.B. having chest pains?

3        A.    No, not that I recall.

4        Q.    Was James Roberts present when Ms. Baral

5  came to the house on April 4th?

6        A.    I don't recall him being there.  I don't

7  know if he was or not.

8        Q.    Alright.  Scrolling down, I want to show

9  you the schedule then for, well, first, looking

10 here at defendants 8673, this is the night shift

11 for April 6, 2018.  Do you see the name there

12 Mirlaine Vil?

13       A.    I believe she was a new staff.  She

14 would not have been here very long.

15       Q.    Do you recall having a conversation with

16 her about a phone call with C.B.'s mother?

17       A.    I vaguely remember the conversation

18 leading up to it.  I don't remember details.  I

19 don't remember.  I can't picture her, and I don't

20 know why.

21       Q.    Can you tell me what you remember?

22       A.    But I know that's what led me to ask

23 Michael Novack about it, because, you know, I

24 brought it up to him, and that's when he told me

25 that his mom had called, because, when I came in at

**JA647**

110

                              CASSATA

1    3, she had told me what had happened.

2         Q.   Did Ms. Vil tell you what C.B.'s mom had

3    said on the phone?

4         A.   She called very upset and wanted to have

5    her son taken to the hospital because he had been

6    complaining he wasn't well.  She was the one who

7    had taken the phone call and given it to Novack.

8         Q.   Scrolling down to defendants 8675, this

9    is the evening shift schedule on Friday, April 6.

10   Is that correct?

11        A.   Correct.

12        Q.   And I'm just going to ask, did you have

13   any conversations with Deshawna Diggs on April 6

14   concerning C.B.'s medical complaints?

15        A.   No.  Those three individuals with the AL

16   next to their name were on administrative leave.

17        Q.   Okay.  What about Ethan Licari?  Did you

18   have any conversations with him on April 6th about

19   C.B.'s complaints?

20        A.   No.

21        Q.   What about Dave Koterba?

22        A.   No.

23        Q.   What about Mirlaine Vil?

24        A.   No.  I also believe I left at 9 o'clock

**JA648**

111

```
 1                        CASSATA
 2    on that Friday.
 3                 MR. SHAPIRO:  Okay.  I don't have any
 4            further questions at the moment, Ms.
 5            Cassata.  Thank you very much for your time.
 6            I am going to reserve my right to ask you a
 7            couple more questions after the other
 8            lawyers ask you some questions, but thank
 9            you.
10    EXAMINATION BY MR. HILL:
11         Q.   Good evening, Ms. Cassata.  My name is
12    Ben Hill.  Can you see and hear me okay?
13         A.   I can.
14         Q.   Was that a yes?
15         A.   Yes.
16         Q.   I'm sorry.  Can you hold on for just one
17    second.  Okay.  I represent Ashley Sessions who has
18    been named as a defendant in this lawsuit, and I
19    have a very few follow-up questions for you.  The
20    same rules apply.  If you don't understand my
21    question, just let me know and I'll try to rephrase
22    it in a way so that you do understand.  Okay?
23         A.   Okay.
24         Q.   Alright.  You mentioned that when you
25    returned from your alternative assignment because
```

```
 1                          CASSATA
 2   of the 147 complaint, that several individuals in
 3   the E house told you in sum and substance that C.B.
 4   was having some health problems.  Is that fair?
 5        A.    And he had been making complaints.  Yes.
 6        Q.    Okay, and you mentioned one individual
 7   in particular who you named first name M.A.?
 8        A.    Correct.
 9        Q.    And how old is M.A.?
10        A.    Mid to late 30's.  He no longer lives
11   here.  He went to a group home.
12        Q.    Okay, and I think you said that M.A. was
13   high functioning was I think the phrase that you
14   used?
15        A.    Yes.
16        Q.    Okay.  Of the individuals that were in
17   the E house upon your return, was M.A. the highest
18   functioning of that group?
19        A.    Yes.
20        Q.    And was he the most reliable reporter of
21   that group?
22        A.    Yes.
23        Q.    Okay, and is it fair to say that among
24   the other individuals in the group, they had
25   varying degrees of mental disabilities and
```

1                        CASSATA

2    limitations?

3         A.   Correct.

4         Q.   Okay.  Now you mentioned that you were

5    out of E house from sometime in January 2018 until

6    the end of March of 2018 approximately.  Is that

7    fair?

8         A.   Yes, roughly.

9         Q.   Okay, and that was because there was a

10   report or an accusation of abuse against you.  Is

11   that correct?

12        A.   Correct.

13        Q.   Okay, and that report or allegation of

14   abuse was made by M.A.  Is that correct?

15        A.   I'm going to assume.  I don't know for

16   sure.  It has been a few years.  I know in my 12

17   years that I have been here there has only been two

18   or three allegations of abuse against me, so they

19   kind of stick out a little bit.  So I would assume

20   it was M.A.

21        Q.   And just so the record is clear, why do

22   you assume it was M.A. who made that report of

23   abuse?

24        A.   Because, like I said, there are only two

25   or three in my 12 years here, and M.A. was very

114

1                          CASSATA

2   high functioning, and I do recall an altercation

3   between he and I.

4        Q.   Okay, and what specifically was M.A.'s

5   allegation against you?

6        A.   I don't recall.

7        Q.   Was it an allegation that you physically

8   abused him?

9        A.   No.  I would have been put out of the

10  facility if it was an allegation of physical abuse.

11       Q.   So am I correct then that it was an

12  allegation of some other type of nonphysical abuse?

13       A.   It was because M.A. didn't always like

14  to adhere to the house rules.

15       Q.   Okay.

16       A.   Sometimes he felt, like I said, he was

17  junior staff and didn't think that the rules

18  applied to him.

19       Q.   Okay, and so I'm just trying to get a

20  sense of what the accusation was against you.

21       A.   I don't recall.

22       Q.   Okay.  Was the accusation that was made

23  against you by M.A. true?

24       A.   No, it was unsubstantiated.

25       Q.   Okay, and I understand you said it was

**JA652**

1                          CASSATA

2    unsubstantiated, but I'm just asking you, separate

3    and apart from any administrative investigation, do

4    you know was the accusation that he made, was it a

5    true accusation or a false accusation?

6         A.   It was false.

7         Q.   Okay, and so --

8         A.   My interpretation it was false.

9         Q.   So at a minimum with respect to that

10   accusation that M.A. made against you, that was not

11   a credible report.  Is that fair?

12        A.   No.  It was open to interpretation.  It

13   was me asking him to follow the rules and him not

14   wanting to.  Because he is so high-functioning, he

15   wanted to be treated a little bit different than

16   everyone else.

17        Q.   Okay.  So it sounds like you do remember

18   some of the circumstances.

19        A.   No.  I just know M.A. and I, and I know

20   where we butted heads, so I'm sure it had something

21   to do along those lines.

22        Q.   You wanting to enforce rules and him not

23   liking that you were enforcing the rules?

24        A.   That him not feeling that they applied

25   to him, because he was higher functioning, and he

116

1                        CASSATA

2    felt he could do things the other guys couldn't do.

3         Q.    Okay, but a 147 is a complaint of abuse

4    that's made to OPWDD, is that correct?

5         A.    Correct.

6         Q.    Okay.  Did M.A. also file a complaint

7    with The Justice Center against you?

8         A.    I don't recall if it went to The Justice

9    Center or not at the time.

10        Q.    Okay.  Have you ever subjected M.A. to

11    any form of abuse?

12        A.    No.

13        Q.    Okay.  You said, and I'm going to jump

14    around here just to save time.  So I apologize in

15    advance for that.

16             You said that you spoke with Mirlaine,

17    whose last name I don't think we actually know, and

18    I think you said that she said that C.B.'s mom had

19    called, and she answered the phone when C.B.'s mom

20    called.  Is that correct?

21        A.    Correct.

22        Q.    Okay.  Now this is what I wasn't clear

23    on.  Did she, that is, Mirlaine tell you that

24    C.B.'s mom told her that she wanted C.B. to go to

25    the hospital, or was that from Mr. Novack?

```
1                       CASSATA
2       A.    That was from Mr. Novack.
3       Q.    Okay.  So Mirlaine did not --
4       A.    I believe it was Marlena.
5       Q.    Marlena?
6       A.    I believe so.  She was here a very short
7  time.
8       Q.    Okay.  So the record is clear, it's your
9  testimony that you had a conversation with Marlena,
10 and she told you that C.B.'s mom had called, is
11 that correct?
12      A.    Correct.
13      Q.    But she is not the one that told you
14 that C.B.'s mom asked for C.B. to go to the
15 hospital.  Is that also correct?
16      A.    She told me that she had asked Mike, so
17 then I asked Mr. Novack if that's what had
18 happened, and he said yes.  She was the one who
19 initially told me what the conversation was, and
20 then I followed up with it with Mike.
21      Q.    And what did Mike say to you exactly?
22      A.    That he had called nursing.  So none of
23 us in the house can call 911.  We can't call the
24 hospital.  We can't -- we don't have any kind of
25 authorization like that.  It all has to come
```

1                              CASSATA

2     through the nursing department.

3          Q.   Okay, and it's fair to say that the

4     nursing department is a separate staff from the

5     direct care providers, which is where you were?

6          A.   Yes.

7          Q.   Okay, and is it fair to say that the

8     direct care providers took their instruction from

9     the nurse and other medical staff when it came to

10    providing medical care to the individuals?

11         A.   Yes.

12         Q.   Alright.  You mentioned that, and these

13    questions are directed to the period of time prior

14    to C.B.'s death, okay, because I understand and you

15    discussed that there were some changes in protocol?

16         A.   Okay.

17         Q.   When you did a bed check prior to C.B.'s

18    death, was there any requirement that you enter the

19    room of the individual that was sleeping at that

20    time?

21         A.   No.

22         Q.   Okay, and was there any requirement

23    again prior to C.B.'s death that you turn on the

24    light of the room in which the individual is

25    sleeping when you did a bed check?

**JA656**

119

1                              CASSATA

2          A.    There's a requirement that you had a

3    visual of the individual in the room.

4          Q.    Okay, but if you were able to see the

5    individual with the light off, there was no

6    explicit requirement that you turn the light on.

7    Is that fair?

8          A.    Correct.

9          Q.    And some individuals slept with the

10   light on, correct?

11         A.    Yes, they did.

12         Q.    Okay, and was C.B. one of those

13   individuals that kept the light on?

14         A.    Yes, he was.

15         Q.    Okay.  I think I recall you also saying

16   to the OIIA investigators that C.B. typically slept

17   with --

18         A.    On his left side facing the wall.

19         Q.    Okay, and so, when you opened the door

20   to C.B.'s room, it's my recollection and

21   understanding from looking at photos that his bed

22   was to the right of the door once you opened it?

23   Is that correct or no?

24         A.    No.  I believe it was right in front

25   like in front of the window.

120

1                          CASSATA

2       Q.   Okay.  So you said that C.B. slept on

3   his left side facing the wall.  Is that correct?

4       A.   Correct.

5       Q.   And so when he's facing the wall, is he

6   facing towards the door or in the opposite

7   direction?

8       A.   Opposite the door.

9       Q.   Okay, and was that true, was that your

10  experience in doing bed checks with respect to C.B.

11  that, when you went into his room again prior to

12  his death obviously, that he was often facing that

13  wall?

14      A.   Yes.

15      Q.   Okay.  Did you ever work any shifts with

16  Ashley Sessions?

17      A.   I don't recall.

18      Q.   Okay.  Do you recall ever training or

19  providing any training to Ashley Sessions?

20      A.   No, I never trained her.

21      Q.   Okay.  Do you know what shift she

22  worked?

23      A.   11 to 7.

24      Q.   Okay, and that's the night shift?

25      A.   Yes.

1                          CASSATA

2          Q.    Did you ever have any issues with Ashley

3    Sessions or the way that she did her work?

4          A.    I don't recall.

5          Q.    You don't recall having any?

6          A.    I don't recall ever working with her.

7          Q.    Okay.  I think you just answered this,

8    but, just so the record is clear, did you ever have

9    any conversations with Ashley Sessions about any of

10   C.B.'s complaints regarding his health that you

11   described earlier today?

12         A.    No.

13         Q.    When is the last time that you've spoken

14   with anyone from C.B.'s family?

15         A.    Before he died.

16         Q.    Okay.  Did you ever have to participate

17   in a takedown of C.B.?

18         A.    No.

19         Q.    Was C.B. ever violent towards you?

20         A.    No.

21         Q.    Did you ever observe C.B. being violent

22   towards other direct care providers at Valley

23   Ridge?

24         A.    I was never there for it.  No.

25         Q.    Are you aware that he was violent with

**JA659**

122

1                              CASSATA

2    other direct care providers?

3          A.    I am aware of it.  Yes.

4          Q.    You may have answered this earlier.

5    Prior to C.B.'s death, when you're doing a bed

6    check, just a regular bed check, was there any

7    requirement that you ensure that the individual was

8    breathing?

9          A.    No.  Just that they were in their bed

10   and visible.

11          MR. HILL:  Okay.  That's all the

12          questions I have.  Thank you.

13          MR. SHAPIRO:  I just have a couple of

14          quick follow-up.

15   EXAMINATION (Continued)

16   BY MR. SHAPIRO:

17          Q.    Carol Weaver, who you discussed earlier,

18   does she still work at OPWDD?

19          A.    She's retired.

20          Q.    And is her last name W-e-b-e-r?

21          A.    W-e-a-v-e-r.

22          Q.    Do you know her -- are you in touch with

23   her still?

24          A.    I am.

25          Q.    Do you know her phone number?

123

1                           CASSATA

2        A.    Yeah.  I don't have it with me.

3        Q.    Do you know where she lives?

4        A.    South New Berlin.

5        Q.    When did she retire?

6        A.    September of 2020.

7        Q.    Does Tammy Boise still work at OPWDD?

8        A.    No.

9        Q.    Are you in touch with her?

10       A.    I'm not.

11       Q.    Do you know where she lives?

12       A.    No, not at this time.

13       Q.    Did you ever have any conflict at work

14   with Anita Baral?

15       A.    No.

16             MR. SHAPIRO:  Okay.  I have nothing

17       further.

18             (Time noted:  5:25 p.m.)

19                              _____

20

21   Subscribed and sworn to

22   before me this____day of_____, 2022.

23   _____

24

25

124

1

2                    C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set

15   my hand this 13th day of February, 2022.

16

17

18                          JOSEPH R. DANYO

19

20

21

22

23

24

25

**JA662**

125

1

2                           I N D E X

3    Witness                                        Page

4    KATHERINA CASSATA                               4

5

6                         E X H I B I T S

7    Plaintiff's                                    Page

8    Exhibit 76   Document Bates stamped            17
                  Cassata 123 and 124
9
     Exhibit 79   Transcript of first OIIA          34
10                interview dated April 12, 2018

11   Exhibit 77   Assignment book                   58

12   Exhibit 80   Transcript of second OIIA         73
                  interview
13
     Exhibit 82   Document Bates stamped            107
14                Defendants 8658 through 8678

15                        oOo

16

17

18

19

20

21

22

23

24

25

```
 1              SIGNATURE PAGE OF KATHERINA CASSATA

 2     Page      Line              Should be Changed to Read

 3     ____      ____      _____

 4     ____      ____      _____

 5     ____      ____      _____

 6     ____      ____      _____

 7     ____      ____      _____

 8     ____      ____      _____

 9     ____      ____      _____

10     ____      ____      _____

11     ____      ____      _____

12     ____      ____      _____

13     ____      ____      _____

14     ____      ____      _____

15     ____      ____      _____

16     ____      ____      _____

17     ____      ____      _____

18

19        I, KATHERINA CASSATA, hereby certify that I have
       read the transcript of my testimony taken under oath and that
20     the transcript is a true and complete record of my testimony,
       and that the answers on the record as given by me are true
21     and correct.

22                        _____

                              KATHERINA CASSATA

23     Sworn to before me
       this____ day of _____, 2022

24

25     _____
            Notary Public
```

**A**

a.m 105:11
ABADY 2:4
ability 5:24
  7:12
able 17:19
  52:24
  57:22
  83:23 86:4
  102:14
  119:4
absence
  87:17
Absolutely
  51:24
abuse 92:17
  113:10,14
  113:18,23
  114:10,12
  116:3,11
abused 114:8
accommodate
  7:15
account
  12:18,22
accurate
  90:24
accusation
  113:10
  114:20,22
  115:4,5,5
  115:10
accused
  19:19,21
ache 63:17
acknowledge
  4:5
active 29:15
  81:14
activity
  40:3
acute 48:21
adhere 50:2
  114:14
administ...
  110:17
  115:3
Administ...
  1:4

admissib...
  4:8
advance
  116:15
afternoon
  4:25 5:4
  34:16 91:7
against- 1:6
agree 4:14
  4:16,18,20
AGREED 3:2,7
  3:10
ahead 56:17
aide 13:6
AL 110:16
Albany 2:11
  2:15,17
allegation
  43:2,3
  92:17
  113:13
  114:5,7,10
  114:12
allegations
  113:18
allow 6:5
allowed
  89:16
alright 51:2
  70:18 71:7
  82:20
  109:8
  111:24
  118:12
altercation
  114:2
alternative
  111:25
AMAC 58:19
amended
  102:19
American
  15:12
amount 49:18
amounts 50:5
Angie 99:15
animal 13:17
Anita 53:2
  58:5,6
  60:14,18

admissib...
  61:7,9,9
  61:12,25
  62:3 63:4
  64:18,20
  70:7,10,11
  73:21
  75:18,23
  76:24
  77:23,24
  78:12,13
  79:7,11
  80:12
  86:11
  107:2
  123:14
ankles 72:22
answer 6:12
  6:16,24,25
  7:9 18:15
  34:25
  39:21
  53:15,19
  54:20,23
  60:20,24
  61:18,22
  61:24 62:4
  62:12
  67:19,25
  73:25 74:4
  74:17
  99:19
  100:3,9,13
answered
  94:12
  116:19
  121:7
  122:4
answering
  7:11
answers 5:12
  34:20
  126:20
anymore
  89:16
apart 115:3
apologize
  116:14
appear
  107:23
appearance

67:3
appears
  101:7
  108:7
application
  18:8
applied
  16:15,23
  17:7
  114:18
  115:24
apply 16:13
  111:20
appropriate
  22:20
appropri...
  44:16,23
approxim...
  20:16
  34:15 37:6
  85:19
  113:6
April 8:19
  11:3 24:6
  24:9,13
  25:7,23
  26:22
  30:16
  31:25
  33:10 34:8
  34:12 36:6
  37:10,11
  45:13,19
  52:6 59:10
  60:7 76:21
  86:10
  93:12 95:3
  95:22 97:8
  98:4 101:4
  101:24
  102:7
  106:18
  108:2,18
  108:19,22
  108:25
  109:5,11
  110:10,14
  110:19
  125:10
area 54:24

areas 65:19
  67:23 68:6
arms 40:14
arose 26:11
arrival 92:5
  93:11
Ashley 1:7
  2:10,15
  4:20 87:4
  87:7
  111:17
  120:16,19
  121:2,9
aside 10:16
  10:19 16:8
  16:10
  22:14
  26:24
  30:14,22
  44:20
  65:16 71:8
  82:20 83:2
  90:6 93:10
  94:19 99:6
  107:2
asked 53:14
  54:18
  56:15 69:2
  98:13,19
  99:18
  117:14,16
  117:17
asking 115:2
  115:13
asks 34:21
  53:18
  60:17
  61:16,23
  62:8 67:16
  67:24
  99:13,25
  100:11
asleep 51:19
  51:20
  53:10
assigned
  30:17,25
  31:9,19,23
  86:9 101:8
assignment

31:6 58:23
59:5
111:25
125:11
**associate's**
13:17,19
**assume** 22:15
113:15,19
113:22
**assumed**
96:23
**attack** 96:24
**attacks**
21:19
**attend** 12:16
**attendance**
15:18
**attention**
18:11,13
28:10
34:19
48:13
67:16
73:20
99:12
**ATTORNEY**
2:15
**Attorneys**
2:4,10,15
**attribute**
50:14
**attributed**
93:2
**audits** 44:17
**August** 20:17
**authoriz...**
117:25
**available**
32:23
**Avenue** 2:5
**AW** 90:10
**aware** 9:6,9
9:15,19
10:9 11:2
28:10
53:19
71:12
78:18
80:14
82:10,14

82:15,20
82:25
83:14 84:6
84:10,11
85:24 86:3
93:8 94:3
94:19,22
94:23,25
97:2,4
104:20
121:25
122:3

--- **B** ---
**B** 95:13,14
95:15
108:16
125:6
**B-o-i-s-e**
80:3,4
**B-o-y-c-e**
80:2
**bachelor's**
13:25
**back** 11:2
12:7,12
15:8 17:8
20:2 33:5
35:6 36:13
36:16,23
38:9 40:15
42:3,18
45:14
57:20
60:15 73:2
73:12
77:17 80:7
82:23
87:16,23
87:24
88:11 90:5
90:21
91:18,21
92:6,18
93:11
102:16
103:8
106:21
**background**
13:11

**Baral** 61:9
63:5 64:5
64:7 66:4
66:12
71:13
75:23 76:6
77:11,15
77:18
78:12 79:8
79:11
107:2
109:4
123:14
**based** 4:9
27:11
**basically**
24:16
**Bates** 17:22
17:25
107:17,19
125:8,13
**bed** 52:23
104:21,25
118:17,25
119:21
120:10
122:5,6,9
**beginning**
45:8 69:2
**behalf** 4:13
4:15,17,19
37:25
**behavior**
35:24 47:9
57:18
76:19
**behavioral**
24:25
28:17 30:3
**behaviors**
44:6
**Behlan** 1:8
9:11,23
86:19
**believe**
11:17,20
17:5 27:9
27:15
28:13
30:11,12

38:24
42:25 44:5
50:7 55:13
58:5,18
60:2,25
73:8 76:9
77:8 80:18
86:11
89:14 90:2
100:4
109:13
110:25
117:4,6
119:24
**Ben** 111:12
**ben@cape...**
2:13
**Benjamin**
2:12 4:19
**Berlin** 123:4
**best** 7:11
19:3 106:3
**beyond** 23:8
**bid** 31:3,3
**bigger** 50:6
**Bill** 100:4
**bit** 33:6
42:18
65:20
68:10
113:19
115:15
**blood** 39:10
62:10
124:11
**board** 90:13
**Boise** 79:25
83:5 84:2
123:7
**book** 35:4,5
35:6,23
36:4,7,11
36:13,21
58:24 59:5
125:11
**books** 32:21
32:21
**bottom** 48:11
**boy** 95:15
**boyfriend**

95:8,10
**break** 7:14
7:16 30:20
44:10 45:2
81:2 83:8
**breath** 21:16
21:23 40:3
40:14 41:6
57:10
61:17
71:17
88:22
89:13 91:5
97:5 98:2
**breathe**
41:12 51:7
51:9,11
52:4,14,20
53:22
54:17
55:24
56:22
57:22
58:10
61:19,21
66:18
71:20 78:7
78:20,23
80:9 83:16
83:23 84:4
85:17 86:4
**breathing**
62:11 65:7
70:12 72:2
81:12
84:21 94:8
105:8,13
122:8
**brief** 6:4
**briefly**
13:10
14:24
19:12
29:12
**BRINKERHOFF**
2:4
**Broome** 14:3
14:4 16:16
16:25
**brought**

**brushing**
29:18
**Buell** 1:8
86:16
**bullet** 39:24
48:20
**butted**
115:20
**butts** 103:17

**C**

**C** 1:8  2:2
4:21  124:2
124:2
**C.B** 1:4  5:3
10:24  11:6
11:9  12:14
12:23
26:13  29:9
38:18,22
40:20  41:5
41:16
42:11  43:5
49:14  50:2
50:3,6,24
51:5  52:10
52:13,16
53:7  55:3
55:9  56:14
56:18,21
56:24  57:3
57:5,16,21
58:9  60:12
61:12
62:19  64:8
64:10,22
65:6,17
66:13,13
66:17,20
67:8  68:5
68:23  69:3
69:5,15
70:11,17
71:5,11,14
72:23  74:3
77:7,12,19
78:2,5,9
78:19,21
79:11,14
79:19  80:4

80:8,15,23
81:6,9,16
82:3,10
83:4,15,21
84:2,7,12
84:14,20
84:23  85:5
85:11,14
86:15
87:17
88:12,18
88:21
89:10,13
90:7,25
91:4,7,9
91:12
92:19,21
93:5,9,12
93:24,24
94:3,24
96:12
97:23  98:2
98:12,18
98:24
103:14
104:15,17
106:15
108:23
109:2
112:3
116:24
117:14
119:12,16
120:2,10
121:17,19
121:21
**C.B.'s** 11:12
11:23  26:4
27:5,12,23
28:6,20
33:22  44:7
46:20,21
47:2  53:14
63:5,8
64:2,13
65:25  73:3
73:6  75:9
75:22
78:15  79:4
83:14  86:3

86:17,20
86:23  87:5
89:20
91:23  92:2
94:10,11
94:15,16
95:2,19,23
97:8  98:5
99:7
101:16
102:19
103:3,19
104:3,5,10
105:15,16
105:21
107:3
108:20
109:16
110:3,15
110:20
116:18,19
116:24
117:10,14
118:14,17
118:23
119:20
121:10,14
122:5
**calendar**
52:7
**call** 37:25
41:12,16
58:2  63:14
65:21,23
65:25  70:4
70:8  77:8
78:12  79:6
80:11,19
90:11
94:19,21
99:21
102:23
109:16
110:8
117:23,23
**called** 26:15
27:25
38:12,23
38:24
57:25

60:24  61:2
61:24  62:2
62:9,13
63:9,11,12
63:25  66:7
73:22
76:24  77:3
77:7,11,15
77:23,24
80:17  83:3
83:5  84:13
84:14
87:20
94:15,18
99:22
100:16
103:23
104:3,7
109:25
110:5
116:19,20
117:10,22
**calling**
65:16
80:15
94:23
**calls** 77:3
94:20
103:10
**calorie**
49:24
**Cameron** 78:4
78:5,9,12
78:13,18
78:20  79:2
79:5,7
83:16,18
83:19
**capable** 88:4
**CAPEZZA** 2:9
**Capitol** 2:16
**card** 68:19
**cards** 51:20
53:10  67:8
68:12,25
**care** 13:5
39:22  40:8
40:19
48:14  49:2
118:5,8,10

121:22
122:2
**cares** 90:23
**Carol** 80:17
80:19  81:5
81:8,17,19
81:21  82:3
83:2,21
122:17
**case** 9:10,13
9:16,24
10:3,6,17
**Cassata** 1:9
1:15  4:1
4:11,25
5:1  6:1
7:1,20  8:1
9:1  10:1
11:1  12:1
12:19  13:1
13:8  14:1
15:1  16:1
17:1,22,23
18:1,2
19:1  20:1
21:1  22:1
23:1  24:1
25:1  26:1
27:1  28:1
29:1  30:1
30:19  31:1
32:1  33:1
34:1  35:1
36:1  37:1
38:1  39:1
40:1  41:1
42:1  43:1
44:1  45:1
45:6  46:1
47:1,25
48:1  49:1
50:1  51:1
52:1  53:1
54:1  55:1
56:1  57:1
58:1  59:1
60:1  61:1
62:1  63:1
64:1  65:1
66:1  67:1

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

| | | | | |
|---|---|---|---|---|
| 67:21 68:1 | **cell** 58:3 | 105:7,11 | **clarific...** | 35:6 36:12 |
| 69:1 70:1 | 70:8 | 118:17,25 | 46:4 | 41:23 |
| 71:1 72:1 | **CELLI** 2:4 | 122:6,6 | **clarify** | 42:20 |
| 73:1 74:1 | **Center** 116:7 | **checked** | 18:12 | 70:15 |
| 75:1 76:1 | 116:9 | 52:22 | **class** 47:13 | **common** 39:13 |
| 77:1 78:1 | **certific...** | **checks** | 47:15,19 | 41:11 |
| 79:1 80:1 | 3:4 20:11 | 104:21 | **clean** 31:14 | 65:19 |
| 81:1 82:1 | **certified** | 120:10 | **clear** 55:21 | 67:23 68:6 |
| 83:1,12 | 20:8 | **chest** 40:13 | 91:22 | **communic...** |
| 84:1 85:1 | **certify** | 51:7,14 | 113:21 | 23:24 |
| 86:1 87:1 | 124:6,10 | 52:17 | 116:22 | 27:17,24 |
| 88:1 89:1 | 126:19 | 53:22 | 117:8 | 29:7 |
| 89:7 90:1 | **CFH** 1:7 | 54:14,16 | 121:8 | **complain** |
| 91:1 92:1 | **chair** 57:11 | 55:22 | **click** 74:9 | 61:1 78:2 |
| 93:1 94:1 | 57:12 | 56:19 | 105:6 | 78:5 79:15 |
| 95:1 96:1 | **change** 25:20 | 57:21 | **clicked** | 93:5,19 |
| 97:1 98:1 | 35:2,13 | 58:10 | 73:21 | **complained** |
| 99:1 100:1 | 37:20 49:5 | 63:23 | **clinic** 15:20 | 55:21,24 |
| 100:17 | 57:17 93:3 | 64:23 | 16:10 | 57:21 |
| 101:1 | 104:14 | 66:14 71:3 | 19:18 | 64:23 |
| 102:1 | **Changed** | 71:21 78:2 | 26:12 | 66:14,18 |
| 103:1 | 126:2 | 78:24 80:5 | 38:15 49:9 | 80:5 83:15 |
| 104:1 | **changes** | 81:13 | 64:10 | 83:22 84:2 |
| 105:1 | 25:18 46:2 | 83:15,22 | 75:20 | 84:7 |
| 106:1 | 104:9,17 | 84:3,24 | **clinical** | **complaining** |
| 107:1,9,16 | 118:15 | 85:17 86:3 | 48:25 | 58:9 63:15 |
| 108:1 | **chaotic** | 88:19 | **closed** 31:13 | 78:19 |
| 109:1 | 43:17 | 89:10 91:2 | **college** | 88:22 |
| 110:1 | **character** | 93:5,9 | 13:13,15 | 89:10,13 |
| 111:1,5,11 | 106:16 | 96:22 97:2 | 13:16 | 91:2,5,10 |
| 112:1 | **charge** 19:12 | 97:23 | 15:13 | 91:13 |
| 113:1 | **charged** | 104:12 | **color** 57:9 | 96:18,20 |
| 114:1 | 17:13 | 108:23 | **column** 28:16 | 96:22 97:2 |
| 115:1 | **charges** | 109:2 | 39:2 | 110:7 |
| 116:1 | 17:16 | **choice** 31:8 | **come** 15:24 | **complains** |
| 117:1 | **chart** 35:21 | **chore** 53:23 | 18:24,25 | 104:11 |
| 118:1 | 35:23 36:2 | 54:2,19 | 33:3 41:24 | **complaint** |
| 119:1 | 36:5,20 | 57:16 | 55:3 58:14 | 23:3 25:14 |
| 120:1 | 39:17 | **chores** 53:23 | 58:16 | 26:7,16 |
| 121:1 | **charting** | **chose** 31:16 | 61:12 | 30:12 |
| 122:1 | 49:12 | **chronic** 26:9 | 63:18,21 | 37:23 79:4 |
| 123:1 | **charts** 35:3 | **circle** 59:16 | 64:7 68:11 | 93:9 112:2 |
| 125:4,8 | 35:7,20 | **circumst...** | 70:13,16 | 116:3,6 |
| 126:1,19 | 36:13,17 | 19:12 | 73:25 96:3 | **complaints** |
| 126:22 | 36:23,25 | 115:18 | 102:16 | 22:24 23:5 |
| **cause** 15:15 | **check** 58:14 | **CIT** 16:16,18 | 106:4,10 | 26:9 40:13 |
| 15:19 16:6 | 62:10 | 16:20 17:7 | 117:25 | 50:17,21 |
| 18:25 | 72:16 | **Civ** 1:7 | **comes** 20:13 | 50:24 51:3 |
| **celebrate** | 94:21 | **clammy** 57:10 | 105:25 | 51:15,22 |
| 11:12,23 | 104:25 | 67:5 | **coming** 8:15 | 53:16 |

54:10 63:5
63:16
64:13
78:15
79:22
80:10
81:17 82:2
82:4,11,16
82:21
84:12 86:3
86:17,20
86:23 87:5
88:14,16
88:19
93:13
102:25
107:3
108:20
110:15,20
112:5
121:10
**complete**
24:19 25:4
53:23
54:15
126:20
**completed**
42:4,6
44:15,22
**completing**
24:21
**complying**
14:14
**component**
20:11
**concern**
23:12 25:5
**concerned**
50:10
**concerning**
9:12 10:13
11:6,9
12:22
20:22
22:20
23:19 47:3
94:16
110:15
**concerns**
25:9 48:21

102:24
**condition**
21:10 55:5
66:5 93:14
94:16
**conditions**
27:4
**conducted**
34:12
**confiden...**
89:6
**confidently**
27:10
**conflict**
123:13
**connection**
11:16
19:23
33:21
45:17
**considered**
32:8
**contact**
60:18
**contacted**
24:15,16
Continued
122:15
**continuing**
20:10
**continuo...**
14:10
48:21
**convenient**
44:11
**conversa...**
10:8 49:20
49:22 81:5
96:8,9,16
99:7
109:15,17
117:9,19
**conversa...**
10:16,19
50:8,12
110:14,19
121:9
**convicted**
17:10,12
18:14 19:4

**copy** 33:4
75:19
**correct** 7:23
7:24 8:19
13:2,3
18:10 19:5
19:6 23:9
23:10,17
26:7,17,18
29:11
30:18
31:23,24
33:12,15
33:23
34:17
35:18 37:5
37:18 38:6
39:23 40:6
43:11 44:5
45:9 47:17
48:12,15
48:16,18
48:24
51:19
52:18
53:25
55:11,22
55:23,25
56:2,4,11
59:10,11
61:10,11
62:15 65:4
66:15,16
66:19,21
66:22 67:2
67:10 68:4
68:7,15,16
68:20
69:25 70:2
75:24 76:4
76:25 77:4
79:9 81:18
83:17 84:5
84:8,9,25
85:22 95:4
95:16
100:5
101:5,6
102:7,21
103:7,11

103:12,20
103:24
104:7,8
105:22
107:23
110:11,12
112:8
113:3,11
113:12,14
114:11
116:4,5,20
116:21
117:11,12
117:15
119:8,10
119:23
120:3,4
126:21
**Cory** 1:8
9:11,23
86:19
**coughing**
22:8
**counsel** 3:3
4:2,7 6:23
7:22 8:6
**counting**
32:21
**couple** 6:3
45:7 50:23
51:10,14
107:15
111:7
122:13
**course** 20:23
**court** 1:2,25
3:13 4:2,4
6:8,18
19:14
**courtroom**
5:17
**cover** 9:18
19:8 95:17
103:17
106:12
**covered** 9:18
10:10
47:13
**COVID** 14:19
**CPR** 20:5

**credibility**
90:12
92:14
**credible**
90:11,16
115:11
**credits**
13:24 14:2
**crime** 19:5
**criminal**
18:14
**current** 13:4
**currently**
12:25
31:21

---

**D**

**D** 31:13
125:2
**daily** 26:20
31:7
**Danyo** 1:17
4:22 124:4
124:18
**DAR** 23:24
24:8,10,13
24:19,21
24:24 25:4
25:9,15
32:25 33:4
34:25 35:2
35:4,4,6
35:19,25
36:4,7,11
36:13,20
36:21
41:20 42:3
42:6,10
43:21 44:3
44:9 45:21
46:15,18
46:22,23
47:4,9,10
47:13,15
47:17,20
47:22 49:4
49:7 65:11
75:17 76:2
76:20
77:15

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

103:16,22
104:2,6
**DARs** 35:8
36:4,16,24
37:15 38:4
44:20
**DaSilva**
102:11
**date** 18:3
24:14
34:10
58:25
73:19
107:21
**dated** 34:8
125:10
**Dave** 110:22
**day** 25:10,12
32:5,8
36:19
41:25 42:7
53:7 54:19
55:13,14
55:15
64:19,20
74:14 75:5
75:10
81:15 96:4
96:6 99:20
101:4
123:22
124:15
126:23
**days** 9:17
31:3 55:12
60:23,24
76:14
100:10
**DDSCTA** 27:6
38:8 41:19
**DDSCTA1** 13:5
13:7 29:10
29:14
**DDSCTA1s**
48:17
**DDSO** 17:3
**death** 11:5
26:4 27:5
27:12,23
28:6,20

33:22 44:7
46:20 47:3
50:24
82:18
83:14,23
84:4 91:23
92:2 94:10
95:2,20,23
97:9,12
98:6
101:16
102:19
103:4,9,19
104:3,5,10
105:16,21
118:14,18
118:23
120:12
122:5
**defendant**
2:10 4:20
7:19 9:9
111:18
**defendants**
1:10 2:15
4:16,18
9:7 107:18
107:20
108:18
109:10
110:9
125:14
**definitely**
12:2 66:8
**degree** 13:20
13:22,25
14:3
**degrees**
13:16
112:25
**Delhi** 13:21
**denied** 77:18
**department**
98:9 118:2
118:4
**deposed** 9:15
**deposition**
1:15 3:5
3:11 5:4,6
8:5 9:21

10:14,20
**describe**
14:24 23:2
29:12 57:7
63:20 67:3
104:24
105:23
**described**
121:11
**describing**
88:4
**Deshawna**
110:14
**details**
109:18
**developm...**
13:5 16:17
17:2
**diagnose**
21:10
**diagnoses**
30:6 38:22
38:23
**diagnosis**
27:4
**died** 11:2
26:13 29:9
52:8,10,13
52:16 54:9
54:13 55:9
55:21
56:18,22
56:25 57:4
60:12
61:13 63:2
66:13,17
66:20,23
67:4,11
68:5 69:21
69:24 70:3
70:21
72:20 73:3
73:7 75:23
77:12 78:6
78:10,16
79:11,16
79:20 80:6
80:9,16
81:6 82:12
83:4 85:21

93:4,24
94:4,17
98:14 99:8
101:24
103:14
104:15,18
105:15
121:15
**diet** 49:24
50:2
**dietician**
39:10,25
40:9 49:21
**different**
17:3 23:23
24:22 29:6
42:17,18
60:23,24
115:15
**differently**
36:4
**difficulty**
40:2 70:11
81:12
**Diggs** 110:14
**diligent**
106:5,8,18
106:23
**dining** 54:24
55:2
**dinner** 69:16
**direct** 39:22
40:8,19
48:14
99:11
118:5,8
121:22
122:2
**directed**
100:18
103:22
104:2,6
118:13
**direction**
39:15
120:7
**directly**
51:15
83:19
104:15

**disabili...**
112:25
**discipline**
14:16
45:16
**disciplined**
14:12
**discuss** 79:4
79:19
107:2
**discussed**
41:6
118:15
122:17
**dismissed**
14:21
17:17
**displaying**
41:5 97:14
**displeasure**
98:9
**distraught**
98:7
**distress**
105:3
**DISTRICT** 1:2
1:2
**doctor** 19:15
19:17
**doctor's**
49:2
**document**
17:22,24
17:25 18:6
18:12 25:8
25:15 26:6
26:10,15
34:19
38:12,18
38:21
40:23
41:14
45:20
46:21
47:25 49:4
59:2 64:13
73:9 76:2
76:16
77:10,14
102:15,24

```
102:25              30:17,23          EHRs 103:3          59:9 81:19         58:22,23
107:17,19          31:2,6,9          either 61:2         95:19,22           65:13
125:8,13           31:16,19          67:12               106:15             73:13,15
documented         31:21,23          97:19               108:2              73:17 99:4
24:24              31:25 41:2        98:24               110:10             101:3
25:23,25           43:7,12           100:9               111:11             102:5,6
47:3 48:22         45:7,11,14        101:25              evenings           107:16,19
102:23             59:12             electronic          27:22 32:6         125:8,9,11
documenting        60:11 79:8        102:22              64:12              125:12,13
103:10             79:12 86:9        Elise 1:7           100:3,10           expect 106:4
documents          87:11,16          86:7,12             event 11:16        106:11
8:8 9:3            89:9,12,24        emergency           12:15,16           experience
23:19 38:8         92:18             104:12              24:23              14:25 88:7
44:21              95:12,16          EMERY 2:4           eventually         90:15
doing 29:17        101:8             emotional           64:7               120:10
53:24 54:7         105:20            96:11               everybody          explain
69:3 90:23         106:21            employed            35:5 36:11         19:16
92:25              108:8             12:25               87:20              72:10
104:25             112:3,17          16:19               everybody's        explicit
120:10             113:5             employment          35:22              119:6
122:5              124:2             14:25 18:9          everyone's         expressed
door 62:14         125:2,6           19:2 20:17          28:14              98:8
62:17,18           e-mail 12:18      ended 19:14         exactly            extremities
66:10 71:5         12:22             35:6 36:12          117:21             22:11
105:5              e-mails           36:22 37:3          exam 21:4,7        72:17,20
119:19,22          12:22             enforce             EXAMINATION        eyes 67:6
120:6,8            earlier           115:22              4:24               ─────────────
dramatic           48:25             enforcing           111:10                  F
57:17              62:13             115:23              122:15             F 124:2
draw 34:19         79:22             engage 29:16        examine            F-e-d-o-...
73:20              97:10             engaging            70:25 71:3         12:11
drawing            102:18            65:20               examined           facilities
18:13              121:11            ensure 32:22        4:23               30:14
48:13              122:4,17          43:21               example 6:15       facility
67:16              early 41:24       44:15               46:18              16:24
drink 11:10        43:10             122:7               91:24              114:10
11:12              eat 50:4          ensuring            exams 20:19        facing
drinks 11:23       eating 29:19      44:3,22             excess 54:5        119:18
12:16              49:25             enter 118:18        excessive          120:3,5,6
drowsy 69:12       education         entitled            50:4               120:12
DTLs 89:22         20:10             38:18               exchanged          fact 4:11
duly 4:22          educational       124:8               11:15              77:10
duties 29:13       13:11             environment         exhibit            factors
29:20,23           effect 3:12       42:21               17:21,25           50:15
30:2,5,8           5:17 47:2         ESQ 2:7,12          34:5,7             facts 47:22
32:11              effectiv...       2:18,19             38:17 46:6         failed 20:18
─────────────      37:21             Estate 1:4          46:17              failure
     E             EHR 33:5          Ethan 110:18        47:24 48:2         21:14,17
E 2:2,2 4:21       102:21            evening             48:11,20           21:24,24
12:7,12            103:2             36:19 59:7          53:12              22:3,6,9
```

```
22:12                    87:22                    112:7                    69:15                    78:21
fair 7:12,17             88:14                    125:9                    93:20                    getting
  22:16                  feeling                  first-aid                Friday 52:23             11:17
  23:12                    50:18,21               20:9                     53:9 54:5                92:25
  33:18                    55:19                  five 107:9               55:13,16                 give 90:9
  36:25                    71:16,23               flag 28:9                56:18,18                 100:25
  37:10 44:4             72:13,25               flagged                  56:21,25                 given 5:13
  56:10                  79:15                    18:25                    57:4,6,8                 5:17 27:8
  57:18,19               80:23 84:7              float 58:2               58:6 60:13               37:9 110:8
  59:6 63:4              87:18 90:7              106:12                   61:2 64:19               126:20
  75:25 89:7             94:24                   floated                  66:7,13,17              Glenwood
  91:25                  115:24                  95:17                    66:20,23                 97:19
  93:20                  fell 51:19              Floor 2:5                67:4,11,12              go 6:3 11:11
  112:4,23               51:20 53:9              flow 43:18               67:13                    16:2 31:16
  113:7                  felt 63:18              focus 53:6               68:13,19                 50:4 53:3
  115:11                 63:20                   focused                  69:21,24                 62:20
  118:3,7                98:10                   47:21                    70:3,20                  64:10
  119:7                  114:16                  49:11                    72:19 73:7               66:11
faked 93:16             116:2                   106:24                   76:9,13,17              70:18 72:9
false 115:5             Fifth 2:5               focusing                 76:18,19                 72:25 74:5
  115:6,8                file 116:6              20:2 57:20               76:21 77:6               84:14 91:6
familiar                 filed 33:3              75:8                     77:7,14                  92:16
  20:24                  filing 3:4              follow                   79:14,16                 98:13,19
  38:12,21               fill 28:20              115:13                   79:20 80:5               104:12
  49:11                  filled 24:2             follow-up                80:9,12                  105:7,9
family 65:25            29:4 46:14             111:19                   110:10                   116:24
  94:11,15               filling                 122:14                   111:2                    117:14
  121:14                 23:19                   followed                 front 52:7               goes 6:4
far 19:13               28:25                   117:20                   72:24                    23:8 49:6
  29:18                  fine 30:21              following                119:24,25                49:8 69:7
Farm 15:5,12           finish 6:6,8            28:10                    functioning              103:2
farther                  6:11 54:12             102:19                   112:13,18                going 6:3,6
  72:25                  66:21 81:4             follows 4:23             114:2                    6:7 7:10
fat 50:5                finishing                food 50:5                115:25                   11:11 15:7
father 21:18            53:7 56:24             force 3:12                further 3:7               17:18
fatigue 22:3           fired 15:15             form 3:8                 3:10 111:4                18:24,25
  40:3 41:6             15:21,23                29:6                     123:17                   19:14 27:9
February                 16:5                    116:11                   124:10                   33:8 34:4
  1:12                   first 4:22              formally 4:3             ──────────               34:4,18
  124:15                 6:5 8:24               forms 23:19                    G                   36:23
Fedorwich               34:6,8                 32:23                    gain 49:15               38:16
  11:25                  35:13 38:9             found 19:14              49:17 50:9               41:25
  12:10                  48:11 52:4             four 60:20               50:11                    43:25 46:5
feel 7:6                53:6 63:9               60:22                    game 68:12               46:10
  50:25                  63:11                   76:24                    68:19,25                 47:23
  52:11                  73:21 89:2             four-page                69:5,14                  53:13
  53:21,21               93:5,8                 38:17                    general 2:15             58:21
  54:11,16               99:11                   frame 91:16              32:14                    60:16
  55:5 56:13             101:8                   free 7:6                 50:12                    68:10
  58:11                  109:9                   frequently               generalized              73:12,14
```

79:6 80:24
91:7 99:10
102:5
107:16
110:13
111:6
113:15
116:13
**good** 4:25
53:21,21
54:16
69:19 72:8
88:14
99:16
111:11
**graduated**
13:12
**Great** 15:11
**green** 35:3,7
35:20,21
35:22 36:2
36:5,13,17
36:20,23
36:25
**ground** 6:4
**group** 11:22
112:11,18
112:21,24
**guess** 15:24
**guy** 50:6
**guys** 41:12
41:25
106:10,24
116:2

**H**

**H** 4:21 60:5
125:6
**hall** 108:11
**hallway**
28:22,24
29:3 54:24
54:25
55:15 60:6
79:17 80:7
**hand** 71:6,8
124:15
**handed**
100:18
**handle** 25:19

**handwriting**
18:5
**happen** 7:5
**happened**
17:6 27:20
37:10
42:16
68:19,22
87:21 88:5
96:6 110:2
117:18
**happening**
42:8 98:11
**happy** 7:7,15
87:23
**head** 6:18
58:9
**heads** 115:20
**health** 23:12
30:6,9
48:21
50:15
53:14
93:20
112:4
121:10
**healthy**
29:24
53:16
**hear** 6:22
51:10,13
78:5 84:15
84:20,23
85:3 94:6
95:7
111:12
**heard** 17:8
51:17 78:2
78:15
84:16,22
93:5
**hearing**
97:23,25
**hearsay**
92:16
**heart** 21:13
21:17,19
21:23,24
22:3,5,8
22:12

96:24
**held** 1:16
**help** 29:20
29:23 30:2
62:24
65:17 76:5
89:6 102:9
102:15
**helped** 38:8
**helpful** 28:2
46:4 102:6
**hereto** 3:3
**hereunto**
124:14
**Hess** 25:13
25:16
34:21
53:13,18
54:18,21
60:17,22
61:16,23
62:8 67:16
67:20,24
73:23 74:2
74:7,10,13
74:16,19
74:22 75:2
99:13,17
99:25
100:7,11
103:10
**Hess's** 61:20
62:2
**Hickey** 2:18
4:15,15
7:25 14:23
41:18
78:17
80:25
101:17
**high** 13:12
15:12
112:13
114:2
**high-fun...**
88:6
115:14
**higher**
115:25
**highest**

112:17
**Hildonen**
2:19 4:17
4:17 7:25
88:10
93:22
**Hill** 2:9,12
4:19,19
44:10
91:15,20
93:23
111:10,12
122:11
**hired** 14:6
24:11
47:12
**hires** 43:18
**history**
35:25,25
71:11
**hit** 90:12
**hold** 55:20
100:25
102:3
111:16
**home** 112:11
**hopefully**
6:4
**hospital**
15:6 26:12
49:6,7
84:14
98:13,19
110:6
116:25
117:15,24
**Houck** 78:4,5
78:9,12,18
78:20 79:2
79:5,7
83:16
**hour** 69:11
**house** 12:7
12:12
30:17,23
31:2,4,6,9
31:13,14
31:16,19
31:21,23
31:25 32:9

32:10,12
32:15,25
35:16,22
36:22,22
41:3 42:15
42:20,25
43:7,12,20
45:7,11,14
59:12
60:11
66:25
67:23 68:6
73:22 74:9
77:23 79:8
79:12
80:21
84:17 86:9
87:11,16
88:5 89:9
89:12,24
92:6,18
93:11
95:12,13
95:14
97:20
100:19
101:8
103:21
105:20
106:19,21
108:8,16
109:5
112:3,17
113:5
114:14
117:23
**houses** 23:22
30:22
39:17
87:22
106:13
**HUDSON** 1:25
**human** 13:14
14:2 21:8
**hurt** 51:8,14
52:17
54:14,16
78:24
85:17
**hurts** 53:22

71:21
hyperten...
40:12

_____
**I**

idea 106:4
identifi...
18:3 34:9
58:24
73:19
107:21
identify
21:13
102:9
illness
96:13
97:14
immediately
92:5
104:13
impacted
105:24
implemented
89:15
103:3
104:10,14
importance
27:22
33:24
imposed
14:20
in-house
27:19
inaccurate
18:22
inaudible
69:9 79:23
incident
68:21
include
23:11
27:24
32:16,24
included
24:10,13
27:2
includes
48:17
increased
40:2

independent
17:5
indicate
59:20,22
60:3
indicated
83:20
individual
35:22
37:21,23
38:2 40:2
42:4,7
49:6,8
77:9 87:15
92:15
98:12
104:11
105:2,6,7
105:12
112:6
118:19,24
119:3,5
122:7
individu...
24:14
39:10
individuals
20:9 26:9
28:15
29:16,21
29:24
31:15
32:14,22
38:10
39:14
48:24 90:6
98:5 106:9
106:14
110:16
112:2,16
112:24
118:10
119:9,13
information
25:21
26:24 27:2
99:20
informed
25:13
initial

101:9
initially
14:7 17:6
117:19
injury 23:5
instruct
63:7
instructed
6:24 41:15
instruction
118:8
interested
124:12
interfere
5:24
internal
32:18,19
32:24
interpre...
115:8,12
interrog...
8:9,12
interview
17:9 33:9
34:6,8,12
37:9 73:16
73:18
76:23
99:11
125:10,12
interviewed
8:18 25:12
interviews
8:25 33:11
33:13,20
intimate
94:13
investig...
33:21
115:3
investig...
99:16
investig...
33:16,25
119:16
issue 37:4
issues 24:25
24:25
28:17 30:3
30:9 35:9

37:16
92:20
93:17
106:12
121:2
it.' 55:2

_____
**J**

J 1:8
J.B 32:6
35:15,17
36:3
J.M 1:4 5:2
James 32:6
35:17
43:12
108:25
109:4
January 90:2
113:5
Jennifer
10:2 86:22
86:24
jibe 87:3
job 15:16
16:6 38:8
66:3
104:22
106:3
Joel 95:11
joined 43:13
Joseph 1:17
4:22 124:4
124:18
Josh 86:16
JOSHUA 1:8
journal
27:19
July 14:8,10
jump 116:13
jumping
90:13
junior 87:19
114:17
junk 50:5
Justice
116:7,8

_____
**K**

K 2:19 4:21

60:4
Kasey 2:19
4:17
kasey.hi...
2:19
Katherina
1:8,15
4:11 125:4
126:1,19
126:22
Katie 11:20
11:24 12:2
12:14
97:10,13
97:16,18
97:22
Katie's 12:3
keep 15:7
29:20,23
67:6
kept 34:22
35:9 36:25
37:16
38:14
43:22 44:4
119:13
kicked 69:12
Kim 55:14
kind 25:14
25:19,19
28:17 49:5
65:14
102:25
113:19
117:24
kitchen 60:5
knew 33:25
69:17
Knight 99:21
know 6:7
7:15 10:10
10:11,12
10:24 12:2
19:9 21:16
30:20 32:3
32:5 37:6
42:8,16,19
44:7 45:10
46:25 47:6
58:6 59:17

59:23
66:10,10
68:25 69:4
69:4,5,6
70:15,17
76:12
79:22
81:24 82:6
82:8,9,22
82:24 83:3
83:5,6
87:7,9
88:5 89:2
90:12
96:17,18
96:19
98:25
99:18
100:13
101:12,19
101:20
102:12
106:2,10
106:14
108:9
109:7,20
109:22,23
111:21
113:15,16
115:4,19
115:19
116:17
120:21
122:22,25
123:3,11
**knowledge**
32:11
80:11 85:2
86:2,14
90:24
**Kominsky**
11:20 12:4
**Koterba**
110:22

——— **L** ———

**L** 1:8
**larceny**
17:10
18:19

**late** 90:5
91:18 92:4
92:18
106:22
112:10
**lately** 92:25
**lawsuit** 7:20
9:7 111:18
**lawyers** 6:23
10:17,20
111:8
**lay** 53:3
62:20
66:11
70:18 74:6
**lazy** 93:2
**lead** 15:6
**leading**
50:23
109:18
**learn** 22:23
106:3
**learned** 95:2
103:9
**leave** 9:17
9:18 89:24
**led** 109:22
**left** 39:7
42:17,23
89:9,12
110:25
119:18
120:3
**legs** 72:22
**Leisa** 10:5,9
96:2,10,25
**let's** 24:8
38:7 60:15
67:15 81:2
102:14,16
**letter** 89:2
**Licari**
110:18
**license**
13:18
**lieu** 4:3
**life** 11:12
11:23
29:16

49:14
51:11,14
94:13
105:11
107:3
**light** 105:5
118:24
119:5,6,10
119:13
**liking**
115:23
**limitations**
113:2
**limits** 23:20
76:13
**line** 58:13
126:2
**lines** 115:21
**list** 26:20
**listen** 8:25
**little** 33:5
35:4 36:10
42:18
65:20
68:10
113:19
115:15
**lives** 112:10
123:3,11
**living** 60:5
65:19
**LLP** 2:4,9
**log** 23:25
27:17,24
29:7
**long** 13:7
43:7 71:22
109:14
**longer**
112:10
**look** 39:2,24
56:12
60:15
63:18,22
67:15
70:13
72:22
107:10
108:2
**looked** 53:2

56:16 57:5
57:7 62:18
67:6 70:16
70:20
85:10
**looking** 39:6
48:19
61:15
72:23
101:19
108:17
109:9
119:21
**lose** 50:18
66:11
**lot** 26:8
42:19
43:18
49:17
50:14,24
72:5 82:22
92:22
93:13
105:20,25
106:11
**LR** 60:5
**lungs** 21:4,7
70:25
**lying** 72:2

——— **M** ———

**M** 1:7 59:14
59:25,25
101:8,9,18
102:9
**M.A** 87:13,17
87:19 88:4
88:12,15
88:18,21
89:5 90:7
90:14,15
91:12 92:8
93:10
98:17
112:7,9,12
112:17
113:14,20
113:22,25
114:13,23
115:10,19

116:6,10
**M.A.'s** 89:2
114:4
**M.S** 90:18,20
90:25 91:4
91:9 92:11
98:8,17
**MAAZEL** 2:4
**machine** 15:4
**majored**
13:13,14
**making** 50:17
50:20
54:10
63:16
69:12
82:10,21
88:13
112:5
**manager** 15:5
32:10,12
36:22
103:21
**manager's**
43:20
**mandatory**
14:14,17
**MAR** 23:24
25:20 26:2
26:19 27:3
27:7,14
35:8,9
37:15,16
38:23,25
45:23,24
45:25 46:3
46:8,15,24
90:6
**March** 42:12
45:12
91:19 92:4
92:19
106:18,22
113:6
**mark** 34:5
58:22
73:14
107:16
**marked** 18:2
34:9 38:17

46:6,17
47:24 48:2
58:24
73:18
101:2
102:4
107:21
**marking**
17:21
**Marlena**
99:20
117:4,5,9
**Marlene** 99:2
100:4,23
100:24
**marriage**
124:11
**MARs** 24:3,4
41:2 44:15
**materials**
47:18
**Matt** 11:24
12:10
**matter** 124:8
124:12,13
**McGINN** 1:8
**McKown** 10:5
10:9 96:2
96:10,25
**Mead** 15:13
**MeadWest...**
15:3
**mean** 7:10
16:18
19:17 23:2
23:21
25:11 28:8
30:7,25
32:19
35:20
42:24
43:16 50:6
50:16
67:22
96:21
99:19
101:23
106:8
108:15
**Meaning** 65:2

**means** 20:7
**meant** 37:19
**med** 13:13
20:11,14
20:23
25:18,20
46:2 49:5
58:19 60:8
62:17,18
66:10 71:4
75:20 93:2
**med-cert...**
20:5,7,15
**medical** 16:8
16:11 20:3
21:10
22:14
24:25 25:5
25:8,14
26:7,16
27:4 35:7
35:9,24
37:14,16
37:22 49:9
64:10
82:10
92:20
93:13,16
94:16
102:24
107:6
110:15
118:9,10
**medication**
25:21,22
26:25
**medications**
5:23 15:24
19:13 20:8
26:20
37:20
**meds** 19:22
27:8 39:20
58:19 60:4
69:12
**meeting** 8:7
**Melanie**
98:25
**member** 80:14
85:23,25

99:6
**memory** 62:14
101:15
**mental**
112:25
**mention** 72:6
97:22,25
**mentioned**
15:10
27:17
28:12
42:23 67:8
83:13,25
84:6 85:24
86:2 97:10
102:18
103:9
105:19
111:24
112:6
113:4
118:12
**merged** 16:16
**mess** 33:5
**messages**
11:6,7,9
11:15
**Michael** 1:9
9:11,15
99:23
102:11
109:23
**Mid** 112:10
**middle** 34:20
53:20,24
72:5 94:7
**Mike** 32:4
36:21,24
82:17,20
84:8,12,14
84:20,23
84:25 85:4
85:5,8
96:2,5
103:21
108:7,13
108:19,23
117:16,20
117:21
**Milford** 15:5

15:12
**mine** 31:4
**minimum**
115:9
**minute** 35:13
**minutes**
107:9
**Mirlaine**
109:12
110:24
116:16,23
117:3
**miscommu...**
36:18
**missed** 99:14
**mom** 84:13,13
94:17
98:23
99:21,22
100:16,16
109:25
110:3
116:18,19
116:24
117:10,14
**moment** 38:7
73:2 111:4
**Monday** 60:19
85:20,21
**monitor** 30:5
**Monitori...**
39:3
**month** 39:20
42:11
**monthly**
39:10,18
39:18,19
**months** 43:9
45:7 93:24
94:4
**morning** 95:3
95:5 96:3
100:12
**mother** 5:2
10:21 99:7
109:16
**move** 55:3
102:14,16
**moved** 31:14
108:16

**Moving** 54:18

___

## N

**N** 2:2 4:21
124:2
125:2
**name** 4:25
12:3 24:15
59:12,14
60:2 79:24
89:2 101:8
101:9
108:5,13
109:11
110:17
111:11
112:7
116:17
122:20
**named** 83:21
83:25
87:13
98:25
111:18
112:7
**names** 28:15
28:16 90:9
**nature** 88:15
**nausea** 40:14
**nearly**
107:10
**neck** 40:15
**need** 6:16,19
7:14 29:17
**needed** 63:18
**never** 17:8
53:16
100:23
103:22
120:20
121:24
**new** 1:2,19
2:6,6,11
2:15,17
42:19
43:18 44:8
87:10
102:21
105:20
106:3,11

```
109:13              108:12           96:5 98:18      104:3,7          73:13,16
123:4               noted 55:14      99:6,24         117:22           73:18
124:5               123:18           100:18,19       118:2,4          76:23
night 28:25         notes 18:18      103:21          _____     99:11
51:19 72:5          23:24 24:8       108:7,19              O          119:16
72:7,8              24:24            108:23                           125:9,12
76:18               25:15            109:23          O 26:13          okay 6:9,13
87:10 94:7          32:25 33:3       110:8            124:2           6:20,21
97:11               33:4 34:22       116:25          o'clock 69:9     7:2,7,14
100:10              35:2,19,25       117:2,17         69:10 93:3      10:24 19:3
101:23,25           36:20            Novack's         93:3           19:7 30:20
102:2,7             38:10            108:13           110:25          34:18,25
109:10              41:20            number          oath 5:9         35:12,17
120:24              42:11            122:21           126:19          35:21,21
no's 6:19           43:21 44:3       nurse 20:13     obesity 39:7     36:10 38:7
nod 6:17            44:9 45:21       22:21           object 4:8       42:15
14:13,15            46:22 47:9       23:16 39:9      objection        44:25
nonphysical         47:21            39:25 40:9       7:2 14:23       45:25 46:7
114:12              49:10            40:13,20         41:18           46:10,14
normal 11:14        65:14            41:8,13,16      78:17            46:16,25
57:17               75:18           65:21 86:9       88:10           54:8 56:16
59:23               107:10           107:4           93:22,23        56:17
63:17               notice 1:16      118:9          objections       57:20
76:13,14            14:16            nursing         3:8 6:23         59:20,25
76:15               72:19           22:25 23:7       91:15           60:10,15
normally            noticeable      26:10,15        observation      61:3 62:8
100:10              49:18            27:25           24:15           62:8,19,23
NORTHERN 1:2        noticed         37:25           observe 78:9     63:10
Notary 1:18         92:21           38:10,13        78:19           70:15
3:11 4:22           notified        38:18,24         106:17,22       73:23 74:2
124:5               26:11           39:19            121:21          74:5,7,13
126:25              52:21,25        44:17,19        observed         77:25
note 24:10          57:23           49:10 50:9      40:10,20         82:19 83:7
25:4,9              84:25 85:9       50:13 52:2       41:4 81:8       83:20 89:7
27:21 35:7          98:22           52:21,25         106:23          99:25
37:15 42:3          notify 22:25    57:23 58:8      obviously        100:11,13
42:6 45:25          23:7            58:16            120:12          101:14
46:12,15            103:15,15       60:11           occasions        102:14
46:18,23            notwiths...     63:18,21         94:14           107:8
47:4,10,13          7:2             65:16 70:4      offense          108:17
47:15,17            Novack 1:9      75:18 79:6       18:15           110:18
47:22 49:7          9:11,12,15      80:15           office 15:7      111:3,12
64:21,22            9:20 32:4       81:21 82:2      Oh 70:17         111:17,22
65:11               36:21,24        82:3,7          73:13           111:23
75:17 76:2          82:17,20        83:3 85:2       OIA 8:9,18       112:6,12
76:18,20            84:8,13,21      85:9 89:22      25:10,12         112:16,23
77:15               84:23,25        98:9,22         33:8            113:4,9,13
91:15               85:4,5,8        102:23          OIIA 33:11       114:4,15
103:16,22           85:11,14        103:10,15       33:16 34:6       114:19,22
104:2,6             85:18 96:2      103:23          34:8 53:11       114:25
                                                    60:15
```

115:7,17
116:3,6,10
116:13,22
117:3,8
118:3,7,14
118:16,22
119:4,12
119:15,19
120:2,9,15
120:18,21
120:24
121:7,16
122:11
123:16
**old** 112:9
**older** 106:5
**Olivia** 25:13
**on-site** 49:9
**on-the-job**
106:2
**once** 42:7
52:21 77:7
119:22
**oOo** 2:21
125:15
**open** 67:6
115:12
**opened**
119:19,22
**operator**
15:4
**opinion**
47:21
**opposite**
120:6,8
**OPWDD** 12:25
14:6,9,12
15:2 16:13
16:24 17:3
18:9 20:3
20:4,21
21:4,10
22:15,20
23:18
30:13
116:4
122:18
123:7
**order** 69:2
**orders** 32:13

**organize**
36:4
**organized**
33:6
**orthostatic**
20:25
**OT** 59:19
**outcome**
17:15
124:13
**outside**
10:23
105:5
**overall** 32:9
53:15
**overindulge**
50:4
**overnight**
44:18
100:4
101:21,23
**overseeing**
43:25
**oversight**
32:14
**overtime**
59:22
**overweight**
50:15
**owned** 19:18
___
**P**
**P** 2:2,2
**P-110** 2:11
**p.m** 1:12
45:3,4
83:9,10
107:12,13
123:18
**page** 18:12
34:18,21
40:12
48:11,19
53:13
54:18
60:16
61:15,16
67:16
68:11
73:21

99:12
125:3,7
126:1,2
**pain** 40:14
40:14
55:22 86:3
**pains** 56:19
57:21
58:10
63:23
64:23
66:14 78:3
80:5 81:13
83:15,22
84:3,24
88:19
89:10 91:2
93:6,9
96:23 97:2
97:23
104:12
108:23
109:2
**pale** 67:5
**paper** 28:14
46:15
74:20,23
75:12,17
75:21
**paperwork**
28:23
**part** 20:23
41:19
47:15,18
81:20
104:22
**participate**
121:16
**particular**
106:17
112:7
**parties** 3:3
124:11
**pass** 20:8,14
31:3
**passed** 52:5
97:21
**passing**
67:14
94:13

**patient** 25:3
25:13
**patient's**
20:22 21:4
21:7
**patted** 62:19
70:17
**pay** 28:10
32:14
**Pearl** 2:10
**peers** 82:22
82:22
**penalties**
4:7
**penalty** 5:13
**pending** 7:17
**people** 33:3
42:19
63:23
105:20
106:3,12
**percent** 36:9
44:7
**perform** 20:9
**period** 42:19
118:13
**Periodic...**
86:14
**perjury** 4:7
5:13
**permitted**
66:2
**person** 12:9
28:22,24
29:3 58:12
58:19 60:8
101:12,22
**personal**
12:18,22
35:23,25
**personally**
21:18
65:18
**petty** 17:10
18:19
**phone** 58:2,3
70:8 94:12
99:21
100:19
109:16

110:4,8
116:19
122:25
**phonetic**
100:5
**photos**
119:21
**phrase**
112:13
**physical**
23:4
114:10
**physically**
23:5,9
56:16 57:5
64:24 67:6
72:24
114:7
**physicals**
74:9
**picked** 58:4
106:14
**picture**
109:19
**Pitch** 68:14
69:14
**Pittsfield**
15:6,20
**place** 36:7
37:7
105:10,14
**placed** 46:15
46:23
**plaintiff**
1:5,16 2:4
4:14
**Plaintiff's**
17:21,25
34:7 46:6
46:17
47:24
53:12
58:22,23
73:17
101:3
102:5
107:16,19
125:7
**plan** 35:24
38:13,18

38:24
**play** 68:14
  68:17,24
  69:5,17,22
  69:25
**played** 68:12
  69:14,16
**playing**
  51:20
  53:10 67:8
  69:6
**please** 4:2
  6:5 7:6
**point** 7:15
  36:16
  39:25
  48:20
  58:20 69:8
  103:17
**policies**
  102:19
**policy** 47:2
  47:8,11
  104:9,14
  104:17
  105:10
**possibility**
  69:13
**possible**
  24:20
  97:18
**possibly**
  11:24
  12:10 32:7
  40:25 69:8
  108:16
**potential**
  30:9
**practice**
  28:3,6
  103:19
  104:25
**practiced**
  47:20
**practiti...**
  65:21
**prepare** 8:4
  9:4
**present**
  31:22 79:7

79:10 80:4
  80:8,21
  84:2 109:4
**presenting**
  30:10
  64:25
**pressure**
  39:11
  62:10
**pretty** 53:16
  55:15
  63:24 98:7
**prevailing**
  37:3
**prevent**
  13:13
**previous**
  27:21
**previously**
  17:4 38:17
  46:5,17
  47:24
  55:14
  101:2
  102:4
  103:18
  105:19
**prior** 8:6,15
  12:15
  14:25
  16:13,15
  20:3 24:9
  25:16
  31:12
  37:11
  41:24
  67:13,13
  82:17
  83:14,23
  84:4 93:12
  94:10
  103:19
  104:3,5
  118:13,17
  118:23
  120:11
  122:5
**probably** 7:5
**problems**
  112:4

**procedures**
  48:6,10,10
**proceeding**
  4:9
**proceedings**
  124:7,9
**process** 44:8
**professi...**
  21:18
**program**
  102:21
**protect** 89:6
**protocol**
  39:13
  118:15
**provide**
  29:15
**providers**
  118:5,8
  121:22
  122:2
**providing**
  118:10
  120:19
**psycholo...**
  89:21
**Public** 1:18
  3:12 4:23
  124:5
  126:25
**punishment**
  14:20
**purposes**
  88:25
**pursuant**
  1:16
**put** 18:23
  27:7,13
  35:3,6
  36:13,16
  46:3,11
  49:24 71:6
  105:14
  114:9
**putting**
  47:21 71:8

———————
**Q**
**question** 3:8
  6:6,7,25

6:25 7:4,9
  7:17 18:13
  18:13
  60:22
  61:20 62:2
  111:21
**questioned**
  92:15
**questions**
  34:20
  107:15
  111:4,7,8
  111:19
  118:13
  122:12
**quick** 122:14
**quickly**
  106:11

———————
**R**
**R** 1:17 2:2
  4:21,22
  124:2,4,18
**raised** 25:5
  28:9
**range** 76:15
**RAYMOND** 1:8
**reacting**
  25:22
**reactions**
  25:19
**read** 27:22
  41:24
  126:2,19
**really** 42:22
  50:3 53:20
  72:8 81:14
  106:10,13
**reason** 5:20
  87:22,25
**rebid** 31:12
**rec** 89:14
  91:6,8
**recall** 11:25
  12:17
  19:13
  40:23 41:2
  41:14 42:9
  43:4 48:8
  49:19,23

51:12 58:5
  58:18
  61:14 64:9
  72:21
  73:11
  79:13
  80:13
  84:19
  88:20,23
  89:22 94:2
  94:9,14
  97:3,6
  99:9
  102:12,13
  104:19
  107:5
  108:9,21
  109:3,6,15
  114:2,6,21
  116:8
  119:15
  120:17,18
  121:4,5,6
**receive** 11:6
  13:16,22
  20:4,21
  21:6 22:19
  23:18
  45:16
**received**
  11:8 12:21
  14:13,21
  21:3,9,12
  22:15,15
  24:9 99:21
**Recess** 45:3
  83:9
  107:12
**recipient**
  22:21
  23:12 25:4
  25:22 26:6
**recipient's**
  26:16
  45:22
**recipients**
  26:25
  30:10
**recognize**
  17:23

```
47:25 59:2          95:18               7:22              return             105:15,21
recollec...         relate 31:5         request 31:9      112:17             108:5,8
 19:4 61:6          related 88:2        requesting        returned           111:6
 62:25               124:10              84:14             43:12              119:22,24
 68:18 75:9         relax 53:3          required          45:10              Roberts 32:6
 76:6               reliable             26:5,14          111:25              35:17
 119:20              88:8                27:13,15         returns 49:6        43:13
record 45:2          112:20             requirement       review 8:8         99:15
 89:4               remarks              118:18,22         8:12,14,21         100:6,15
 108:17              28:17               119:2,6           9:3 38:10          109:2,4
 113:21             remember             122:7             41:20             room 54:24
 117:8               33:17              reserve           reviewed 8:9        55:2 60:5
 121:8               40:24 51:5          111:6             8:11,16            65:19
 124:9               60:10,13          reserved 3:9       33:10              66:10 71:4
 126:20,20           68:13,14          resolved          reviewing           92:22
recordke...          68:24              19:15             41:15              104:12
 32:16,18            69:22,25           48:22            Ridge 12:5          105:3
 32:20,24            88:24             resources          16:21,22           118:19,24
records              109:17,18          13:14 14:3        16:24 17:7         119:3,20
 35:24               109:19,21        respect            30:14 49:9         120:11
red 28:9             115:17             41:16             87:13              rooms 105:9
reduced             Remote 1:15         115:9             94:15,24          roster
 49:24              rephrase 7:6         120:10           103:25             100:23
refer 22:20          111:21           respective          104:6             101:20
 89:5              report 30:6          3:3               105:17            roughly
referred             39:9,25          response           121:23             113:8
 23:16               40:9,13,20        26:15             right 5:10         row 39:6
referring            41:7 51:22         58:13             6:15 8:2          rubbed 74:4
 14:18               51:25 64:4         70:14 82:4        10:24 11:3        rule 6:16
 16:21 24:6          64:15,17         responsi...         16:19             rules 6:4
 37:22               65:9 94:6          29:13             19:24              111:20
 39:22 48:9          113:10,13          32:12             23:16             114:14,17
 48:10               113:22           responsi...         28:16             115:13,22
 50:22 54:2          115:11             43:21             29:10             115:23
 89:18             reported             44:15             30:17             run 32:15
refresh 61:6         39:19 63:5         48:14             33:11,14          runs 36:21
 62:24               77:18           responsible          33:22 34:2        Ryan 2:18
 68:18 75:9          124:7              28:25 44:3        34:13,16           4:15
 76:5              reporter             44:22             38:5 39:3         ryan.hic...
regard 83:4          1:17 4:2,4       rest 70:19          45:8 52:8          2:18
regarding            6:8,18            72:9 90:12         52:12,15
 10:12,22            88:8 90:16       restriction         56:5 57:14   ──────────────
 11:13               112:20            89:15             67:9 69:17            S
 36:19               124:4            result             74:21        ──────────────
 121:10            REPORTING           104:10            75:16 77:5      S 2:2,10
regards              1:25            retire 123:5        82:8 93:21        4:21,21
 80:15             represent         retired             95:3 96:6        125:6
regular              5:2 107:23        122:19            96:7 102:8      safe 19:10
 122:6               111:17          retraining         103:3,8          29:21
regularly          represented        44:8              104:20           45:13
                                                                        safety 12:13
                                                                        Sam 2:7 4:13
```

5:2 44:10
80:25
**sat** 54:25
79:17
**save** 75:17
116:14
**saw** 64:20,24
65:2 66:24
82:3
**saying** 16:23
27:11 47:6
51:6 90:14
119:15
**says** 39:3,6
39:9,25
40:13
48:14,20
59:18,19
60:22
67:20,21
73:23 74:2
74:7,10,13
74:16,19
74:22 75:2
99:16,17
100:6,7,15
100:17
**schedule**
59:6,8
101:4
102:6
109:9
110:10
**schedules**
107:22
**school** 13:12
15:12
**science**
13:17
**scooching**
57:12
**screen** 17:18
**scroll** 34:18
46:10
53:13
60:16
**scrolling**
107:25
109:8
110:9

**sealing** 3:4
**second** 6:16
8:23 18:11
39:24
55:20
62:10
63:13,14
63:25
73:15,18
101:2
111:17
125:12
**secondhand**
99:19
**section** 35:5
36:12
**see** 17:19
18:15,19
23:5,9
31:22
34:11,23
35:10
36:14
37:17
38:19 39:3
39:7,12
40:5,16
41:24
48:14,23
55:5,7
57:3 59:12
59:14
60:17 61:4
61:12 62:6
62:22 64:8
68:2 72:16
74:2 75:6
76:6
100:21
101:3,9
105:12
108:3,5,9
108:13
109:11
111:12
119:4
**seeing** 40:23
40:24 48:8
**seen** 48:4,25
64:18

97:16
**send** 11:6
**sense** 41:11
114:20
**sent** 11:8
12:21
**separate**
36:5,7
55:12
115:2
118:4
**September**
123:6
**series**
107:22
**serious** 66:6
66:8
**seriously**
63:24
**service**
22:21
23:11 25:4
25:22 26:6
26:16,25
30:10
38:18
45:21
**services**
38:13
**Sessions** 1:7
2:10,16
4:20 87:4
87:7
111:17
120:16,19
121:3,9
**set** 124:14
**setting** 16:9
16:11
**seven** 15:3
**severe** 63:17
63:21
**shaking** 6:17
**Shapiro** 2:7
4:13,13,24
5:2 44:12
44:25 45:5
81:3 83:7
83:11 89:4
91:17

107:8,14
111:3
122:13,16
123:16
**sheet** 23:25
28:12,21
29:2
**shift** 27:19
27:21
28:10,25
29:4,4
31:3 32:5
32:8 36:19
36:19
41:23 42:4
43:23,24
44:2,14,21
59:7,9,23
64:15,17
65:9,12
81:19
87:10
95:22
100:10
101:4
108:2,8
109:10
110:10
120:21,24
**shifting**
56:17
**shifts**
120:15
**shipment**
15:24
19:23
**short** 71:16
88:22 97:5
98:2 117:6
**shortage**
105:17
**Shorthand**
1:17 124:4
**shortly**
44:12
73:22
**shortness**
21:16,23
40:3,14
41:6 61:17

89:13 91:5
**shoulder**
71:6,9
**show** 17:18
33:8 34:4
38:16 46:5
46:5,16
47:23
53:11
58:21
73:12 99:4
99:10
102:3,15
109:8
**showers**
29:18
**showing**
65:13
96:13
101:2
102:4
**sick** 57:5
67:7
**side** 71:5
119:18
120:3
**sign** 32:22
105:11
**SIGNATURE**
126:1
**signed** 3:11
3:12 15:25
19:24
**significant**
28:4,8
**signs** 20:22
20:25
45:22 46:2
46:12,21
70:21 73:4
73:6,10
76:2,10,12
76:16
96:13
97:13,16
**similarly**
6:11
**sister** 94:21
94:23
**sit** 53:24

54:8,25
55:13,16
56:6 57:16
**sitting**
57:11,12
66:9 68:23
101:14
**situation**
24:17 98:8
**skills** 29:16
**sleeping**
69:10 72:7
72:8,11
94:4
106:15
118:19,25
**slept** 119:9
119:16
120:2
**slightly**
24:22
**Smith** 10:2
86:22,24
**smoke** 89:16
**smoking**
89:15
**smoothly** 6:5
**social** 89:21
**somewhat**
33:4
**son** 1:4
10:22
110:6
**soon** 24:20
**sorry** 19:16
73:14
101:17
107:9
111:16
**sorts** 22:16
**sounds** 52:8
115:17
**South** 123:4
**speak** 9:20
10:13 70:6
97:7 98:5
99:5
**specific**
52:3
**specific...**

114:4
**spending**
68:5
**spoke** 8:6
9:23 10:21
11:21
19:15,17
25:10 61:7
63:4 66:4
81:22 96:5
100:15,17
116:16
**spoken** 9:12
10:2,5
94:11
121:13
**spot** 9:18
10:10
**spots** 95:17
**sshapiro...**
2:7
**staff** 39:22
40:8,19
48:14
77:22 78:2
78:15
79:10,15
80:14
82:11,24
83:3 84:16
84:18
85:23,25
87:10,20
92:7,10,19
92:23 97:7
99:6
103:25
105:17
106:6,12
106:17,22
106:25
107:6
109:13
114:17
118:4,9
**stamped**
17:22 18:2
107:17,20
125:8,13
**stand** 53:2

**standing**
71:4
**stands** 60:4
**start** 24:8
55:4 65:20
**started**
15:11
34:15
50:17,20
53:20
54:23
**starting**
14:25
**State** 1:18
2:15 124:5
**statement**
78:21,22
83:18
**STATES** 1:2
**stay** 65:18
**stealing**
19:19,22
**stethoscope**
70:23
**stick** 113:19
**stipulate**
4:3
**STIPULATED**
3:2,7,10
**stomach**
63:17
**stopped** 54:7
91:7
**straight**
53:5
**Street** 2:10
**strike** 16:9
25:3 85:25
**stuff** 105:25
**subjected**
116:10
**Subscribed**
123:21
**substance**
112:3
**suffering**
105:17
**suggest** 60:7
60:9
**Suite** 2:11

**sum** 112:3
**Sunday** 82:17
84:17 85:2
94:17 96:6
98:13 99:7
99:22
100:8,12
101:15
**SUNY** 13:21
**superhuman**
93:18
**supervisor**
32:2,8,9
35:2,14,16
42:17
43:13,24
44:2,21
95:14,17
100:20
**supervis...**
44:14
**supervisors**
36:19
**support**
35:24
**supposed**
25:8,14
27:7,24
28:19,20
40:8,19
41:7 43:22
45:20 47:3
99:23
**sure** 12:13
18:24
29:17 36:9
44:7 53:5
55:15 58:6
62:15
64:19 77:2
83:12
100:5
102:5
103:15
105:2
108:10
113:16
115:20
**surprise**
42:21

43:15
77:21
**surprises**
42:22
**surprising**
42:10
**surrounding**
19:12
**swearing** 4:3
**sweating**
52:25 55:4
55:10,17
57:3,9
65:4 66:10
66:24
70:12
**swelling**
22:11
**switch** 73:14
**Switching**
73:2
**swollen**
72:17,20
**sworn** 3:13
4:22
123:21
126:23
**symptom**
21:17,23
21:24 22:3
22:5,8,12
**symptoms**
21:13 23:6
30:6,9
41:5
**system** 23:23

—————
**T**
—————
**T** 4:21,21
124:2,2
125:6
**table** 51:21
68:24
**take** 7:10,14
7:16 20:9
20:12,22
26:21
30:19 33:3
39:18
44:10,25

63:7,18,22
63:24
70:21
71:11 73:6
81:2 83:7
107:9
**takedown**
121:17
**taken** 1:16
5:6 33:2
45:3 46:21
58:20 64:2
75:18 83:9
107:12
110:6,8
126:19
**talk** 6:12
10:11 38:7
86:6,12,16
86:19,22
86:24 87:4
92:7,10
95:23,25
96:12
97:13
108:19,22
108:25
**talked** 11:11
80:22
98:23
100:16
**talking**
15:17
71:14
91:16
101:15,17
**Tammy** 79:17
79:19 80:4
80:8,11
83:5 84:2
123:7
**Tammy's**
79:24
**teach** 29:16
**team** 89:14
89:17,19
89:20
**Technically**
45:25
**technician**

13:18 15:7
**teeth** 29:18
**tell** 5:10
13:10
19:11 20:7
23:21 25:7
26:19
37:19
42:23
43:16
46:11
49:22
50:16,21
51:2,5
52:19
53:14
56:18,21
59:18 66:4
68:21
72:24
77:17 81:8
81:21 82:3
82:16,19
84:11 85:8
85:18
87:17
88:12,15
88:18,21
90:7,25
91:4,9,12
96:9 98:12
98:23
102:20
103:13
106:8
109:21
110:3
116:23
**telling**
25:16
33:25
100:14
**term** 20:24
49:11
**test** 20:13
**testified**
4:23 60:2
91:17,20
**testify** 5:20
5:25

**testimony**
4:6 5:16
18:21
40:22
117:9
126:19,20
**testing**
14:14,17
14:19
**text** 11:6,7
11:8,15
**thank** 111:5
111:8
122:12
**thing** 41:11
43:23
85:16
98:11
**things** 6:19
22:16 24:2
29:18
42:18
43:25 66:2
116:2
**think** 20:6
48:6 59:19
91:20
95:16
97:18
99:14,17
99:23
102:18
105:19
112:12,13
114:17
116:17,18
119:15
121:7
**third** 48:20
68:10
**thought**
53:15
63:21 66:5
93:18
**three** 15:23
15:25
19:21
60:20,22
76:24
110:16

113:18,25
**throwing**
68:25
**Thursday**
61:2 68:13
**time** 3:9
6:22,22
7:5,5 11:5
12:14,15
15:17 16:5
20:2 23:11
23:22,23
24:5,14
25:2,4
26:4,6,8
26:13,15
26:21 27:5
27:9,12,16
27:23,25
28:5,19
29:9,13
30:20
33:17
35:22
37:12,13
43:17 44:5
45:21
46:20 47:2
51:8 52:4
62:10 63:9
63:11,13
63:14,25
67:17 68:5
68:17
79:25
80:25
81:20
89:22
90:10
91:16 93:5
93:8 95:8
95:10,13
96:14,15
96:23 97:8
97:20 98:4
99:25
102:23,24
103:22
104:2,6
105:16,21

106:13
111:5
116:9,14
117:7
118:13,20
121:13
123:12,18
**times** 51:10
51:13,17
52:19
54:25
60:17,21
60:23
76:24 77:6
**tired** 51:8
51:18 69:7
69:7 72:14
**title** 13:4
66:3
**TJM** 1:7
**today** 5:12
5:16,21
6:5 8:5,15
8:16 9:4
10:22
18:21 41:2
101:14
121:11
**told** 25:17
33:13,16
52:4,11,14
52:17 53:3
66:8,12
70:11 72:7
72:9 79:6
79:21
80:23
82:23
83:21
84:20,23
85:9 87:19
92:8,11
93:10 95:9
96:8,17
98:16
109:24
110:2
112:3
116:24
117:10,13

Page 146

117:16,19
tolerating
 40:2
top 34:11
 61:16
touch 57:10
 71:9
 122:22
 123:9
towel 74:20
 74:23
 75:13,17
 75:21
trained
 23:15
 24:18,23
 25:2,3
 49:3
 120:20
training
 20:4,5,21
 21:3,6,9
 21:12
 22:14,15
 22:19,23
 23:18 24:9
 47:12,16
 48:7 106:2
 120:18,19
transcript
 4:9 8:12
 8:14 33:8
 34:5,7
 53:12
 60:16
 61:15
 67:15
 73:13,15
 73:17
 88:25 89:5
 99:10
 124:8
 125:9,12
 126:19,20
transcri...
 62:16
transcripts
 8:22 33:10
transfer
 23:25

28:12,21
 29:2
transition
 36:8 42:19
transitions
 37:7
treated
 115:15
treatment
 13:5 29:15
 89:19,20
tri-fold
 74:17,19
trial 3:9
trouble 53:7
 56:24 65:7
 71:25
 78:10
 84:21
 93:25 94:3
 100:22
troubling
 94:7
true 4:6
 26:22 28:5
 114:23
 115:5
 120:9
 124:9
 126:20,20
truth 5:10
 33:14
truthfully
 5:21,25
 7:11
try 6:12
 65:17
 86:24
 111:21
trying 55:10
 56:6 57:3
 57:11
 114:19
tune 87:21
 106:9
turn 118:23
 119:6
turned 31:14
turning
 18:11

40:12
twice 8:18
 51:12,16
 60:25 77:3
two 21:19
 31:12
 33:10 43:9
 51:17
 55:12
 103:5
 113:17,24
two-page
 17:22
type 114:12
typically
 41:20
 105:10
 119:16

———— U ————
um-hum 6:14
 6:17
umbrella
 17:2
unable 58:10
 65:2 83:16
 84:3
understand
 5:3,9,13
 5:18 7:4
 7:19 39:15
 40:7,18
 41:4
 111:20,22
 114:25
 118:14
understa...
 21:22 22:2
 24:12 26:5
 26:14 27:6
 27:12
 41:10
 45:20
 119:21
understood
 7:10 19:11
 25:8 27:13
 33:20,24
unfortunate
 96:19

UNITED 1:2
universe
 83:13
unpack 35:12
unsubsta...
 114:24
 115:2
unusual
 67:24,25
 68:8
upset 69:4
 90:22
 96:11
 110:5
urinating
 93:25
use 70:23
usually
 28:22
 41:23
 48:24
 69:16

———— V ————
V-i-l 101:9
vacation
 97:19
vaccination
 14:22
vacuum 52:24
 53:8 54:22
 55:10,19
 56:3,7
 57:4,12
 65:3 70:12
 79:18
vacuuming
 54:4,9,13
 54:15,20
 54:23
 56:25 62:4
 66:21,24
 76:19
 78:10
vaguely
 109:17
Valley 12:5
 16:21,22
 16:24 17:7
 30:14 49:9

87:12
 94:15,24
 103:25
 104:5
 105:17
 121:22
various
 23:19
varying
 112:25
verbally
 6:17
verified
 4:10
vet 16:10
veterina...
 13:18 15:6
 15:20 16:8
 19:18
vicinity
 78:25
VIDEO 1:25
Vil 98:25
 99:2
 101:18,18
 102:9
 109:12
 110:3,24
violent
 121:19,21
 121:25
visably 55:5
visible
 122:10
visit 26:12
 26:12
visual 119:3
visualize
 105:6
visually
 105:12
vital 20:22
 20:25
 45:22 46:2
 46:12,21
 70:21 73:3
 73:6,10
 76:2,10,12
 76:16
vitals 20:9

39:19
62:13,13
63:8 64:2
64:4 74:8
74:11
75:10,22
**volunteer**
101:21

---
**W**
---
**W** 2:18
**W-e-a-v-e-r**
122:21
**W-e-b-e-r**
122:20
**waived** 3:6
**waking** 72:4
**wall** 119:18
120:3,5,13
**want** 15:7
18:12 19:9
30:19 33:7
35:12 38:9
56:14
58:21
73:12,20
77:2 81:3
83:12
92:16
107:25
109:8
**wanted** 18:24
19:8,10
31:15 35:3
36:3,20,21
36:24
49:25
65:19
110:5
115:15
116:24
**wanting**
115:14,22
**WARD** 2:4
**wasn't** 11:13
19:21
42:15,16
43:19
52:24 54:5
55:19

56:14
63:16
72:25
79:21
81:14,14
89:15
92:17
93:16
106:19
110:7
116:22
**watch** 10:22
30:8 49:25
**watches**
20:14
**water** 53:3
62:20
66:11 74:5
**way** 4:9
24:23 47:6
68:11
71:23 82:6
83:6 98:24
106:3
111:22
121:3
124:12
**we'll** 6:12
89:4
**we're** 25:14
100:5
108:17
**we've** 69:6
100:23
**weakness**
40:4 41:6
**Weaver** 80:17
80:19 83:2
83:21
122:17
**Wednesday**
52:5,10,13
52:16,20
53:6,7,9
53:20 54:9
54:13 55:9
55:18,21
56:7,12,16
57:20 58:7
58:17,19

60:11,13
60:18,25
61:7,13,24
62:25 64:9
64:11,14
64:19
65:16 66:5
67:12,13
67:17 73:3
73:4,9
75:5,8,22
76:3,7
77:3,11,13
77:25 78:6
78:10,16
79:11
80:15,18
93:4
108:18,22
**week** 11:11
53:20 54:4
67:22 68:4
79:23
80:20 81:6
82:11 83:4
83:14,23
84:4 107:3
**weeks** 50:23
51:11,14
**weight** 39:10
39:17
49:15,17
50:9,10,19
66:11
**weights**
39:18
**went** 11:10
11:22
13:12 42:2
52:23
75:19
87:21
97:11
112:11
116:8
120:11
**WHEREOF**
124:14
**Williams** 1:7
86:7,12

**Winans** 95:11
**window** 69:11
119:25
**withdrawn**
92:22
**withheld**
19:9
**witness** 4:4
4:5,10,12
92:15
124:14
125:3
**witnessed**
67:19,20
67:21
**woken** 94:6
**woman** 102:11
**work** 6:18
12:5,7,12
14:25
16:13,15
16:23 17:7
30:22
32:13
41:19
81:19 87:3
87:14
95:12,16
95:19
97:20
100:2,24
105:24
120:15
121:3
122:18
123:7,13
**worked** 12:14
15:3,4,5
15:11 16:9
16:11
30:13,24
31:7 42:20
84:16
87:12 95:8
95:13
100:3
106:22
120:22
**worker** 89:21
**working** 14:9

15:11 20:2
28:24 45:7
81:16 95:5
108:7
121:6
**works** 100:12
**worried**
98:11
**wouldn't**
11:7 26:10
42:21
64:12
106:14
**write** 6:8
27:20,21
28:17
47:17 49:7
64:16,22
65:6 74:13
103:22
104:2,6
**writing**
47:20,22
**written**
20:12
42:11 47:2
47:11,18
108:12
**wrote** 47:9
64:21
65:12
74:22
75:12,16
75:22
76:18,20
103:16

---
**X**
---
**x** 1:3,11
125:2,6

---
**Y**
---
**yeah** 15:9
28:14 33:7
44:12 52:7
61:22 67:5
74:4,20,24
100:13,22
100:25
101:23,25

102:3
123:2
**year** 16:3,15
20:13
49:14
**yearly** 20:12
20:19
**years** 11:25
13:9 15:4
31:12 69:6
103:5
113:16,17
113:25
**Yep** 13:12
**yes's** 6:19
**York** 1:2,19
2:6,6,11
2:15,17
124:6
**yup** 74:15,15
75:4

**Z**
**zoom** 1:17
59:17

**0**
**00091** 1:7

**1**
**1** 13:6
**10** 34:19
**100** 36:9
44:7
**10020** 2:6
**107** 125:13
**10th** 2:5
**11** 31:4
59:22
60:16
120:23
**12** 13:9 34:8
34:12
37:10,11
113:16,25
125:10
**12207** 2:11
**12224** 2:17
**123** 17:23
18:2 125:8

**124** 17:23
18:2 125:8
**13** 61:16
**13th** 124:15
**14** 99:12
**147** 33:2
43:2 45:17
87:17 88:2
88:11 89:9
89:12,25
90:5,21
91:18,21
112:2
116:3
**17** 125:8
**1st** 39:20
45:13

**2**
**2** 48:19
53:13
105:11
**2:09** 1:12
**2:56** 34:15
**20** 1:7
**2000** 13:23
**2002** 18:19
**2003** 16:4
**2007** 21:21
**2010** 14:8,10
16:14
20:17
21:21
**2016** 31:17
31:20,22
**2018** 8:10,19
11:3 12:7
12:12 20:3
24:6,9,13
25:7,23
26:22
30:16,16
31:20,25
33:10 34:8
34:12 36:6
37:10,11
38:9 40:23
41:3 42:3
42:9,12
43:10 45:8

45:13,19
52:6 59:10
77:17
86:10
87:13 90:3
90:6 92:4
93:12
101:4
102:7
103:8
106:18
108:3
109:11
113:5,6
125:10
**2019** 103:6
**2020** 17:11
103:6
123:6
**2022** 1:12
123:22
124:15
126:23
**21-page**
107:17
**212** 1:25
**24-hour**
23:25
28:12,21
29:2 65:9
**26** 101:3
**273-9911**
1:25
**27th** 14:22
**28** 102:5,6
**29** 47:24
48:2,11

**3**
**3** 31:4 54:18
59:22
110:2
**3:04** 45:3
**3:16** 45:3
**30** 2:10
**30's** 112:10
**34** 125:9

**4**
**4** 40:12 52:6

59:10
67:16
69:11
108:2
125:4
**4:08** 83:9
**4:21** 83:9
**4:55** 107:12
**4th** 60:8
67:18 75:3
108:19,22
108:25
109:5

**5**
**5** 69:10,11
93:3
**5:00** 107:12
**5:25** 123:18
**55** 46:17
65:13
**58** 46:6
125:11

**6**
**6** 38:17
76:21
109:11
110:10,14
**6-1** 50:6
**600** 2:5
**6th** 110:19

**7**
**7** 96:3
120:23
**73** 125:12
**76** 17:21,25
125:8
**77** 58:22,23
125:11
**79** 34:5,7
53:12
73:13 99:4
125:9

**8**
**8** 1:12 36:6
69:9 93:3
**80** 73:15,17

125:12
**82** 107:17,19
125:13
**8658** 107:18
107:20
125:14
**8667** 108:18
**8673** 109:10
**8675** 110:9
**8678** 107:18
107:20
125:14
**8A** 18:13,18
**8th** 101:4

**9**
**9** 102:7
110:25
**911** 65:23
117:23
**9th** 52:9
95:3,22
97:8 98:4
101:24

**JA686**

# Sealed Exhibit D

# Sealed Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

J.M., as Administrator of the Estate of Her Son, C.B.,

                            Plaintiff,         **L.R. 56.1 STATEMENT OF**
                                          **MATERIAL FACTS**

        -against-

                                         1:20-CV-00091 (TJM/CFH)

ASHLEY SESSIONS, et al.

                         Defendants.
_____

       Pursuant to Rule 56.1 of the Local Rules of this Court, defendant Ashley Sessions hereby respectfully presents this statement of material facts as to which there is no genuine issue to be tried in support of her Motion for Summary Judgment.

1. Valley Ridge Center for Intensive Treatment (Valley Ridge) is a home operated by the Office for People with Developmental Disabilities (OPWDD) in Norwich, New York. Valley Ridge is within the Broome County Developmental Disabilities Service Office (DDSO) catchment area.

2. As of April 8, 2018, Defendant Ashley Sessions was employed by OPWDD at Valley Ridge as a Developmental Disabilities Secure Care Treatment Aide (DDSCTA) Trainee. Hill Decl., Ex. A, at 13-14.

3. Ms. Sessions's job responsibilities included direct care and supervision of Valley Ridge residents. Her job responsibilities did not include the diagnosis or recognition of medical conditions. Hill Decl., Ex. A, at 108-109.

4. Ms. Sessions did not have any medical training. Hill Decl., Ex. A. at 108-109.

5. On the night of April 8, 2018, Ms. Sessions worked the overnight shift, from 11:00 p.m. to 7:00 a.m., at the "E" house at Valley Ridge. *See* Hill Decl., Ex. E, Dep. Ex. 41.

6. As part of her job responsibilities on the overnight shift, Ms. Sessions was required to conduct bed checks of all "E" house residents. Hill Decl., Ex. A, at 93-94.

7. According to Broome DDSO policy, bed checks were visual checks to make sure that the resident was in bed and in a safe position. Hill Decl., Ex. E, Dep. Ex. 19. Employees conducting bed checks ordinarily were not expected to enter the room or check for signs of life such as ensuring that the resident was breathing. Hill Decl., Ex. A, at 93-96; Ex. B, at 265, 273; Ex. C. at 105. The only exception to this policy was for residents who the treatment team had identified as presenting "medical or intense needs." Hill Decl., Ex. E, Dep. Ex. 19.

8. On April 8, 2018, C.B. was a resident of Valley Ridge. Dkt. No. 25, Am. Compl. at ¶¶ 27-28.

9. C.B had complained to staff during the day that he had trouble breathing. Defendant Nurse Elise Williams examined C.B. at the house and then at the medical clinic. She recorded his complaint as congestion and difficulty voiding. His lungs were clear and his blood pressure and blood oxygen levels were normal. She advised him to drink plenty of fluids and to take Robitussin as needed. Hill Decl., Ex. E, Dep. Ex. 17, at PL9153; Ex. B, at 193-194.

10. Nurse Williams did not communicate any concerns about C.B.'s health to Ms. Sessions following her examination of him. Hill Decl., Ex. A, at 87-88; Ex. B, at 86-87, 121.

11. No one communicated any concerns about C.B.'s health to Ms. Sessions on or about April 8, 2018. Hill Decl., Ex. A, at 87-88, 113-114; Ex. C, at 52, 94, 118-119.

12. On the night of April 8, 2018, C.B.'s treatment team had not identified him as having "medical or intense needs." *See* Hill Decl., Ex. E, Dep. Ex. 17, at PL9153; Ex. B, at 252; Ex. A-20.

13. On the night of April 8, 2018, policy dictated that Ms. Sessions perform ordinary, visual bed checks of C.B. Hill Decl., Ex. E, Dep. Ex. 19; *see* Hill Decl., Ex. B, at 252, 265.

14. Ms. Sessions performed bed checks of C.B. at 11:00 p.m. on April 8 and 1:00 a.m. on April 9. She did not perform the bed checks of C.B. that she was supposed to perform at 3:00 a.m. and 5:00 a.m. Hill Decl., Ex. A at 14-15, 20. She later falsely recorded in OPWDD records that she had performed the 3:00 a.m. and 5:00 a.m. checks and that C.B. had been up at 1:00 a.m. to use the bathroom. Hill Decl., Ex. E, Dep. Ex. 20.

15. On April 9, 2018, at approximately 6:30 a.m., OPWDD staff member Jennifer Smith attempted to rouse C.B. for his morning medication. He was lying on his back. She did not realize he was dead until she touched him. Hill Decl., Ex. A, at 124-125; *see* Ex. E, Dep. Ex. 16, 17; 55, at PL008973.

16. OPWDD terminated Ms. Sessions's employment. Hill Decl., Ex. E, Dep. Ex. 46.

17. Medical Examiner Dr. John N. Cruz performed a post-mortem examination of C.B. According to Dr. Cruz's report, C.B. could have died at any time from approximately 4:30 to 6:30 A.M. on April 9, 2019. Hill Decl., Ex. E, Dep Ex. 16; Ex. D, at 4. C.B. "died from idiopathic or viral cardiomyopathy and was in heart failure at the time of his death." Ex. E, Dep. Ex. 16. Although the doctor concluded that C.B. had been suffering from this condition for months and was on the night of his death experiencing pulmonary edema, he explained that "this can present in a subtle manner and sometimes with only diminished

breath sounds at the lung bases which would require a very good clinician to find." Hill

Decl., Ex. E, Dep. Ex. 16.

Dated:  November 15, 2023

                                 **CAPEZZA HILL, LLP**

By:  _____

                                 BENJAMIN W. HILL
                                 Attorney for Defendant Sessions
                                 Bar Roll No. 514953
                                 30 South Pearl Street, Suite P-110
                                 Albany, New York 12207
                                 Ben@capezzahill.com
                                 518.478.6065

# Sealed Dkt 119-1

# Sealed Dkt 119-2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

J.M., as Administrator of the Estate of Her Son, C.B.,

|  |  |
|---|---|
| *Plaintiff*, | **NOTICE OF MOTION** |
| | 20-CV-00091 |
| -against- | (TJM)(CFH) |

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

*Defendants*.
_____

**PLEASE TAKE NOTICE** that upon the accompanying Declaration of Ryan W. Hickey and the exhibits thereto; the Declaration of Raymond McGinn and the exhibits thereto; the Declaration of Elise Williams, the Declaration of Cassaundra Murray, and the exhibit thereto, the Local Rule 56.1(a) Statement; the accompanying Memorandum of Law; and upon all the pleadings and proceedings herein, defendants Elise Williams, Joshua A. Buell, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack (collectively the "State Defendants"), on a date to be scheduled upon filing by the Clerk of Court, will make a motion at the United States District Court, Northern District of New York, Albany, New York, pursuant to Federal Rule of Civil Procedure 56(a) for an order granting the State Defendants summary judgment and dismissing the Amended Complaint [ECF No. 25], together with such other or further relief as may be just.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your pleadings to oppose said motion, but you must respond by

affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial.  Any factual assertions in defendants' Declarations will be accepted by the Judge as being true unless you submit affidavits or other documentary evidence contradicting our assertions.  If you do not so respond, summary judgment, if appropriate, may be entered against you.  If summary judgment is granted against you, those portions of your case will be dismissed and there will be no trial on those causes of action.

   **PLEASE TAKE FURTHER NOTICE**, that pursuant to Rule 7.1 of the Local Rules of Practice of the United States District Court for the Northern District of New York, any papers to be submitted in opposition to the within motion must be filed with Clerk of the Northern District of New York and served upon counsel for the defendant within the time period set by the Court upon the filing of this motion.

Dated:  November 15, 2023
   Albany, New York

       LETITIA JAMES
       Attorney General
       State of New York
        *Attorney for the State Defendants*
       The Capitol
       Albany, New York 12224-0341

       By: s/ Ryan W. Hickey
       Ryan W. Hickey
       Assistant Attorney General, of Counsel
       Bar Roll No. 519020
       Telephone: (518) 776-2616
       Email: Ryan.Hickey@ag.ny.gov

TO:  Counsel of record (*Via ECF*)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

J.M., as Administrator of the Estate of Her Son, C.B.,

**DECLARATION**

20-CV-00091

(TJM)(CFH)

                      *Plaintiff,*

-against-

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

                      *Defendants.*

---

    **Raymond J. McGinn**, on the date noted below and pursuant to §1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

    1.    I am a defendant in the above-captioned action and I make this Declaration in support of Defendants' Motion for Summary Judgment.

    2.    I retired from the New York State Office for People with Developmental Disabilities ("OPWDD") where I worked as a Family Nurse practitioner at Valley Ridge Center for Intensive Treatment ("Valley Ridge"). I was working as a Family Nurse Practitioner at Valley Ridge in 2018 during the time period relevant to this action.

    3.    This Declaration is based upon my personal knowledge and upon my review of records that were prepared and maintained at Valley Ridge in the ordinary course of business.

1

4.      I understand that Plaintiff alleges in this action that I failed to exercise reasonable professional judgment in the treatment of the decedent C.B.'s medical needs.   Plaintiff's allegations are completely false.

5.      In particular, it is my understanding that Plaintiff alleges that I ignored signs that the decedent. C.B. was gaining an excessive amount of weight; and that I ignored signs of swelling in C.B.'s legs, and C.B.'s complaints of feeling fatigued.

*Weight Gain*

6.      Individuals at Valley Ridge are weighed monthly.

7.      I did not personally weigh each patient.   Rather, I would review a resident's weight charts on an annual basis unless the nursing staff alerted him that a resident had gained a significant amount of weight in a short period of time.

8.      C.B. gained approximately 13 pounds between December 2017 and April 2018.  A copy of C.B.'s Weight Chart is attached hereto as **EXHIBIT A.**

9.      In response to this weight gain, I encouraged C.B. to make healthy food choices and to increase physical activity.

10.      C.B. was placed on a calorie-controlled diet.   However, Valley Ridge cannot compel residents to restrict their caloric intake, nor can they force residents to stop consuming high calorie foods or snacking outside their normal meals.

11.      Weight gain is a side effect of many antipsychotic medications, and I believed C.B.'s weight gain was caused by his antipsychotic medications.  In my practice at Valley Ridge it was not uncommon to see weight gain among the residents

2

12.    I also performed routine monitoring of C.B.'s laboratory tests, including his renal function, lymphatic, electrolytes, and thyroid function to ensure they were maintained at normal levels and not contributing to his weight gain.

*Urinary Symptoms*

13.    Attached as **EXHIBIT B** is a true and correct copy of my Unit Physician Notes. Attached as **EXHIBIT C** is a true and correct copy of C.B.'s "Physicians Order Form" which indicates the medications I ordered for him.

14.    I performed a physical exam of Plaintiff on January 15, 2018.

15.    C.B. complained of "nocturia," or frequent need to rise at night to urinate.

16.    Nocturia is most typically caused by problems with the prostate or by a urinary tract infection.

17.    I examined C.B.'s prostate and found that it was not tender or enlarged.

18.    C.B. did not complaint of "dysuria," or painful urination, which is a symptom commonly associated with a kidney or urinary tract infection.

19.    C.B's urine test was negative for infection.

20.    I believed that C.B. may be experiencing urinary symptoms related to his antipsychotic medications.   I prescribed Tamsulosin, a medication that relaxes the prostate to promote more complete emptying of the bladder.

21.    During my examination of C.B. on January 15, 2018, I did not observe any signs of pitting or edema.

22.    C.B.'s heart had regular rate and rhythm ("RRR").

3

23.    As further indicated by my notes, I also examined C.B. on February 20, 2018 for complaints of dermatitis on his cheeks.  I prescribed hydrocortisone.

24.    February 20, 2018 is the last date on which I examined C.B. prior to his death.

25.    Also, it should be noted that, because C.B. was prescribed the psychiatric medication clozapine, he was required to undergo regular blood testing count because clozapine can cause a reduction in white blood cell count. C.B. received such regular blood testing, and, as indicated in Exhibit A, his labs were consistently within normal limits.

26.    I do not recall observing any sign of fluid retention by C.B. over the last year of his life.

27.    Checking for signs of fluid retention is part of a physical exam, during which I would look for "pitting" on the lower extremities which would indicate "edema," or fluid retention. Part of my physical exam of patients was to check all extremities for pitting.

28.    At no time did I ignore signs that C.B. was suffering from heart failure or any other condition.

29.    At no time did I ignore any sign that C.B. was in medical distress.  C.B.'s death was a complete shock to me.

30.    I exercised reasonable professional judgment at all times in rendering care and treatment to C.B.

31.    Accordingly, I respectfully request that Defendants' motion for summary judgment be granted.

4

Dated:           November 14, 2023
                 Marathon , New York



Raymond J. McGinn

# Sealed Exhibit A

# Sealed Exhibit B

# Sealed Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son, C.B.,

                                    *Plaintiff,*

                -against-

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A. BUELL, COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK,

                               *Defendants.*

**DECLARATION**

20-CV-00091

(TJM)(CFH)

      **Elise M. Williams**, on the date noted below and pursuant to §1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

      1.     I am a defendant in the above-captioned action and I make this Declaration in support of Defendants' Motion for Summary Judgment.

      2.     I am currently employed by the New York State Office for People with Developmental Disabilities ("OPWDD") as a Family Nurse practitioner at Valley Ridge Center for Intensive Treatment ("Valley Ridge"). I have been a Family Nurse Practitioner since 2021. Prior to being a Family Nurse Practitioner, I was a Registered Nurse at Valley Ridge

      3.     This Declaration is based upon my personal knowledge and upon my review of records that were prepared and maintained at Valley Ridge in the ordinary course of business.

4.      I understand that Plaintiff alleges in this action that I failed to exercise reasonable professional judgment in the treatment of the decedent C.B.'s medical needs.   Plaintiff's allegations are completely false.

5.      As I have previously explained during the investigation of C.B.'s death, as well as during my deposition in this action, on April 8, 2018 at approximately 1:30 p.m., I saw C.B. in the "E" House at Valley Ridge.

6.      When I saw C.B. on April 8, 2018 he complained of difficulty voiding his bladder. I also observed that C.B. had some sinus congestion.

7.      I asked C.B. whether he had been taking cough syrup that was available to him as needed, and C.B. responded that he had.

8.      I then told C.B. that I would examine him in the clinic.  The medical clinic at Valley Ridge is located in a separate building from "E" House.

9.      At 2:30 p.m., I saw C.B. in the clinic.

10.      Defendant Joshua Buell was also present during the examination.  It is normal practice at Valley Ridge to have a male employee present when I am examining a male resident.

11.      When C.B. arrived at the clinic, I observed that he was breathing heavily due to the walk from "E" House to the clinic, but that his breathing normalized once he arrived.

12.      I took C.B.'s vital signs, which were within normal limits.

13.      I listened to C.B.'s lungs, which were clear.

14.      I also examined C.B.'s bladder, noting that it was non-distended. C.B. did not complain of discomfort as I felt his bladder.  C.B. did not complaint of any pain or burning while urinating.

2

15.    My examination on April 8, 2018 did not reveal, nor did C.B. complain, of any sign or symptom that was indicative of a medical emergency or that, in my professional judgment, warranted any additional testing or treatment beyond what I performed.

16.    I encouraged C.B. to rest, to drink fluids, and to request the cough medicine that was already available to him in "E" House to address his congestion.

17.    C.B. then returned to "E" House.  I received no further calls or complaints from C.B., or from anyone about C.B on April 8, 2018.

18.    My shift ended at 5:00 p.m. on April 8, 2018 and I went home.

19.    I did not learn of C.B.'s death until April 10, 2018 when I returned to work after my day off.

20.    At no time did I ignore any sign that C.B. was in medical distress.  C.B.'s death was a complete shock to me.

21.    I exercised reasonable professional judgment at all times in rendering care and treatment to C.B.

22.    Accordingly, I respectfully request that Defendants' motion for summary judgment be granted.

Dated: November 13, 2023
     Norwich, New York

Elise M. Williams

3

# JA707

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

J.M., as Administrator of the Estate of Her Son, C.B.,

|  |  |
|---|---|
| *Plaintiff*, | **DECLARATION** |
| -against- | 20-CV-00091 |
| ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A. BUELL, COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, | (TJM)(CFH) |
| *Defendants*. | |

_____

Ryan W. Hickey, on the date noted below and pursuant to § 1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.     I am an Assistant Attorney General and appear in this action on behalf of Letitia James, Attorney General of the State of New York, attorney for the State Defendants in this action.

2.     I make this Declaration in support of the State Defendants' motion for summary judgment.

3.     Attached hereto as **EXHIBIT A** is the "Stipulation and Proposed Order for a Conditional Dismissal" in *J.M. v. State of New York*, New York Court of Claims, Claim No. 134617.

4.     Attached hereto as **EXHIBIT B** is the deposition transcript of Elise Williams dated December 20, 2021.[1]

_____

1 Exhibits B -G have been separately filed on CM/ECF using the "Medical Records Filed" function.

5.       Attached hereto as **EXHIBIT C** is the deposition transcript of Joshua Buell dated January 13, 2022.

6.       Attached hereto as **EXHIBIT D** is the deposition transcript of Corey Behlen dated January 13, 2022.

7.       Attached hereto as **EXHIBIT E** is the deposition transcript of Raymond McGinn dated February 11, 2022.

8.       Attached hereto as **EXHIBIT F** is the deposition transcript of Katherina Cassata dated February 8, 2022.

9.       Attached hereto as **EXHIBIT G** is the deposition transcript of Michael Novack dated January 10, 2022.

Dated:  Albany, New York
         November 15, 2023

                                         *s/ Ryan W. Hickey*
                                         Ryan W. Hickey

> **FILED**
> **12/18/2020**
> NY COURT OF CLAIMS
> ALBANY, NY

STATE OF NEW YORK
COURT OF CLAIMS

| | |
|---|---|
| J.M., as Administrator of the Estate of C.B., | **STIPULATION AND PROPOSED ORDER FOR A CONDITIONAL DISMISSAL** |
| Claimant, | |
| v. | **Claim No. 134617** |
| THE STATE OF NEW YORK, | **(Hon. Catherine C. Schaewe)** |
| Respondent. | |

The parties, by their attorneys, stipulate as follows:

WHEREAS, Claimant J.M., as Administrator of the Estate of C.B., commenced an action in the New York State Court of Claims on March 16, 2020, alleging that the State of New York is liable for the death of her son C.B., who died while in the care and custody of the State at the Valley Ridge Center for Intensive Treatment, a facility that is operated by the New York State Office for People with Developmental Disabilities ("OPWDD");

WHEREAS, on January 27, 2020, J.M. commenced an action in the United States District Court for the Northern District of New York, J.M. v. Sessions, et al., No. 20-sv-00091 (TJM)(CFH) (N.D.N.Y.) (the "Federal Action"), alleging that individual OPWDD employees are liable for the death of C.B.;

WHEREAS, the claims in the Federal Action arise out of the same events that gives rise to this action;

WHEREAS, the parties have negotiated in good faith to reach this Stipulation providing for a conditional dismissal of this action to promote comity and efficient use of the Court's and Parties' resources;

1

THEREFORE, the parties, through their respective undersigned counsel, hereby stipulate, subject to Court approval, as follows:

**1.  Conditional Dismissal of Litigation**

a.   Subject to the Court's approval, this action shall be conditionally dismissed  until Claimant exercises her right to reopen it, pursuant to Section 2 of this Stipulation, or the dismissal becomes final, pursuant to Section 4 of this Stipulation. After the Court enters the Order conditionally dismissing this case, none of the parties may seek judicial relief in this action, except to reopen the case and proceed with the litigation in accordance with the terms, conditions, and procedures set forth in this Stipulation.

b.   The time for completion of discovery as set out in 22 NYCCR 206.10(d) shall be tolled during the time that this case is conditionally dismissed.

c.   The parties agree that this action and all of the claims asserted herein are timely under the applicable statutes of limitations. Neither the conditional dismissal of this action nor the reopening of this action pursuant to Section 2 of this Stipulation shall affect the timeliness of this action or the claims asserted herein, or give rise to a defense to this action or the claims asserted herein under any applicable statute of limitations.

**2.  Claimant's Right to Reopen the Case**

a.   At Claimant's request, the case shall be reopened if one of the following conditions has been met:

i.   The Federal Action is dismissed in its entirety, or a final judgment  is issued, or a settlement is reached, or the case is otherwise resolved;

2

ii.     Discovery has closed in the Federal Action;

iii.    The Federal Action is wholly or partially stayed or held in abeyance; or

iv.    Any other unforeseen event that the parties agree is a reasonable condition for reopening the case.

b.    To reopen the case, Claimant shall:

i.    Serve upon Defendant's attorney, via personal service, certified mail, return receipt requested, or email, a letter stating that Claimant intends to reopen the case and setting forth the basis for reopening the case under the terms of this Stipulation; and

ii.    Either file a Note of Issue with the required Statement of Readiness or send a letter to the assigned Judge requesting a conference to schedule discovery.

c.    Filing of the Note of Issue and Statement of Readiness or mailing of the letter requesting a conference to schedule discovery must occur within sixty (60) days of service of the letter upon the Defendant's attorney.

**3. No Admission and Other Reservations**

a.    This Stipulation and its contents do not constitute an admission by Defendant of any violation of law or wrongdoing or an admission by Claimant that any conduct of Defendant was lawful or correct. This Stipulation and its contents are not a waiver of Claimant's claims in this action or the Federal Action, or of any other claims Claimant may have that arise after the Effective Date.

**4. Final Dismissal**

a.    Unless the case is reopened pursuant to the terms of this Stipulation, this

3

conditional dismissal will become final ninety (90) days after the exhaustion of all

appellate rights in the Federal Action.

5. **Effective Date**

    a.    This Stipulation shall be submitted to the Court by counsel to the parties and shall

become effective on the date when the so-ordered Stipulation is entered by the

Court.

It is hereby stipulated and agreed:

DATED: New York, New York
          December 11 , 2020

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
Counsel to Claimant

By: _____
Samuel Shapiro

DATED: Binghamton, New York
          December 17 2020

LETITIA JAMES
Attorney General of the State of New York
Counsel to Defendant

By: _Douglas H. Squire_____
Douglas Squire

DATED:  Binghamton, New York
December 17, 2020

SO ORDERED:

_____
Hon. Catherine C. Schaewe

4

STATE OF NEW YORK : COURT OF CLAIMS                          AFFIDAVIT OF SERVICE

J.M. as Administrator of the Estate of C.B.,

                                        Claimant,

        -against-

THE STATE OF NEW YORK,                                       Claim No.  134617

                                        Defendant.


COUNTY OF BROOME        )
                        )       ss:
CITY OF BINGHAMTON      )

        MARLENE L. BOEDICKER, being duly sworn, says:

        I am over eighteen years of age and an Administrative Assistant I in the office of the Attorney General of the State of New York, attorney for the Defendant herein.

        On the 23rd day of December, 2020, I served the annexed "So Ordered" Stipulation of Conditional Dismissal with Notice of Entry upon the party named below, by depositing a true copy thereof, properly enclosed in a sealed, postpaid wrapper, in the letter box of the United States Post Office in the city of Binghamton, New York, a depository under the exclusive care and custody of the United States Post Office Department, directed to the said party at the addresses within the State respectively thereto designated by him for that purpose as follows:

        Sam Shapiro, Esq.
        Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP
        600 Fifth Avenue, 10th Floor
        New York, NY 10020

                                        _____
                                        MARLENE L. BOEDICKER

Sworn to before me this
23rd day of December, 2020.

_____
DOUGLAS H. SQUIRE
Assistant Attorney General

STATE OF NEW YORK
COURT OF CLAIMS

---

J.M. as Administrator of the Estate of C.B.,

Claimant,

-against-

THE STATE OF NEW YORK,

Defendant.

Claim No. 134617

---

**"SO ORDERED" STIPULATION FOR A CONDITIONAL DISMISSAL
WITH NOTICE OF ENTRY**

---

LETITIA JAMES, Attorney General
Attorney for Defendant

By: DOUGLAS H. SQUIRE
Assistant Attorney General
of Counsel

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
44 Hawley Street, 17th Fl.
Binghamton, NY  13901
Telephone: 607/251-2770

# Sealed Exhibit B

# Sealed Exhibit C

# Sealed Exhibit D

# Sealed Exhibit E

# Sealed Exhibit F

# Sealed Exhibit G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

J.M., as Administrator of the Estate of Her Son, C.B.,

|                           |                    |
|---------------------------|--------------------|
| *Plaintiff,*              | 20-CV-00091        |
| -against-                 | (TJM)(CFH)         |

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

                                        *Defendants.*

_____

     **CASSAUNDRA MURRAY**, on the date noted below and pursuant to § 1746 of title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

    1.  I am employed by the New York State Office for People With Developmental Disabilities ("OPWDD") as Chief Psychologist for OPWDD's Broome Developmental Disabilities State Operations Office ("Broome DDSOO"). The geographic region overseen by the Broome DDSOO contains counties on New York's Southern Tier, inclusive of Chenango County in which is located the Valley Ridge Center for Intensive Treatment ("Valley Ridge CIT") operated by OPWDD.

    2.  I supervise the psychologists within Broome DDSOO in a clinical capacity. I provide clinical oversight by providing treatment recommendations, reviewing and approving behavior support plans, capacity assessments, and functional behavioral assessments. I complete forensic and clinical evaluations, capacity assessments for end-of-life matters and guardianship applications, and serve on various committees.

3.   I make this Declaration in support of Defendants' Motion for Summary Judgment.  I am familiar with the facts set forth herein based upon personal knowledge, discussion with Agency staff, and OPWDD's records.

4.   I make Declaration to provide the date of admission and legal status pursuant to New York State Mental Hygiene Law ("MHL") Article 15 of C.B., the decedent in this action, while he received care at Valley Ridge CIT.

5.   In my capacity as Chief Psychologist, I am fully familiar with, and have access to, OPWDD records concerning the legal status under which an individual is admitted to OPWDD facilities including Valley Ridge CIT.

6.   Under MHL Article 15, OPWDD facilities care for individuals who are admitted on both a voluntary and involuntary basis.  Individuals who are admitted on a voluntary basis must be promptly discharged upon their request, unless they are converted to an involuntary admission status by court order.

7.   At the request of the Office of the Attorney General in this case, I have reviewed the records maintained by Valley Ridge CIT concerning the decedent C.B.'s legal status. Based upon my review of such records, I have confirmed that C.B. was a voluntary admission to Valley Ridge CIT for his entire time there.

8.   Specifically, on May 19, 2015, C.B. submitted an Application for Voluntary Admission pursuant to MHL Section 15.13 and was admitted to Valley Ridge CIT on that same date on such voluntary legal status.  A copy of C.B.'s May 19, 2015 Application for Voluntary Admission is attached hereto as **Exhibit A**.

9.   Furthermore, C.B. remained on voluntary status for his entire time at Valley Ridge CIT from the date he entered on May 19, 2015 up to the date of his death on April 9, 2018.  He was never

converted to involuntary status for any period and he did not request release from Valley Ridge CIT at any time.

Cassaundra Murray

Dated:  Norwich, New York
October _31_, 2023

# Sealed Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————

J.M., as Administrator of the Estate of Her Son, C.B.,

|  |  |
|---|---|
| *Plaintiff*, | 20-CV-00091 |
| -against- | (TJM)(CFH) |

ASHLEY SESSIONS; ELISE WILLIAMS; JOSHUA A.
BUELL, COREY C. BEHLEN; RAYMOND J. McGINN;
KATHERINA L. CASSATA; MICHAEL NOVACK,

*Defendants*.
———————————————————————

**STATEMENT PURSUANT TO RULE 56.1(a)**

Pursuant to Rule 56.1(a) of the Local Rules of this Court, Elise Williams, Joshua A. Buell,

Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, and Michael Novack contend that

as to the following material facts, no genuine issue exists:

*C.B. is Voluntarily Admitted to Valley Ridge*

1.      Under New York Mental Hygiene Law Article 15, facilities operated by the New

York State Office for People with Developmental Disabilities ("OPWDD") care for individuals

who are admitted on both a voluntary and involuntary basis.  Declaration of Cassaundra Murray

at ¶ 6.

2.      Individuals who are admitted to OPWDD facilities on a voluntary basis under

Article 15 must be promptly discharged upon their request, unless they are converted to

involuntary admission status by a court order.  *Id.*

3.      The decedent in this action, C.B., was a voluntary admission to Valley Ridge Center for Intensive Treatment. *Id.* at ¶ 7.

4.      On May 19, 2015, C.B. submitted an Application for Voluntary Admission pursuant to New York Mental Hygiene Law section 15.13 and was admitted to Valley Ridge on that same date on voluntary legal status. *Id.* at ¶ 8 and Exhibit A.

5.      C.B. remained in voluntary legal status from the date he entered on May 19, 2015 up to the date of his death on April 9, 2018. *Id.* at ¶ 9.

6.      C.B. was not converted to an involuntary status for any period. *Id.*

7.      C.B. did not request release from Valley Ridge CIT at any time. *Id.*

<u>*C.B.'s Death*</u>

8.      On the morning of April 9, 2018, C.B. was found unresponsive in his bedroom at Valley Ridge by Valley Ridge staff.  Behlen Deposition at 106.

9.      C.B.'s autopsy indicated that his death was caused by acute pulmonary edema due to idiopathic cardiomyopathy, a heart condition.  McGinn Deposition at 108-110.

<u>*Defendant Williams Examines C.B. on April 8, 2018*</u>

10.     On April 8, 2018 at approximately 1:30 p.m., Nurse Elise Williams saw C.B. in the "E" House at Valley Ridge. Declaration of Elise Williams ("Williams Dec.") at ¶ 5; *see also* Williams Deposition[1] at 179-181.

11.     When Williams saw C.B. on April 8, 2018, he complained of difficulty voiding his bladder.  Williams Dec. at ¶ 6.

12.     C.B. did not complain of any burning or discomfort while urinating. *Id.* at ¶ 14.

---

[1] Citations to "[Witness Name] Deposition" are to the disposition transcripts which are attached to the Declaration of Ryan W. Hickey.

2

13.     On April 8, 2018, Williams also observed that C.B. had some sinus congestion.  *Id*. at ¶ 6.

14.     On April 8, 2018, Williams asked C.B. whether he had been taking cough syrup that was available to him as needed, and C.B. responded that he had.  *Id*. at ¶ 7.

15.     On April 8, 2018, at 2:30 p.m., Williams saw C.B. in the clinic, which is located in a separate building.  *Id*. at ¶ 9.

16.     Williams observed that C.B. was breathing heavily due to the walk from "E" House to the clinic, but that his breathing normalized after arriving at the clinic. *Id.* at ¶ 11.

17.     Williams took C.B.'s vital signs, which were within normal limits.  *Id.* at ¶ 12.

18.     Williams listened to C.B.'s lungs, which were clear.  *Id.* at ¶ 13.

19.     Williams examined C.B.'s bladder, finding that it was non-distended with no complaints of discomfort on palpation. *Id.* at ¶ 14.

20.     Williams encouraged C.B. to rest and drink fluids, and to request another dose of cough syrup for his congestion. *Id.* at ¶ 16.

21.     Williams received no further calls or complaints about C.B. on April 8, 2018.  *Id.*

22.     Williams completed her shift at 5:00pm on April 8, 2018, and did not learn of C.B.'s death until April 10, 2018 when she returned to work.  *Id.* at ¶¶ 17-18.

*Defendant Buell is Present During the April 8, 2018 Examination*

23.     Defendant Joshua Buell was working at Valley Ridge as a Developmental Disabilities Secure Care Treatment Aide ("DDSCTA") I on April 8, 2018.  Buell Deposition at 66.

24.     Williams asked Buell to be present in the clinic while she examined C.B. because it was the practice at Valley Ridge to have a male staff member present if a female nurse was examining a male patient.  *Id.*

3

25.     Buell observed that C.B. "seemed like he had a cold" when he arrived at the clinic. *Id.* at 69.

26.     Buell did not observe any swelling in C.B.'s arms or legs, nor did C.B. complain to Buell about any such swelling.  *Id.* at 85.

27.     Later on April 8, 2018, Buell saw C.B. watching television in "E" House, but C.B. did not make any complaints to him.  *Id.* at 79.

*Defendant McGinn Monitors and Treats C.B's Health Conditions*

28.     In 2018, McGinn worked as a family nurse practitioner at Valley Ridge. Declaration of Raymond J. McGinn ("McGinn Dec.")  at ¶ 2.

29.     Individuals at Valley Ridge are weighed monthly.  *Id.* at ¶ 6.

30.     McGinn's practice was to review resident's weight charts on an annual basis unless the nursing staff alerted him that a resident had gained more than ten pounds in a month.  *Id.* at ¶ 7.

31.     C.B. gained approximately 13 pounds between December 2017 and April 2018.  *Id*. at ¶ 8 and Exh. A.

32.     In response to C.B.'s weight gain, McGinn encouraged C.B. to make healthy food choices and to increase physical activity.  *Id*. at ¶ 9.

33.     C.B. was placed on a calorie-controlled diet. *Id*. at ¶ 10.

34.     Staff at Valley Ridge cannot compel residents to restrict their caloric intake, nor can they force residents to stop consuming high calorie foods or snacking outside their normal meals.  *Id*.

35.     McGinn believed that C.B.'s weight gain was caused by his antipsychotic medications.  *Id*. at ¶ 11.

36.     McGinn performed routine monitoring of C.B.'s laboratory tests, including his renal function, lymphatic, electrolytes, and thyroid function to ensure they were maintained at normal levels and not contributing to his weight gain.  *Id*. at ¶ 12 and Exh. B.; *see also* McGinn Deposition at 75-79.

37.     McGinn does not recall observing any sign of fluid retention by C.B. over the last year of his life.  McGinn Dec. at ¶ 26.

38.     Checking for signs of fluid retention is part of a physical exam, during which McGinn would look for "pitting" on the lower extremities which would indicate "edema," or fluid retention.  *Id*. at ¶ 27.  Part of McGinn's physical exam of patients is to check all extremities for pitting. *Id*.

39.     McGinn's performed a physical exam of Plaintiff on January 15, 2018.  *Id*. ¶ 14. During that exam, McGinn did not observe any signs of pitting or edema.  *Id*. at ¶ 21.

40.     On January 15, 2018, C.B. complained of "nocturia," or the frequent need to rise at night to urinate.  *Id*. at ¶ 15.

41.     "Nocturia" is most typically caused by problems with the prostate or by a urinary tract infection.  *Id*. ¶ 16.

42.     McGinn examined C.B.'s prostate and found that it was not tender or enlarged.  *Id*. at ¶ 17.

43.     C.B's urine test was negative for infection.  *Id*. at ¶ 19.

44.     C.B. did not complain of "dysuria," or painful urination, which is a symptom commonly associated with a kidney or urinary tract infection.  *Id.*

45.     McGinn believed that C.B. may be experiencing urinary symptoms related to his antipsychotic medications.  *Id*. at ¶ 20.

5

46.     McGinn prescribed Tamsulosin, a medication that relaxes the prostate to promote more complete emptying of the bladder.  *Id*.

<u>*Defendant Behlen Does Rounds on the Night Shift from April 8-9, 2018*</u>

47.     Defendant Corey Behlen was working as the head of shift for the night shift on April 8 to April 9, 2018.  Behlen Deposition at 83-84.

48.     Behlen was present in "E" House from 3:00am to 5:30am.  *Id.* at 95-96.

49.     While in "E" House, Behlen observed Defendant Ashley Sessions in the hallway and in the office.  *Id*. at 96.

50.     Behlen did not observe Sessions sleeping at any point.  *Id.* at 130.

51.     From the desk inside the "E" Building Office, employees can see into the hallway that runs outside the residents' bedrooms, and thus can see if residents have left their bedrooms. *Id*. at 131.

52.     When Behlen saw Sessions in the office, she was using the computer for email, and, at another point, writing something at the desk.  *Id*. at 132.


<u>*Defendant Cassata Reports C.B.'s Medical Complaints to Nursing Staff*</u>

53.     On two occasions in the days leading up to his death, Defendant Katherina Cassata, a DDSCTA, observed C.B. having difficulty completing his assigned chore of vacuuming.  Cassata Deposition at 51-56.

54.     C.B. reported to her that he did not feel well and Cassata reported these complaints to the nursing staff at Valley Ridge.  *Id*. at 57-65.

55.     Cassata also recorded her observations of C.B., and contacts with nursing, in the "end of shift" notes.  *Id.*

6

> *Defendant Novack Receives a Call from J.M. about C.B.'s Medical Issues*
> *and Notifies Nursing Staff*

56.      On April 8, 2018, Defendant Michael Novack, a DDSCTA 2, spoke to Plaintiff J.M. on the phone. Novack Deposition at 112.

57.      J.M. told Novack that C.B. was not feeling well.  Novack reported this to nursing staff.  *Id.* at 118.

Dated:        November 15, 2023
              Albany, New York

                          LETITIA JAMES
                          Attorney General of the State of New York
                              *Attorney for the State Defendants*
                          The Capitol
                          Albany, New York 12224-0341

                          By: *s/ Ryan W. Hickey*
                          Ryan W. Hickey
                          Assistant Attorney General, of Counsel
                          Bar Roll No. 519020
                          Telephone: (518) 776-2616
                          Email: Ryan.Hickey@ag.ny.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                    Plaintiff,

    -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

                Defendants.

20 Civ. 00091 (TJM)(CFH)

**PLAINTIFF'S L.R. 56.1.
STATEMENT OF MATERIAL
FACTS**

**C.B.**

    1.     C.B. was born in May 1983. Exhibit A 000009.[1]

    2.     C.B. suffered from autism and Mood Disorder NOS, Impulse Control Disorder,

Mild Mental Retardation, Antisocial Personality Disorder, and a history of closed head injury.

Exhibit B 10:19-11:4; Exhibit C 009010.

    3.     When he was 18 years old, C.B. was moved into the care of the New York State

Office for People with Developmental Disabilities ("OPWDD") because "he couldn't be home."

Exhibit B 10:9-18.

    4.     C.B. moved into Valley Ridge CIT, a facility owned and operated by OPWDD, in

May 2015. Exhibit C 009010.

**Michael Novack**

    5.     In April 2018, Novack was a Developmental Disabled Secure Care Treatment

Aide ("DDSCTA") at Valley Ridge CIT. Exhibit D 13:6-24. He had worked for OPWDD

---

[1] Exhibits cited herein are appended to the Declaration of Samuel Shapiro, filed herewith. For Bates-stamped
materials, page numbers refer to the Bates stamp.

continuously since 2002 and was promoted to a DDSCTA 2 in or around 2018. Exhibit D. 13:19-24; 15:16-21.

6.     In April 2018, Novack was responsible for supervising all the staff that worked in the Valley Ridge CIT E-House ("E-House"). Exhibit D 25:3-26:5.

7.     Novack never looked at C.B.'s Plan of Nursing Services, even though it was kept in a book in E-House. Exhibit D 40:17-41:5.

8.     Novack never instructed the staff he supervised to follow C.B.'s Plan of Nursing Services. Exhibit D 93:14-22.

9.     Novack never received any training on how to diagnose a medical condition. Exhibit D 20:25-21:7.

10.     In April 2018, OPWDD policy required Valley Ridge CIT staff to do "focus charting." Exhibit E.

11.     Novack never did "focus charting" in his time working at Valley Ridge CIT. Exhibit D 63:9-18.

12.     Novack never spoke to anyone at OPWDD about C.B.'s weight gain. Exhibit D 67:21-68:11.

**Elise Williams**

13.     On April 8, 2018, Elise Williams was a Registered Nurse. She was the RN on duty at Valley Ridge CIT that day. Exhibit F 176:1-177:6.

14.     On April 8, 2018, Williams did not have a master's degree and was not licensed as a Nurse Practitioner. Exhibit F 16:9-23; 19:15-24.

15.     A Registered Nurse is not someone who provides "medical care at the advanced level." Exhibit F 32:7-17.

16.    As of April 8, 2018, Williams had not received training on how to diagnose a cardiovascular medical condition. Exhibit F 42:19-24.

17.    It is illegal for a Registered Nurse to diagnose a medical condition. Exhibit F 42:23-24.

18.    Williams knew shortness of breath could be a symptom of a cardiovascular medical condition. Exhibit F 43:21-25.

19.    Williams knew fatigue could be a symptom of a cardiovascular medical condition. Exhibit F 47:15-19.

20.    Williams knew coughing could be a symptom of a cardiovascular medical condition. Exhibit F 47:20-23.

21.    Williams knew swelling of the extremities could be a symptom of a cardiovascular medical condition. Exhibit F 48:7-10.

22.    Williams knew C.B. had been diagnosed with hypertension and that he had been putting on weight. Exhibit F 145:10-148:25; 226:7-12.

23.    As C.B.'s case managing nurse in 2018, Williams was responsible for writing quarterly and annual reports about the care C.B. received, medical concerns relating to C.B., and C.B.'s medication changes, and also for answering medical questions concerning C.B. Exhibit F 66:5-67:9.

24.    In 2018, Williams was the primary point person for C.B.'s medical care and developed C.B.'s "plan of nursing services." Exhibit F 92:17-22; 93:19-22; 122:23-24; 124:14-125:11.

25.    On April 8, 2018, Valley Ridge CIT had an EKG machine on site. Exhibit F 88:22-89:2.

26.     Williams never recommended doing a physical exam of C.B. to assess whether he was gaining weight because he was retaining fluids. Exhibit F 163:15-25.

**Raymond McGinn**

27.     McGinn worked as a nurse practitioner for OPWDD from February 2017 to December 31, 2021. Exhibit G 17:13-16; 19:23-20:4. He was the only nurse practitioner—and only medical provider—assigned to Valley Ridge in April 2018. Exhibit G 25:20-26:4; 26:20-24; 28:8-12.

28.     McGinn was aware that shortness of breath was a symptom of heart failure. Exhibit G 21:2-4.

29.     McGinn was aware that fatigue was a symptom of heart failure. Exhibit G 22:2-4

30.     McGinn was aware that coughing was a symptom of heart failure. Exhibit G 22:5-7.

31.     McGinn was aware that swelling of the extremities was a symptom of heart failure. Exhibit G 22:8-10.

32.     McGinn was aware that orthopnea was a symptom of heart failure. Exhibit G 22:24-23:2.

33.     McGinn was aware that paroxysmal nocturnal dyspnea was a symptom of heart failure. Exhibit G 23:3-5; 23:15-18.

34.     McGinn, in his role as a nurse practitioner, diagnosed pulmonary edema "innumerable times" over his career. Exhibit G 23:23-24:12.

35.     In his role as Valley Ridge's nurse practitioner, McGinn was responsible for responding to residents' medical complaints. Exhibit G. 29:22-30:3.

36.     McGinn was responsible for making referrals to other medical professionals if a resident had a medical issue that could not be addressed at Valley Ridge. Exhibit G 30:16-31:2.

37.     McGinn was responsible for ensuring that Valley Ridge CIT had communication systems "in place to notify the nursing staff and, if necessary, [himself] about medical issues occurring with Valley Ridge [CIT] residents." Exhibit H 14. Yet he did not do so. Exhibit G 38:13-17.

38.     In 2018, McGinn did not have regularly scheduled meetings with nursing staff. Exhibit G 34:11-20.

39.     He "very rarely" met with direct care staff in 2018. Exhibit G 34:21-25.

40.     In 2018 McGinn did not have a regular practice of reviewing nursing notes. Exhibit G 35:8-12.

41.     In 2018, McGinn did not ever review notes made by direct care staff. Exhibit G 35:13-15.

42.     In 2018, McGinn did not regularly review direct care staff shift reports. Exhibit G 36:5-7.

43.     In 2018, McGinn did not regularly read staff communication logs. Exhibit G 36:8-10.

44.     McGinn never set up a formal communication book to facilitate communications between him and the nurses at Valley Ridge about any acute conditions. Exhibit G 39:17-24.

45.     McGinn never instructed nurses at Valley Ridge that there were certain symptoms he should be notified about. Exhibit G 42:23-43:6.

46.     McGinn relied on nursing staff's discretion to refer urgent matters to him, without providing instruction on how to exercise that discretion. Exhibit G 43:7-21.

5

47.     McGinn was part of C.B.'s treatment team in 2018. Exhibit G 48:15-22.

48.     It was McGinn's practice to review weight charts where residents' monthly weights were recorded. Exhibit G 55:22-56:2.

49.     McGinn's practice was to review weight charts only annually unless he learned that a resident had a weight gain of "more than several pounds in a short period of time." Exhibit G 56:3-10.

50.     McGinn did not do anything to determine why C.B. was gaining weight at the rate he was during the last year of his life. Exhibit G 75:5-9.

51.     McGinn did not take any steps to determine whether C.B. was retaining fluid during the last year of his life. Exhibit G 76:5-12.

52.     McGinn had no practice or protocol to ensure that nursing staff told him if a resident was having increased difficulty tolerating physical activity. Exhibit G 84:11-25.

53.     McGinn saw C.B. for an examination on January 16, 2018. Exhibit G 92:21-93:3.

54.     C.B. was complaining of nocturia—needing to urinate frequently at night. Exhibit G 92:25-93:8.

55.     McGinn prescribed C.B. Flomax. Exhibit G 94:25-95:3.

56.     McGinn did not monitor the effectiveness of the medication, other than informally asking the nurses to tell him if C.B. continued to complain. Exhibit G 95:4-9.

57.     McGinn saw C.B. for an examination on February 20, 2018, regarding an area of redness on his cheek. Exhibit G 88:25-89:5.

**Katherina Cassata**

58.     In April 2018, Cassata was working as a direct care staff member at Valley Ridge CIT. Exhibit I 29:9-11.

6

59.     Cassata was assigned to E-House. Exhibit I 30:16-18.

60.     On April 4, 2018, C.B. told Cassata he "couldn't breathe." Exhibit I 52:3-15.

61.     On April 4, 2018, C.B told Cassata his "chest hurt." Exhibit I 52:3-18.

62.     On April 4, 2018, C.B told Cassata he was "tired all the time." Exhibit I 50:20-51:8.

63.     On April 4, 2018, C.B. became exhausted from vacuuming and could not finish—he told Cassata, "I can't do it." Exhibit I 55:9-56:11.

64.     It "wasn't like C.B. to not want to do something when [staff] asked him to do it." Exhibit I 56:12-16.

65.     Cassata did not document C.B.'s medical complaints on April 4, 2018. Exhibit J.

66.     Cassata did not document C.B.'s inability to finish vacuuming on April 4, 2018. Exhibit J.

67.     Cassata did not inform any nurse, doctor, or medical professional about C.B.'s medical complaints or his inability to finish vacuuming on April 4, 2018. Exhibit K 48:10-50:22.

68.     On April 6, 2018, C.B. told Cassata he "couldn't breathe." Exhibit I 56:21-23.

69.     On April 6, 2018, C.B. told Cassata "he was having chest pains." Exhibit I 56:17-20.

70.     On April 6, 2018, C.B. "looked physically sick." Exhibit I 57:3-6.

71.     On April 6, 2018, C.B. "had no color." Exhibit I 57:7-9.

72.     On April 6, 2018, C.B. "was sweating." Exhibit I 57:7-9.

73.     On April 6, 2018, C.B. "was clammy to the touch." Exhibit I 57:7-10.

74.     On April 6, 2018, C.B. "was out of breath." Exhibit I 57:7-10.

75.     On April 6, 2018, C.B. "was sitting down in the chair trying to vacuum sitting

down in the chair like scooching himself along." Exhibit I 57:7-13.

76.     For C.B., having to sit down to do a chore was a "dramatic change" from his

normal behavior. Exhibit I 57:16-19.

77.     Cassata did not document C.B.'s medical complaints on April 6, 2018. Exhibit J.

78.      Cassata did not document C.B.'s inability to finish vacuuming on April 6, 2018.

Exhibit J.

79.     Cassata did not inform any nurse, doctor, or medical professional about C.B.'s

medical complaints on April 6, 2018. Exhibit K 48:10-50:22.

**Ashley Sessions**

80.     On the night of April 8-9, 2018, Sessions was a DDSCTA Trainee at Valley

Ridge CIT. Exhibit L 13:21-14:8.

81.     On the night of April 8-9, 2018, Sessions arrived for her shift at E-House, Exhibit

L 14:12-15, spoke to the staff she was relieving and was told about issues that had occurred on

the previous shift, Exhibit L 86:13-23.

82.     On the night of April 8-9, 2018, one of Sessions' duties was to "perform bed

checks on C.B. every two hours," at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 5:00 a.m. Exhibit L

14:16-25.

83.     On April 9, 2018, Sessions did not perform a bed check on C.B. at 3:00 a.m.

Exhibit L 15:2-5.

84.     On April 9, 2018, Sessions did not perform a bed check on C.B. at 5:00 a.m.

Exhibit L 15:6-9.

85.     Sessions did not perform C.B.'s bed checks at 3:00 a.m. and 5:00 a.m. because

she "was watching movies" and "was distracted." Exhibit L 81:2-17.

86.     Sessions falsified OPWDD records to falsely claim that she had done a bed check on C.B. at 3:00 a.m. and 5:00 a.m. on April 9, 2018. Exhibit M PL010396; Exhibit L 82:25-83:4.

87.     Sessions lied to New York State police on April 9, 2018 about performing bed checks on bed checks on C.B. at 3:00 a.m. and 5:00 a.m. on April 9, 2018. Exhibit L 23:21-24:8; Exhibit N.

88.     Sessions pleaded guilty to falsifying a written statement. Exhibit L 15:10-16.

89.     Sessions spent the night shift on April 8-9, 2018, watching movies on a computer. Exhibit L 72:19-73:4; 77:21-24.

90.     When she conducted bed checks of individuals residing at Valley Ridge CIT in April 2018, Sessions would "click their door open, open their door, make sure that they were in their room and safe." Exhibit L 93:3-12.

**Corey Behlen**

91.     Behlen was Head of Shift at Valley Ridge CIT for the evening and night shifts on April 8-9, 2018. Exhibit O 81:7-84:14.

92.     Behlen was in E-House from approximately 3:00 a.m. to 5:30 a.m. on April 9, 2018. Exhibit O 95:9-96:6; Exhibit P PL010512.

93.     Behlen was watching television in the living room of E-House during the early morning of April 9, 2018. Exhibit O 96:3-16.

94.     Behlen saw Ashley Sessions on the computer during the early morning of April 9, 2018. Exhibit O 96:17-97:9.

95.     Behlen did not check to see whether Sessions completed bed check forms on April 8-9, 2018. Exhibit O 98:11-13.

96.     Behlen allowed staff he supervised to watch television and movies during

overnight shifts. Exhibit O 99:2-15.

97.　From April 9, 2018, through September 10, 2018, Behlen was "not allowed to be head of shift because of what happened around C.B.'s death." Exhibit O 125:24-126:5.

98.　From April 9, 2018, through September 20, 2018, Behlen was "subjected to supervisory checks periodically because of what occurred surrounding C.B.'s death." Exhibit O 126:6-12.

99.　Watching television for 2-3 hours in E-House is not "what the [Head of Shift] duties entail." Exhibit Q.

**Joshua Buell**

100.　Buell was a DDSCTA 2 at OPWDD from July 2008 to April 2021. Exhibit R 12:2-9.

101.　In April 2018, Buell was a DDSCTA 2 at Valley Ridge CIT responsible for supervising the DDSCTA 1s in E-House. Exhibit R 13:18-20; 24:18-25:1; 25:16-26:11.

102.　Buell may have worked overtime at E-House occasionally in April 2018. Exhibit R 24:14-17.

103.　On April 8, 2018, Buell was head of day shift. Exhibit R 65:6-10.

104.　During his April 8, 2018, shift, Buell first saw C.B. in the clinic. Exhibit R 66:10-12.

105.　Buell did not give any instructions concerning C.B. to E-House staff following C.B.'s clinic visit. Exhibit R 89:8-11.

**Documentation Policies at Valley Ridge CIT**

106.　In April 2018, Valley Ridge CIT staff was supposed to make a note about each individual no less than once daily. Exhibit F 101:3-7.

107.    In April 2018, Valley Ridge CIT nurses created Plans of Nursing Service for each resident. Exhibit F 122:22-124:9.

108.    Plans of Nursing Service were created to provide staff with instructions about how to identify and respond to medical concerns from individuals. Exhibit F 122:22-124:9.

109.    C.B.'s Plan of Nursing Services was kept in a book in E-House. Exhibit D 40:17-25. It was last updated in March 2018. Exhibit T OPWDD0000032.

110.    As the E-House supervisor, Novack was responsible for "check[ing] the paperwork" in E-House, including the daily activity ("DAR") notes, the shift reports, and the 24-hour reports, and "mak[ing] sure that it's being completed." Exhibit O 42:8-43:19.

111.    Direct care staff was required to note "complaints of being tired" and "whether an individual missed program." Exhibit O 59:16-60:2.

112.    Direct care staff was required to report to nursing staff if C.B. had increased difficulty tolerating activity. Exhibit T; Exhibit F 131:23-25.

113.    Direct care staff was required to report to nursing staff if C.B. complained of shortness of breath. Exhibit T; Exhibit F 132:2-9.

114.    Direct care staff was required to report to nursing staff if C.B. was tiring easily. Exhibit T; Exhibit F 132:16-18.

115.    Direct care staff was required to report to nursing staff if C.B. complained of chest pains. Exhibit T; Exhibit F 132:5-7.

116.    In 2018, at the end of each shift, Valley Ridge CIT direct care staff was supposed to complete a shift report for each resident to document behaviors or medical concerns that occurred during the shift. Exhibit U 19:3-21:5; Exhibit V 26:11-17.

117.    In 2018, Valley Ridge CIT direct care staff working in E-House was responsible

11

for being aware of what was in C.B.'s Plan of Nursing Services. Exhibit U 26:21-27:3; Exhibit V 32:20-33:2.

118.     Valley Ridge CIT direct care staff was supposed to document any time C.B. exhibited a symptom listed in his Plan of Nursing Services. Exhibit U 28:10-21

119.     Valley Ridge CIT direct care staff did not make any notes—no daily activity (DAR) notes, no shift notes, no 24-hour notes—about C.B. between March 1, 2018, and his death on April 9, 2018.  Exhibit J.

**C.B.'s Repeated Symptoms of Heart Failure Are Ignored**

120.     C.B. was diagnosed with hypertension—commonly known as high blood pressure—between June 2017 and January 2018. Exhibit F 126:3-10.

121.     C.B. gained more than 21 pounds between December 2017 and April 2018. Exhibit W.

122.     C.B. gained ten pounds in the final month of his life. Exhibit W.

123.     C.B. had a healthy diet before his death and was trying to lose weight. Exhibit V 46:7-20.  He had been placed on a calorie-controlled diet in April 2017. Exhibit X; Exhibit G Tr. 71:23-72:24.

124.     C.B. was working out to lose weight prior to his death. Exhibit V 46:21-25.

125.     In the weeks leading up to his death, C.B. told Novack he was not going to class because he was tired. Exhibit D 88:5-11.

126.     Before his death, C.B. "was always complaining of heart burn." Exhibit P PL10515; Exhibit O 74:19-76:20.

127.     Novack was told that C.B. had been lethargic prior to his death. Exhibit D 83:19-22.

128.    Novack did not document anywhere that he had been told C.B. had been lethargic. Exhibit D 83:23-25.

129.    In the weeks leading up to his death, C.B.'s breathing was erratic. Exhibit V 49:24-50:4.

130.    C.B. did not complain frequently about medical problems. Exhibit F 173:20-174:4; 233:9-14; Exhibit V 55:24-56:11.

131.    C.B. did not have a habit of overstating medical concerns. Exhibit F 174:5-15.

132.    C.B. had "2+ pitting edema bilaterally" at the time of his death. Exhibit HH DEF000012.

133.    The edema developed over a period of several days leading up to C.B.'s death. Exhibit Z at 5.

134.    The edema was present when Williams examined C.B. on April 8, 2018. Exhibit Z at 5.

**April 8, 2018: C.B.'s Final Plea for Help**

135.    C.B. called his mother at 11:14 a.m. on April 8, 2018 and said he had problems breathing and he could not urinate. Exhibit B. 15:19-16:3; Exhibit AA. C.B. had never made these complaints before, and he hung up on J.M. at the end of the call, which he "never d[id]." Exhibit B 20:20-21:3.

136.    Feeling a "sense of emergency," since C.B. had not made these complaints before, J.M. called Novack at 11:26 a.m. on April 8, 2018, and told him her son "was having problems breathing" and "couldn't pee." Exhibit D 111:6-9; Exhibit B 15:10-13; 17:16-19; 19:23-20:6; Exhibit AA. Novack made no notes of this call. Exhibit D 114:11-14.

137.    On April 8, 2018, C.B. "report[ed] to Mike Novack that he was having difficulty

13

breathing." Exhibit V 59:19-22. Novack did not make any notes of C.B.'s symptoms or complaints. Exhibit D 119:24-120:4; *see* Exhibit J.

138.    Other residents noticed that C.B. was "wheezing" on April 8, 2018. Exhibit BB 9:20-23.

139.    C.B. "was having trouble breathing" on April 8, 2018. Exhibit BB 9:24-10:1.

140.    C.B. was "antsy" on April 8, 2018. Exhibit CC at 9.

141.    C.B. kept asking, "when was the nurse going to come down and see me?" Exhibit CC at 9.

142.    C.B. asked "more than once" to see a nurse on April 8, 2018. Exhibit V 61:10-20.

143.    On April 8, 2018, C.B. told Novack he (C.B.) needed to go to the hospital. Exhibit BB 9:16-19.

144.    Novack did not call Williams on April 8, 2018, to report anything about C.B.'s medical condition. Exhibit F 195:6-197:24.

145.    Williams initially saw C.B. in E-House around 1:30 p.m. as part of the nursing rounds she was doing that day. Exhibit F 184:7-186:2.

146.    On April 8, 2018, McKown reported to Williams that C.B. was complaining about having difficulty breathing. Exhibit V 59:5-11.

147.    C.B. was having difficulty breathing when he arrived at the medical clinic and saw Williams. Exhibit F 206:25-207:4.

148.    C.B. was at the clinic for less than 15 minutes. Exhibit F 194:12-18.

149.    Williams did not take any history from C.B. on April 8, 2018, nor did she reviewing any nursing notes or documents prior to examining him. Exhibit F 213:9-14, 220:18-21.

14

150.    Williams did not ask C.B. if he had been feeling tired recently. Exhibit F 219:24-17.

151.    Williams did not ask C.B. if he had been waking up frequently in the middle of the night. Exhibit F 219:24-220:3.

152.    Williams did not ask C.B. how long he had been feeling congested. Exhibit F 219:24-220:9.

153.    Williams did not look to see if there was swelling in C.B.'s legs, feet, arms, or hands. Exhibit F 223:7-21.

154.    Williams did not listen to C.B.'s heart or perform an EKG on April 8, 2018. Exhibit F 195:3-5, Exhibit DD PL009153.

155.    Williams did not check C.B.'s respiratory rate. Exhibit DD PL009153.

156.    Williams did not alert an on-call provider to C.B.'s condition on April 8, 2018. Exhibit F 226:13-21.

157.    Williams encouraged C.B. to drink more fluids and stay hydrated. Exhibit EE PL010552.

158.    After C.B. left the clinic on April 8, 2018, Williams did not follow-up on his condition in any way. Exhibit F 236:10-13.

159.    Williams did not order a medical bed check for C.B. on the night of April 8, 2018. Exhibit F 252:21-24.

160.    C.B. died between 4:00 a.m. and 5:30 a.m. on April 9, 2018. Exhibit Z at 4.

161.    C.B. was discovered unresponsive in his room at 6:30 a.m. on April 9, 2018. Exhibit U 71:24-72:8.

162.    When he was discovered, he was cold to the touch and his lips were blue. Exhibit

U 73:14-74:2.

**Valley Ridge CIT: A Restricted Facility**

163.    Valley Ridge CIT is surrounded by fencing. Exhibit FF.

164.    Valley Ridge CIT residents are not free to come and go as they please.  Exhibit F

240:9-14.

165.    C.B. could not go see a medical provider by himself. Exhibit F 240:7-14.

166.    C.B. could not decide to go to the hospital by himself. Exhibit F 240:7-14; Exhibit

U 32:20-33:11; Exhibit G 65:17-19.

167.    An individual resident of Valley Ridge could not go to the emergency room

without the approval of either the nursing staff or an on-call provider. Exhibit G 66:8-13.

168.    If a Valley Ridge CIT resident called 911 in April 2018, that call would be routed

to Valley Ridge CIT's safety department. Exhibit F 279:15-280:6.

169.    If a resident's family member called to raise a medical concern about a resident,

the protocol was for staff to contact the nurse, and there was no requirement that the call be

documented. Exhibit R 50:23-51:6.

**Justice Center Investigation**

170.    The New York State Justice Center for the Protection of People with Special

Needs ("Justice Center") investigated the circumstances leading to C.B.'s death. Exhibit GG.

171.    The investigation "revealed substantial systemic problems, including inadequate

management, training, and supervision at the facility that exposed [C.B.] to harm or risk of

harm." Exhibit GG PL008587.

172.    The investigation described Valley Ridge CIT's "failures: (1) to implement a

procedure to require all communications from the house to nursing be documented in the

individual resident record as well as house communication log; (2) to require shift notices [to]

include any signs and symptoms of individual medical complaints." Exhibit GG PL008587.


Dated: December 22, 2023
        New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP


                                        /s/ Samuel Shapiro
                                        Samuel Shapiro
                                        Laura S. Kokotailo*

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiff*

                                        *Application for admission to practice
                                        in NDNY forthcoming

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., <br><br> Plaintiff, <br><br> -against- <br><br> ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, <br><br> Defendants. | 20 Civ. 00091 (TJM)(CFH) <br><br> **PLAINTIFF'S RESPONSE TO ASHLEY SESSIONS' L.R. 56.1. STATEMENT OF MATERIAL FACTS** |

Pursuant to Rule 56.1 of the Local Rules of this Court, Plaintiff J.M., as Administrator of the Estate of Her Son, C.B., hereby submits this response to Defendant Ashley Sessions' statement of material facts.

1. Valley Ridge Center for Intensive Treatment (Valley Ridge) is a home operated by the Office for People with Developmental Disabilities (OPWDD) in Norwich, New York. Valley Ridge is within the Broome County Developmental Disabilities Service Office (DDSO) catchment area.

**RESPONSE:** Undisputed.

2. As of April 8, 2018, Defendant Ashley Sessions was employed by OPWDD at Valley Ridge as a Developmental Disabilities Secure Care Treatment Aide (DDSCTA) Trainee. Hill Decl., Ex. A, at 13-14.

**RESPONSE:** Undisputed.

3. Ms. Sessions's job responsibilities included direct care and supervision of Valley Ridge residents. Her job responsibilities did not include the diagnosis or recognition of medical conditions. Hill Decl., Ex. A, at 108-109.

**RESPONSE:** Disputed. Sessions, like all Valley Ridge CIT direct care staff, was required to make a note about each individual no less than once daily. Exhibit F 101:3-7. Sessions was also required to be familiar with C.B.'s Plan of Nursing Services, Exhibit F 122:22-124:9, and to report to nursing staff if C.B. had increased difficulty tolerating activity, complained of shortness of breath, or was tiring easily, Exhibit T OPWDD0000032.

4.      Ms. Sessions did not have any medical training. Hill Decl., Ex. A. at 108-109.

**RESPONSE:** Disputed. Sessions received training on CPR and was CPR certified. Exhibit L 104:3-7.

5.      On the night of April 8, 2018, Ms. Sessions worked the overnight shift, from 11:00 p.m. to 7:00 a.m., at the "E" house at Valley Ridge. *See* Hill Decl., Ex. E, Dep. Ex. 41.

**RESPONSE:** Undisputed.

6.      As part of her job responsibilities on the overnight shift, Ms. Sessions was required to conduct bed checks of all "E" house residents. Hill Decl., Ex. A, at 93-94.

**RESPONSE:** Undisputed.

7.      According to Broome DDSO policy, bed checks were visual checks to make sure that the resident was in bed and in a safe position. Hill Decl., Ex. E, Dep. Ex. 19. Employees conducting bed checks ordinarily were not expected to enter the room or check for signs of life such as ensuring that the resident was breathing. Hill Decl., Ex. A, at 93-96; Ex. B, at 265, 273; Ex. C. at 105. The only exception to this policy was for residents who the treatment team had identified as presenting "medical or intense needs." Hill Decl., Ex. E, Dep. Ex. 19.

**RESPONSE:** Disputed. When Sessions did bed checks, she was required to make sure individuals "were in their room and safe." Exhibit L 93:3-12.

8.      On April 8, 2018, C.B. was a resident of Valley Ridge. Dkt. No. 25, Am. Compl. at ¶¶ 27- 28.

**RESPONSE:** Undisputed.

9.     C.B had complained to staff during the day that he had trouble breathing. Defendant Nurse Elise Williams examined C.B. at the house and then at the medical clinic. She recorded his complaint as congestion and difficulty voiding. His lungs were clear and his blood pressure and blood oxygen levels were normal. She advised him to drink plenty of fluids and to take Robitussin as needed. Hill Decl., Ex. E, Dep. Ex. 17, at PL9153; Ex. B, at 193-194.

**RESPONSE:** Disputed. C.B. was "wheezing" during the day on April 8, 2018. Exhibit BB 9:20-23. He was also "antsy." Exhibit CC at 9. He asked "more than once" to see a nurse. Exhibit V 61:10-20. C.B. told Novack he (C.B.) needed to go to the hospital. Exhibit BB 9:16-19. C.B.'s mother also called Novack and told him C.B. "was having problems breathing" and "couldn't pee." Exhibit D 111:6-9; Exhibit B 19:23-20:6. At the clinic, Williams did not take any history from C.B. on April 8, 2018. Exhibit F 213:9-14. Nor did Williams listen to C.B.'s heart, Exhibit F 195:3-5, or check C.B.'s respiratory rate. Exhibit DD PL009153.

10.     Nurse Williams did not communicate any concerns about C.B.'s health to Ms. Sessions following her examination of him. Hill Decl., Ex. A, at 87-88; Ex. B, at 86-87, 121.

**RESPONSE:** Undisputed.

11.     No one communicated any concerns about C.B.'s health to Ms. Sessions on or about April 8, 2018. Hill Decl., Ex. A, at 87-88, 113-114; Ex. C, at 52, 94, 118-119.

**RESPONSE:** Disputed. C.B.'s health concerns were documented in C.B.'s Plan of Nursing Services, which was kept in E-House. Exhibit D 40:17-25. C.B.'s excessive weight gain was documented in his weight chart. Exhibit W. In addition, Sessions spoke to the staff she was relieving and was told about issues that had occurred on the previous shift. Exhibit L 86:13-23.

12.     On the night of April 8, 2018, C.B.'s treatment team had not identified him as having "medical or intense needs." *See* Hill Decl., Ex. E, Dep. Ex. 17, at PL9153; Ex. B, at 252; Ex. A-20.

**RESPONSE:** Disputed. During the day on April 8, 2018, Valley Ridge CIT direct care staff observed that C.B. had medical needs. He complained to direct care staff that he was having trouble breathing, Exhibit V 59:19-22, he was "wheezing," Exhibit BB 9:20-23, and he asked to go to the hospital, Exhibit BB 9:16-19. Sessions also spoke to the staff she was relieving and was told about issues that had occurred on the previous shift. Exhibit L 86:13-23.

13.     On the night of April 8, 2018, policy dictated that Ms. Sessions perform ordinary, visual bed checks of C.B. Hill Decl., Ex. E, Dep. Ex. 19; *see* Hill Decl., Ex. B, at 252, 265.

**RESPONSE:** Disputed to the extent "ordinary" is undefined. When doing bed checks, Sessions was required to make sure individuals "were in their room and safe." Exhibit L 93:3-12.

14.     Ms. Sessions performed bed checks of C.B. at 11:00 p.m. on April 8 and 1:00 a.m. on April 9. She did not perform the bed checks of C.B. that she was supposed to perform at 3:00 a.m. and 5:00 a.m. Hill Decl., Ex. A at 14-15, 20. She later falsely recorded in OPWDD records that she had performed the 3:00 a.m. and 5:00 a.m. checks and that C.B. had been up at 1:00 a.m. to use the bathroom. Hill Decl., Ex. E, Dep. Ex. 20.

**RESPONSE:** Undisputed that Sessions did not perform bed checks of C.B. at 3:00 a.m. and 5:00 a.m., and that Sessions falsified OPWDD records.

15.     On April 9, 2018, at approximately 6:30 a.m., OPWDD staff member Jennifer Smith attempted to rouse C.B. for his morning medication. He was lying on his back. She did not realize he was dead until she touched him. Hill Decl., Ex. A, at 124-125; *see* Ex. E, Dep. Ex. 16, 17; 55, at PL008973.

**RESPONSE:** Undisputed that Smith attempted to rouse C.B. at approximately 6:30 a.m.

and that C.B. was dead at that time.

16.     OPWDD terminated Ms. Sessions's employment. Hill Decl., Ex. E, Dep. Ex. 46.

**RESPONSE:** Undisputed.

17.     Medical Examiner Dr. John N. Cruz performed a post-mortem examination of C.B. According to Dr. Cruz's report, C.B. could have died at any time from approximately 4:30 to 6:30 A.M. on April 9, 2019. Hill Decl., Ex. E, Dep Ex. 16; Ex. D, at 4. C.B. "died from idiopathic or viral cardiomyopathy and was in heart failure at the time of his death." Ex. E, Dep. Ex. 16. Although the doctor concluded that C.B. had been suffering from this condition for months and was on the night of his death experiencing pulmonary edema, he explained that "this can present in a subtle manner and sometimes with only diminished breath sounds at the lung bases which would require a very good clinician to find." Hill Decl., Ex. E, Dep. Ex. 16.

**RESPONSE:** Disputed. According to Dr. Charash, C.B. died between 4:00 a.m. and 5:30 a.m. Exhibit Z at 4. Dr. Charash also opined that C.B. "developed a viral myocarditis within a few days to weeks of his death." Exhibit Z at 5.

Dated: December 22, 2023
     New York, New York

                                   EMERY CELLI BRINCKERHOFF
                                   ABADY WARD & MAAZEL LLP

                                   */s/ Samuel Shapiro*
                                   Samuel Shapiro
                                   Laura S. Kokotailo*

                                   600 Fifth Avenue, 10th Floor
                                   New York, New York 10020
                                   (212) 763-5000

                                   *Attorneys for Plaintiff*

                                   *Application for admission to practice
                                   in NDNY forthcoming

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M., as Administrator of the Estate of Her Son, C.B., | 20 Civ. 00091 (TJM)(CFH) |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANTS' L.R. 56.1. STATEMENT OF MATERIAL FACTS** |
| -against- | |
| ASHLEY SESSIONS; ELISE M. WILLIAMS; JOSHUA A. BUELL; COREY C. BEHLEN; RAYMOND J. McGINN; KATHERINA L. CASSATA; MICHAEL NOVACK, | |
| Defendants. | |

Pursuant to Rule 56.1 of the Local Rules of this Court, Plaintiff J.M., as Administrator of

the Estate of Her Son, C.B., hereby submits this response to Defendants' statement of material

facts.

*C.B. is Voluntarily Admitted to Valley Ridge*

1.      Under New York Mental Hygiene Law Article 15, facilities operated by the New

York State Office for People with Developmental Disabilities ("OPWDD") care for individuals

who are admitted on both a voluntary and involuntary basis.  Declaration of Cassaundra Murray at ¶

6.

**RESPONSE:** Undisputed.

2.      Individuals who are admitted to OPWDD facilities on a voluntary basis under

Article 15 must be promptly discharged upon their request, unless they are converted to involuntary

admission status by a court order.  *Id.*

**RESPONSE:** Disputed. No resident at Valley Ridge CIT, including C.B., was permitted to

discharge to see a medical provider or go to a hospital upon their request. Exhibit F 240:7-14;

Exhibit U 32:20-33:11; Exhibit G. 65:17-19.

3.     The decedent in this action, C.B., was a voluntary admission to Valley Ridge Center for Intensive Treatment. *Id.* at ¶ 7.

**RESPONSE:** Disputed. C.B. was moved into OPWDD care because "he couldn't be home." Exhibit B 10:9-18.

4.     On May 19, 2015, C.B. submitted an Application for Voluntary Admission pursuant to New York Mental Hygiene Law section 15.13 and was admitted to Valley Ridge on that same date on voluntary legal status. *Id.* at ¶ 8 and Exhibit A.

**RESPONSE:** Disputed. The phrase "voluntary legal status" is vague and undefined. Like all Valley Ridge CIT residents, C.B.'s movements were restricted and he could not see a medical provider without permission or go to a hospital without the approval of either the nursing staff or an on-call provider. Exhibit F 240:7-14; Exhibit U 32:20-33:11; Exhibit G 65:17-19; 66:8-13.

5.     C.B. remained in voluntary legal status from the date he entered on May 19, 2015 up to the date of his death on April 9, 2018. *Id.* at ¶ 9.

**RESPONSE:** Disputed. The phrase "voluntary legal status" is vague and undefined. Like all Valley Ridge CIT residents, C.B.'s movements were restricted and he could not see a medical provider without permission or go to a hospital without the approval of either the nursing staff or an on-call provider. Exhibit F 240:7-14; Exhibit U 32:20-33:11; Exhibit G 65:17-19; 66:8-13.

6.     C.B. was not converted to an involuntary status for any period.  *Id.*

**RESPONSE:** Disputed. The phrase "involuntary status" is vague and undefined. Like all Valley Ridge CIT residents, C.B.'s movements were restricted and he could not see a medical provider without permission or go to a hospital without the approval of either the nursing staff or an on-call provider. Exhibit F 240:7-14; Exhibit U 32:20-33:11; Exhibit G 65:17-19; 66:8-13.

7.     C.B. did not request release from Valley Ridge CIT at any time.  *Id.*

**RESPONSE:** Disputed. On April 8, 2018, C.B. asked to be released from Valley Ridge CIT to go to the hospital. Exhibit BB 9:16-19.

<u>*C.B.'s Death*</u>

8.      On the morning of April 9, 2018, C.B. was found unresponsive in his bedroom at Valley Ridge by Valley Ridge staff.  Behlen Deposition at 106.

**RESPONSE:** Undisputed.

9.      C.B.'s autopsy indicated that his death was caused by acute pulmonary edema due to idiopathic cardiomyopathy, a heart condition.  McGinn Deposition at 108-110.

**RESPONSE:** Disputed. The medical examiner concluded that C.B. "died from either an idiopathic or viral cardiomyopathy and was in heart failure at the time of his death." Exhibit HH. According to Dr. Charash's unrebutted opinion, C.B. "likely suffered from viral myocarditis." Exhibit Z at 5.

<u>*Defendant Williams Examines C.B. on April 8, 2018*</u>

10.      On April 8, 2018 at approximately 1:30 p.m., Nurse Elise Williams saw C.B. in the "E" House at Valley Ridge. Declaration of Elise Williams ("Williams Dec.") at ¶ 5; *see also* Williams Deposition at 179-181.

**RESPONSE:** Undisputed.

11.      When Williams saw C.B. on April 8, 2018, he complained of difficulty voiding his bladder.  Williams Dec. at ¶ 6.

**RESPONSE:** Disputed. Other complaints were reported to Williams when she saw C.B. in E-House. McKown reported to Williams that C.B. was complaining about having difficulty breathing. Exhibit V 59:5-11. And C.B. was noticeably "wheezing" and "having trouble breathing." Exhibit BB 9:20-10:1.

12.      C.B. did not complain of any burning or discomfort while urinating. *Id.* at ¶ 14.

**RESPONSE:** Disputed. Other complaints were reported to Williams when she saw C.B. in E-House. McKown reported to Williams that C.B. was complaining about having difficulty breathing. Exhibit V 59:5-11. And C.B. was noticeably "wheezing" and "having trouble breathing." Exhibit BB 9:20-10:1.

13.     On April 8, 2018, Williams also observed that C.B. had some sinus congestion. *Id.* at ¶ 6.

**RESPONSE:** Disputed. C.B. did not have sinus congestion. He was "wheezing" and "having trouble breathing" on April 8. Exhibit BB 9:20-10:1. Williams failed to ask C.B. or anyone else when his symptoms started and therefore failed to discover that he had been having chest pains for days, Exhibit I 52:3-18; 56:17-20, he had been having trouble breathing for days, Exhibit I 52:3-15; 56:21-23, and that he had been complaining about being "tired all the time," Exhibit I 50:20-51:8.

14.     On April 8, 2018, Williams asked C.B. whether he had been taking cough syrup that was available to him as needed, and C.B. responded that he had. *Id.* at ¶ 7.

**RESPONSE:** Undisputed.

15.     On April 8, 2018, at 2:30 p.m., Williams saw C.B. in the clinic, which is located in a separate building. *Id.* at ¶ 9.

**RESPONSE:** Undisputed.

16.     Williams observed that C.B. was breathing heavily due to the walk from "E" House to the clinic, but that his breathing normalized after arriving at the clinic. *Id.* at ¶ 11.

**RESPONSE:** Disputed. C.B. had been having trouble breathing on before going to the clinic and for days earlier. Exhibit BB. 9:20-10:1; Exhibit I 52:3-15; 56:21-23. Williams did nothing to determine the cause of his difficulty breathing.

17.     Williams took C.B.'s vital signs, which were within normal limits. *Id.* at ¶ 12.

**RESPONSE:** Disputed. Williams did not check C.B.'s respiratory rate. Exhibit DD.

18.     Williams listened to C.B.'s lungs, which were clear.  *Id.* at ¶ 13.

**RESPONSE:** Disputed. Williams could not assess whether C.B.'s lungs were clear because, as a RN, she did not provide "medical care at the advanced level." Exhibit F 32:7-17. It was even illegal for her to diagnose a medical condition. Exhibit F 42:23-24.

19.     Williams examined C.B.'s bladder, finding that it was non-distended with no complaints of discomfort on palpation. *Id.* at ¶ 14.

**RESPONSE:** Undisputed.

20.     Williams encouraged C.B. to rest and drink fluids, and to request another dose of cough syrup for his congestion. *Id.* at ¶ 16.

**RESPONSE:** Undisputed that Williams encouraged C.B. to drink fluids, which was akin to a death sentence, since hydrating underlying cardiomyopathy would provoke C.B. into pulmonary edema. Exhibit Z at 6.

21.     Williams received no further calls or complaints about C.B. on April 8, 2018.  *Id.*

**RESPONSE:** Disputed. Williams could not know whether C.B. had continued complaints because she did not follow up on his condition in any way. Exhibit F 236:10-13.

22.     Williams completed her shift at 5:00pm on April 8, 2018, and did not learn of C.B.'s death until April 10, 2018 when she returned to work. *Id.* at ¶¶ 17-18.

**RESPONSE:** Undisputed.

### *Defendant Buell is Present During the April 8, 2018 Examination*

23.     Defendant Joshua Buell was working at Valley Ridge as a Developmental Disabilities Secure Care Treatment Aide ("DDSCTA") I on April 8, 2018.  Buell Deposition at 66.

**RESPONSE:** Disputed. In April 2018, Buell was a DDSCTA 2 at Valley Ridge. Exhibit R

5

13:18-20.

24.     Williams asked Buell to be present in the clinic while she examined C.B. because it was the practice at Valley Ridge to have a male staff member present if a female nurse was examining a male patient. *Id.*

**RESPONSE:** Undisputed.

25.     Buell observed that C.B. "seemed like he had a cold" when he arrived at the clinic. *Id.* at 69.

**RESPONSE:** Disputed. C.B. did not have a cold. He was "wheezing" and "having trouble breathing" on April 8. Exhibit BB 9:20-10:1. He had been having chest pains for days, Exhibit I 52:3-18; 56:17-20, he had been having trouble breathing for days, Exhibit I 52:3-15; 56:21-23, and that he had been complaining about being "tired all the time," Exhibit I 50:20-51:8.

26.     Buell did not observe any swelling in C.B.'s arms or legs, nor did C.B. complain to Buell about any such swelling. *Id.* at 85.

**RESPONSE:** Disputed. The cited testimony does not indicate whether Buell even looked at C.B.'s arms or legs.

27.     Later on April 8, 2018, Buell saw C.B. watching television in "E" House, but C.B. did not make any complaints to him. *Id.* at 79.

**RESPONSE:** Disputed. Buell testified he did not recall whether C.B. said anything to him about how he was feeling. Exhibit R 79:21-23.

### *Defendant McGinn Monitors and Treats C.B's Health Conditions*

28.     In 2018, McGinn worked as a family nurse practitioner at Valley Ridge. Declaration of Raymond J. McGinn ("McGinn Dec.")  at ¶ 2.

**RESPONSE:** Undisputed.

6

29.     Individuals at Valley Ridge are weighed monthly. *Id.* at ¶ 6.

**RESPONSE:** Undisputed.

30.     McGinn's practice was to review resident's weight charts on an annual basis unless the nursing staff alerted him that a resident had gained more than ten pounds in a month. *Id.* at ¶ 7.

**RESPONSE:** Undisputed.

31.     C.B. gained approximately 13 pounds between December 2017 and April 2018. *Id*. at ¶ 8 and Exh. A.

**RESPONSE:** Disputed. C.B. gained more than 21 pounds between December 2017 and April 2018. Exhibit W.

32.     In response to C.B.'s weight gain, McGinn encouraged C.B. to make healthy food choices and to increase physical activity. *Id*. at ¶ 9.

**RESPONSE:** Undisputed that McGinn encouraged C.B. to make healthy food choices and increase physical activity and that C.B. kept gaining weight.

33.     C.B. was placed on a calorie-controlled diet. *Id*. at ¶ 10.

**RESPONSE:** Undisputed that C.B. was placed on a calorie-controlled diet and kept gaining weight.

34.     Staff at Valley Ridge cannot compel residents to restrict their caloric intake, nor can they force residents to stop consuming high calorie foods or snacking outside their normal meals. *Id*.

**RESPONSE:** Disputed to the extent this "fact" suggests C.B. was consuming high calorie foods in the weeks leading up to his death. C.B. had a healthy diet before his death and was trying to lose weight. Exhibit V 46:7-20.

35.     McGinn believed that C.B.'s weight gain was caused by his antipsychotic

7

medications. *Id*. at ¶ 11.

**RESPONSE:** Disputed. McGinn did not do anything to determine why C.B. was gaining weight at the rate he was during the last year of his life. Exhibit G 75:5-9.

36.     McGinn performed routine monitoring of C.B.'s laboratory tests, including his renal function, lymphatic, electrolytes, and thyroid function to ensure they were maintained at normal levels and not contributing to his weight gain. *Id*. at ¶ 12 and Exh. B.; *see also* McGinn Deposition at 75-79.

**RESPONSE:** Disputed. McGinn did not do anything to determine why C.B. was gaining weight at the rate he was during the last year of his life. Exhibit G 75:5-9.

37.     McGinn does not recall observing any sign of fluid retention by C.B. over the last year of his life.  McGinn Dec. at ¶ 26.

**RESPONSE:** Disputed. McGinn did not take any steps to determine whether C.B. was retaining fluid during the last year of his life. Exhibit G 76:5-12.

38.     Checking for signs of fluid retention is part of a physical exam, during which McGinn would look for "pitting" on the lower extremities which would indicate "edema," or fluid retention. *Id*. at ¶ 27.  Part of McGinn's physical exam of patients is to check all extremities for pitting. *Id*.

**RESPONSE:** Undisputed that an appropriate physical exam includes checking a patient's extremities for pitting.

39.     McGinn's performed a physical exam of Plaintiff on January 15, 2018. *Id*. ¶ 14. During that exam, McGinn did not observe any signs of pitting or edema. *Id*. at ¶ 21.

**RESPONSE:** Disputed. McGinn's notes from his January 15, 2018 exam do not say anything about examining C.B. for pitting or edema. Exhibit Y.

40.     On January 15, 2018, C.B. complained of "nocturia," or the frequent need to rise at night to urinate. *Id*. at ¶ 15.

**RESPONSE:** Undisputed.

41.     "Nocturia" is most typically caused by problems with the prostate or by a urinary tract infection. *Id*. ¶ 16.

**RESPONSE:** Disputed. Nocturia can be a symptom of heart failure. Exhibit H.

42.     McGinn examined C.B.'s prostate and found that it was not tender or enlarged. *Id*. at ¶ 17.

**RESPONSE:** Undisputed.

43.     C.B's urine test was negative for infection. *Id*. at ¶ 19.

**RESPONSE:** Undisputed.

44.     C.B. did not complain of "dysuria," or painful urination, which is a symptom commonly associated with a kidney or urinary tract infection. *Id.*

**RESPONSE:** Undisputed.

45.     McGinn believed that C.B. may be experiencing urinary symptoms related to his antipsychotic medications. *Id*. at ¶ 20.

**RESPONSE:** Undisputed that McGinn ignored the possibility that C.B.'s nocturia was caused by a heart condition.

46.     McGinn prescribed Tamsulosin, a medication that relaxes the prostate to promote more complete emptying of the bladder. *Id.*

**RESPONSE:** Undisputed.

*Defendant Behlen Does Rounds on the Night Shift from April 8-9, 2018*

47.     Defendant Corey Behlen was working as the head of shift for the night shift on

April 8 to April 9, 2018.  Behlen Deposition at 83-84.

**RESPONSE:** Undisputed.

48.    Behlen was present in "E" House from 3:00am to 5:30am.  *Id.* at 95-96.

**RESPONSE:** Undisputed.

49.    While in "E" House, Behlen observed Defendant Ashley Sessions in the hallway and in the office.  *Id*. at 96.

**RESPONSE:** Disputed. Behlen was watching TV while in E-House. Exhibit O 96:3-16. He saw Sessions on the computer, but he did not know what she was doing on the computer. Exhibit O 96:17-97:9.

50.    Behlen did not observe Sessions sleeping at any point.  *Id.* at 130.

**RESPONSE:** Disputed. Behlen could not have observed Sessions closely enough to know if she was sleeping, since Sessions admitted to "watching movies" on the computer, Exhibit L 81:2-17, and Behlen claims he had no idea she was watching movies, Exhibit O 96:17-97:9.

51.    From the desk inside the "E" Building Office, employees can see into the hallway that runs outside the residents' bedrooms, and thus can see if residents have left their bedrooms. *Id*. at 131.

**RESPONSE:** Disputed. Sessions could not see into the hallway because she "was watching movies" on the computer and "was distracted." Exhibit L 81:2-17.

52.    When Behlen saw Sessions in the office, she was using the computer for email, and, at another point, writing something at the desk.  *Id*. at 132.

**RESPONSE:** Disputed. Behlen did not "know what [Sessions] was doing directly" when he saw her. Exhibit O 96:24-97:9.

*Defendant Cassata Reports C.B.'s Medical Complaints to Nursing Staff*

53.     On two occasions in the days leading up to his death, Defendant Katherina Cassata, a DDSCTA, observed C.B. having difficulty completing his assigned chore of vacuuming. Cassata Deposition at 51-56.

**RESPONSE:** Undisputed that Cassata saw C.B. become exhausted from vacuuming on April 4, 2018, Exhibit I 55:9-56:11, and that Cassata saw C.B. on April 6, 2018, "sitting down in the chair trying to vacuum sitting down in the chair like scooching himself along," Exhibit I 57:7-13.

54.     C.B. reported to her that he did not feel well and Cassata reported these complaints to the nursing staff at Valley Ridge. *Id*. at 57-65.

**RESPONSE:** Disputed. C.B. reported many complaints to Cassata, but Cassata did not report any of them to nursing staff at Valley Ridge. Exhibit K 48:10-50:22.

55.     Cassata also recorded her observations of C.B., and contacts with nursing, in the "end of shift" notes. *Id.*

**RESPONSE:** Disputed. No notes have been produced with Cassata's purported observations. Exhibit J.

11

*Defendant Novack Receives a Call from J.M. about C.B.'s Medical Issues*
*and Notifies Nursing Staff*

56.        On April 8, 2018, Defendant Michael Novack, a DDSCTA 2, spoke to

Plaintiff J.M. on the phone. Novack Deposition at 112.

**RESPONSE:** Undisputed.

57.        J.M. told Novack that C.B. was not feeling well.  Novack reported this to nursing

staff. *Id.* at 118.

**RESPONSE:** Disputed. J.M told Novack her son "was having problems breathing" and

"couldn't pee." Exhibit G 111:6-9; Exhibit B 19:23-20:6. Novack did not call Williams on April 8,

2018, to report anything about C.B.'s medical condition. Exhibit F 195:6-197:24.

Dated: December 22, 2023
       New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


*/s/ Samuel Shapiro*
Samuel Shapiro
Laura S. Kokotailo*

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

*Application for admission to practice
in NDNY forthcoming

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.M., as Administrator of the Estate of Her Son,
C.B.,

                Plaintiff,

     -against-

ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. McGINN; KATHERINA L.
CASSATA; MICHAEL NOVACK,

              Defendants.

20 Civ. 00091 (TJM)(CFH)

## DECLARATION OF SAMUEL SHAPIRO

      SAMUEL SHAPIRO declares under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

      1.     I am a partner with the law firm of Emery Celli Brinckerhoff Abady Ward &

Maazel LLP, counsel for Plaintiff in the above-captioned matter.  I submit this Declaration in

opposition to Defendants' Motions for Summary Judgment, ECF Nos. 118, 120.

      2.     A true and correct copy of C.B.'s Death Certificate is attached as Exhibit A (filed

under seal as a medical record).

      3.     A true and correct copy of excerpts from the transcript of the deposition of

Plaintiff J.M. is attached as Exhibit B (filed under seal as a medical record).

      4.     A true and correct copy of C.B.'s Behavioral Support Program is attached as

Exhibit C (filed under seal as a medical record).

5.       A true and correct copy of excerpts from the transcript of the deposition of Defendant Michael Novack is attached as Exhibit D.

6.       A true and correct copy of Broome DDSO's Nursing and Policy Procedure on focus charting, dated August 2008, is attached as Exhibit E.

7.       A true and correct copy of excerpts from the transcript of the deposition of Defendant Elise M. Williams is attached as Exhibit F.

8.       A true and correct copy of excerpts from the transcript of the deposition of Defendant Raymond J. McGinn is attached as Exhibit G.

9.       A true and correct copy of an excerpt of the Expert Report of Georgia Persky, RN, BSN, MBA, PhD, NEA-BC, dated June 28, 2023, is attached as Exhibit H.

10.      A true and correct copy of excerpts from the transcript of the deposition of Defendant Katherina L. Cassata is attached as Exhibit I.

11.      A true and correct copy of C.B.'s Staff Observations/Notes (also referred to as the "DAR notes") from February 23, 2018, through April 9, 2018, is attached as Exhibit J (filed under seal as a medical record).

12.      A true and correct copy of excerpts from the transcript of the deposition of Anita Baral is attached as Exhibit K.

13.      A true and correct copy of excerpts from the transcript of the deposition of Defendant Ashley Sessions is attached as Exhibit L.

14.      A true and correct copy of C.B.'s bed check charts is attached as Exhibit M (filed under seal as a medical record).

15.     A true and correct copy of Defendant Ashley M. Sessions' statement to the New York State Police, dated April 9, 2018, is attached as Exhibit N (filed under seal as a medical record).

16.     A true and correct copy of excerpts from the transcript of the deposition of Defendant Corey C. Behlen is attached as Exhibit O.

17.     A true and correct copy of excerpts from a transcript of Defendant Corey C. Behlen's OPWDD OIIA interview is attached as Exhibit P (filed under seal as a medical record).

18.     A true and correct copy of an email message from Laurie Miller dated April 17, 2018, is attached as Exhibit Q (filed under seal as a medical record).

19.     A true and correct copy of excerpts from the transcript of the deposition of Defendant Joshua A. Buell is attached as Exhibit R.

20.     A true and correct copy of Broome DDSOO's policy and procedures for resident documentation and charting, issued August 2018, is attached as Exhibit S.

21.     A true and correct copy of C.B.'s Plan of Nursing Services dated January 30, 2018 and March 27, 2018 is attached as Exhibit T (filed under seal as a medical record).

22.     A true and correct copy of excerpts from the transcript of the deposition of Jennifer Smith is attached as Exhibit U.

23.     A true and correct copy of excerpts from the transcript of the deposition of Leisa McKown is attached as Exhibit V.

24.     A true and correct copy of C.B.'s Weight Chart is attached as Exhibit W (filed under seal as a medical record).

25.     A true and correct copy of an email from Margaret Fassett, RD II, to Defendant Raymond McGinn dated April 21, 2017 is attached as Exhibit X (filed under seal as a medical record).

26.     A true and correct copy of C.B.'s Unit Physician Notes is attached as Exhibit Y (filed under seal as a medical record).

27.     A true and correct copy of the Expert Report of Dr. Bruce D. Charash, M.D. is attached as Exhibit Z (filed under seal as a medical record).

28.     A true and correct copy of the call log of Plaintiff J.M. from April 8, 2018, is attached as Exhibit AA.

29.     A true and correct copy of excerpts from the transcript of the deposition of Samantha Feliciano is attached as Exhibit BB.

30.     A true and correct copy of excerpts from a transcript of Leisa McKown's interview with OIIA is attached as Exhibit CC (filed under seal as a medical record).

31.     A true and correct copy of C.B.'s Nursing Notes is attached as Exhibit DD (filed under seal as a medical record).

32.     A true and correct copy of excerpts from a transcript of Elise M. Williams's interview with OIIA is attached as Exhibit EE (filed under seal as a medical record).

33.     A true and correct copy of a photograph of the exterior of buildings at Valley Ridge CIT is attached as Exhibit FF.

34.     A true and correct copy of the report of the results of the investigation into C.B.'s death by the Justice Center for the Protection of People with Special Needs is attached as Exhibit GG (filed under seal as a medical record).

35.     A true and correct copy of the Medical Examiner's Report for C.B., dated June

12, 2018, is attached as Exhibit HH (filed under seal as a medical record).

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct to the best of my knowledge.

Dated:  December 22, 2023
        New York, New York

                                        _/s/Samuel Shapiro_____
                                        Samuel Shapiro

# Sealed Exhibit A

# Sealed Exhibit B

# Sealed Exhibit C

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
J.M., as Administrator
of the Estate of
Her son, C.B.,

        Plaintiff

          No. 20 Civ. 00091(TJM)(CFH)

    -against-

ASHLEY SESSIONS, ELISE M. WILLIAMS,
JOSHUA A. BUELL, CORY C. BEHLAN,
RAYMOND J. MCGINN,
KATHERINA L. CASSATA and
MICHAEL NOVACK,

       Defendants.
- - - - - - - - - - - - - - - - - - - - - -x

    Oral deposition of MICHAEL NOVACK was
held via Zoom, commencing January 10th, 2022,
at 10:00 a.m., before NICOLE LEBOVIC, a Court
Reporter and Notary Public in and for the
State of New York.

2

```
 1
 2    A P P E A R A N C E S:
 3
 4        EMERY CELLI BRINKERHOFF ABADY
          WARD & MAAZEL, LLP
 5                Attorneys for Plaintiffs
                  600 Fifth Avenue
 6                10th Floor
                  New York, New York 10020
 7
          BY:   SAM SHAPIRO, ESQ.
 8                sshapiro@ecbawm.com
 9
10
11        CAPEZZA HILL, LLP
                  Attorneys for Defendant
12                ASHLEY SESSIONS
                  30 S Pearl Street
13                Suite P-110
                  Albany, New York 12207
14
          BY:   BENJAMIN HILL, ESQ.
15                ben@capezzahill.com
16
17
18        NEW YORK STATE ATTORNEY GENERAL- ALBANY
                  Attorneys for Defendants
19                ELISE M. WILLIAMS, JOSHUA A.
                  BUELL, CORY C. BEHLAN, RAYMOND J,
20                MCGINN, KATHERINA L. CASSATA
                  and MICHAEL NOVACK
21                The Capitol
                  Albany, New York 12224
22
          BY:   RYAN W. HICKEY, ESQ.
23                ryan.hickey@ag.ny.gov
24                KASEY K. HILDONEN, ESQ.
                  kasey.hildonen@ag.ny.gov
25
```

1                    MICHAEL NOVACK

2          A.     Yes, I do.

3          Q.     Is that something that you ever

4    check when you're not at work?

5          A.     No, I do not.

6          Q.     Are you currently employed, Mr.

7    Novack?

8          A.     Yes, by OPWDD.

9          Q.     And what's your title currently?

10         A.     DDSCTA 2.

11         Q.     Tell me what DDSCTA means?

12         A.     Developmental Disabled Secure

13   Care Treatment Aide.

14         Q.     And so DDSCTA is an acronym,

15   right?

16         A.     Yes, that's correct.

17         Q.     So it's D-D-S-C-T-A; is that

18   correct?

19         A.     D-D-S-C-T-A, yes.

20         Q.     And you're a DDSCTA 2, right?

21         A.     Correct.

22         Q.     How long have you held that

23   title?

24         A.     Maybe 14 years, 15 years.

25         Q.     Have you ever sought a promotion?

1                    MICHAEL NOVACK

2          Q.    Could you tell me briefly, Mr.

3    Novack, your educational background?

4          A.    I have some college, about a

5    little more than two years of college.

6          Q.    And you graduated from high

7    school?

8          A.    Yes, I did.

9          Q.    Where did you go to do your

10   college?

11         A.    For college I went to Cortland

12   for two years and then I did some classes at

13   Broome?

14         Q.    Any degrees?

15         A.    No, no degrees.

16         Q.    When did you start working for

17   OPWDD?

18         A.    2002, February.

19         Q.    Have you been working for OPWDD

20   continuously since 2002?

21         A.    Yes, I have.

22         Q.    What did you do before you

23   started working for OPWDD?

24         A.    I worked at IBM.

25         Q.    What did you do at IBM?

                    MICHAEL NOVACK

 1

 2      A.      Yes, I am right now.

 3      Q.      What certification do you have?

 4      A.      That I took the course, that I

 5  took a refresher course.

 6      Q.      Is your CPR certification

 7  current?

 8      A.      I believe so, yeah.

 9      Q.      To your knowledge, has -- did you

10  become CPR certified in about 2002 when you

11  started with OPWDD?

12      A.      No, actually I had it also when I

13  was working at IBM, they did courses there.

14      Q.      Has your certification ever

15  lapsed, to your knowledge?

16      A.      It may have, I really don't know.

17  I'm not sure how often -- I did it so long

18  ago at IBM.

19      Q.      What about since you've been at

20  OPWDD, has your certification lapsed?

21      A.      Not to my knowledge.

22      Q.      Did you ever receive any training

23  on how to examine someone's lungs?

24      A.      No.

25      Q.      You never received any training

                      MICHAEL NOVACK

 1

 2    on how to diagnosis a medical condition; is

 3    that right?

 4         A.    No.

 5         Q.    I'm correct, right?

 6         A.    You're right, no, I have not

 7    received training on diagnosis.

 8         Q.    Have you ever received any

 9    training on how to identify symptoms of

10    heart failure?

11         A.    Of what?

12         Q.    Heart failure?

13         A.    I may have, I don't recall that.

14    I don't recall that particular training, no.

15         Q.    When you say you may have,

16    sitting here today, can you recall any OPWDD

17    training that you participated in that

18    addressed symptoms of heart failure?

19         A.    No, I don't remember any of that,

20    no.

21         Q.    To your knowledge, can shortness

22    of breath be a symptom of heart failure?

23         A.    I don't know.  I don't know the

24    answer to that.

25         Q.    To your knowledge, can fatigue be

25

1              MICHAEL NOVACK

2    I guess.

3         Q.    You mentioned you were a

4    supervisor; is that correct?

5         A.    (No audible response.)

6         Q.    I didn't hear your answer, Mr.

7    Novack.

8              MR. SHAPIRO:  I'm having a heard

9         time hearing -- just Off the record for

10        a second.

11             (A brief recess was taken.)

12             MR. SHAPIRO:  Can you read back

13        the last question.

14             (The requested portion was read.)

15        A.    Yes, it is, correct.

16        Q.    And tell me what that entails?

17        A.    That entails making sure that

18   everyone else is doing their job along with

19   paying the guys on a weekly basis, making

20   sure that the staff, their times is done and

21   I guess that's about it, I guess.

22        Q.    Who are you responsible for

23   supervising?

24        A.    Who I am responsible for?

25        Q.    Supervising?

1               MICHAEL NOVACK

2       A.      The staff in the house.

3       Q.      When you say, "The staff in the

4    house," does that mean the DDSCTA 1s?

5       A.      Yes, the DDSCTA 1s in the house.

6       Q.      And in April of 2018,

7    approximately how many DDSCTA 1s were

8    assigned to E-House?

9       A.      I really have no idea.

10      Q.      More than ten?

11      A.      No, I don't think so, no.

12      Q.      And as a DDSCTA 2, in April of

13   2018, who was your direct supervisor?

14      A.      I don't remember.  It might have

15   been Nancy Fitzgerald.

16      Q.      Who's Nancy Fitzgerald?

17      A.      She's my DA3.  You asked who my

18   supervisor was.

19      Q.      And is she currently your

20   supervisor?

21      A.      Yes, she is.

22      Q.      So, is the chain of command among

23   staff at Valley Ridge, does it go DDSCTA is

24   the lowest, followed by DDSCTA 2, followed

25   by DA3?

40

1                    MICHAEL NOVACK

2     here, the heading of the column says,

3     "Monitoring reporting," do you see that?

4          A.    Yes.

5          Q.    Do you have an understanding of

6     what this column is communicating?

7          A.    "Report noncompliance in

8     medication regimen, report any complaints"

9     or something, I can't read the rest of it.

10              So, I report -- I report any

11    complaints they have any ways to medical, I

12    report them.

13         Q.    Do you understand this document

14    to be a directive towards direct care staff

15    such as yourself?

16         A.    I don't recall ever seeing this.

17         Q.    Have you ever seen a plan of

18    nursing service for anyone at Valley Ridge?

19         A.    I don't recall that, no.

20         Q.    That's not something that's kept

21    in E-House?

22         A.    Yes, there is a book in the house

23    there, yes.

24         Q.    What's in that book?

25         A.    The plan of nursing service.

41

1                      MICHAEL NOVACK

2          Q.    But that's not something you look

3     at?

4          A.    No, it's not something I look at,

5     no.

6          Q.    Did you ever receive training or

7     instruction about reviewing plans of nursing

8     service?

9          A.    I don't remember.  I don't

10    remember receiving training on this.  I just

11    know they were in each house, I thought they

12    had diagnoses in it.

13         Q.    So those are available in the

14    house, but your practice is not to review

15    them?

16         A.    Yeah, I don't.

17         Q.    And in April 2018, you were not

18    familiar with C.B.'s plan of nursing

19    service, am I correct?

20         A.    Not this document, no.

21         Q.    I'm correct that in April of 2018

22    you were not familiar with C.B.'s plan of

23    nursing service; is that correct?

24         A.    I'm not familiae with that

25    document, right, that is correct.

63

1              MICHAEL NOVACK

2      Q.    I'm going to show you what's been

3  marked as Plaintiff's Exhibit 30.  It's a

4  two-page document starting with Defendant

5  8639.

6             Does this document look familiar

7  to you, Mr. Novack?

8      A.    No, it does not.

9      Q.    And focus charting is not

10 something you've ever used in your time

11 working at Valley Ridge?

12     A.    I don't recall the term.

13     Q.    Do you have any understanding on

14 -- if you look at this document, do you have

15 any understanding what it means, focus

16 charting?

17     A.    No, I don't know what they're

18 looking for.

19     Q.    I'm going to direct your

20 attention to the second page of the

21 document.

22     A.    Okay.

23     Q.    At the bottom of the second page

24 there's a line in bold that says, "Staff

25 knowledge of the CFA and IPP is essential to

67

1                    MICHAEL NOVACK

2        A.    Yes, that's what it looks like.

3        Q.    And then by the end of 2017,

4   December of 2017, he weighed 272.8 pounds,

5   do you see that?

6        A.    Yes.

7        Q.    So over the next six months, he

8   gained more than 22 pounds, right?

9        A.    That's what it looks like.

10        Q.    And then on the second page we

11   see in April 2018 his initial weight was

12   294 pounds, do you see that?

13        A.    Yes.

14        Q.    And then he was reweighed to be

15   285.6 pounds, right?

16        A.    Yes, I see that.

17        Q.    So, he had gained another

18   13 pounds since December 2017, right, at

19   least?

20        A.    Okay.

21        Q.    Do you recall any conversation

22   with anyone at OPWDD regarding C.B.'s weight

23   gain?

24        A.    No, I don't remember.  I don't

25   recall talking about his weight.

```
 1                    MICHAEL NOVACK
 2   think you're referring to him being --
 3   because I was looking at my notes again and
 4   I was referring to him being in his room on
 5   and off.
 6        Q.    Okay.  And that was something you
 7   observed in the weeks before his death, that
 8   he was in his room a lot; is that correct?
 9        A.    That he was in his room on and
10   off.
11        Q.    And did you also observe that he
12   was lethargic in the weeks prior to his
13   death?
14        A.    No, that was somebody else that
15   told me that.
16        Q.    Who told you that?
17        A.    I don't recall, that was over --
18   you know, that was close to four years ago.
19        Q.    So you recall someone telling you
20   that C.B. had been lethargic prior to his
21   death?
22        A.    Yes.
23        Q.    Did you make any -- did you
24   document that report anywhere?
25        A.    No.
```

88

1              MICHAEL NOVACK

2              (Audio playing.)

3    Q.    Did you hear that, Mr. Novack?

4    A.    I believe so, yes.

5    Q.    So, is it correct that C.B. told

6 you he wasn't going to class because he was

7 tired?

8    A.    I did say that, yes.

9    Q.    And that's correct, right, that

10 was true, right?

11    A.    As far as I know.

12         MR. HILL:  Just object to the

13    form of the last one.

14    Q.    Do you have any reason sitting

15 here today to believe that what you told the

16 OIIA investigators was not truthful?

17    A.    No, I have no reason --

18         MR. HILL:  Referring to what he

19    said or what C.B. told him or just in

20    general?

21         I apologize, Sam.

22         MR. SHAPIRO:  That's all right.

23         I'm asking if he has any reason

24    sitting here today to believe what he,

25    Mr. Novack, said to the OIIA

1                          MICHAEL NOVACK

2    document you're personally familiar with,

3    right?

4         A.    No.

5         Q.    And so, you would have had no way

6    of following C.B.'s plan of nursing services

7    in April of 2018 if you weren't aware of it,

8    right?

9              MR. HILL:  Objection.

10             MS. HILDONEN:  Objection.

11        Q.    You can answer, Mr. Novack.

12        A.    Okay, if I'm not aware of it, I

13   guess I can't follow it.

14        Q.    And did you do anything to

15   instruct the DDSCTA 1s, who you supervise,

16   regarding C.B.'s plan of nursing service?

17        A.    Did I instruct the DDSCTA 1 to

18   this is, is that what you're asking?

19        Q.    That's right.

20        A.    No, I would not -- if I'm not

21   aware of it, how can I instruct them to

22   follow it?

23        Q.    Did you make any notes in C.B.'s

24   DAR notes regarding C.B. feeling tired?

25        A.    I don't recall if I did or not.

                         MICHAEL NOVACK

1
2        A.    No.

3        Q.    Do you have any knowledge of what

4   his mother said to him on April 8, 2018?

5        A.    No, I wouldn't know that.

6        Q.    But you spoke directly to C.B.'s

7   mother on April 8, 2018, right?

8        A.    According to my tape there, yeah,

9   I did speak with her.

10        Q.    And how would a resident's family

11   member get in touch with you in E-House?

12        A.    They would call the phone, it's

13   the same phone that you can call.

14        Q.    Is there a general number for

15   Valley Ridge?

16        A.    Yeah, there's a general number

17   for it too, yeah.

18        Q.    But is there a direct line to

19   E-House?

20        A.    Well, yes.

21        Q.    Is that the line that C.B. 's

22   mother called?

23        A.    I believe so, to the best of my

24   knowledge.

25        Q.    Prior to April 8, 2018, had you

114

1          MICHAEL NOVACK

2     A.   I don't recall what she had said

3  to me during the conversation, if I had

4  that.

5     Q.   Did she ask to be transferred to

6  a nurse?

7     A.   I don't recall.

8     Q.   Did you offer to transfer her to

9  a nurse?

10    A.   I don't recall that.

11    Q.   Did you make any notes concerning

12 your call with C.B.'s mom on April 8, 2018?

13    A.   I'm sure I did not make any notes

14 of it, but I did call the nurse back again.

15         MR. SHAPIRO:  All right.  We can

16    take a break.

17         Ben, when are you going to be

18    ready to come back?

19         MR. HICKEY:  Why don't we plan to

20    come back at 1:45.

21         (A recess was taken.)

22    Q.   Mr. Novack, did another E-House

23 resident tell you on April 8th that C.B. had

24 to sit down in a chair to catch his breath?

25    A.   I don't recall that happening.  I

1                    MICHAEL NOVACK

2        Q.    Did you tell the nurse that

3    another individual had seen C.B. needing to

4    catch his breath and sitting in a chair?

5        A.    I don't recall if I told the

6    nurse that or not.

7        Q.    What did the nurse say to you

8    after you made these reports?

9        A.    I don't remember, that was so

10   long ago.  I couldn't tell you what she said

11   to me.

12       Q.    She didn't direct you to take

13   C.B.'s vitals, did she?

14       A.    I don't recall what she did say.

15       Q.    If you had taken C.B.'s vitals,

16   would you have noted and documented that

17   anywhere?

18       A.    I would have probably given it to

19   the nurse.

20       Q.    And --

21       A.    And told her about the vitals.

22       Q.    Just given it verbally?

23       A.    Yeah, probably, yes.

24       Q.    Did you document anywhere in the

25   DAR notes the fact that you had called the

1                    MICHAEL NOVACK

2    nurse regarding C.B.?

3        A.    I don't recall.  You have the

4    records, right?

5        Q.    Is that something you would have

6    documented in the DAR notes?

7        A.    No, I wouldn't necessarily.

8        Q.    As one of the E-House

9    supervisors, was it your responsibility to

10   make sure that DAR notes were kept for each

11   individual in E-House?

12       A.    I don't think at that time we

13   were keeping track of that.  That document

14   you showed was from August of 2018, correct?

15       Q.    The policy document, right.  No,

16   I'm asking -- fair enough, I'm asking in

17   April of 2018, was one of your

18   responsibilities as house supervisor to make

19   sure or to keep track of each individual's

20   DAR note?

21       A.    No, I don't believe so, no.

22       Q.    Whose responsibility was that?

23       A.    It would be everybody's

24   responsibility to do that.

25       Q.    A DDSCTA 1 --

# Exhibit E

# JA795

| BROOME DDSO | ISSUING DEPT. Nursing | SECTION C-2-3 |
|---|---|---|
| Nursing Policy and Procedure | Subject Charting | Date of Issue 08/08 (rev) (07/94) |

## FOCUS CHARTING

**DEFINITION**

Focus Charting is a method for organizing information in an individual's Staff Observation Notes (form BDS Med 54A).  It is a person-centered approach with each entry reflecting issues/concerns specific to the individual.  This methodology, while not the only format, will be the **primary format** to be used in Section III (Unit Activity) and Section IV (Medical).

Focus Charting uses a column format to separate topic words or phrases from the body of the notes.  The column format helps the writer organize information into groups of related data and helps the reader locate specific information quickly.  The primary purpose of the focus column is to aid communication among members of the health care team.

**INSTRUCTION**

1. A *FOCUS* may be a key word or diagnostic category from a nursing diagnosis or need on the CFA, IPP, ISP or Plan of Care for Nursing Services.

   The writer chooses the word or phrase that best communicates the individual's need (i.e., focus), allowing the reader to follow the progress of each issue/concern **until its documented resolution.**

   Examples: Self-care: eating, tooth brushing, toileting
             Alteration in activity tolerance
             Skin integrity

   Nurses should use nursing diagnoses.

2. A *FOCUS* may be a sign, symptom or acute change of an existing condition of importance to the nursing and/or medical diagnoses or treatment plan.

   The presence of this sign indicates a problem for which the nurse or team member is providing clinical monitoring.  Using the focus column in this way communicates to staff a new or abnormal finding or a person's significant response to therapy.  This focus alerts other to the need for evaluation of current medical or nursing diagnosis and treatment.

DEF 008639

| BROOME DDSO | ISSUING DEPT. | SECTION C-2-3 |
|---|---|---|
| | Nursing | |
| Nursing | Subject | Date of Issue |
| Policy and Procedure | Charting | 04/02 (rev)<br>(07/94) |

Examples:    Arrhythmia                    Fever
             Increased blood pressure      Constipation
             Medication reaction           Loose stool
             Respiratory distress          Injury

3.   A *FOCUS* may be a significant event in the individual's care, not
     identified in a CFA, IPP, or ISP.

     When a significant treatment/intervention or event took place the
     use of the focus format communicates the information quickly and
     clearly, enhancing rapid review of the person's current status.

     Examples: Family visit
               Community outing
               Transfer

4.   A *FOCUS* may identify the topic of the note.  This facilitates
     documentation and review of notes by all staff.

     Examples: Social Service/discharge planning
               Nursing/colostomy teaching
               Dietician/instruct low fat diet
               PT/bedside exercise tolerance
               Dental
               Nursing/quarterly physical exam
               DA/day monthly summary


**CONSIDERATIONS:**

**Staff knowledge of the CFA and IPP is essential to accurate evaluation.**
Whenever possible, state the focus in a way that reflects the person's
concern rather than a nursing task or medical diagnosis.  For example,
"swollen ankle" describes a condition and is therefore a better focus
than "warm soaks," which is a statement of nursing treatment.
"Activity tolerance" is a useful focus because it leads to a
description of activity type, frequency, description of activity type,
frequency duration, assistance required and the individuals' condition
during exercise.

DEF 008640

# Exhibit F

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

J.M., as Administrator

of the Estate of

Her son, C.B.,

         Plaintiff

             No. 20 Civ. 00091(TJM)(CFH)

   -against-


ASHLEY SESSIONS, ELISE M. WILLIAMS,

JOSHUA A. BUELL, CORY C. BEHLAN,

RAYMOND J, MCGINN,

KATHERINA L. CASSATA and

MICHAEL NOVACK,


        Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x


    Oral deposition of ELISA M. WILLIAMS was
held via Zoom, commencing December 20th,
2021, at 10:00 a.m., before NICOLE LEBOVIC, a
Court Reporter and Notary Public in and for
the State of New York.


HUDSON COURT REPORTING & VIDEO   (212) 273-9911

                                                                    2

1
2     A P P E A R A N C E S:
3
4          EMERY CELLI BRINKERHOFF ABADY
           WARD & MAAZEL, LLP
5                   Attorneys for Plaintiffs
                    600 Fifth Avenue
6                   10th Floor
                    New York, New York 10020
7
           BY:  SAM SHAPIRO, ESQ.
8                    sshapiro@ecbawm.com
9
10
11         CAPEZZA HILL, LLP
                    Attorneys for Defendant
12                  ASHLEY SESSIONS
                    30 S Pearl Street
13                  Suite P-110
                    Albany, New York 12207
14
           BY:  BENJAMIN HILL, ESQ.
15                  ben@capezzahill.com
16
17
18         NEW YORK STATE ATTORNEY GENERAL- ALBANY
                    Attorneys for Defendants
19                  ELISE M. WILLIAMS, JOSHUA A.
                    BUELL, CORY C. BEHLAN, RAYMOND J,
20                  MCGINN, KATHERINA L. CASSATA
                    and MICHAEL NOVACK
21                  The Capitol
                    Albany, New York 12224
22
           BY:  RYAN W. HICKEY, ESQ.
23                  ryan.hickey@ag.ny.com
24                  KASEY K. HILDONEN, ESQ.
                    kasey.hildonen@ag.ny.com
25

                        ELISE M. WILLIAMS

1

2        A.    Yes.

3        Q.    And you received a bachelor's of

4    science in nursing from Binghamton

5    University, correct?

6        A.    Yes.

7        Q.    In 2015, right?

8        A.    Yes.

9        Q.    Since this résumé, have you had

10   any additional education?

11       A.    I have, yes.

12       Q.    What is that?

13       A.    I graduated this past May,

14   May 2021 with my master's degree as a family

15   nurse practitioner.

16       Q.    Where did you graduate from?

17       A.    Binghamton University.

18       Q.    You said it was a master's as a

19   family nurse practitioner?

20       A.    Yes.

21       Q.    Are you now registered as a nurse

22   practitioner?

23       A.    I am, yes.

24       Q.    Is that a license that you

25   received to practice as a nurse

1                    ELISE M. WILLIAMS

2    your bachelor's degree, right?

3         A.    Correct.

4         Q.    What about for the nurse

5    practitioner, what do you understand the

6    requirements to be to sit for that exam?

7         A.    So, the requirements for that

8    exam, again, are fulfilling the program

9    requirements.  We have to have a minimum of

10   500 hours of clinical to meet those program

11   requirements.  We are also held to a

12   standard of scoring at a "B" grade or higher

13   for all of our classes in order pass those

14   classes.

15        Q.    Are you required to have a

16   bachelor's degree in order to sit for the

17   nurse practitioner exam?

18        A.    Master's degree.

19        Q.    When did you take that exam, the

20   nurse practitioner exam?

21        A.    I took that on October 30th of

22   2021.

23        Q.    Do you know if you passed yet?

24        A.    I did, yes.

25        Q.    Focusing on your registered nurse

1                  ELISE M. WILLIAMS

2   to be done, where they'll be like, "Check it

3   a couple of days in a row and see if there's

4   some sort of change happening."

5                  But it can be done as a nursing

6   action as well.

7       Q.    Let me just try to make sure I

8   understand the terms you're using.  You used

9   the term "Provider," what do you mean by

10  that term?

11      A.    So provider would mean a nurse

12  practitioner or an MD or a DO, who is

13  providing medical care at the advanced

14  level.

15      Q.    A registered nurse is not a

16  provider; is that right?

17      A.    No.

18      Q.    And you used the phrase "Nurse's

19  action," what does that mean?

20      A.    So, there is some things that a

21  nurse is capable of doing and allowed to do

22  legally speaking that they don't need the

23  doctor's order to do, they could do it as a

24  nurse's action.

25                  So like, I can tell my staff,

42

ELISE M. WILLIAMS

1
2  going through water?

3        A.    Rhonchi.

4        Q.    Rhonchi?  Could you spell that

5  for me?

6        A.    It's R-H-O-N-C -- sorry, spelling

7  it not my forte.

8        Q.    No problem.

9        A.    R-H-O-N-I-C or C-I -- something

10  like that.

11       Q.    Got it.

12             Now, as part of your training to

13  become a registered nurse, were you trained

14  on how to diagnosis medical conditions?

15       A.    No.

16       Q.    Is that something as a registered

17  nurse that you would be expected to do?

18       A.    No.

19       Q.    And as part of your training as a

20  registered nurse, I assume you never

21  received training on how to diagnosis

22  cardiovascular medical conditions?

23       A.    Correct.  As a registered nurse,

24  it is actually illegal to diagnose.

25       Q.    And you never received training

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1                    ELISE M. WILLIAMS

2    on how to diagnose pulmonary conditions as a

3    registered nurse either, right?

4         A.    Correct.

5         Q.    Did you receive training on how

6    to identify symptoms of various medical

7    conditions?

8         A.    We do receive training at the RN

9    level on different symptoms that can be

10   indicatory of other diseases and of the

11   disease processes where it pretty much comes

12   down to, okay, if you see these symptoms,

13   then you want to let the provider know,

14   "Hey, this is what I'm seeing, I have

15   concerns."

16        Q.    And in connection with that

17   training, did you receive training about

18   identifying symptoms or indicators of

19   cardiovascular medical conditions?

20        A.    Yes.

21        Q.    Were you trained -- during your

22   training, did you learn that shortness of

23   breath can be a symptom of a cardiovascular

24   medical condition?

25        A.    Yes.

1              ELISE M. WILLIAMS

2  history has been of, "Okay, this is your

3  asthma kicking up," then we say -- we kind

4  of go with that pattern, where if it's

5  something that shows up off of their kind of

6  baseline patterning, then we say, "Okay,

7  this could be something different."

8        Q.    So it's important to you, as a

9  medical provider, to understand the person's

10  history with respect to shortness of breath

11  and whether that history has sort of changed

12  as that person is presenting to you during

13  an exam, is that fair to say?

14        A.    Yes.

15        Q.    Can fatigue be a symptom of or an

16  indicator of cardiovascular condition?

17        A.    It can and it can also -- what I

18  want to call a very broad indicator for a

19  number of conditions.

20        Q.    How about a cough, could that be

21  a symptom or indicator of a cardiovascular

22  condition?

23        A.    It could be, yes.

24        Q.    And that could be a symptom or an

25  indicator of a pulmonary condition as well?

1                    ELISE M. WILLIAMS

2          A.    It can, yes.

3          Q.    What about fatigue, can that be a

4    symptom or indicator of a pulmonary

5    condition?

6          A.    It can be.

7          Q.    How about swelling of the

8    extremities, can that be a symptom or

9    indicator of a cardiovascular condition?

10         A.    It can, yes.

11         Q.    How about a pulmonary condition?

12         A.    Pulmonary condition?  I'm going

13   to say not as likely.

14         Q.    Are you familiar with the term --

15   the medical condition "Orthopnea"?

16         A.    I am not.

17         Q.    Are you familiar with the medical

18   condition -- I'm going to butcher this

19   pronunciation -- paroxysmal nocturnal

20   dyspnea?

21              MR. SHAPIRO:  I'll spell that for

22         you, Nicole -- P-A-R-O-X-Y-S-M-A-L --

23         nocturnal dyspnea -- D-Y-S-P-N-E-A.

24         A.    I am I think familiar with that

25   one.

1              ELISE M. WILLIAMS

2      April of 2018, the primary nurse for E-House

3      at Valley Ridge?

4          A.    As a case managing nurse, yes.

5          Q.    Tell me what that means, what is

6      a case managing nurse?

7          A.    So, the primary nurse for -- that

8      covers a house like, that what we do is

9      there are quarterly reports done up on each

10     individual.  So, in a year you have three

11     quarterlies and then an annual report.

12     Those reports are -- the quarterlies are

13     three-month review, the annual is a yearly

14     review of the care that this person has

15     received, any medical concerns, medication

16     changes that have happened during that time.

17              So, we're responsible for writing

18     up those reports.  We're responsible for

19     kind of being the point person for the

20     people who live in that house to come to if

21     they have questions about their medications,

22     questions about their care, medical-related

23     questions.

24              Instead of having them go to six

25     different people and get six different

1              ELISE M. WILLIAMS

2    answers, it's organized so that if they do

3    have concerns, they can go to a person and

4    that person says, "You need to talk to this

5    person because they're your case manager."

6         Q.    So were you the case managing

7    nurse for everyone who lived in E-House back

8    in April of 2018?

9         A.    Yes.

10        Q.    How many individuals was that?

11        A.    I don't remember the exact

12   number.

13        Q.    Less than ten?

14        A.    Yes.

15        Q.    Less than five?

16        A.    No, I don't believe so.

17        Q.    So somewhere between five and ten

18   individuals who lived in E-House, right?

19        A.    Yes.

20        Q.    How many -- back in April of

21   2018, how many RNs worked at Valley Ridge?

22        A.    I don't remember.  To give you a

23   number, I would have to look back at the

24   nursing schedule.

25        Q.    Okay, we'll look over one of

88

1              ELISE M. WILLIAMS

2      A.    So, the nursing office where the

3  registered nurses are and where myself would

4  be, that is -- so there's a main hallway

5  that goes the long way through the whole

6  program building and then there's classrooms

7  and office space on each side of that

8  hallway.

9            So, our office is on one side of

10  the hallway and then directly across the

11  hall is the clinic door.  So, you go out of

12  one door and into the other door.

13      Q.    And do all the nurses share one

14  single office?

15      A.    All the nurses do.  The provider

16  around the NA 1 have a separate office

17  across the hall just down -- like they're

18  the next door down.

19      Q.    And that was the layout in 2018

20  as well?

21      A.    Correct.

22      Q.    Do you have -- well, let me just

23  ask you specifically, did you have EKG

24  equipment in the medical clinic back in

25  2018?

1                    ELISE M. WILLIAMS

2          A.    We did, yes.

3          Q.    What about any imaging equipment?

4          A.    No -- well, actually, skip that,

5    there might have been some imaging equipment

6    that the dentist used for doing dental

7    x-rays, but nothing medical of nature.

8          Q.    Got it.

9                 What about any equipment to asses

10   the lungs?

11         A.    The equipment we have there at

12   that time the best I could speak to is we

13   have a stethoscope, we have an otoscope,

14   tongue blades, just your simple -- what you

15   would see in a typical doctor's office exam

16   room.

17                We do have a portable EKG

18   machine, but that's pretty much the extent

19   of what we have.

20         Q.    What is an otoscope?

21         A.    It's that little handheld thing

22   they use to look in your ears.

23         Q.    Did Valley Ridge back in 2018

24   have any other equipment to asses the heart?

25         A.    Nothing other than the EKG, no.

92

1              ELISE M. WILLIAMS

2   Valley Ridge?

3        A.    The nearest hospital to us is UHS

4   Chenango Memorial Hospital.  It about a

5   ten-minute drive, thereabouts.

6        Q.    And is that typically where an

7   individual would go if he or she had an

8   acute medical need?

9        A.    It is and it depends on need.

10   There's been times where I, myself, send

11   people out and instead of sending them to

12   the closest location, which is CMH, I would

13   opt to send them to a hospital down in

14   Binghamton instead based off of their need

15   and what my knowledge is of what the local

16   hospital can and cannot provide.

17        Q.    Okay.  Is it fair to say in 2018

18   as the primary nurse for E-House, one of

19   your jobs was to be the primary point person

20   for all the individuals who lived in

21   E-House, their medical care; is that right?

22        A.    Correct.

23        Q.    And you were responsible for

24   understanding their medical conditions,

25   right?

1              ELISE M. WILLIAMS

2       A.     So, we're responsible --

3              MS. HILDONEN:  Objection to form.

4       Q.     You can answer.

5       A.     Sorry.

6              MS. HILDONEN:  If you understand

7       the question.

8       A.     So, in regards to the question,

9    you're asking if we're kind of digging

10   through all of their overall health stuff

11   and knowing what's going on with their

12   health care like the back of our hand type

13   of thing?

14      Q.     Well, I'm asking if one of your

15   duties and responsibilities as the primary

16   nurse for E-House, was to understand the

17   medical conditions for the individuals who

18   lived in E-House?

19      A.     It is and another part of our

20   responsibility is -- there's a form done up

21   called the plan of nursing service, that's

22   the form that a case manager nurse does up.

23             And what that is is it's a form

24   that helps bring it from kind of the medical

25   jargon of the nursing world down into more

1                   ELISE M. WILLIAMS

2                   Others are more involved

3    depending on the person who's authoring the

4    note.  They'll talk about, "Okay, they went

5    on an outing.  They went to Walmart.  They

6    went to Burger King.  They purchased their

7    own stuff.  They made adequate change.  They

8    were able to do the activity well and

9    correctly and conduct themselves properly."

10                  So, the notes vary depending on

11   what they're about and who's writing them

12   and stuff.

13        Q.    Where are those DAR notes kept?

14        A.    I'm trying to think of at that

15   point in time where they would have been

16   kept.

17                  They have notes that are in the

18   house.  So those notes are typically in the

19   house.  At that point we were still running

20   on paper charting entirely.  So, Is believe

21   they would be in that person's binder or

22   chart in the house.

23        Q.    So was there like a specific DAR

24   notebook, for example?

25        A.    I don't remember.

1              ELISE M. WILLIAMS

2        A.    Yes, it is.

3        Q.    So, back in April of 2018, it was

4   true that the staff was supposed to document

5   or chart for each individual no less than

6   once daily, was that true?

7        A.    Yes.

8        Q.    Was it also true back in April of

9   2018, that staff was supposed to document

10  any acute health concerns until they

11  resolve?

12       A.    So typically, the documentation

13  of the acute health concerns, typically what

14  happens is the staff notes that there is a

15  concern, they'll put a note in the chart

16  saying, you know, this concern came up.  The

17  RN either initials or first initial, last

18  name, whatever notified and then pretty much

19  that drops the ball from being on them to

20  dropping it on to nursing and then nursing

21  deals with the concern.

22       Q.    Is this policy that you're

23  looking at or is this policy about

24  documenting once per day, that doesn't apply

25  to nursing, does it?

1                   ELISE M. WILLIAMS

2    provider fills out.

3         Q.    And am I correct that individuals

4    who lived at Valley Ridge are typically --

5    see a doctor for a physical once a year, is

6    that the typical schedule?

7         A.    Yes.

8         Q.    And was that true for C.B.?

9         A.    To my memory, yes.

10             MR. SHAPIRO:  I want to mark as

11        Plaintiff's Exhibit 6 here.  This is a

12        four-page document.  It's Bates stamped

13        OPWDD 29 through 32.

14             (Bates stamped OPWDD 29-32 was

15        marked as Plaintiff Exhibit 6 for

16        identification; 12/20/21.)

17        Q.    Give you a moment to review that,

18    tell me when you're done, Ms. Williams?

19        A.    Okay.

20        Q.    Do you recognize Exhibit 6?

21        A.    I do.

22        Q.    What is it?

23        A.    So, it's the plan of nursing

24    service or PONS, as we call it sometimes.

25             What this is is a -- as I

1                     ELISE M. WILLIAMS

2      mentioned this morning -- a breakdown of

3      what the individual's medical issues are

4      into simpler English for our house staff to

5      look at and then say, "Okay, according to

6      this, what -- how do we treat it and what do

7      we do?  When do we have to call the nurse?"

8                     So, as you can see for, let's

9      say, obesity, which doesn't really need a

10     whole lot of explaining, many people know

11     what that is.

12                    But under the column, "Treatment

13     recommendations," they have staff to

14     encourage him to take medications as

15     ordered, encourage him to get his labs done

16     as ordered, for him to follow dietary

17     recommendations, follow-up with a provider

18     there, his primary care as needed.

19                    Today encourage him to exercise,

20     their recording of the weight and blood

21     pressure mostly, making sure that he drinks

22     enough water, healthy food choices.  You

23     know, just kind of your typical things like

24     that.

25                    And then just the next column

1                    ELISE M. WILLIAMS

2    over, the "Monitoring reporting," tells them

3    when to contact the nurse and/or the

4    dietician they say.

5                    And then there's the other things

6    that you're to watch for and if they see it,

7    they contact nursing, "Hey, so and so is

8    showing this and according to PONS, you

9    know, here's what it says."

10        Q.    And would you agree with me that

11   this is actually two PONS, right, in this

12   Exhibit 6, is that right -- well, let me ask

13   a better question.

14                   The first on page 2 of this

15   document, OPWDD 30, do you see your

16   signature there?

17        A.    Yes.

18        Q.    And that you signed on

19   January 30, 2018, right?

20        A.    Yes.

21        Q.    And on the last page of the

22   document, OPWDD 32, do you see your

23   signature there as well?

24        A.    Yes.

25        Q.    And that you signed on March 27,

1             ELISE M. WILLIAMS

2    2018, right?

3        A.    Yes.

4        Q.    So does that -- fair to say that

5    you reviewed this PONS in January of 2018

6    and then again in March of 2018?

7        A.    Yes.

8        Q.    And the PONS, the second one, the

9    one that you reviewed on March of 2018,

10   there's a new issue on there, right?

11       A.    Correct.

12       Q.    And that's nearsightedness,

13   right?

14       A.    Correct.

15       Q.    Both the January and the March

16   review have a diagnosis of hypertension on

17   them, do you see that?

18       A.    Hmm-hmm.

19       Q.    Sorry, you have to answer

20   verbally.

21       A.    Yes.

22       Q.    And if we go back for a moment to

23   Exhibit 7, the annual nursing care

24   assessment, hypertension was not one of the

25   diagnosis listed there; is that correct?

ELISE M. WILLIAMS

2    A.    Correct.

3    Q.    Was hypertension a new diagnosis

4  that was given to C.B. between June of 2017

5  and January of 2018?

6    A.    Looking at these two documents, I

7  would say yes.

8    Q.    And what is hypertension?

9    A.    Commonly known as high blood

10  pressure.

11    Q.    How would a new diagnosis be

12  added to a person's medical record?

13    A.    So, for that particular

14  diagnosis, what would happen is we would

15  notice as nurses that when we get a blood

16  pressure, it's creeping up and trending

17  higher and higher each time we check it

18  versus you know, maybe you get one high and

19  then the others go back to their baseline,

20  as what we discussed this morning.

21          That information would then be

22  brought to the provider and we would notify

23  the provider and say, "Hey, here's this

24  finding."  Sometimes we monitor it a little

25  bit further to see, okay, exactly how high

131

                    ELISE M. WILLIAMS

1

2          A.     I don't remember.

3          Q.     Going back to the PONS here,

4    Exhibit 6, in the monitoring and reporting

5    column there are some places where it says,

6    "Report to RN" and other places where it

7    says, "Report to nurse," is there a

8    distinction there?

9          A.     There is not.

10         Q.     Nurse means RN, correct?

11         A.     Correct.

12         Q.     Not a provider?

13         A.     Correct.

14         Q.     Not a nurse practitioner?

15         A.     Correct.

16         Q.     And based on the PONS that you

17   reviewed on -- in March of 2018, which is

18   OPWDD 31 to 32, for C.B.'s hypertension, the

19   direct care staff was supposed to report to

20   the nurse C.B.'s monthly weight and blood

21   pressure, right?

22         A.     Yes.

23         Q.     And if C.B. had increased

24   difficulty with tolerating activity, right?

25         A.     Yes.

1                    ELISE M. WILLIAMS

2        Q.     And that included shortness of

3    breath, fatigue or weakness, right?

4        A.     Correct.

5        Q.     And if C.B. complained of chest

6    pain, right?

7        A.     Correct.

8        Q.     Shortness of breath, right?

9        A.     Correct.

10       Q.     Nausea, right?

11       A.     Correct.

12       Q.     Direct care staff was also

13   supposed to report to nursing if C.B.'s

14   lower legs or ankles appeared puffy, right?

15       A.     Correct.

16       Q.     And if C.B. was tiring easily,

17   right?

18       A.     Correct.

19       Q.     Or not acting like his usual

20   self, right?

21       A.     Correct.

22       Q.     How would those reports to

23   nursing be made?

24       A.     Reports like that were typically

25   made to the float phone that I mentioned

145

1                    ELISE M. WILLIAMS

2            MR. SHAPIRO:  I'm marking as

3       Plaintiff's Exhibit 1, a two-page

4       document.  It's Bates stamped

5       Plaintiffs 10381 through 10382.

6            (Bates stamped Plaintiff

7       10381-10382 was marked as Plaintiff

8       Exhibit 1 for identification;

9       12/20/21.)

10           Q.    Do you recognize this document,

11  Ms. Williams?

12           A.    I do.

13           Q.    And what is this?

14           A.    This is the monthly weight chart,

15  which shows the weights and if any

16  re-weights obtained.

17           Q.    Who completes this weight chart?

18           A.    The staff in the house obtain the

19  weight, they call it into us and then we

20  would -- as nurses, we would maintain the

21  chart.

22           Q.    And the chart is kept in --

23           A.    The patient's ledger.

24           Q.    So this chart would have been

25  kept in C.B.'s medical chart, is that fair

1               ELISE M. WILLIAMS

2     to say?

3          A.    Yes.

4          Q.    Why are there sometimes

5     re-weights done?

6          A.    When we have somebody who weighs

7     and shows a month-to-month weight change of

8     five pounds plus or minus the month before,

9     then our policy is that he have to get a

10    re-weight to verify where weight is accurate

11    or whether maybe they had their snow boots

12    on versus sandals.  You know, the different

13    variables can you can get in there.

14          So, we'll let staff know when

15    they call us, "Okay, we're going to need a

16    re-weight on that one."  So then later that

17    day or the next day, maybe a couple of days

18    later if the person refuses to get back on

19    the scale.  Staff will obtain another weight

20    and we compare that to the first weight.

21          Q.    Is one reading being more

22    authoritative than the other?

23          A.    Usually we go off of the

24    re-weight.

25          Q.    Is that true even when there's a

1                    ELISE M. WILLIAMS

2    significant discrepancy between the initial

3    weight and the re-weight?

4         A.    To my knowledge, yes.

5         Q.    So look at Exhibit 1, C.B.

6    arrived at Valley Ridge in June 2015, right?

7         A.    Yes.

8         Q.    And he arrives, he weighed 250

9    pounds; is that right?

10        A.    From what I'm seeing, 238.

11        Q.    Sorry, my apologies, you're

12   right.  238, right?

13        A.    Correct.

14        Q.    And then moving ahead to

15   June 2017, two years later, then he weighed

16   250 pounds, right?

17        A.    Correct.

18        Q.    So, that's two years at Valley

19   Ridge, right, he gained 12 pounds, right?

20        A.    Correct.

21        Q.    Then by the end of 2017, in

22   December of 2017, he's weighing

23   272.8 pounds; is that right?

24        A.    Correct.

25        Q.    So he gained 12 pounds in two

ELISE M. WILLIAMS

1  
2    years and then 22.8 pounds in five or
3    six months; is that right?
4         A.    Correct.
5         Q.    And by April of 2018, his initial
6    weight was 294, right?
7         A.    The initial weight?  I'm not
8    understanding you.
9         Q.    Sorry, the initial reading from
10   April of 2018 was 294 pounds, right?
11        A.    Yes.
12        Q.    And then he was reweighed and the
13   reweigh was 285.6 pounds, right?
14        A.    Correct.
15        Q.    So over -- between December 2017
16   and April of 2018, he had gained at least
17   another almost 13 pounds, right?
18        A.    Correct.
19        Q.    Was that weight gain an area of
20   concern for C.B.'s medical team?
21        A.    It was an area that we followed
22   and discussed with him.  We discussed areas
23   of making better eating choices.  We
24   encouraged him to try to get more exercise,
25   to try to be mindful of what he ate.

163

1                  ELISE M. WILLIAMS

2    are?

3         A.    So, the CBC is the complete blood

4    count.  The CMP is a complete metabolic

5    panel.  And a BMP is a basic metabolic

6    panic.  So basic has a few less values to be

7    run as compared to what a CMP has.

8         Q.    And your understanding is that

9    this lab work, the blood count, either the

10   complete and/or the basic metabolic panel,

11   the results of those would indicate whether

12   someone is retaining fluid?

13        A.    They would help to alert to that,

14   yes.

15        Q.    Did the medical team ever discuss

16   doing physical exams to determine whether he

17   was retaining fluids?

18        A.    Not that I remember.

19        Q.    Did you ever recommend doing an

20   exam of C.B.'s extremities to see if they

21   were swollen?

22        A.    Did we recommend to the medical

23   provider?

24        Q.    Yes.

25        A.    Not that I remember.

1                  ELISE M. WILLIAMS

2    reports?

3         A.    Noted in the nursing note?

4         Q.    Let's start there, would you have

5    noted it in the nursing note?

6         A.    If there was reports of, you

7    know, where -- if I'm understanding, reports

8    where they're saying -- people are saying or

9    he's saying, "I've been more tired recently"

10   where I would have had a chat with him and

11   seen what the scoop was, I would have noted

12   it.

13        Q.    What if you had received a report

14   from someone of the house staff?

15        A.    There would have been the same, I

16   would have assessed him and continued on.

17        Q.    Was C.B. someone who had frequent

18   medical complaints?

19        A.    I don't remember.

20        Q.    You described earlier that there

21   are some individuals at Valley Ridge who

22   complained frequently and say they have ten

23   out of ten in pain, right, do you remember

24   that testimony?

25        A.    I do.

                         ELISE M. WILLIAMS
1
2        Q.    Was C.B. one of those kinds of
3    individuals?
4        A.    No.
5        Q.    Can you recall any incidents of
6    him vastly overstating a medical concern?
7               MS. HILDONEN:  Objection.
8        A.    Not that I remember.
9        Q.    Do you recall any incident of him
10   overstating a medical concern at all?
11              MS. HILDONEN:  Objection.
12       A.    I don't remember.
13       Q.    You don't recall one sitting here
14   right now, is that what your testimony is?
15       A.    Yes.
16              MR. SHAPIRO:  I'm going to mark
17         as Plaintiff Exhibit 31, a one-page
18         document.  The Bates stamp is
19         Defendants 8657.
20              (Bates stamp Defendant 8657 was
21         marked as Plaintiff Exhibit 31 for
22         identification; 12/20/21.)
23       Q.    It's an RN schedule.
24       A.    I have it.
25       Q.    Do you recognize this document,

1                    ELISE M. WILLIAMS

2          Q.     And looking at your name, you're

3     under the day shift, correct?

4          A.     Correct.

5          Q.     And it looks like you were not

6     working between Saturday, March 31st and

7     Thursday, April 5th, right?

8          A.     Correct.

9          Q.     And then on April 6th it says,

10    "6:00 p.m.," what does that mean to you?

11         A.     Most likely that means that

12    instead of leaving at 5:00 p.m., I left at

13    6:00 p.m.

14         Q.     Got it.  And then you were

15    working on Saturday, April 7th and Sunday,

16    April 8th, right?

17         A.     Correct.

18         Q.     And on April 8th, am I correct

19    that Dan was the nurse who worked the

20    evening shift?

21         A.     Correct.

22         Q.     What's Dan's last name?

23         A.     Ohl -- O-H-L.

24         Q.     So on April 8th during the day

25    shift, which is 7:00 a.m. to 5:00 p.m.; is

1                    ELISE M. WILLIAMS

2    that correct?

3         A.    Right.

4         Q.    You were the only RN on duty

5    until Dan showed up; is that right?

6         A.    Correct.

7         Q.    And Dan would have showed up

8    around 2:00 p.m. for his evening shift,

9    right?

10        A.    Correct.

11        Q.    So there was a period in the

12   afternoon on April 8th where both you and

13   Dan were there, right?

14        A.    Yes.

15        Q.    And I think you mentioned

16   earlier, April 8th was a Sunday, right, by

17   looking at this document, would you agree?

18        A.    Correct.

19        Q.    And back in April 2018, was there

20   any provider on duty on weekends?

21        A.    There was a medical on-call.

22        Q.    But that -- sorry, go ahead.

23        A.    There was no provider physically

24   at the facility.

25        Q.    So the only medical staff

184

ELISE M. WILLIAMS

1

2    Q.    Were you aware of any of those

3    things occurring at any point with C.B.?

4    A.    Not that I remember, no.

5    Q.    Just looking at this transcript

6    again, if we go to page 10549.

7         You told the interviewer that you

8    first encountered C.B. in the house around

9    1:30, right?

10        MS. HILDONEN:  Why don't we give

11        her a second to look at that page?

12        MR. SHAPIRO:  That's fine.

13        MS. HILDONEN:  Are you there, Ms.

14        Williams?

15        THE WITNESS:  I'm there, yes.

16   A.    Yes, it was listed around

17   1:30 p.m.

18   Q.    Okay.  And you said you were

19   doing rounds; is that right?

20   A.    Per this document, yes.

21   Q.    What are rounds?

22   A.    So at least once a shift, we go

23   around to each of the houses and anyone who

24   needs assessing on more of a routine base,

25   where we're monitoring different things, we

                    ELISE M. WILLIAMS

 2   check on them, we check on just kind of

 3   overall how things are going in the house

 4   and if anyone has any concerns or questions.

 5            And we go house to house that

 6   way, whether they need medications pulled,

 7   overflow covered, taking around paperwork,

 8   training, stuff like that.

 9        Q.    Okay.   And so, when you saw C.B.

10   on April 8th, you saw him as part of your

11   rounds; is that correct?

12        A.    Per this document.

13        Q.    You saw him in the house --

14   sorry, let me ask the question again.

15            When you saw him initially in

16   E-House, you saw him as part of the rounds

17   that you were doing that day; is that

18   correct?

19        A.    Per this document, yes, I was out

20   doing the rounds.  And as far as I can

21   decipher when I got to E-House, he would

22   have approached me.

23        Q.    Sitting here today, do you have

24   any memory that's contrary to what you told

25   Investigator Hess on April 10th?

186

1                    ELISE M. WILLIAMS

2         A.     No, I do not.

3         Q.     Turning to the next page, 10550,

4    you said you were with him in the house for

5    just a couple of minutes; is that correct?

6              MS. HILDONEN:   What page are you

7         referring to, Mr. Shapiro?

8              MR. SHAPIRO:   10550.

9         A.     Per that page on this document,

10   yes.

11        Q.     Do you have any memory today

12   that's contrary to what you told

13   Investigator Hess on that point?

14        A.     No.

15        Q.     And you had him -- I'm on the

16   same page here, 10550, you had him come up

17   to the clinic because of his complaint about

18   not being able to void himself; is that

19   right?

20        A.     Per this document, yes.

21        Q.     And again, you have no

22   recollection today that's contrary to what's

23   in this document, right?

24        A.     Correct.

25        Q.     And you wanted to palpate his

1                    ELISE M. WILLIAMS

2        A.    Correct.

3        Q.    And to take Robitussin as needed,

4    right?

5        A.    Correct.

6        Q.    And to rest if he needed, just to

7    take a nap, right?

8        A.    Correct.

9        Q.    And you said that he came to the

10   clinic around 2:30, right?

11       A.    Per this document, yes.

12       Q.    And he was 10, 15 minutes tops,

13   right?

14       A.    Per this document, yes.

15       Q.    And again, your memory today is

16   not any different from what you told

17   Investigator Hess in April 2018, right?

18       A.    Correct.

19       Q.    And then - you can go to the next

20   page, to 10553, the very bottom, the

21   investigator asked if you listened to his

22   lungs, heart, everything, do you see that?

23       A.    I see it, yes.

24       Q.    And you told the investigator

25   that you did listen to his lungs, right?

1                 ELISE M. WILLIAMS

2          A.    Correct.

3          Q.    And that you did not listen

4     specifically to his heart, right?

5          A.    Correct.

6          Q.    So, isn't it true on April 8th

7     that you had received a report from someone

8     named Mike Novack that C.B. wasn't feeling

9     well?

10         A.    I don't recall.

11         Q.    Who is Mike Novack?

12         A.    He's one of the house staff, the

13    house supervisor during day shift.

14         Q.    And he had told you that C.B.

15    wasn't feeling well on April 8th, right?

16              MS. HILDONEN:  Objection.

17         A.    I don't remember.

18         Q.    Are you able to pull up

19    Exhibit 11 again?

20              MS. HILDONEN:  Mr. Shapiro, if

21         you're going to ask questions on

22         Exhibit 11, you need to set some

23         foundation.

24              MR. SHAPIRO:  No, I don't think

25         that's right, Kasey, I can ask her any

1              ELISE M. WILLIAMS

2       question I want about this exhibit.  If

3       she remembers, she can answer.  If not,

4       then it is what it is.

5       Q.    I'm drawing your attention to

6  page 19, OPWDD 743?

7       A.    I've got it.

8       Q.    And specifically to the summary

9  of an interview with Mike Novack at the

10  bottom, it's number 19?

11      A.    Okay.

12      Q.    The last bullet point on the page

13  reads, "DDSCTA-2 Novack indicates that

14  individual C.B. spoke to his mother that day

15  and she also relayed individual C.B. was not

16  feeling well.  He reported to her that he

17  had contacted nursing and administered cough

18  syrup to individual C.B."

19            Do you see that?

20      A.    I do.

21      Q.    Is it correct that Mr. Novack

22  contacted you about C.B.'s concern?

23            MS. HILDONEN:  Objection.

24      Q.    What is your answer, Ms.

25  Williams?

197

1                    ELISE M. WILLIAMS

2       A.    I don't remember.

3       Q.    If he had contacted you, would he

4   have done it on the float phone?

5             MR. HILL:  Objection.

6       A.    To my knowledge, he would have,

7   unless he had called the -- one of the desk

8   phones in the clinic or in the office.

9       Q.    And if Mr. Novack had called you

10  and told you that C.B. wasn't feeling well,

11  that's something you would have wrote down

12  in your nursing notes, right?

13      A.    With having seen him further in

14  the day and address the concern further in

15  the day, I may or may not have.

16      Q.    If Mr. Novack had contacted you

17  and said C.B. wasn't feeling well, you would

18  told that to the investigator, right?

19      A.    To the best of my memory --

20            MR. HILL:  Objection to form.

21      Q.    What was the answer?  I'm sorry,

22  I missed it.

23      A.    To the best of my memory I would

24  have.

25      Q.    That would be an important piece

206

1              ELISE M. WILLIAMS

2      referring to her prior testimony, so

3      I'm just trying to clarify it.

4              MR. HILL:  That's fine.  I think

5      if you're going to do that, just make

6      sure it's in front of her so she can

7      take a look.

8              MR. SHAPIRO:  Yes, I think she

9      has it.

10             MS. HILDONEN:  What document are

11     you referring to, Mr. Shapiro?

12             MR. SHAPIRO:  Exhibit 4 and page

13     10551.

14             MS. HILDONEN:  Exhibit 4 is

15     two pages.

16             MR. SHAPIRO:  I'm sorry,

17     Exhibit 3, my apologies.

18             MS. HILDONEN:  Ms. Williams, were

19     you able to locate that document?

20             THE WITNESS:  I am, yeah, I'm

21     trying to find the page he referenced.

22     Q.    Do you see that discussion with

23 the investigator?

24     A.    I do, yes.

25     Q.    And am I correct that you stated

207

1                 ELISE M. WILLIAMS

2     that C.B. was having difficulty breathing

3     when he arrived at the clinic?

4          A.    He was, yes.

5          Q.    And my question now is slightly

6     different.  My question is, earlier in the

7     day, hadn't C.B. complained about having

8     difficulty breathing?

9                MS. HILDONEN:  Objection.

10         A.    Sorry, I'm reviewing the

11    document.

12               MS. HILDONEN:  Is there a place,

13         Mr. Shapiro, that Ms. Williams should

14         be looking?

15               MR. SHAPIRO:  No, this is just a

16         question.

17         Q.    Did you hear on April 8th that

18    C.B. had complained about having difficultly

19    breathing?

20         A.    Not that I remember.

21         Q.    Okay.

22         A.    The only thing respiratory-wise I

23    remember receiving any report was regarding

24    congestion.

25         Q.    Okay.  Then I do want you to take

1                ELISE M. WILLIAMS

2        A.    I did not, no.

3        Q.    And when you saw him arrive at

4   the clinic and he was breathing heavy, did

5   you take any history from him about his

6   difficultly breathing?

7        A.    In regards to his presenting

8   symptoms right at that minute?

9        Q.    Did you take any history from him

10  when he showed up to you at the clinic?  Did

11  you take any history about his difficulty

12  breathing?

13       A.    I don't remember exact history

14  taken, no.

15       Q.    It's important, I think you

16  testified earlier, to understand the

17  baseline, right, when you're doing an exam;

18  isn't that right?

19       A.    It is, yes.

20       Q.    Okay.  So you'd want to know,

21  right, how long he's been having difficulty

22  breathing, right, that would be relevant

23  information, right?

24            MS. HILDONEN:  Objection.

25       A.    When seen right before seeing him